UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRACH FAMILY FOUNDATION, INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AXA EQUITABLE LIFE INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 16-cv-740<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brach Family Foundation, Inc. ("Brach Family"), on behalf of itself and all others similarly situated, for its Complaint against defendant AXA Equitable Life Insurance Company ("AXA"), states as follows:

**NATURE OF THE ACTION**

1. This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by AXA. Plaintiff seeks to represent a class of AXA policyholders who are subjected to an unlawful and excessive cost of insurance ("COI") increase by AXA. AXA's COI increase violates the plain terms of Plaintiff's and all putative class members' insurance policies.

2. The policies at issue are all flexible-premium, universal life ("UL") policies issued by AXA on a product line called Athena Universal Life II ("AUL II"). The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. This allows

1

policyholders to minimize their capital investment and generate greater rates of return through other investments. Any premiums paid in excess of COI charges and expense components are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest.

3. The first page of the AXA policy contains a bold-face title calling the policy a "**Flexible Premium Universal Life Insurance Policy**" and describes the policy as a "flexible premium universal life insurance policy," where the policyholder can, within limits, "make premium payments at any time and in any amount." AXA markets these products to policyholders in a "fact card" emphasizing that "you design premium payments according to your budget" and can "choose the amount and frequency of your premium payments."

4. Despite the fact that UL policies are marketed and sold to enable policyholders to minimize their premium payments and keep policy account values as low as possible, AXA has unlawfully sought to punish policyholders for doing exactly that. AXA has announced that it will dramatically increase COI rates on certain AUL II policyholders, targeting those who exercise their contractual right to keep their accumulated policy account values as low as possible and pay flexible premiums.

5. According to press reports, AXA is raising COI rates for a block of nearly 1,700 universal life policies that were selected in part for their pattern of premium payments; specifically, the increases are targeting owners who minimize their premium payments and keep policy values as low as possible – even though the policies expressly allow them to do so.

6. By increasing COI rates, AXA seeks to force Plaintiff and other AXA policyholders to either (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums

policyholders have previously paid. AXA, in turn, will make a huge profit—either through higher premium payments or by eliminating policies (through lapses or surrenders) and keeping the premiums they have paid to date. In its most recent SEC filing, AXA states that the COI increase will be larger than the increase it previously had anticipated, resulting in a $46 million *increase* to its net earnings – a figure that is in addition to the profits that management had initially assumed for the COI increase.

7. As described in detail below, AXA's conduct is unlawful. While the policies permit AXA to adjust the cost of insurance rates periodically, they allow AXA to do so based only on certain specified factors, such as reasonable assumptions about mortality and investment experience. "Minimal funding" is not one of those enumerated factors.

8. AXA has publically stated that the COI increase is warranted because the affected insureds are dying sooner than AXA anticipated and its investment experience has been less favorable than expected. But in fact mortality trends for the affected insureds have continued to *improve* substantially since the time the policies issued, and investment experience does not depend on the premium payment patterns of any particular policyholder or subset of policyholders, but rather relates to the performance of AXA's overall investments.

9. Insurance companies are also required to file answers to interrogatories and give actuarial opinions every year as to whether any of their anticipated experience has changed, and in AXA's 2014 filing, dated February 25, 2015—just seven months before the increase was announced—AXA was required to answer whether its "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience" and responded "no." Given this response, AXA cannot justify an enormous rate increase a mere 7 months later on the grounds that it was "based on" a change to anticipated experience.

10.     Further, the policies at issue require that any change in COI rates "will be on a basis that is equitable to all policyholders of a given class." AXA has admitted that its COI increases are directed at only a certain *subset* of policies of the same class at issuance – those with issue ages above 70 and current face value above $1 million – and there is no equitable basis for singling out that subset for an increase.

11.     The size of the increase is extraordinary.  As reported in the press, the AXA COI increases that have been observed have ranged from 25% to 70% as compared to prior COI charges, and some will experience much higher increases than that.

