## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BRACH FAMILY FOUNDATION, INC., on behalf of itself and all others similarly situated, ) ) ) | Civil Action No. 16-cv-740 |
| Plaintiff, ) | **FIRST AMENDED CLASS** |
| ) ) | **ACTION COMPLAINT** |
| vs. ) | |
| ) | |
| AXA EQUITABLE LIFE INSURANCE COMPANY, ) ) | **JURY TRIAL DEMANDED** |
| Defendant. ) ) | **REDACTED** |

Plaintiff Brach Family Foundation, Inc. ("Brach Family"), on behalf of itself and all others similarly situated, for its Complaint against defendant AXA Equitable Life Insurance Company ("AXA"), states as follows:

### NATURE OF THE ACTION

1.     This is a class action brought on behalf of plaintiff and similarly situated owners of life insurance policies issued by AXA.   Plaintiff seeks to represent a class of AXA policyholders who are subjected to an unlawful and excessive cost of insurance ("COI") increase by AXA.   AXA's COI increase violates the plain terms of Plaintiff's and all putative class members' insurance policies, and AXA's purported justification for the COI increase establishes that AXA has knowingly made numerous, material misrepresentations in violation of New York Insurance Law Section 4226.

2.     The policies at issue are all flexible-premium, universal life ("UL") policies issued by AXA on a product line called Athena Universal Life II ("AUL II"). The principal benefit of UL policies is that they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force. Unlike other kinds of whole life insurance that require

1

fixed monthly premium payments, the premiums required for UL policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest expense that a policyholder pays. This structure allows policyholders to minimize their capital investment and generate greater rates of return through other investments. Any premiums paid in excess of COI charges and expense components are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest.

3.    AXA has announced that it will dramatically increase COI rates on certain AUL II policyholders, and it began implementing the rate hike in March 2016. AXA is raising COI rates for a block of approximately 1,700 universal life policies. AXA has admitted that its COI increases are directed at only a certain *subset* of policies of the same policy class at issuance – those with issue ages above 70 and current face value above $1 million. It has offered no justification for those arbitrary cut-offs, and there is none.

4.    The size of the COI increase is extraordinary. ███████████████ ████████████████████████████████████████ The AXA COI increases range from approximately 25% to 70% as compared to prior COI charges. In its most recent SEC filing, AXA states that the COI increase will be larger than the increase it previously had anticipated, resulting in a $46 million increase to its net earnings – a figure that is in addition to the profits that management had initially assumed for the COI increase.

5.    By increasing COI rates, AXA seeks to force Plaintiff and other AXA policyholders to either (a) pay exorbitant premiums that AXA knows would no longer justify the ultimate death benefits, or (b) lapse, surrender, or partially-surrender (e.g., lower the face amount) and forfeit the premiums policyholders have previously paid. AXA, in turn, will make a

huge profit – either through higher premium payments or by eliminating policies (through lapses, surrenders or partial-surrenders) and keeping the premiums they have paid to date.

6.      As described in detail below, AXA's conduct is unlawful.  The policies at issue require that any change in COI rates "will be on a basis that is equitable to all policyholders of a given class." AXA has admitted that its COI increases are directed at only a certain *subset* of policies of the same class at issuance – those with issue ages above 70 and current face value above $1 million – and there is no equitable basis for singling out that subset for an increase. The COI rate increase inequitably singles out and punishes policies insuring the lives of 70 year olds compared to identically rated and situated 69 year olds; 80 year olds compared to identically rated 79 year olds; policies with a face value over $1 million compared to $999,999 and less; those who exercise their rights to minimally fund the policies; and the elderly, who are out of options for replacing their insurance contracts.  There is no actuarially sound basis to treat 2 policyholders differently simply because the issue-ages of the insureds are above and below 70, or the policies have face-values above and below $1 million.

7.      Further, while the policies permit AXA to adjust the cost of insurance rates periodically, they allow AXA to do so based only on certain specified factors, such as changes in reasonable assumptions about mortality and investment experience.   AXA has publicly stated that the COI increase is warranted because the affected insureds are dying sooner than AXA anticipated and its investment income experience has been less favorable than expected, but neither factor actuarially supports this enormous rate hike.

