**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRACH FAMILY FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> AXA EQUITABLE LIFE INSURANCE COMPANY, <br><br> Defendant. | No. 16 Civ. 740 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

David R. Gelfand
Stacey J. Rappaport
Daniel R. Walfish
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

*Attorneys for Defendant AXA Equitable Life*
*Insurance Company*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 3

      A.     Overview of AULII and the Policy ................................................................. 3

      B.     The COI Adjustment and This Litigation ...................................................... 6

ARGUMENT ........................................................................................................................ 7

I.     PLAINTIFF LACKS STANDING TO STATE, AND FAILS TO STATE, A
       SECTION 4226 CLAIM .......................................................................................... 7

      A.     Plaintiff Lacks Constitutional Standing To Invoke Section 4226(d) ............. 7

      B.     Plaintiff Fails To State a Claim Under Section 4226 ................................... 10

II.    THE FAC FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT ............... 15

      A.     The Procedures and Standards Theory Cannot Sustain a Claim ................. 16

      B.     The Unreasonable Founding Assumptions Theory Cannot Sustain a Claim ........ 18

      C.     The Inequitable Treatment Theory Cannot Sustain a Claim ....................... 20

      D.     The Unenumerated Factors Theory Cannot Sustain a Claim ...................... 23

CONCLUSION ................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2 Park Ave. Assocs. v. Cross & Brown Co.*,
   43 A.D.2d 37 (1st Dep't 1973) .........................................................................14

*ACE Sec. Corp. v. DB Structured Prods., Inc.*,
   25 N.Y.3d 581 (2015)......................................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................7, 14, 18

*Beal Sav. Bank v. Sommer*,
   8 N.Y.3d 318 (2007).........................................................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ...........................................................................................7

*Bishop v. Wells Fargo & Co.*,
   __ F.3d __, 2016 WL 2587426 (2d Cir. May 5, 2016) .......................................11

*Brooks v. AIG SunAmerica Life Assurance Co.*,
   480 F.3d 579 (1st Cir. 2007)..............................................................................16

*Cilente v. Phoenix Life Ins. Co.*,
   21 N.Y.S.3d 236 (1st Dep't 2015) .....................................................................14

*Cohen v. Avanade, Inc.*,
   874 F. Supp. 2d 315 (S.D.N.Y. 2012) ...............................................................11

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) ..............................................................................25

*Davis v. F.E.C.*,
   554 U.S. 724 (2008) ............................................................................................8

*Decker v. Massey-Ferguson Ltd.*,
   681 F.2d 111 (2d Cir. 1981) ..............................................................................12

*Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*,
   810 F.3d 861 (2d Cir. 2015) ..............................................................................25

*Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*,
   411 F.3d 384 (2d Cir. 2005) ..............................................................................17

*Fleisher v. Phoenix Life Ins. Co.*,
   18 F. Supp. 3d 456 (S.D.N.Y. 2014).............................................................4, 24

*Gaidon v. Guardian Life Ins. Co. of Am.*,
   679 N.Y.S.2d 611 (1st Dep't 1999) ...................................................................15

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
   1997 WL 710669 (N.Y. Sup. Ct. N.Y. Co. Oct. 21, 1997), *aff'd*, 259 A.D.2d 360 (1st Dep't
   1999)....................................................................................................................15

*Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*,
   2015 WL 1809001 (S.D.N.Y. Apr. 20, 2015) ....................................................25

*Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*,
   18 N.Y.3d 765 (2012)..........................................................................................19

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) ..................................................................................15

*Hassan v. Fraccola*,
   851 F.2d 602 (2d Cir. 1988) ................................................................................22

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005) ..................................................................................11

*Jordan v. Verizon Corp.*,
   2008 WL 5209989 (S.D.N.Y. Dec. 10, 1998) ....................................................25

*Kaye Dentistry, PLLC v. Turchin*,
   2014 WL 2649976 (S.D.N.Y. June 13, 2014) ...............................................14, 18

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
   561 F.3d 112 (2d Cir. 2009) ................................................................................10

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ...........................................................................11, 14

*Lundy v. Catholic Health Sys. of L.I. Inc.*,
   711 F.3d 106 (2d Cir. 2013) ................................................................................11

*Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*,
   702 F.3d 118 (2d Cir. 2012) .......................................................................16, 17, 19

*Newman v. Dinallo*,
   881 N.Y.S.2d 365 (N.Y. Sup. Ct. Nassau Co. 2009),
   *aff'd on other grounds*, 892 N.Y.S.2d 500 (2d Dep't 2010) ..............................13

*Paskar v. City of New York*,
   3 F. Supp. 3d 129 (S.D.N.Y. 2014).......................................................................6

*Phillips v. AIG, Inc.*,
   498 F. Supp. 2d 690 (S.D.N.Y. 2007) .................................................................14

*Porwick v. Fortis Benefits Ins. Co.*,
  2004 WL 2793186 (S.D.N.Y. Dec. 6, 2004) ....................................................................15

*Priestley v. Headminder, Inc.*,
  647 F.3d 497 (2d Cir. 2011) .........................................................................................24

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
  68 F.3d 1478 (2d Cir. 1995) .........................................................................................11

*Robainas v. Metro. Life Ins. Co.*,
  2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) ..............................................................9, 14

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) .........................................................................................11

*Ross v. AXA Equitable Life Ins. Co.*,
  115 F. Supp. 3d 424 (S.D.N.Y. 2015) ....................................................................7, 8, 9

*Schilke v. Wachovia Mortgage, FSB*,
  820 F. Supp. 2d 825 (N.D. Ill. 2011) ...........................................................................6

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1998) .........................................................................................12

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  732 F.2d 253 (2d Cir. 1984) .........................................................................................6

*Smith v. Westchester Cty.*,
  769 F. Supp. 2d 448 (S.D.N.Y. 2011) ..........................................................................6

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540, 2016 WL 2842447 (U.S. May 16, 2016) ..............................................7, 8

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ..................................................................................3, 7, 24

*Trevethan v. Select Portfolio Servicing, Inc.*,
  __ F. Supp. 3d __, 2015 WL 6913144 (S.D. Fla. Nov. 6, 2015) ...........................................6

*Von Hoffmann v. Prudential Ins. Co. of Am.*,
  202 F. Supp. 2d 252 (S.D.N.Y. 2002) ..........................................................................15

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) .........................................................................................3

*Yarbough v. AXA Equitable Life Ins. Co.*,
  2015 WL 6792225 (S.D.N.Y. Oct. 22, 2015) ................................................................9

*Ziemba v. Rell*,
  409 F.3d 553 (2d Cir. 2005) .........................................................................................10

**Statutes**

N.Y. Comp. Codes R. & Regs. tit. 11, §§ 53-3.3, 53-3.6.......................................11, 15

N.Y. Dep't of Ins. Op. No. 00-12-05, 2000 WL 34630175 (Dec. 13, 2000) ...............................21

N.Y. Dep't of Ins. Op. No. 02-12-02, 2002 WL 33011225 (Feb. 12, 2002)................................22

N.Y. Ins. L. § 4224.....................................................................................3, 22

N.Y. Ins. L. § 4226.............................................................................*passim*

NYSID CL No. 1980-18, 1980 WL 566567 (Dec. 19, 1980) ......................................17

NYSID CL No. 1983-4, 1983 WL 801581 (Mar. 16, 1983) ........................................17

NYSID CL No. 2001-20, 2001 WL 34906686 (Aug. 13, 2001)...................................17

**Other Authorities**

N.Y. Department of Financial Services, *Basic Types of Policies*,
    http://www.dfs.ny.gov/consumer/cli_basic.htm ...............................................3, 4

Harvey W. Rubin, *Dictionary of Insurance Terms* (6th ed. 2013) ...............................11

*Black's Law Dictionary* (10th ed. 2014) .......................................................16

Howard M. Zaritsky & Stephan R. Leimberg, *Tax Planning with Life Insurance*
    ¶1.06[3] (2d ed. 1998 & Supp. 2016-1)......................................................3, 4

Soc'y of Actuaries Rep. of the Indiv. Life Ins. Exper. Comm., *Mortality Under Standard
    Indiv. Underwritten Life Ins. Between 1995 and 2000 Policy Anniversaries* (May 2004),
    https://www.soa.org/Files/Research/Exp-Study/1995_2000_Final_Report.pdf....................22

Defendant AXA Equitable Life Insurance Company ("AXA") respectfully submits this memorandum and the Declaration of Stacey J. Rappaport, dated May 27, 2016 ("SJR Decl.") in support of its motion to dismiss the First Amended Complaint ("FAC") of Brach Family Foundation, Inc. ("Plaintiff" or "Brach") pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(1), and 12(b)(6).