## THE PARTIES

12.     Plaintiff Brach Family Foundation, Inc. is a not-for-profit corporation that is incorporated, validly existing, and in good standing under the laws of the State of New York, and its principal place of business is in New York.  Plaintiff is the owner of an AUL II life insurance policy (number 157208381), insuring the lives of Jane Doe,[1] which was issued on or about May 21, 2007 by AXA and currently has a face value of $20 million (the "Doe Policy").  At issuance, Jane Doe was age 81.  The Doe Policy remains in-force with AXA.  The Doe Policy is subject to AXA's COI increase that was announced in October 2015, and that will be reflected with the first monthly deduction processed on or after March 8, 2016.

13.     Defendant AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York.  The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant

---

[1] For privacy reasons, plaintiff has substituted "John and Jane Doe" for the names of the actual insureds.

4

and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

15. This Court has personal jurisdiction over AXA because it is incorporated in New York and its principal place of business is in New York.

16. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including AXA's COI rate overcharge.

## FACTUAL BACKGROUND

### A. The Policies at Issue

17. The policies at issue are individual Athena Universal Life II policies issued by AXA from 2004 to 2007. The policies at issue are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments specified in the policies. A copy of the Doe Policy, redacted of personal information, is attached hereto as Exhibit A.

18. Flexible-premium policies are preferred by many policy owners because they allow the owners to pay the bare minimum required to keep the policy in force (that is, the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that yield higher returns than the interest credited on the Policy Account. Policyholders can choose to keep their Policy Account Value as close to zero as possible—in other words, they can choose not to pay any more premiums than the absolute minimum to cover COI and the other administrative expenses. With fixed-premium policies, by contrast, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums. AXA has promoted these flexible-premium policies as

policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments."

19.     The size of the COI charge is highly significant to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to AXA (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the policy account value and credited with interest by AXA).

20.     Each of the AXA policies in this product line shares the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision.

Ex. A, Doe Policy at 9.

21.     The "Changes in Policy Cost Factors" provision, in turn, states as follows:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be **on a basis that is equitable to all policyholders of a given class**, and will be determined **based on reasonable assumptions** as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse. . . . Any change in policy cost factors will be determined in accordance with **procedures and standards on file**, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered.

*Id.* at 11 (emphasis added).

22.     The relevant terms of all AUL II policies are substantively identical to those set forth in the Doe Policy.  The policies at issue are all form policies, and insureds are not permitted to negotiate different terms.  They are all contracts of adhesion.

**B.     AXA's Unlawful COI Increase**

23.     On or about October 1, 2015, AXA announced that effective with the first monthly deduction that occurs on or after January 1, 2016, it was increasing the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA states that it notified affected policyholders of the increase by letters mailed on or about October 5, 2015. In December 2015, AXA announced that it would defer by two months the effective date for the COI increase, so that the COI increase will now be reflected for the affected policies with the first monthly deduction processed on or after March 8, 2016. The stated reason for the delay was to enable more policyholders to obtain illustrations reflecting the new COI increase.

24.     AXA has repeatedly explained that the increase is based on only two factors: allegedly less favorable "future mortality and investment experience" over the past few years. According to a Wall Street Journal article, an AXA spokesperson is cited as explaining the increase is because "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold." AXA's most recent 10-Q filed with the SEC similarly explains that "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And AXA has distributed a FAQ on the "Athena Universal Life II COI Rate Change," in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates."

25. The COI increase breaches the policy in at least three ways: (i) it is not "equitable to all policyholders of a given class"; (ii) it is not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse"; and (ii) it is not "in accordance with procedures and standards on file" with the relevant insurance officials.

### i) AXA'S Increase is Not Equitable

26. The policy states that "Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be **on a basis that is equitable to all policyholders of a given class**." For a change to be "equitable," at a bare minimum the change cannot unfairly discriminate against certain policyholders within the same class.

27. AXA's COI increase is not "equitable to all policyholders of a given class" in at least three ways.

28. First, the AXA increase unfairly targets policyholders who exercised their contractually permissible right to minimally fund their policies. As press reports indicate, AXA increased the COI rate on a group of policyholders that were selected in part for their pattern of premium payments; specifically, the increases target owners who minimize their premium payments and keep policy values as low as possible. When AXA states that it is imposing an increase on the affected block because "investment experience" is less favorable than it anticipated, AXA appears to be claiming that the affected group of policyholders was selected for the increase because of their low funding patterns.