8.      In fact, mortality trends for the affected insureds have continued to *improve* substantially since the time the policies issued, and investment income experience does not depend on the premium payment patterns of any particular policyholder or subset of

policyholders, but rather relates to the performance of AXA's overall investments, which have not changed in a way that would warrant an increase on this size or a *disparate* increase for different policyholders.

9.     Insurance companies are also required to file annual answers to interrogatories and give actuarial opinions every year as to whether any of their anticipated experience has changed. In AXA's 2014 filing, dated February 25, 2015—just seven months before the increase was announced—AXA was required to answer whether its "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience" and responded "no." It has similarly failed to disclose any such change in experience in interrogatory responses or annual illustrations sent to policyholders since these policies issued.   Given this response, AXA cannot justify an enormous rate increase a mere 7 months later on the grounds that it was "based on" a change to anticipated experience.  Even if AXA's story attempting to justify its massive COI increase were to be believed, that would only establish the irrefutable fact that AXA has filed materially false interrogatories and distributed misleading illustrations and annual statements that misrepresent the benefits and advantages of the policies and AXA's financial condition and experiences.

### THE PARTIES

10.     Plaintiff Brach Family Foundation, Inc. is a not-for-profit corporation that is incorporated, validly existing, and in good standing under the laws of the State of New York, and its principal place of business is in New York. Plaintiff is the owner of an AUL II life insurance policy (number 157208381), insuring the life of Jane Doe,[1] which was issued on or about May 21, 2007 by AXA and currently has a face value of $20 million (the "Doe Policy"). At issuance, Jane Doe was age 81.  The Doe Policy remains in-force with AXA.  The Doe Policy is subject to

---

[1] For privacy reasons, plaintiff has substituted "Jane Doe" for the name of the actual insured.

AXA's COI increase that was announced in October 2015, and that will be reflected with the first monthly deduction processed on or after March 8, 2016.

11.     Defendant AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York.  The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

13.     This Court has personal jurisdiction over AXA because it is incorporated in New York and its principal place of business is in New York.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) because the events giving rise to plaintiff's causes of action occurred in this District, including AXA's COI rate overcharge.

## FACTUAL BACKGROUND

**A.     The Policies at Issue**

15.     The policies at issue are individual Athena Universal Life II policies issued by AXA from 2004 to 2007.  These policies are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments specified in the policies. A copy of the Doe Policy, redacted of personal information, has previously been filed at Docket 1-1.

16.     Flexible-premium policies are preferred by many policy owners because they allow the owners to pay the bare minimum required to keep the policy in force (that is, the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that yield higher returns than the interest credited on the Policy Account. Policyholders can choose to keep their Policy Account Value as close to zero as possible—in other words, they can choose not to pay any more premiums than the absolute minimum to cover COI and the other administrative expenses.   With fixed-premium policies, by contrast, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums.   AXA has promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments."

17.     The size of the COI charge is highly significant to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to AXA.   This is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the policy account value and credited with interest by AXA.

18.     Each of the AXA policies in this product line shares the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision.

Docket 1-1, Doe Policy at 9.

19.     The "Changes in Policy Cost Factors" provision, in turn, states as follows:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be **on a basis that is equitable to all policyholders of a given class**, and will be determined **based on reasonable assumptions** as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse. . . . Any change in policy cost factors will be determined in accordance with **procedures and standards on file**, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered.

*Id.* at 11 (emphasis added).

20.     The relevant terms of all AUL II policies are substantively identical to those set forth in the Doe Policy.  The policies at issue are all form policies, and insureds are not permitted to negotiate different terms.  They are all contracts of adhesion.

**B.     AXA's Unlawful COI Increase**

21.     On or about October 1, 2015, AXA announced that effective with the first monthly deduction that occurs on or after January 1, 2016, it was increasing the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA states that it notified affected policyholders of the increase by letters mailed on or about October 5, 2015. In December 2015, AXA announced that it would defer by two months the effective date for the COI increase, making the increase effective for the affected policies with the first monthly deduction processed on or after March 8, 2016. The stated reason for the delay was to enable more policyholders to obtain illustrations reflecting the new COI increase.