## PRELIMINARY STATEMENT

Hoping to profit from the death of an elderly woman, Plaintiff acquired an insurance policy (the "Policy") that AXA issued in 2007 as part of its Athena Universal Life II ("AULII") line. AULII is typical of universal life insurance ("UL"). Under the terms of the Policy, premiums are paid into a cash account that serves as a savings vehicle. Each month, charges are deducted from the account, including for what is known as the cost of insurance ("COI"). The COI rates are not guaranteed; the Policy expressly allows AXA to reset them up to specified maximums. Contractually, a change to the COI rates must be based on reasonable assumptions about, among other things, mortality and/or investment income. The Policy also provides that a COI adjustment must be done "on a basis that is equitable to all policyholders of a given class."

Last year AXA vetted with the New York Department of Financial Services ("DFS"), AXA's primary regulator, a proposed COI increase for classes of outstanding AULII policies, namely those with issue age (in other words, age of the insured at the time of policy issuance) of 70 to 79, and 80 and above, and where the face amount of the policy is $1 million and above. The adjustment (which was within contractual maximums) was based on AXA's expectations about future mortality and investment income having changed relative to the assumptions that were used in the original pricing of the policies. After review and discussion of the materials submitted by AXA, DFS confirmed in writing its determination that the COI increase for these

classes of policies was "unobjectionable." AXA thereafter invoked its contractual rights, and implemented the increase.

This is Brach's second attempt to state a claim challenging the COI adjustment. It fails as a matter of law. The FAC adds to breach of contract theories a claim under Section 4226 of the New York Insurance Law, which prohibits certain kinds of knowing misrepresentations by an insurer. But Brach does not allege that it was injured by – or even saw, much less relied on – any supposed misrepresentations. Brach accordingly has no standing to assert this claim, and the Court lacks subject-matter jurisdiction over it. The FAC also fails to allege, plausibly or with the degree of particularity required of fraud-based claims, *any* of the elements of a Section 4226 claim, including specific misrepresentations by AXA, fraudulent intent, and causation.

The FAC also asserts four theories of contract breach, none of which are legally cognizable. Plaintiff contends that the COI increase runs afoul of a provision in the Policy that a COI adjustment will comport with "procedures and standards on file, if required, with the [relevant] insurance supervisory official." Plaintiff cannot point to a single filed procedure or standard that AXA overlooked or disobeyed. Plaintiff also asserts, with the benefit of hindsight, that the assumptions on which the original COI rates were based were unreasonable. But the Policy (for good reason) does not say anything about reasonable assumptions at *issuance*, only that a *change* will be based on reasonable assumptions; and in any event, any challenge to the initial assumptions would be time-barred.

Plaintiff theorizes that the increase was not "equitable to all policyholders of a given class." Plaintiff's basic position is that AXA is permitted only to apply a COI increase to *all* AULII policyholders, as opposed to just a subset. Notwithstanding the irrelevant digressions in

the FAC, the affected policies collectively represent distinct "classes"[1] within the meaning of

actuarial practice and New York insurance law, and the COI increase applies to *all* the policies

within those classes, such that there is no inequitable treatment.  Indeed, were there some flaw in

the definition of, or treatment across, the insurance classes, DFS would have pointed it out.

Instead, DFS expressly stated otherwise: "We have reviewed your proposal . . . to increase the

cost of insurance charges *on select issues (issue ages 70 and above with face amounts of

$1,000,000 or more)* [of AULII], and find it unobjectionable."  SJR Decl. Ex. 4 (emphasis

added).  Plaintiff's remaining contract theory is that the COI increase impermissibly was based

on unenumerated factors, but Plaintiff does not plausibly identify any such factors.  The Court

should dismiss the FAC with prejudice.

## BACKGROUND[2]

### A.    Overview of AULII and the Policy

AULII, which AXA marketed from 2004 to 2007, combines features of life insurance

protection and a savings program.  FAC [Dkt. 28] ¶ 15.  It is a flexible-premium UL product,

which means that, in contrast to other forms of life insurance, (1) the policyholder chooses how

much to pay in premiums, but also (2) the insurer has the discretion to adjust certain charges and

features.  As DFS has explained for the public: "Although [UL] gives you maximum flexibility,

you will need to actively manage the policy . . ., especially because the insurance company can

increase mortality and expense charges."[3]

---

[1] The term "class" in insurance law, *see, e.g.*, N.Y. Ins. Law § 4224(a)(1), is different from a "class" for purposes of Rule 23.  AXA does not concede that this action is appropriate for class action treatment.

[2] This summary is based on the allegations in the FAC, the Policy and related documents attached to the FAC and the original Complaint, other documents incorporated by reference into the FAC or possessed by and relied on by Plaintiff, and certain matters of which judicial notice may be taken.  *See, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016); *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 123 (2d Cir. 2011).

[3] DFS, *Basic Types of Policies*, http://www.dfs.ny.gov/consumer/cli_basic.htm ("DFS Website"); *see also* Howard M. Zaritsky & Stephan R. Leimberg, Tax Planning with Life Insurance ¶ 1.06[3] (2d ed. 1998 &

The mechanics of AULII are typical of UL products.[4]  Upon issuance, the policyholder makes an initial premium payment.  *See* Dkt. 1-1 (Policy) at 4.[5]  That payment (and any subsequent premium payment) is placed in the policyholder's Policy Account, which earns interest.  *See id.* at 2.  The Policy Account is the savings component.  Each month COI and administrative charges are deducted from the Policy Account.  *See id.* at 3, 13.  The COI pays for the insurance component of the policy.  After issuance, the policyholder generally chooses when and how much to pay in premiums.  *See* FAC ¶ 2.  If the Policy Account value is insufficient to cover the monthly charges, the policy will lapse, unless there is a no-lapse guarantee.[6]  Upon the insured's death, the insurer pays the policy beneficiary the specified death benefit, also known as the face amount of the policy.  Policy at 3, 10-11.  During the life of the insured, the policy can be surrendered in exchange for the Policy Account value, minus applicable charges.  *Id.* at 14.

The policy that Plaintiff allegedly owns has a face amount of $20 million and was issued in 2007 on the life of Rosalia Perlmutter, who at the time was 81 years old.  FAC ¶ 10 & Policy at 4, 24; SJR Decl. Ex. 2 at 1.[7]  The original applicant and owner was purportedly a family trust associated with Ms. Perlmutter.  SJR Decl. Ex. 2 at 2.  Plaintiff, which claims to be a not-for-

Supp. 2016-1) ("Despite the many advantages of UL contracts, *advisers and clients often overlook the major risks shifted to the policy owner in return for the potential for higher gain within the UL contract*.  In traditional whole life policies, the insurer guarantees the policy owner that mortality and expense charges are built into the guaranteed level premium and cannot be increased.  However, in UL, . . . the insurer guarantees only that mortality charges and expense rates will not exceed certain maximums." (emphasis added)).

[4] For a general description of UL, *see, e.g.*, DFS Website; *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 460-62 (S.D.N.Y. 2014); Zaritsky & Leimberg, *supra* note 3, ¶ 1.06[1].

[5] The Policy (filed as Exhibit A to the original Complaint, Dkt. 1-1) is resubmitted as Exhibit 1 to the SJR Decl.  Page numbers for the Policy cited herein are based on the ECF header for Exhibit A to the Complaint.

[6] The Policy does not have a "no lapse" guarantee.  *See* Policy at 4 ("THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE.  THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: . . . (4) *CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY* . . . ." (emphasis added; capitalized in original)).