29. But it is not equitable to impose an increase on policyholders based on their funding patterns. The policies are expressly marketed and designed as flexible-premium policies that permit policyholders to select whatever funding pattern they choose, provided only that they pay enough to keep the policies in force. AXA cannot equitably punish policyholders for

8

exercising these fundamental contractual rights and the policies – which enumerate the permissible factors to consider in increasing COI rates – do not mention minimal funding or premium payment patterns as permissible factors for AXA to consider. Further, even if AXA could permissibly target individuals that minimally fund (which it cannot), its increase would still be inequitable because the group of policies that it targeted for the increase – those which have both issue ages 70 and above and current face value amount of $1 million and above – include many individuals who did *not* minimally fund.

30. Second, there is no actuarially acceptable justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value amount of $1 million and above. The policy does not permit AXA to use issue age or face value to determine who gets a COI increase. Rather, the policy provides that COI charges will be determined based on reasonable assumptions as to "expenses, mortality, policy and contract claims, taxes, investment income, and lapse." Of these, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. But AXA cannot reasonably expect that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value. Nor is it plausible that AXA's reasonable assumptions about future mortality and investment income experience would differ between these two policies. Insurance companies do not make investment decisions on a policy-by-policy basis—the money for investments is all pooled together, and the performance of those investments does not depend on the premium payment patterns of any particular policyholder or subset of policyholders. In other words, the criteria that AXA used for determining whom to saddle with an enormous COI increase – age and face amount – do not coincide with any actuarially acceptable reasons for imposing a COI

9

increase on select policies. As a result, the increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant policy class.

31. Third, to plaintiff's knowledge, with one exception, AXA has not announced an increase in COI rates for any other UL policies besides the subset of policies that are subject to the increase discussed above. Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we have no plans to raise COIs on any other products, including products we are currently selling." Had AXA dramatically revised its expectations of future mortality or investment income, its COI rates would have increased for a broad range of life insurance policies. That it did not implement any such broad increase confirms that the COI increases are being used to target certain policies and policyholders in an inequitable manner and based on improper factors not provided for in the policy.

### ii) AXA's Increase Is Not Permitted by the Enumerated Factors

32. The policies at issue list the six "reasonable assumptions" that any COI rate changes must be "based on": "expenses, mortality, policy and contract claims, taxes, investment income, and lapses." The phrase 'based on,' as used in this context, is a limiting phrase, not a 'such as' or 'including but not limited to' phrase; accordingly, COI rate adjustments must be 'based on' the enumerated factors and *only those factors*.

33. AXA states that the increase is based on two factors: investment experience and mortality. Neither of these statements is true and neither warrants the increase.

### a) Mortality Has Improved

34. AXA claims that the increase is warranted in part because it found that "policyholders were dying sooner" than it expected. But the opposite is true. Mortality rates

have improved steadily *each year* – i.e., mortality risks have only gotten *better* over time, as people are living much longer than anticipated when the products were priced and issued.

35. Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A mortality table is a chart showing the rate of death at a certain age.

36. In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced the 2001 CSO Mortality Table, which is a standard table commonly used by insurers in calculating cost of insurance rates. The Society of Actuaries is currently investigating an update of the CSO tables with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

37. The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries. The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

11

38.     The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies (including AXA's predecessor, Equitable Life Insurance) with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently. That trend continues.  AXA itself recognizes that in 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

39.     The trend of improving mortality is even more pronounced for the older age insureds affected by the AXA increase.  In particular, the 2008 VBT showed an improvement for older age mortality as compared to prior tables commonly used at the time the AUL II policies were priced, and the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

### b) Investment Income Cannot Warrant the Increase

40.     AXA also claims that the increase was based on a change to its expectations of future "investment experience." Specifically, that its "investments were earning less than forecast when the policies were sold." "Investment experience" is not a listed factor that may be considered for increasing COI rates, but "investment income" is a listed factor.

41.     Insurance companies like AXA aggregate capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether up or down,

the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. Therefore, even if AXA's investment income has changed, this factor cannot justify imposing a COI increase on the subset of AUL II policies upon which AXA is imposing the COI increase.