22.     AXA has repeatedly explained that the increase is based on only two factors: allegedly less favorable "future mortality and investment experience" over the past few years. According to a Wall Street Journal article, an AXA spokesperson explained that the reason for the increase is that "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold." AXA's most recent 10-Q filed with the SEC

similarly explains that "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And AXA has distributed a FAQ on the "Athena Universal Life II COI Rate Change," in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates." AXA has not publicly explained which portion of the increase is attributable to change in mortality and which is attributable to changes in investment experience, but AXA has always cited changes to both as contributing to the supposed need to raise COI rates.

23.     The COI increase breaches the policy in at least three ways: (i) it is not "equitable to all policyholders of a given class"; (ii) it is not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse"; and (iii) it is not "in accordance with procedures and standards on file" with the relevant insurance officials.

### i) AXA'S Increase Is Not Equitable

24.     The policy states that "[c]hanges in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be **on a basis that is equitable to all policyholders of a given class**." For a change to be "equitable," at a bare minimum the change cannot unfairly discriminate against certain policyholders within the same class.

25.     AXA's COI increase is not "equitable to all policyholders of a given class" in several, independent ways.

26.     First, there is no actuarially acceptable justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value

amount of $1 million and above.  Prior to the COI increase, ███████████████████

████████████████████████████████████.  The COI

increase, however, was not graded (i.e., gradually imposed across face-amount ranges) but

applied in a step (i.e., those with $1 million policy got a full increase, and those with a $900,000

got no increase), and thus the COI increase results in a ███████████████████████

████████████████████████████████████████████████

policy, resulting in inequitable treatment of all policyholders of a given class.

27.    Actuarial studies, in fact, indicate *lower* mortality rates for large face policies

(*see, e.g.,* Report to the Society of Actuaries by Mary Bahna-Nolan, May 23, 2012, at 7), a fact

that also renders inequitable AXA's choice to impose the COI increase only on policies with

over $1 million face. ██████████████████████████████████████

According to the Actuarial Standards Board, an "A/E ratio" equals: actual deaths in a group of

lives being evaluated over a specified period divided by the expected deaths over the same

period. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ the fact that AXA chose to saddle

the COI increase only on policies with more than $1 million in face value results in inequitable

treatment of all policyholders of a given class.

28.    Second, ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████.  The COI increase, however, has been applied in a step at

issue age 70 so that after the COI increase, a policy with issue age 70 has become significantly more expensive to the COI rate hike victim (and more profitable to AXA) than a policy with issue age 69, resulting in inequitable treatment of all policyholders of a given class.

29.     The same inequitable result occurs between a policy with issue age of 79 and issue age of 80 where another sudden step-up in the COI increase takes place, and thus a policy with issue age 80 has become significantly more expensive to the COI rate hike victim (and more profitable to AXA) than a policy with issue age of 79, resulting in inequitable treatment of all policyholders of a given class. ███████████████████████████████████

████████████████████████████████████████████████████████████████

However, the new COI increase has been done in a single step, and not subject to interpolation in the same way as the original pricing. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ – that is not equitable. This will lead to the situation that two people who might only be a couple of weeks different in age have significantly different premiums. Additionally, even if AXA's definition of classes were actuarially justified (which they are not) the effect described here applies within AXA's own defined class. The step application of the COI increase results in a policy with issue age 70 becoming more profitable than a policy with issue age 79, so even by AXA's own (invalid) definition of class, AXA has not treated policy holders equitably within a class.

30.     Third, the COI rate increase is also not equitable to all policyholders of a given class even if it is based on reasonable assumption as to investment income (which it is not),

because AXA's overall investment income experience does not justify the <u>disparate</u> COI increases (ranging from 25% to 70%) AXA imposed across COI rate hike victims.