[7] The version of the Policy application appended to the original Complaint redacts the name of the insured and original applicant.  The application submitted herewith unredacts this information.

profit corporation, FAC ¶ 10, does not explain how, when, or why it acquired the Policy.
Plaintiff has no discernible connection to Ms. Perlmutter, her family, or the trust that applied for
the Policy.  *See, e.g.*, SJR Decl. Ex. 2.  Plaintiff, in other words, has acquired the Policy in the
secondary market, seeking to profit from the death of a woman with whom Plaintiff has no
relationship other than an interest in her early demise.

      The Policy could not be clearer that AXA is allowed to set and reset the COI rates at any
level up to a specified maximum.  On page 3 of the Policy, AXA prominently explains that,
subject to certain limitations, the COI rates can change at any time.[8]  The Policy discloses how
the monthly COI charge is calculated: it is the "*current* monthly cost of insurance rate"
multiplied by the net amount of risk (defined as the death benefit minus the Policy Account
value) at the beginning of the policy month, plus certain charges not at issue here.  Policy at 13.
The Policy expressly states that AXA will "determine cost of insurance rates from time to time"
but that any change "will be as described in the 'Changes in Policy Cost Factors' provision" and
"*will never be more than* those shown in" a table that sets forth the *maximum* monthly COI rate
that AXA may charge for a given age attained by the insured.  *Id.* at 7-8, 14 (emphasis added).
The "Changes in Policy Cost Factors" provision, in relevant part, states as follows (*id.* at 16):

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and
> expense charges) will be on a basis that is equitable to all policyholders of a given class,
> and will be determined based on reasonable assumptions as to expenses, mortality, policy
> and contract claims, taxes, investment income, and lapses.  Any change in policy cost
> factors will never result in . . . policy charges that exceed the maximum policy charges
> guaranteed in the policy.  Any change in policy cost factors will be determined in
> accordance with procedures and standards on file, if required, with the insurance
> supervisory official of the jurisdiction in which this policy is delivered.

---

[8] Policy at 4 ("WE HAVE THE RIGHT TO CHANGE THE AMOUNT OF INTEREST CREDITED TO THE
POLICY AND THE AMOUNT OF COST OF INSURANCE OR OTHER EXPENSE CHARGES
DEDUCTED UNDER THE POLICY WHICH MAY REQUIRE MORE PREMIUM TO BE PAID THAN
WAS ILLUSTRATED OR CAUSE THE CASH VALUES TO BE LESS THAN ILLUSTRATED.").

**B.      The COI Adjustment and This Litigation**

In late 2015, AXA announced an adjustment to the COI rates for a subset of AULII policies (the "COI Adjustment"). Specifically, AXA announced that effective January 1, 2016, it would raise COI rates on AULII policies for which both (i) issue age is 70 and above[9], and (ii) current face amount is $1 million or greater. FAC ¶ 21 (the "Affected Classes" of policies and their holders). AXA explained the reason for the COI Adjustment in an FAQ and 10-Q filing (both quoted in the FAC): the company "expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established."[10] The COI Adjustment took effect on March 8, 2016. *Id.* ¶ 21. The increased COI rates remain within the contractual maximums, and Plaintiff does not contend otherwise.

DFS reviewed the COI Adjustment before it was implemented. SJR Decl. Ex. 4.[11] AXA submitted to DFS a variety of materials concerning the proposed COI Adjustment, and responded to the questions DFS asked. *See id.* On October 5, 2015, DFS wrote to AXA: "We have reviewed your proposal . . . to increase the cost of insurance charges on select issues . . . of [AULII], and find it unobjectionable." *Id.* DFS added (emphasis added):

> In our review *we were satisfied that the increase in the cost of insurance charges* did not reflect an increase in your profit goals, but instead *was based on changes in your future expectations as to mortality and investment earnings from those that were used in the original pricing of these policies.*

---

[9] The age delineation captures two different classes used by AXA: 70-79, and 80+. *See* FAC ¶¶ 28-29.

[10] FAC ¶ 22; SJR Decl. Ex. 3 at 2.

[11] The court may take judicial notice of DFS's letter. *See supra* note 2. "[G]overnment records are appropriate for judicial notice" on a motion to dismiss, *Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014). Courts commonly take judicial notice of (among other types of records) letters from government agencies, as well as filings and correspondence with insurance regulators. *See, e.g., Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 258 (2d Cir. 1984) (approving judicial notice of "letter from a middle-level [Federal Highway Administration] administrator"); *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 461 n.12 (S.D.N.Y. 2011) (taking judicial notice of letter from federal agency); *Trevethan v. Select Portfolio Servicing, Inc.*, 2015 WL 6913144, at *2 (S.D. Fla. Nov. 6, 2015) (noticing filings with insurance regulator); *Schilke v. Wachovia Mortgage, FSB*, 820 F. Supp. 2d 825, 835 n.4 (N.D. Ill. 2011) (same).

Brach filed this action on February 1, 2016.  After AXA moved to dismiss, Dkt. 18, the

Court *sua sponte* gave Plaintiff an opportunity to amend.  Dkt. 21.  In the interim, AXA supplied

Plaintiff, at its request, with the documents AXA had provided to DFS.  Plaintiff has not come up

with a basis to second-guess DFS.  The FAC should be dismissed, with prejudice.

## ARGUMENT

The plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), demands that

Plaintiff demonstrate "more than the mere possibility" that AXA breached its contractual

obligations or violated the New York Insurance Law.  To avoid subjecting AXA to the

"enormous expense" of discovery, *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 559 (2007), the

Complaint must contain "factual content that allows the court to draw the reasonable inference

that the defendant is liable" as alleged.  *Iqbal*, 556 U.S. at 678; *accord Tongue v. Sanofi*, 816

F.3d 199, 209 (2d Cir. 2016).  Assessing the sufficiency of a Complaint is "a context-specific

task that requires the reviewing court to draw on its judicial experience and common sense."

*Iqbal*, 556 U.S. at 679.  Facts "'merely consistent with'" liability are not enough.  *Id*. at 678

(quoting *Twombly*, 550 U.S. at 557).  The FAC comes nowhere close to satisfying this standard.

## I.   PLAINTIFF LACKS STANDING TO STATE, AND FAILS TO STATE, A SECTION 4226 CLAIM

### A.   Plaintiff Lacks Constitutional Standing To Invoke Section 4226(d)

"The Supreme Court has, time and again" – and yet again recently, *see Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 2016 WL 2842447, at *5 (U.S. May 16, 2016) – "reaffirmed that the

'irreducible constitutional minimum' of standing requires a plaintiff to establish three elements."

*Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (Furman, J.).

"Specifically, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection

between the injury and the conduct complained of,' and (3) a 'likel[ihood] that the injury 'will be

redressed by a favorable decision.'" *Id.* (citations omitted); *accord Spokeo*, 2016 WL 2842447, at *5. "Where, as here, a case is at the pleading stage, the plaintiff must '*clearly . . . allege facts demonstrating*' each element" of standing. *Spokeo*, 2016 WL 2842447, at *5 (emphasis added). And, "a plaintiff must demonstrate standing for *each claim* he seeks to press and for *each form of relief* that is sought." *Davis v. F.E.C.*, 554 U.S. 724, 734 (2008) (internal quotation marks and citation omitted) (emphasis added).

Plaintiff lacks standing to assert a claim under Section 4226.[12]   Plaintiff contends it is a "person aggrieved," N.Y. Ins. L. § 4226(d), because it "paid premiums" to an insurer that "failed to comply with New York law governing representations made by" the insurer.  FAC ¶ 80. Plaintiff claims that (i) AXA's policy "illustrations and annual statements" to policyholders, *id.* ¶¶ 74, 76, 77, and (ii) its answers to "interrogatories" filed annually with regulators relating to nonguaranteed elements did not make required disclosures.  *Id.* ¶ 75.  However, Plaintiff alleges absolutely no information whatsoever about ***its*** transaction in acquiring the policy or what ***it*** relied on at any point then or since.  There is thus no way to connect this Plaintiff's actions to any alleged misrepresentations.  That is a fatal defect.