### c) Minimal Funding is Not An Enumerated Factor

42. Despite its rhetoric, the AXA increase targets policyholders who exercised their contractually permissible right to minimally fund their policies. But funding pattern or Policy Account Value is not one of the enumerated factors that AXA may consider in adjusting its COI rates. Further, even if AXA were somehow permitted to consider funding patterns in increasing COI rates, it could not have had any change in its "reasonable assumptions" as to how these policies would be funded. They were marketed as flexible-premium policies; at issuance, AXA knew these policies would attract owners, such as life settlement investors, who typically minimally fund the policies.

### CLASS ACTION ALLEGATIONS

43. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to herein as the "AXA COI Increase Class"—consists of:

> All owners of Athena Universal Life II issued by AXA Equitable Life Insurance Company that were subjected to a cost of insurance rate increase announced by AXA on or about October 1, 2015 (excluding defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

44. The AXA COI Increase Class consists of hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable. The identities and

addresses of class members can be readily ascertained from business records maintained by AXA.

45.   The claims asserted by the Plaintiff are typical of the claims of the AXA COI Increase Class.

46.   The Plaintiff will fairly and adequately protect the interests of the AXA COI Increase Class and does not have any interests antagonistic to those of the other members of this class.

47.   The Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

48.   Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

49.   This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over those questions affecting only individual members. Those common questions include:

(a)   the construction and interpretation of the form insurance policies at issue in this litigation;

(b)   whether AXA's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)   whether AXA breached its contracts with the class members; and

(d)   whether Plaintiff and Class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages.

50. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a) the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b) when AXA's liability has been adjudicated, claims of all class members can be determined by the Court;

(c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d) without a class action, many class members would continue to suffer injury, and AXA's violations of law will continue without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on behalf of Plaintiff and the AXA COI Increase Class)

51. Plaintiff realleges and incorporates herein the allegations of paragraphs 1 through 52 of this complaint as if fully set forth herein.

52. The subject policies are binding and enforceable contracts.

53. AXA's rate increase has materially breached the Policies in several respects, including but not limited to the following:

(a) AXA breached the policies by increasing COI rates based on a policy's Account Value even though Account Value is not one of the permissible and enumerated bases for increasing cost of insurance rates;

(b) AXA breached the policies by increasing the COI rates on bases that do not apply equitably to the class of insureds;

(c) AXA breached the policies because AXA's COI rate increase was not based on the permissible factors stated in the policies, such as AXA's expectations of future mortality;

(d) AXA breached the policies because AXA's COI rate increase was not determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered.

54. Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by AXA's conduct as set forth herein.

55. To the extent that AXA has announced, but not fully implemented, the COI increase, AXA has anticipatorily breached the policies by stating unequivocally that it intends to breach the contract by implementing a COI increase effective with the first monthly deduction that occurs on or after March 8, 2016.

56. Each of the policies also includes an implied covenant that AXA will act in good faith and deal fairly, and that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. AXA breached the implied covenant of good faith and fair dealing by undermining plaintiffs' right to

pay premiums as needed to cover their monthly deductions. By increasing the cost of insurance rates in the manner in which it did, AXA is, among other things, penalizing and deterring policyholders from exercising their contractual right to maintain a minimal policy value, which AXA has no right to do.

57.     As a direct and proximate cause of AXA's material breaches of the policies, plaintiff and the COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding Plaintiff and the class compensatory damages pursuant to the First Claim for Relief;

3.     Awarding Plaintiff and the class pre-judgment and post-judgment interest pursuant to their First Claim for Relief, as well as costs;

4.     Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: February 1, 2016

        s/ Seth Ard
        Seth Ard
        SUSMAN GODFREY L.L.P.
        560 Lexington Avenue, 15th Floor
        New York, NY  10022
        Tel.:   212-336-8330
        Fax:   212-336-8340
        sard@susmangodfrey.com

        Steven G. Sklaver (application for admission *pro hac vice* to be filed)
        Frances S. Lewis
        SUSMAN GODFREY L.L.P.
        1901 Avenue of the Stars, Suite 950
        Los Angeles, CA 90067-6029
        Tel:   310-789-3100
        Fax:   310-789-3150
        ssklaver@susmangodfrey.com
        flewis@susmangodfrey.com

        *Attorneys for Plaintiff and the Class*