31.     Fourth, the policy does not permit AXA to use issue age or face value to determine who gets a COI increase or who comprises a class.  The policy does not say that a class can be defined by issue age or face amount, and the policies do not list issue age or face amount as a factor that can be considered in raising COI rates.  By promising that changes will be "equitable to all policyholders of a given class," policyholders have the contractual assurance of knowing that they cannot be singled out unfairly into a small group by the insurance company for a price increase. That contractual language would be rendered meaningless if AXA could simply redefine what it means to be a "class" whenever it so chooses.

32.     Fifth, the criteria that AXA used for determining whom to saddle with an enormous COI increase – age (70+) and face amount ($1+ million) – do not coincide with any actuarially acceptable reasons for imposing a COI increase on select policies. The policy provides that COI charges will be determined based on reasonable assumptions as to "expenses, mortality, policy and contract claims, taxes, investment income, and lapse." Of these, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. No reasonable assumption as to mortality would differ between these two policies.  AXA cannot reasonably assume that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value.  The same is true with regard to investment income:  no reasonable assumption as to investment income experience would differ between these two policies. AXA does not make investment decisions on a policy-by-policy basis – the money for investments is all pooled together, and the performance of those investments does not depend on the premium

payment patterns of any particular policyholder or subset of policyholders.  As a result, the increase is not being implemented "on a basis that is equitable to all policyholders" in the relevant policy class.

33.    Sixth, the increase is also inequitable because it treats policies within risk classes differently.   For example, the increase will apply to some Standard risk-class policyholders due to a supposed change in the experience of those policies, but not others, even if the only difference is that one Standard policy is a $900,000 policy and the other a $1,000,000 policy.  It is not equitable to re-determine COI rates for policies of a certain face amount while completely ignoring the experience of similarly-situated policies that had all been priced together, which had similar experience.   AXA is sub-dividing an allocated risk class *after* issuance and treating members of risk classes differently.  That is contrary to the plain language of the policies, and is inequitable to all policyholders of a given class. Retrospectively splitting risk-class groups and applying a COI rate increase to just a portion of that group — for example, raising COI rates on someone who was rated "Standard" at 69 years and 11 months at issuance, but not someone who was "Standard" at 70 years and 1 month, is to treat two actuarially similar people differently, which is inequitable.

34.    Seventh, the increase is also inequitable because it unfairly targets the elderly who are out of options for replacing their insurance contracts.   Splitting the class at issue age 70 results in COI increases affecting only those policy holders who have few options for dealing with it.   The policies were issued from 2006-2008, so issue age 70 now means policies of attained ages 78 and upwards. Obtaining a newly issued policy at age 78 is extremely difficult, and some insurers even have maximum age limits, for example Columbus Life only allows

purchase of a policy up to 79th birthday. That makes the increase targeted on this group of insureds – without sufficient actuarial justification – even more inequitable.

35.     Eighth, with one exception, AXA has not announced an increase in COI rates for any other UL policies besides the subset of policies that are subject to the increase discussed above.  Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we have no plans to raise COIs on any other products, including products we are currently selling."  Had AXA determined COI rates "based on reasonable assumptions" as to mortality or investment income, as stated in the policy, or any of the other characteristics it may permissibly consider under ASOP 2 when defining a policy class, then its COI rates would have increased for a broad range of life insurance policies, and not just AUL II.  That AXA did not implement any such broad increase confirms that the COI increases are being unlawfully used to target certain policies and policyholders in an inequitable manner and based on improper factors not provided for in the policy.

36.     Ninth, the COI rate increase unfairly targets policyholders who exercised their contractually permissible right to minimally fund their policies.  As press reports indicate, AXA increased the COI rate on a group of policyholders that were selected in part for their pattern of premium payments; specifically, the increases target owners who minimize their premium payments and keep policy values as low as possible.  But funding pattern or Policy Account Value is not one of the enumerated factors that AXA may consider in adjusting its COI rates. Further, it is not equitable to impose an increase on policyholders based on their funding patterns nor to use age and face amounts to target those most likely to minimally fund.  Even if AXA could permissibly target individuals that minimally fund (which it cannot), its increase would still be inequitable because by using issue age and face amount as proxies for funding, the group

of policies that it targeted for the increase – those which have both issue ages 70 and above and current face value amount of $1 million and above – includes many individuals who did *not* minimally fund.