This case, therefore, is just like *Ross*: "Notably, Plaintiffs do not allege in the Complaint that AXA's [alleged disclosure failures] caused them financial harm . . . . *Nor do Plaintiffs specifically allege that they relied on, or were influenced by, AXA's representations* . . . in deciding to purchase policies from AXA."  115 F. Supp. 3d at 430-31 (emphasis added).  Put

---

[12] The statute makes it unlawful for an insurer to "issue or circulate . . . any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts," and to "make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates."  N.Y. Ins. L. § 4226(a)(1), (4).  Further: an "insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the [N.Y. C.P.L.R.]."  *Id.* § 4226(d).

differently: "Plaintiffs do not allege that *they* would not have purchased policies from AXA but for its nondisclosures." *Id.* at 437 (emphasis added).

This represents a failure of the first two elements of constitutional standing. *See Robainas v. Metro. Life Ins. Co.*, 2015 WL 5918200, at *4, *6 (S.D.N.Y. Oct. 9, 2015) (no standing where "the named Plaintiffs do not contend that they specifically read, heard, or relied on [defendant's] alleged misstatements beyond a general allegation that [defendant] misled the public, including policyholders"); *accord Ross*, 115 F. Supp. 3d at 435-36 & n.2 ("Plaintiffs fail to establish a causal connection between AXA's challenged conduct and any economic harm suffered by virtue of their purchasing decisions."); *Yarbough v. AXA Equitable Life Ins. Co.*, 2015 WL 6792225, at *1 (S.D.N.Y. Oct. 22, 2015) (following *Ross* and *Robainas*).

Plaintiff must "allege and show that [it] personally" – not some hypothetical member of the putative class – has standing to assert each claim. *Ross*, 115 F. Supp. 3d at 432 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *accord Robainas*, 2015 WL 5918200, at *5. Plaintiff fails to do so, speaking only generally about unnamed "policyholders." *See, e.g.*, FAC ¶ 78 ("[h]ad AXA complied with [§ 4226], *policyholders*" – not Plaintiff – "would have been given far more advanced warning of the COI rate increases, so that *policy owners*" – not Plaintiff – "would not have bought the policy at all or, if purchased after issuance, *the purchaser*" – not Plaintiff – "would have paid much less for the policy." (emphasis added)). The FAC even alleges that "*Some policy holders also had Lapse Protection Riders, which they forfeited, but would not have, had AXA not made the material misrepresentations at issue here.*" *Id.* (emphasis added). The Policy owned by Plaintiff never had such a rider.

Even if those allegations somehow could be read as applying to Plaintiff – and they should not be – there is no standing. If the FAC is right, then AXA, by *underestimating*

- 9 -

mortality and charging COI rates based on those lowered assumptions, held those rates *down* "for years," making AULII policies "cheaper," than they otherwise would have been. *Id.* ¶¶ 73-74. According to the FAC, with different disclosure, policyholders would not have bought AULII policies at all or would have paid "much less" for them on the secondary market, or "would have surrendered or lapsed the policies." *Id.* ¶ 78.[13] But as shown by the profusion of what-might-have-beens, all of that is highly speculative, negating not just injury-in-fact, *see Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 122 (2d Cir. 2009) (no standing where claim of injury was based on speculation about how plaintiff would fare under hypothetical ERISA plan), but also the needed "causal connection" between conduct and harm. *See, e.g., Ziemba v. Rell*, 409 F.3d 553, 554 (2d Cir. 2005) (no Article III standing where "'the links in the chain of causation' . . . [were] too attenuated").

AULII policyholders have long had the benefit of life insurance coverage (indeed, in many cases have been paid the death benefit) – at bargain rates, if Plaintiff is to be believed. Plaintiff nevertheless seeks to go beyond its forward-looking contractual challenge to the COI Adjustment, and force AXA to disgorge all past premiums paid under the Policy based on sheer conjecture about what might have happened to unnamed "policyholders" if certain non-specified disclosures – ones that Plaintiff is unable to plausibly allege it or anyone else saw or relied on – had been different. Such an endeavor is not within the jurisdiction of the federal courts.

### B.    Plaintiff Fails To State a Claim Under Section 4226

Section 4226 demands, as relevant here, plausible allegations at least as to (1) the existence of an affirmative (a) "misrepresent[ation]" concerning the "terms, benefits or

---

[13] The FAC also claims that "[t]he marketability of the policy holders' policies, and the ability of policy owners to obtain new insurance for the insured" has been impacted. FAC ¶ 78. Even assuming that these are cognizable forms of injury (which is doubtful), they do not apply to Plaintiff. The FAC nowhere alleges that Plaintiff ever had an interest in "market[ing]" the Policy or buying "new insurance" on Ms. Perlmutter's life.

advantages" of an insurance policy in "any illustration, circular, statement or memorandum," or (b) "misleading representation, or any misrepresentation of the financial condition" of an insurer[14] (2) known by AXA to be violative, that (3) caused the plaintiff to be "aggrieved." *See* N.Y. Ins. L. §§ 4226(a)(1), (4) & (d).  Moreover, because the cause of action sounds in fraud (it is based on knowing misrepresentations), Plaintiff must satisfy the heightened pleading requirements of Rule 9(b),[15] or in other words "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  Plaintiff's Section 4226 allegations do *none* of this.

### 1.    The FAC Pleads No Actionable Misrepresentation or Omission

The FAC "gives only a general description" of the supposedly fraudulent statements – gesturing at unidentified policy illustrations,[16] annual policyholder statements, and interrogatory submissions – and "fails altogether to identify" the necessary "'where and when.'"  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 324 (S.D.N.Y. 2012) (Furman, J).  The FAC also fails to explain, plausibly or with particularity, *how* these unspecified documents were misleading.  The

---

[14] Section 4226 prohibits only an affirmative *representation* (whether an outright "misrepresentation" or merely a "misleading representation," *i.e.*, a half-truth), not a pure omission.  And it creates no duty of affirmative disclosure.  *See, e.g.*, *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995) (in New York, omissions cannot be fraudulent without an independent duty to disclose).

[15] The heightened pleading standards of Rule 9(b) apply to statutes that create a cause of action for fraud.  *See, e.g.*, *Bishop v. Wells Fargo & Co.*, __ F.3d __, 2016 WL 2587426, at *5 (2d Cir. May 5, 2016) (False Claims Act); *Rombach v. Chang*, 355 F.3d 164, 170-72 (2d Cir. 2004) (misstatement provisions of the Securities Act of 1933, when "premised on allegations of fraud" as opposed to negligence); *Lundy v. Catholic Health Sys. of L.I. Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (RICO); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (fraudulent transfer statute).

[16] An illustration is a chart that projects the hypothetical value of the Policy Account over time on the basis of assumed rates and charges.  *See* Harvey W. Rubin, Dictionary of Insurance Terms 397 (6th ed. 2013).  AULII illustrations were supplied at policy issuance and (notwithstanding Plaintiff's references to "annual illustrations," FAC ¶¶ 9, 74) thereafter only upon request.  *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 53-3.6(b) (insurer not required to affirmatively furnish annual illustrations); SJR Decl. Ex. 3 at 2.  Plaintiff does not allege that it ever requested, received, reviewed, or relied on an illustration.

Section 4226 claim alleges that if "AXA's justifications for the COI hikes are to be believed" –

as they were by DFS – "then AXA applied unreasonabl[e] . . . haircuts" (apparently meaning

percentage discounts that were too optimistic) to the relevant industry-standard mortality table

"when setting the original pricing of AULII."  FAC ¶ 73.  This, the FAC speculates, "*would have*

*resulted* in" illustrations that, because they were "based on unreasonable mortality assumptions,"

somehow "misrepresented the terms, benefits, and advantages of its AULII product."  *Id.*

(emphasis added).

　　This makes no sense, and fails to explain just how any illustration misrepresented "the

terms, benefits, or advantages," N.Y. Ins. L. § 4226(a)(1), of the Policy.  The illustration at

issuance (and all subsequent ones) accurately reflected COI rates at the time, and Plaintiff does

not contend otherwise.  Plaintiff's theory is apparently that AXA lulled the original owner to take

out a $20 million policy insuring the life of an 81-year-old woman through aggressive pricing,

kept rates low for a *nine-year period* during which the COI rates were exactly as illustrated – and

during which AXA bore the risk of an octogenarian's death – and then, when the insured turned

90, sprung the trap and raised the rates because of what had been hidden all along: that the initial

assumptions were unreasonable.  That is not a plausible or Rule 9(b)-compliant fraud claim.