37.    Tenth, the COI increase is not equitable to policies issued to ███████████ ████████████████ AXA contends that it applied the ████████████████████



███████ to amount of policies in issue, to AXA's alleged profit shortfall as compared to original pricing.  Thus, the COI increase imposed on the ███████████████ unfairly discriminates against them, and forces them to *subsidize* any possible profit shortfall AXA claims to be experiencing from ███████████████, which is inequitable.  ███████████████████ ████████████████████████████ and based on industry experience ███████████ ███████████ policies are not in fact showing any future profitability shortfall at all, and thus for these groups the COI increase represents an inequitable increase in forecast profits over the original projections.

ii)    **AXA's COI Increase Is Not "Based on Reasonable Assumptions" as to Mortality or Investment Income.**

38.    The policies at issue list the six "reasonable assumptions" that any COI rate "changes" must be "based on": "expenses, mortality, policy and contract claims, taxes, investment income, and lapses."   Accordingly, COI rate adjustments must be "based on reasonable assumptions" as to the enumerated factors and only those factors, and if reasonable assumptions have not changed, no increase is permissible. Further, the magnitude of the changes to those enumerated factors must actually support the magnitude of the change on the COI rates imposed. None of the enumerated factors supports the COI rate increase, and even if there have been changes, none of the changes support the actual scope and magnitude of the increase imposed.

39.    AXA states that the increase is based on reasonable assumptions regarding two factors: investment experience and mortality.   Neither of these statements is true and no reasonable assumption regarding the two warrants the increase.

### a) Mortality Has Improved

40.    AXA claims that the increase is warranted in part because it found that "policyholders were dying sooner" than it expected.   But the opposite is true.   Mortality rates have improved steadily *each year* – i.e., mortality risks have only gotten *better* over time, as people are living much longer than anticipated when the products were priced and issued.

41.    Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.   A mortality table is a chart showing the rate of death at a certain age.

42.     In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced the 2001 CSO Mortality Table, which showed strong mortality improvements, particularly at older ages, over the 1980 CSO table. The Society of Actuaries is currently investigating an update of the CSO tables with a current target publication date of 2017. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

43.     The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables. These surveys have consistently showed mortality improvements over the last three decades, particularly for ages 70-90.

44.     Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table
- 2015 Valuation Basic Table

45.     The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies (including AXA's predecessor, Equitable Life Insurance) with policy anniversaries between 1990 and 1995. This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint. The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables and the 1975-80 Basic Tables, demonstrating that mortality experience has continued to improve substantially and consistently. That trend continues. AXA itself recognizes that in 2014, the SOA finalized new mortality tables and a new mortality

improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

46.     The trend of improving mortality is even more pronounced for the older age insureds affected by the AXA COI increase.   In particular, the 2008 VBT showed an improvement for older age mortality as compared to prior tables commonly used at the time the AUL II policies were priced, and the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

47.     AXA states that its <u>original</u> mortality assumptions for AUL II came from the 1975-80 Basic Table, which it describes as "flat."  AXA further claims that this 1975-80 table will predict <u>lower</u> mortality rates for higher ages than newer allegedly "steep" tables such as 1990-95 VBT or 2001 VBT.   But this is wrong.  Mortality tables over time – such as 75-80 Basic, 90-95 Basic, 2001 VBT, 2008 VBT, and 2015 VBT – have displayed strong mortality <u>improvements</u> across groups. In particular, the mortality rates at ages 90-100 are **<u>lower</u>** in the recent tables than the 75-80 Basic Table, contrary to AXA's claim that recent tables predict higher mortality for higher ages than the 75-80 Basic Table.  AXA's incorrect claims on this topic only confirm that the COI increase was not properly based on any changes to reasonable mortality assumptions.