　　The FAC offers no basis for the accusation that the initial assumptions were

unreasonable, and the Court should not credit it.  An insurance company's assumptions are

inherently forward-looking expectations.  In actuarial science as in economics, "'prognostication,

though faulty, does not, without more, amount to fraud.'"  *See, e.g.*, *Decker v. Massey-Ferguson*

*Ltd.*, 681 F.2d 111, 117 (2d Cir. 1981); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124,

1129 (2d Cir. 1998) ("misguided optimism is not a cause of action . . .  We have rejected the

legitimacy of 'alleging fraud by hindsight.'").  More importantly, AXA had no obligation to

disclose *any* of its mortality assumptions, whether at issuance or upon the "updat[es]" alleged by Plaintiff.  FAC ¶ 74.  An insurer's mortality assumptions "constitute trade secrets and need not be disclosed."  *Newman v. Dinallo*, 881 N.Y.S.2d 365 (Table), 2009 WL 637697, at *3 (N.Y. Sup. Ct. Nassau Co. 2009), *aff'd on other grounds*, 892 N.Y.S.2d 500 (2d Dep't 2010).

The FAC alleges – using documents that AXA provided to DFS and then to Plaintiff in discovery – a $500 million future profit shortfall associated with the Affected Classes of AULII.  FAC ¶¶ 74-76.  According to Plaintiff, AXA "knew about this alleged profitability shortfall for years, but unlawfully continued to use the original pricing through March 2016."  *Id*. ¶ 74.  This too is not fraud.  AXA has *never* been under a *duty* to *raise* COI rates, let alone to cause them (or illustrations and policyholder statements) to somehow track projected (un)profitability in real time.  There was thus nothing "unlawful" about not raising COI rates until March 2016 – just as there would have been nothing "unlawful" about never doing so at all.  More fundamentally the FAC does not allege that AXA made any affirmative statement, let alone misstatement, about the profitability of AULII in any illustration or annual statement to a policy owner.  Similarly, the FAC does not identify any source of an affirmative obligation to disclose this information.

The FAC also alleges that AXA filed interrogatory answers with regulators that were "false and misleading" on account of the supposed $500 million profitability shortfall.  *Id*. ¶ 75.  But Plaintiff does not point to any interrogatory that asked about profitability – or any aspect of AXA's "financial condition," N.Y. Ins. L. § 4226(a)(4) – much less one that created an affirmative obligation to disclose a profitability shortfall.  Plaintiff mentions an interrogatory question about whether "current experience" diverges from "anticipated experience factors," but fails to explain how the "No" answer AXA gave was incorrect.  FAC ¶ 75.  As Plaintiff would

have it, AXA previously supplied inaccurate submissions to DFS – and yet DFS, far from taking action when it learned the truth, had no objection to the COI Adjustment.  That is not plausible.

In sum the FAC fails to allege, let alone with particularity, any statement or omission actionable under Section 4226.  *See Phillips v. AIG, Inc.*, 498 F. Supp. 2d 690, 699 (S.D.N.Y. 2007) (dismissing Section 4226 claim where plaintiff failed to identify "any specific contractual provision that is misleading").

### 2.   Plaintiff Does Not Allege Knowledge of Wrongdoing

Like common-law or federal securities fraud, Section 4226(d) requires that the insurer have "knowingly" committed the alleged violation.  *See Cilente v. Phoenix Life Ins. Co.*, 21 N.Y.S.3d 236, 238 (1st Dep't 2015).  Rule 9(b) demands factual allegations "'that give rise to a *strong inference of fraudulent intent.*'"  *Kaye Dentistry, PLLC v. Turchin*, 2014 WL 2649976, at *5 (S.D.N.Y. June 13, 2014) (Furman, J.) (quoting *Lerner*, 459 F.3d at 290) (emphasis added). The FAC fails on this score too, offering a "threadbare recital," *Iqbal*, 556 U.S. at 678, that AXA "knowingly violated" the statute, FAC ¶ 79, but offering no evidence of "conscious misbehavior or recklessness," nor a theory of "motive and opportunity" that bears any plausible relationship to the (inadequately) alleged misrepresentations.  *Turchin*, 2014 WL 2649976, at *5.

### 3.   Plaintiff Is Not a Statutory "Person Aggrieved"

A Section 4226(d) plaintiff must be "aggrieved" as a "consequence" of a knowing misrepresentation.  That is, as with classic fraud, the plaintiff must demonstrate a causal connection between violation and injury – in other words, reliance, causation, and damages.[17]

---

[17] *See, e.g., Robainas*, 2015 WL 5918200, at *7 (Section 4226 "appears to require a plaintiff to experience a concrete injury in order to state a cause of action. . . . [A]n aggrieved party is one that experiences some sort of wrong or harm."); *2 Park Ave. Assocs. v. Cross & Brown Co.*, 43 A.D.2d 37, 40 (1st Dep't 1973) (N.Y. Real Prop. L. § 442-e – which, similar to N.Y. Ins. L. § 4226, allows a "person aggrieved" to recover a penalty in the amount of "commission, compensation or profit" received by a broker "in consequence of" the relevant violations – "extends only to such persons as are immediately and proximately injured by the very act prohibited and their privies.").

As discussed above (I.A.), Plaintiff does not allege that it or anyone else received or reviewed, let alone relied on, *any* of AXA's (unspecified) representations – or that they caused it injury.

Even if Plaintiff *had* pled reliance (and it has not), such reliance would not have met the additional requirement that it be reasonable.  *See, e.g.*, *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996).  AXA's illustrations necessarily contained warnings that "the benefits and values are not guaranteed," "the assumptions on which they are based are subject to change by the insurer," and "This illustration assumes that the currently illustrated nonguaranteed elements will continue unchanged for all years shown.  This is not likely to occur."  N.Y. Comp. Codes R. & Regs. tit. 11, §§ 53-3.3(a)(12)(i-ii), (b)(5).  Numerous courts have held that such language (alone or in combination with similar policy language) defeats the reasonableness of any purported reliance on the non-guaranteed values not changing.[18]

## II.    THE FAC FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

Plaintiff alleges that AXA breached the Policy in four respects:

(a)    "because AXA's COI rate increase was not determined in accordance with procedures and standards on file, if required, with the [relevant] insurance supervisory official," *id*. ¶ 68(d) (the "Procedures and Standards Theory").

(b)    "by determining COI rates based on unreasonable assumptions," *id*. ¶ 68(b) (the "Unreasonable Founding Assumptions Theory");

---

[18] *See, e.g.*, *Porwick v. Fortis Benefits Ins. Co.*, 2004 WL 2793186, at *7 (S.D.N.Y. Dec. 6, 2004) ("The illustration states that the information shown therein is based on current assumptions and is subject to change monthly.  The Table of Current Values . . . indicates that . . . the valuations set forth in the table are not guaranteed.  Accordingly, given the specific disclaimers, it was unreasonable for plaintiff to rely on the illustration and/or Table of Current Values to conclude that the interest rates were guaranteed"); *Von Hoffmann v. Prudential Ins. Co. of Am.*, 202 F. Supp. 2d 252, 260-61 & n.3 (S.D.N.Y. 2002) (express disclaimers defeated reasonable reliance on alleged misrepresentations in policy illustrations); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 1997 WL 710669, at *8 (N.Y. Sup. Ct. N.Y. Co. 1997) ("plaintiffs' reliance upon" non-guaranteed elements not changing from the time of issuance was "unreasonable, both based on the specific disclaimers contained in the illustrations and the accompanying documents, and upon common experience"), *aff'd*, 259 A.D.2d 360 (1st Dep't 1999); *Gaidon v. Guardian Life Ins. Co. of Am.*, 679 N.Y.S.2d 611, 612 (1st Dep't 1999) ("in light of the express terms of the policies . . ., plaintiffs' claimed reliance on the alleged misrepresentations and illustrations was unreasonable").