48.     AXA, in fact, ████████████████████████████████████ ████████████████████████████, without ever disclosing allegedly worse mortality expectations through the illustrations of non-guaranteed elements disseminated to policyholders. As AXA knew, in the time leading up to the COI increase, mortality continued to *improve*, and there was no recent negative mortality experience that would justify a large and sudden increase in 2015. AXA continued to inform the regulator in its public filings through as late as February

2015 that it had not in fact observed any negative change in its mortality experience. AXA's alleged worse mortality experience would have manifested itself a long time ago, and AXA's continuing representations to regulators that its mortality expectations have not changed belie its current story that it has suffered a serious setback in mortality assumptions.

49.     Even if AXA's story trying to justify the COI increase is to be believed, that would only prove that its original assumptions were not reasonable, which cannot justify the increase. AXA is claiming that COI increases of 70% are justified based largely on a change in its mortality expectations. Such a massive change in mortality expectations – in light of continually *improving* mortality across the country – would imply, at best, that AXA's original mortality assumptions were grossly wrong and unreasonable. This would result in a breach: the policies only permit a COI increase based on a change in "reasonable assumptions." Because reasonable assumptions about mortality have not changed for the worse since the time when these policies were issued, the increase cannot be justified even if AXA's story is credited, and its interrogatories were ignored.

### b) Investment Income Does Not Warrant the COI Rate Increase

50.     AXA also claims that the increase was based on a change to its expectations of future "investment experience." The truth, however, is that the ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████, and changes in investment income, if any, are a minor factor which on their own, would not justify the size and scale of the COI increase.

51.     Insurance companies like AXA aggregate capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether up or down, the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. No reasonable policyholder would expect, upon seeing that changes could be based on "investment income," that the exercise of his or her contractual right to fund however he or she pleases would somehow result in a rate increase for that specific policyholder. Similarly, no reasonable policyholder would expect, upon seeing that changes could be based on "investment income," that an increase could somehow be imposed on those with higher issue-ages or face-amounts, and in disparate amounts. Therefore, even if AXA's investment income has changed, this factor cannot justify imposing a COI increase on the subset of AUL II policies upon which AXA is imposing the COI increase – and, as a result, the increase is "inequitable" both because any change in investment income cannot justify an increase on this particular group, and because it cannot justify disparate increases within the group hit by the increase.

52.     Furthermore, for the COI increase to be "based on reasonable assumptions" as to investment income, the actual increase imposed must correspond to the actual changes in investment income observed.  AXA has routinely issued public financial reports in which it refers to its net premiums received and what it refers to publicly as "investment income." Since 2004, there has been no discernible pattern of changes in AXA's publicly reported "investment income" or publicly reported premiums received, and no observable correlation between "investment income" and premiums received that would justify any increase, let alone any

changes that would support an increase to the COI rates for a subset of policyholders (and no others) that inequitably vary between 25% and 70% and above.

### iii) Non-Compliance With Procedures and Standards on File

53.     The policies also provide that any increase must be "determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered." AXA's increase also violates this provision. There are numerous regulations and standards on file with the applicable state insurance regulators that AXA is required to comply with and failed to do so in violation of the contract. The following are illustrative examples of certain procedures on file that AXA has not followed:

54.     By way of example, the NAIC promulgates model laws on unfair trade practice insurance, which New York and other states have adopted, prohibiting the unfair discrimination between individuals of the same class and equal protection of life. By violating these required standards that are on file with the regulator, AXA breached the plain terms of these policies.

55.     In addition, every year in New York, AXA, like other insurance companies, is required to file answers to interrogatories and give actuarial opinions as to the determination procedures for its non-guaranteed elements (*i.e.*, COI charges). In AXA's 2014 filing, dated February 25, 2015—just seven months before the increase was announced—AXA was required to answer whether its "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience" and responded "no." The purpose of the interrogatory procedure is to help protect against sudden and large COI increases. Given this response, AXA cannot justify a rate increase a mere 7 months later.

**The Increased Rates Were Never Publicly Filed or Disclosed**

56.     AXA has not publicly disclosed, made available for public comment, or publicly filed any of its revised COI rates or the supporting documents. AXA has fought the public disclosure of its underlying analysis that supposedly supported its COI rate increase.   The percentage increases in COI rates has never been made publically available for comment prior to its implementation.