(c)     "by increasing the COI rates on bases that are not equitable to all policyholders of a given class," FAC ¶ 68(a) (the "Inequitable Treatment Theory"); and

(d)     "by determining COI rates based on factors not enumerated in the policies," *id.* ¶ 68(c) (the "Unenumerated Factors Theory").

Each of these theories should be dismissed as a matter of law.

## A.     The Procedures and Standards Theory Cannot Sustain a Claim

Plaintiff claims that AXA breached the Policy clause requiring any COI increase to be "determined in accordance with *procedures* and *standards on file, if required, with the insurance supervisory official* of the jurisdiction in which the policy is delivered." FAC ¶ 68(d) (emphasis added); Policy at 16. The original Complaint did not even attempt to identify any "procedures and standards on file" that AXA violated. *See* Dkt. 1 ¶¶ 25, 53(d). The FAC fares no better.[19]

The FAC first attempts to identify as a "file[d]" "procedure" or "standard" the National Association of Insurance Commissioners (NAIC) "model laws on unfair trade practice insurance [sic], which New York and other states have adopted, prohibiting the unfair discrimination between individuals of the same class and equal protection [sic] of life." FAC ¶ 54. But a model law is not a "procedure" or "standard," nor in any relevant sense is it "on file" with an insurance regulator – or "required" to be.[20] *See* Black's Law Dictionary (10th ed. 2014) ("standard" defined as "[a] criterion for measuring acceptability, quality, or accuracy"; "procedure" defined as "[a] specific method or course of action"); *Ment Bros. Iron Works Co. v. Interstate Fire &*

---

[19] The FAC's vague reference to "numerous regulations and standards on file with the applicable state insurance regulators that AXA is required to comply with," FAC ¶ 53, merits no consideration. *See, e.g., Brooks v. AIG SunAmerica Life Assurance Co.*, 480 F.3d 579 (1st Cir. 2007). The *Brooks* plaintiffs alleged that a COI increase violated a policy term requiring compliance with "procedures and standards on file," but did not specify what the violated procedures and standards were, giving rise to a "ruinous pleading defect" because the allegation was "a veritable shot in the dark." *Id.* at 586-87, 591.

[20] To avoid rendering the "if required" phrase meaningless, the clause must refer to "procedures and standards" that insurers are *required* to file, *if any. See, e.g., Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007) ("A reading of the contract should not render any portion meaningless.").

*Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) ("[t]erms in an insurance contract must be given their plain and ordinary meaning" (internal quotation marks omitted)).

Read in context, the Policy language is obviously aimed at ensuring compliance by *AXA* with *its own* procedures and standards relating to changes to policy cost factors to the extent those were required to have been submitted to regulators.[21]  It would be absurd to construe the Policy to require AXA to comply not just with New York's statutes, but with any *unenacted* model law that NAIC might happen to promulgate.[22]

The other straw at which the FAC grasps is AXA's year-end 2014 (hence pre-COI Adjustment) answer to DFS-mandated interrogatories and related actuarial opinions concerning non-guaranteed elements.  FAC ¶ 55.  It is true that AXA answered "no" to the question whether, as of year-end 2014 – before AXA had determined to implement the COI Adjustment – "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience."  *Id.*  This question and answer cannot fairly be described as "procedures and standards."  Plaintiff, moreover, does not begin to explain how the COI Adjustment submitted to DFS in 2015 and implemented in 2016 is inconsistent with, let alone foreclosed by, the 2014

---

[21] This contract language was originally called for by a Circular Letter ("CL") issued by DFS's predecessor, the New York Department of Insurance ("NYSID"), early in the history of UL.  *See* NYSID CL 1983-4, 1983 WL 801581, at *1; *see also* NYSID CL 1980-18, 1980 WL 566567, at *1.  The CL contained guidelines for UL policy forms filed for approval, one of which was that the insurer "state[] in the policy that: (a) adjustments in policy cost factors . . . will be by class and based upon changes in future expectations for such elements as: investment earnings, mortality, persistency and expenses; and (b) *any change in policy cost factors will be determined in accordance with procedures and standards on file with the Insurance Department*."  1983 WL 801581, at *1 (emphasis added).  The CL also required that insurers file an "actuarial memorandum" that, among other things, contained a "description of the conditions, methods and procedures to be used for the adjustment of policy costs."  *Id.* at *2.  In 2001, NYSID repealed the CL.  *See* NYSID CL No. 2001-20, 2001 WL 34906686, at *1.  To the extent any regulators have continued to require or expect a policy form filed for approval (i) to contain the "procedures and standards" language or (ii) to be accompanied by an actuarial memorandum containing "methods and procedures to be used for the adjustment of policy costs," the "procedures and standards" clause in the AULII policy form (developed in 2004) satisfies those demands.  Plaintiff has not alleged that AXA departed from relevant "methods and procedures" in any actuarial memorandum.

[22] *See, e.g.*, *Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) ("In construing insurance policies" under New York law, "'absurd results should be avoided.'").

answer.  *See Turchin*, 2014 WL 2649976, at *4 (dismissing complaint "devoid of any allegations

regarding *how* Defendant[] violated" the relevant contractual provision (emphasis added)).

Here, the Court may apply judicial "common sense," *Iqbal*, 556 U.S. at 679.  AXA's

submission in question is publicly available.  If it contained anything resembling a procedure or

standard that Plaintiff could credibly claim AXA violated, Plaintiff would have pointed to the

language rather than gesturing vaguely at an opaque yes/no question and trying to characterize it

as a procedure or standard.  The Procedures and Standards Theory fails to state a claim.

> **B.      The Unreasonable Founding Assumptions Theory Cannot Sustain a Claim**

Having reviewed AXA's submissions to DFS, Plaintiff does not allege that *any* of the

mortality assumptions that AXA proffered as the "dominant" (FAC ¶ 50) basis for the COI

Adjustment are unreasonable.[23]  Nor does Plaintiff offer a plausible basis for challenging the

reasonableness of AXA's current assumptions as to future investment income.[24]  Instead

Plaintiff's theory that AXA breached "by determining COI rates based on unreasonable

---

[23] Plaintiff challenges the decision to apply the COI Adjustment only to certain classes of policyholders and not others.  Those assertions are addressed below.  Plaintiff also repeats challenges asserted in other COI litigations to the *authenticity* of the insurer's stated rationales.  These challenges are not plausible as to AXA – or even relevant.  As to mortality: The FAC says that "people are living much longer than anticipated when the products were priced and issued," FAC ¶ 40, and includes a stock discussion (*compare id.* ¶¶ 41-46 *with* Compl. ¶¶ 26-31, *37 Besen Parkway LLC v. John Hancock Life Ins. Co. (U.S.A.)*, No. 15 Civ. 09924 (S.D.N.Y. Dec. 21, 2015)) of industry mortality tables that is basically devoid of AXA-specific allegations.  At best Plaintiff alleges that American life spans have long been improving – an elementary fact that Plaintiff cannot seriously allege AXA did not or does not take into account.  (Indeed, if the FAC is taken seriously, an insurer in the modern era could *never* revise initial assumptions in the direction of less favorable mortality.  DFS obviously disagrees.)  The contractual requirement is that the COI Adjustment be "determined based on reasonable assumptions" – *i.e.*, *AXA*'s proprietary assumptions, not those contained in published mortality tables.  Policy at 16.  The relevant questions are: *for this specific group of insureds*, (1) are AXA's current assumptions reasonable, and (2) does the difference between the initial and current assumptions justify the increase?  With access to the same material DFS reviewed, Plaintiff fails to allege, much less plausibly, that any assumption on which the increase was based was not reasonable or, when compared to the assumptions originally used at issuance, does not actually result in a predicted shortfall in future profitability for the Affected Classes.

assumptions," FAC ¶ 68(b), appears to be based mainly on a paragraph in the FAC in which

Plaintiff argues that if AXA's justifications for the COI Adjustment are taken at face value,

> that would only prove that [AXA's] *original assumptions were not reasonable*, which cannot justify the increase. . . . Such a massive change in mortality expectations . . . would imply, at best, that AXA's *original mortality assumptions* were grossly wrong and unreasonable.  *This would result in a breach*: the policies only permit a COI increase based on a change in "reasonable assumptions."