## CLASS ACTION ALLEGATIONS

57.     This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to herein as the "AXA COI Increase Class"—consists of:

> All owners of Athena Universal Life II issued by AXA Equitable Life Insurance Company that were subjected to a cost of insurance rate increase announced by AXA on or about October 1, 2015 (excluding defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

58.     The AXA COI Increase Class consists of hundreds of consumers of life insurance and is thus so numerous that joinder of all members is impracticable.   The identities and addresses of class members can be readily ascertained from business records maintained by AXA.

59.     The claims asserted by the Plaintiff are typical of the claims of the AXA COI Increase Class.

60.     The Plaintiff will fairly and adequately protect the interests of the AXA COI Increase Class and does not have any interests antagonistic to those of the other members of this class.

61.   The Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

62.   Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

63.   This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over those questions affecting only individual members. Those common questions include:

(a)   the construction and interpretation of the form insurance policies at issue in this litigation;

(b)   whether AXA's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

(c)   whether AXA breached its contracts with the class members; and

(d)   whether Plaintiff and Class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages,

(e)   whether AXA's failure to adequately disclose its alleged ███████████ ███████████ is materially misleading in violation of New York Insurance Law § 4226;

(f)   whether AXA's issuance of illustrations and annual statements to Plaintiff and Class members without including ███████████████████ violates New York Insurance Law § 4226;

(g)   whether AXA knowingly filed false and misleading interrogatories with regulators, which misrepresented that its anticipated experience factors underlying any

nonguaranteed elements were not different from current experience, violated New York Insurance Law § 4226.

64.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)   the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)   when AXA's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)   this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)   without a class action, many class members would continue to suffer injury, and AXA's violations of law will continue without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(e)   this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FRAUDULENT CONCEALMENT

65. Plaintiff did not discover and could not have discovered through the exercise of due diligence that they were injured by the COI increase, or by the false representations made by AXA in violation of New York Insurance Law § 4226, much less how that injury was caused,

until at the very earliest when the COI increase was announced, and those representations were made known to plaintiff. Defendant's conduct as alleged herein constitutes a continuing violation of the law.

## FIRST CLAIM FOR RELIEF

### Breach of Contract (on behalf of Plaintiff and the AXA COI Increase Class)

66.   Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

67.   The subject policies are binding and enforceable contracts.

68.   AXA's rate increase has materially breached the Policies in several respects, including but not limited to the following:

(a)   AXA breached the policies by increasing the COI rates on bases that are not equitable to all policyholders of a given class;

(b)   AXA breached the policies by determining COI rates based on unreasonable assumptions;

(c)   AXA breached the policies by determining COI rates based on factors not enumerated in the policies; and

(d)   AXA breached the policies because AXA's COI rate increase was not determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered.

69.   In the event that any breach alleged herein is not explicitly covered by the terms of the contract, AXA has breached the covenant of good faith and fair dealing by the conduct alleged in sections (B)(i)-(iii) above.

70.   Plaintiff has performed all of its obligations under the policies, except to the extent that its obligations have been excused by AXA's conduct as set forth herein.

71.   As a direct and proximate cause of AXA's material breaches of the policies, plaintiff and the COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

### Misrepresentation in Violation of New York Insurance Law, Section 4226 (on behalf of Plaintiff and the AXA COI Increase Class)

72. New York Insurance Law Section 4226(a) imposes liability on any insurer that issues or circulates any illustration, circular, statement, or memorandum misrepresenting the terms, benefits, or advantages of any of its insurance policies, and also imposes liability on any insurer that makes any misleading representation, or any misrepresentation of the financial condition of any such insurer. N.Y. Ins. Law § 4226(a)(1) & (4).

73. If AXA's justifications for the COI hikes are to be believed, then AXA applied unreasonably extreme and aggressive haircuts to the 75-80 mortality table when setting original pricing of AUL II, and these pricing assumptions were designed to make AXA products cheaper than competitors and gain market share.   This would have resulted in materially misleading illustrations that were based on unreasonable mortality assumptions, which thereby misrepresented the terms, benefits, and advantages of its AUL II product.