*Id*. ¶ 49 (emphasis added).  Plaintiff asserts, in other words, that AXA breached because its

*original* COI rates were supposedly based on unreasonable assumptions.  *See also id*. ¶ 37 (initial

assumptions "were totally unreasonable *at the time of issuance*" (emphasis added)).

This Unreasonable Founding Assumptions Theory fails as a matter of law.  The Policy

requires that "*[c]hanges* in policy cost factors" be "determined based on reasonable

assumptions."  Policy at 16 (emphasis added).  (The FAC mis-quotes the Policy, which does not

say "that a COI increase [must be] based on *a change in 'reasonable assumptions,'*" FAC ¶ 49.)

The Policy is silent as to the *original* determination of policy cost factors or the reasonableness

of the assumptions underlying them.  *See Ment Bros.*, 702 F.3d at 122 (policy terms must be

given "plain and ordinary meaning").

And this makes sense:  A contractual guarantee as to the reasonability of the *original*

assumptions would open the floodgates to meritless hindsight-based litigation whenever an

insurer's original assumptions are revised.  Plus, even if Plaintiff could (though it cannot) make

out a breach based on the use of allegedly unreasonable assumptions during the 2004-2007

issuance of AULII, and even if Brach were the proper plaintiff to assert such a claim (which is

far from clear), it would be time-barred.  The six-year limitations period begins running at the

breach, *e.g.*, *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 18 N.Y.3d 765, 770 (2012), and

---

[24] Plaintiff simply alleges – referring to *past*, not future, investment income – that "there has been no discernible pattern of changes in AXA's publicly reported 'investment income.'" FAC ¶ 52.  In addition, publicly reported past investment income is across multiple product lines and businesses, not limited to AULII.

there is no "discovery" rule.  *E.g.*, *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 594 (2015).

### C.    The Inequitable Treatment Theory Cannot Sustain a Claim

The Policy states that a COI rate increase will be done "on a basis that is equitable to all policyholders of a given class."  Policy at 16.  Plaintiff cannot and does not seriously dispute that the COI Adjustment applies to all policyholders within the Affected Classes, so Plaintiff tries a different tack:  it seeks to redefine the relevant classes.

Plaintiff argues in essence that AXA was not permitted to apply the increase only to the 70-79 and 80+ age classes with face amount above $1 million, but rather was required to apply the increase to *all* AULII policyholders.  FAC ¶¶ 24-37.[25]  This challenge should be rejected as a matter of law.  It makes sense only if the "given class" has to be all AULII policyholders – a reading that would render the phrase meaningless and therefore must be avoided.  *See* footnote 20, *supra*.  Because line-drawing is permitted *within* the pool of AULII policyholders, there will necessarily be differences as one crosses a class boundary.  DFS specifically acknowledged that the COI Adjustment would apply only to "select issues (issue ages 70 and above with face amounts of $1,000,000 or more)" of AULII, and found this decision by AXA to be un-objectionable.  SJR Decl. Ex. 4.

As a threshold matter, the FAC is simply wrong to argue that AXA's COI rates should "have increased for a broad range of life insurance policies, and not just AULII."  FAC ¶ 35.  Insurers in New York are not required to impose across-the-board increases, either *across*

---

[25] The Court should not be led astray by the proliferation of sub-theories in this portion of the FAC.  Prolixity is not a substitute for plausibility.  Many of the sub-theories are redundant of each other or Plaintiff's other theories of breach.  For instance, the "fourth" and "ninth" sub-theories (FAC ¶¶ 31, 36) are addressed in section II.D. *infra*.  The suggestion ("seventh," FAC ¶ 34) that the increase is unfair to the elderly, because they have more difficulty finding new insurance, is off-point; and in any case, Plaintiff is not an elderly person with standing to level this accusation.  The "tenth" sub-theory (*id.* ¶ 37) second-guesses the assumptions at issuance, an argument addressed in section II.B. *supra*.

product lines, or to all policies *within* a product line.  As NYSID has explained: "The blanket characterization of *all applicants for, and insureds under*, all individual term life insurance policies (or *all such applicants for, and insureds under, all individual permanent life insurance policies*) *offered by an insurer* as a single 'class' is overly broad."[26]  Rather, "[a]n insurer is free to impose any appropriate rules for classifying, selecting, and pricing risks that it believes are required based on sound underwriting practices and in accordance with accepted insurance and actuarial principles[.]"[27]

Plaintiff attempts to allege inequitable treatment by asserting that policies with face amounts of $1 million or more are treated differently from policies with a face amount of $900,000, even for the same issue age.  FAC ¶¶ 26-27, 32.  Plaintiff also alleges that there is not a "smooth increment" in the new COI rates as one moves from a policy with issue age 69 (which is not affected by the increase) to one with issue age 70, and again from 79 to 80.  *Id.* ¶¶ 28-29.  These allegations derive from materials that AXA presented to DFS and produced to Plaintiff.  Even if assumed true, they do not suffice *as a matter of law* to establish that the COI Adjustment was not done on a basis "equitable to all policyholders of a given class."

Plaintiff argues that "AXA cannot reasonably assume that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value."  *Id.* ¶ 32.  AXA makes no such assumption.  This argument, and others of its ilk in the FAC, confuse two different concepts: the establishment of the relevant policy groupings, or classes, and the reasonableness of the mortality assumptions for those classes.  Mortality experience and assumptions for AULII policies with issue age 70+ may, in fact, differ as between face amounts above and below $1

---

[26] N.Y. Dep't of Ins. Op. No. 00-12-05, 2000 WL 34630175, at *4 (Dec. 13, 2000) (emphasis added).

[27] *Id.* at *3.

million.  But whether they do or not is beside the point.  AXA is entitled to define the policy

classes by ten-year issue age groupings *and* face amount.[28]  Within the defined classes, there is

no inequitable treatment.[29]

Ultimately Plaintiff would like either to redefine the policyholder classes in a manner of

its own choosing, or to argue that each and every policyholder should be a class of one.[30]

Neither position is valid.  First, the two classes to which AXA applied the increase are identical

to policy classes used by AXA at the time of original pricing of these policies.  *See* FAC ¶¶ 27-

29 (describing policyholder classes used in original pricing).  Second, AXA is entitled to group

policyholders in any manner *it* chooses as long as the grouping is consistent with actuarial

principles.[31]  AXA did so, and DFS found the groupings unobjectionable.  To treat policyholders

---

[28] Studying policies in separate ten-year age bands and face amount categories (including a $1 million+ band), is common actuarial practice.  *See, e.g.*, Soc'y of Actuaries Rep. of the Indiv. Life Ins. Exper. Comm., *Mortality Under Standard Indiv. Underwritten Life Ins. Between 1995 and 2000 Policy Anniversaries* 7-11, 13, 19, 21 (May 2004), *available at* https://www.soa.org/Files/Research/Exp-Study/1995_2000_Final_ Report.pdf.

[29] Plaintiff argues, with no substantiation, that even within AXA's defined classes, there is inequitable treatment because the COI increase "results in a policy with issue age 70 becoming more profitable than a policy with issue age 79."  FAC ¶ 29.  But the question is not whether all policies within a given class are equally profitable or received the exact same dollar amount of COI increase.  The issue is whether the increase was "equitable" – not equal in dollars – to policyholders within a given class.  The phenomenon Plaintiff describes, even if true, would have been no less so pre-COI increase – and Plaintiff does not (and cannot) allege otherwise.

[30] Yet another of Plaintiff's notions is that the relevant class is the risk classification (*i.e.*, underwriting rating) at issuance.  FAC ¶¶ 33, 37.  The problem with all of Plaintiff's proposed approaches to class – whether it is to focus on all AULII policyholders, underwriting classifications, or something else – is that *they would be inequitable*.  They would have the result of forcing large groupings of policyholders (lower issue ages, lower face amounts, etc.) to bear the costs of an anticipated shortfall that is concentrated in categories to which they do not belong – namely, the Affected Classes.