74. Prior to the COI increase, AXA alleges that it had a ███████ shortfall in future best estimate cash flows. AXA, however, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████ An alleged ████████ shortfall does not appear overnight.  AXA has ████████ ████████████████████ and AXA knew about this alleged profitability shortfall for years, but unlawfully continued to use the original pricing through March 2016, and continued to provide illustrations and annual statements that were materially misleading and unlawfully more favorable than AXA's best estimate of pricing.

75. If AXA's ████████████████ shortfall justification for its COI hikes is to be believed, then AXA also knowingly filed false and misleading interrogatories with regulators, which misrepresented that its anticipated experience factors underlying any nonguaranteed elements were not different from current experience.

76. AXA knowingly withheld from regulators and the public its alleged ████████ ████████ shortfall for years, and thereby misrepresented its financial condition, and issued false illustrations and annual statements misrepresenting the terms, benefits, and advantages of its AUL II product.

77. If AXA's story is to be believed, then AXA's illustrations sent from issue date until 2015 also did not meet other requirements of the New York regulations and ASOP 24.  The Illustrated Scale shown in illustrations sent to policyholders must not be more favorable to the policy holder than the lesser of the Disciplined Current Scale and the Currently Payable Scale. The Disciplined Current Scale must be "reasonably based on actual recent historical experience." As a result, the law prohibits AXA from showing policyholders illustrations that reflect COI rates based on old assumptions that are more favorable to policyholders than reasonable recent assumptions.   But if AXA's story is to be believed – such that its mortality assumptions are now *much worse* than its mortality assumptions in the early 2000s, even though mortality experience has only consistently *improved* since then – then AXA violated

this prohibition by illustrating COI rates that were not based on "reasonable actual recent historical experience," and thereby misrepresented the benefits and advantages of the policies through these misleading representations.

78. These material misrepresentations are significant, and injured plaintiff. Had AXA complied with New York Insurance Law § 4226, policyholders would have been given far more advanced warning of the COI rate increases, so that policy owners would not have bought the policy at all or, if purchased after issuance, the purchaser would have paid much less for the policy. Had no material misrepresentations been made, policy owners also would have surrendered or lapsed the policies years earlier, thereby avoiding pouring hundreds of thousands of dollars of additional premiums into the policies, the value of which has been substantially diminished by the material misrepresentations and new COI rate increases. The marketability of the policy holders' policies, and the ability of policy owners to obtain new insurance for the insured, has also been destroyed by AXA's material misrepresentations, thereby depriving policy owners of their economic interests in the policies. Some policy holders also had Lapse Protection Riders, which they forfeited, but would not have, had AXA not made the material misrepresentations at issue here.

79. AXA knowingly violated N.Y. Ins. Law § 4226(a) and (d) and/or knowingly received premiums and other compensation in consequence of such violation.

80. Plaintiff and members of the Class have paid premiums for life insurance policies sold by an insurer authorized by the State of New York that nonetheless failed to comply with New York law governing representations made by such an authorized insurer. Plaintiff is therefore a persons aggrieved under the statute as a result of AXA's misrepresentations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiff and the class compensatory damages pursuant to the First Claim for Relief;

3.      Awarding Plaintiff and the class pre-judgment and post-judgment interest pursuant to their First Claim for Relief, as well as costs;

4.      Awarding a penalty in the amount of all premiums paid to AXA by Plaintiff and members of the Class for life insurance policies that were in effect during the Class Period;

5.      Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: May 2, 2016

        s/ Seth Ard
        Seth Ard
        SUSMAN GODFREY L.L.P.
        560 Lexington Avenue, 15th Floor
        New York, NY  10022
        Tel.:    212-336-8330
        Fax:    212-336-8340
        sard@susmangodfrey.com


        Steven G. Sklaver (admitted *pro hac vice*)
        Frances S. Lewis
        SUSMAN GODFREY L.L.P.
        1901 Avenue of the Stars, Suite 950
        Los Angeles, CA 90067-6029
        Tel:    310-789-3100
        Fax:    310-789-3150
        ssklaver@susmangodfrey.com
        flewis@susmangodfrey.com

        *Attorneys for Plaintiff and the Class*