[31] An actuarially justified class need not be defined in terms of mortality.  Frequently it is not.  For example, an insurer could define as distinct classes policies sold directly and policies sold through agents.  *See* N.Y. Dep't of Ins. Op. No. 02-12-02, 2002 WL 33011225, at *2 (Feb. 12, 2002).  Such a distinction surely has little to do with whether an insured "is likely to die materially sooner."  FAC ¶ 32.  In fact, the statute prohibiting discrimination in life insurance *assumes* that a "class" is defined on some basis *other than* mortality.  *See* N.Y. Ins. Law § 4224(a)(1) (prohibiting "any unfair discrimination between individuals of the same class and of equal expectation of life, in the . . . rates charged for policies of life insurance").  If a class could be defined only with reference to mortality expectation, the statute would not have used the conjunctive phrase "individuals *of the same class and of equal expectation of life*."  *See, e.g.*, *Hassan v. Fraccola*, 851 F.2d 602, 604 (2d Cir. 1988) ("we should interpret the statute to avoid surplusage").

"of a given class" equitably does not require the same treatment *across* classes.  Thus,

differences between 69 and 70 year olds, or 79 and 80 year olds, are permitted, as are differences

between policies with face amount above and below $1 million.  Plaintiff fails to plausibly allege

that the groupings here are not actuarially justified, dooming the Inequitable Treatment Theory.

> ### D.   The Unenumerated Factors Theory Cannot Sustain a Claim

Plaintiff also theorizes that AXA "determin[ed] the COI Adjustment based on factors not

enumerated in the policies."  FAC ¶ 68(c).  To the extent the FAC identifies any such

unenumerated "factor," the FAC asserts only (a) that the COI Adjustment targets policyholders

who are minimally funding their accounts, and (b) that AXA used age and face amount to delimit

the classes to which the COI Adjustment applies.  Plaintiff identifies no other non-enumerated

factor on which the COI Adjustment was supposedly based.

There is no basis for the implausible accusation that the COI Adjustment applies only to

policyholders who are minimally funding their accounts.[32]  The FAC otherwise consistently and

correctly notes that the COI Adjustment applies to *all* members of the Affected Classes and that

"*the group of policies that [AXA] targeted for the increase* – those which have both issue ages 70

and above and current face value amount of $1 million and above – *includes many individuals*

*who did not minimally fund*."  FAC ¶ 36 (emphasis added).  The Affected Classes are defined by

issue age and face amount, not funding levels.  *E.g.*, *id*. ¶ 21; SJR Decl. Ex. 3 at 2.  Where, as

here, an allegation is contradicted by the rest of the FAC and documents referenced in it, it must

---

[32] *See* FAC ¶ 6 (COI Adjustment "singles out and punishes . . . those who exercise their rights to minimally fund the policies"), ¶ 36 (COI Adjustment "targets policyholders who exercised their contractually permissible right to minimally fund"), ¶ 51 ("No reasonable policyholder would expect . . . that the exercise of his or her contractual right to fund however he or she pleases would somehow result in a rate increase for that specific policyholder.").

be dismissed as implausible.  *E.g.*, *Priestley v. Headminder, Inc.*, 647 F.3d 497, 506 (2d Cir. 2011); *Sanofi*, 816 F.3d at 206 n.6.[33]

Plaintiff also suggests that the application of the COI Adjustment to only the Affected Classes is impermissible because "the policies do not list issue age or face amount as a factor that can be considered in raising COI rates."  FAC ¶ 31.  This garbled assertion once again confuses (1) the parameters used to delineate a class with (2) the types of assumptions that can be the basis for an increase.  The "given classes" here are *defined* in terms of issue age and face amount; the increase itself is *based* on changes to AXA's assumptions about certain enumerated factors (mortality, investment income) as they apply to the Affected Classes.

Plaintiff's reading violates the rule against absurdity.  *See* footnote 22, *supra*.  Were it accepted, *no* COI increase could ever be permissible because there will always be some limitation or definition not "enumerated" in the Policies.  For example, by Plaintiff's lights, AXA could never apply a COI increase only to smokers, or only to males (since sex and smoker status are not enumerated factors) – even though sex and smoker status (like issue age and face

---

[33] To the extent that Plaintiff alleges that the COI Adjustment was not *solely* applicable to policyholders who minimally fund, but rather *motivated by* lowered funding levels in the Affected Classes *as a whole*, that too fails to state a claim.  As another court in this District concluded, an insurer in AXA's position is allowed to consider how funding levels vary in different classes of policies.  *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456 (S.D.N.Y. 2014).  (AXA does not concede that it did so.)  The returns that an insurer realizes on investments – its investment earnings, or income, which is an enumerated basis in the Policy for a COI adjustment – are naturally a function of (1) the quantity of funds invested, and (2) the rate of return on those investments.  *See, e.g., id.* at 476.  If there is a decrease, or expected decrease, in either of these variables, an insurer may reasonably expect investment income to decrease.  The amount of funds available to invest is a function of the premiums paid in to Policy Accounts, which insurance companies themselves invest.  *See, e.g., id.* at 475-76.  If the Policy Accounts are well funded, the insurer will have more money available to invest, and thus greater investment returns.  Plaintiff's suggestion that investment returns are "entirely unrelated to the funding decisions or premium payment patterns of . . . even a subset of policyholders," FAC ¶ 51; *see also id.* ¶ 32 (same allegation), therefore makes no sense.  *Fleisher* observed that "[a]s a matter of simple logic, . . . one would expect Phoenix to take Policy Values into account when predicting future investment earnings."  18 F. Supp. 3d at 476-77.  It follows that even if AXA did as Plaintiff alleges and "t[ook] Policy [Account] Values into account in its calculation of its 'expectations of . . . investment earnings,' [AXA] did not rely on impermissible factors; Policy [Account] Values are a logical thing to consider when predicting expected investment earnings."  *Id.* at 479.

amount bands) are well-known actuarially accepted classifications.[34]  As these examples show, the parameters used to define a class need not be among the enumerated bases for a COI increase.  The Unenumerated Factors Theory should be dismissed.

## CONCLUSION[35]

For the foregoing reasons, AXA respectfully requests that this Court dismiss the First Amended Complaint with prejudice.

Dated: May 27, 2016

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ David R. Gelfand
  David R. Gelfand
  Stacey J. Rappaport
  Daniel R. Walfish
  28 Liberty Street
  New York, NY 10005
  (212) 530-5000

  *Attorneys for Defendant*

---

[34] Plaintiff does not seriously believe this.  Elsewhere it asserts that AXA should have taken risk classification into account in apportioning the increase.  FAC ¶¶ 33, 37.  Risk classification is not an enumerated factor.

[35] The FAC half-heartedly recites that "[i]n the event that any breach alleged herein is not explicitly covered by the terms of the contract, AXA has breached the covenant of good faith and fair dealing by the conduct alleged . . . above."  FAC ¶ 69.  This does not state a claim.  Even if Plaintiff purports "to be pleading the implied-covenant and contract claims in the alternative, the former 'are not in the alternative when they are based on the exact same allegations' as the latter, as they are here."  *Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, 2015 WL 1809001, at *4 (S.D.N.Y. Apr. 20, 2015) (Furman, J.).  Under New York law, implied covenant claims are routinely dismissed as redundant of an express contract claim.  *See, e.g.*, *Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013); *Jordan v. Verizon Corp.*, 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 1998).  In particular, "'[a]n implied-covenant claim can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim and the relief sought is not intrinsically tied to the damages allegedly resulting from the breach of contract.'"  2015 WL 1809001, at *10 (citation omitted).  Here, *no* distinct conduct is alleged, *see* FAC ¶ 69 ("AXA has breached the covenant of good faith and fair dealing *by the conduct alleged in sections B(i)-(iii)* above," *i.e.*, the contract allegations), nor has Plaintiff even tried to identify any separate damages that would flow from an implied-covenant breach.  *See id.* ¶ 71.  Furthermore, Plaintiff's attempted reservation of the theory for the eventuality that "any *breach* alleged herein is not *explicitly covered by the terms of the contract*," *id.* ¶ 69, merely invites unwarranted speculation as to what allegations might or might not constitute a "breach."