**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRACH FAMILY FOUNDATION, INC., on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> AXA EQUITABLE LIFE INSURANCE COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 16-cv-740 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Seth Ard
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330
Fax:
sard@susmangodfrey.com

Steven G. Sklaver (*pro hac vice*)
Frances S. Lewis
Rohit D. Nath (*pro hac vice*)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Tel: 310-789-3100
Fax: 310-789-3150
ssklaver@susmangodfrey.com
flewis@susmangodfrey.com
rnath@susmangodfrey.com

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... ii

BACKGROUND .......................................................................................................... 3

STANDARD OF REVIEW ........................................................................................ 4

ARGUMENT ................................................................................................................ 5

I.      Plaintiff states a plausible claim for breach of contract ................................ 5

     A.      The COI increase is inequitable to all policyholders of a given class .................. 6

          i.      AXA's definition of "class" should be rejected.......................................... 7

          ii.     The COI increase is plausibly inequitable under any definition of class.... 9

     B.      The COI increase was plausibly not based on any enumerated factors ............... 12

          i.      The COI increase was not based on mortality or investment earnings..... 12

          ii.     AXA unlawfully targeted minimally funded policies............................... 14

     C.      AXA had no change in *reasonable* assumptions if its justification are accepted. 15

     D.      AXA's construction of "procedures and standards on file" should be rejected ... 17

II.     Plaintiff has standing and adequately alleges a violation of § 4226 ................................. 18

     A.      The FAC establishes every element of standing................................................... 19

     B.      Plaintiff adequately alleges a claim for relief under § 4226 ................................ 22

          i.      Rule 9(b) does not apply to claims under § 4226 ..................................... 22

          ii.     AXA's false statements............................................................................. 23

          iii.    AXA knowingly made false statements.................................................... 24

          iv.     The FAC adequately alleges that Plaintiff is a "person aggrieved".......... 25

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
  404 F.3d 566 (2d Cir. 2005) ...................................................................................... 18

*Baur v. Veneman*,
  352 F.3d 625 (2d Cir. 2003) ...................................................................................... 21

*Beller v. William Penn Life Ins. Co. of N.Y.*,
  8 A.D.3d 310 (N.Y. App. Div. 2004) ........................................................................ 2

*Brooks v. AIG SunAmerica Assurance Company*,
  480 F.3d 579 (1st Cir. 2007) ..................................................................................... 17

*Bruce v. U.S. Dep't of Justice*,
  314 F.3d 71 (2d Cir. 2002) ........................................................................................ 13

*Calcutti v. SBU, Inc.*,
  273 F. Supp. 2d 488 (S.D.N.Y. 2003) ........................................................................ 5

*Carter v. HealthPort Techs., LLC*,
  __ F.3d __, 2016 WL 2640989 (2d Cir. 2016) ......................................................... 19

*Cilente v. Phoenix Life Ins.*,
  2014 WL 70336 (N.Y. Sup. Ct. 2014) ................................................................. 22, 25

*Decker v Massey-Ferguson Ltd.*,
  681 F.2d 111 (2d Cir. 1981) ...................................................................................... 24

*Farberware, Inc. v. Groben*,
  764 F. Supp. 296 (S.D.N.Y. 1991) ............................................................................ 23

*Fisher v. Mandell, LLP v. Citibank, N.A.*,
  632 F.3d 793 (2d Cir. 2011) ........................................................................................ 5

*Fleisher v. Phoenix Life Ins. Co.*,
  18 F. Supp. 3d 456 (S.D.N.Y. 2014) ................................................................. passim

*Fogg v. Morris Plan Ins. Soc'y*,
  115 Misc. 491 (Sup. Ct. App. T. 1st Dep't 1921) ..................................................... 11

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013) ........................................................................................ 4

*Gaidon v. Guardian Life Ins. Co. of Am.*,
  94 N.Y.2d 330 (Ct. App. 1999) ................................................................................ 23

*IHS Acquisition XV, Inc. v. Kings Harbor Care Ctr.*,
  98-cv-7621, 1999 WL 223152, at *2 (S.D.N.Y. Apr. 16, 1999) ................................................. 4

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ..................................................................................... 21

*In re RadPro SecurPass Scanner Cases*,
  No. 13-CV-6095 CS, 2014 WL 4054310 (S.D.N.Y. Aug. 13, 2014) ........................................ 4

*John P. Villano Inc. v. CBS, Inc.*,
  176 F.R.D. 130 (S.D.N.Y. 1997) .............................................................................................. 22

*Kern v. John Hancock Mut. Life Ins. Co.*,
  186 N.Y.S.2d 992 (1st Dep't 1959) .......................................................................................... 11

*Kramer v. Time Warner*,
  937 F.2d 767 (2d Cir. 1991) ...................................................................................................... 5

*Leberman v. John Blair & Co.*,
  880 F.2d 1555 (2d Cir. 1989) .................................................................................................. 16

*Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ........................................................................................... 5, 9, 17

*Metro. Life Ins. Co. v. Trilling*,
  194 A.D. 178 (1st Dep't 1920) ................................................................................................ 11

*MIC Gen. Ins. Co. v. Chambers*,
  Case No. 15-CV-3324 (JMF), 2016 WL 3198307 (S.D.N.Y. June 8, 2016) ....................... 1, 5

N.Y. Dep't of Ins. Op. No. 00-12-05,
  2000 WL 34630175, at *4 (Dec. 13, 2000) .............................................................................. 7

N.Y. Dep't of Ins. Op. No. 02-12-02,
  2002 WL 33011225, at *2 (Feb. 12, 2002) ............................................................................... 8

N.Y. Dep't of Ins. Op. No. 7-2-03,
  2003 WL 24312445 (July 2, 2003) ........................................................................................... 7

N.Y. Gen. Counsel Op. No. 6-29-2001 (#2),
  2001 WL 34906716, at *3 (June 29, 2011) ............................................................................. 16

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012) .................................................................................................... 20

*Paskar v. City of New York*,
  3 F. Supp. 3d 129 (S.D.N.Y. 2014) .......................................................................................... 4

*Polycast Tech. Corp. v. Uniroyal, Inc.*,
    728 F. Supp. 926 (S.D.N.Y. 1989) ............................................................. 24, 25

*Ross v. AXA Equitable Life Insurance Company*,
    115 F. Supp. 3d 424 (S.D.N.Y. 2015) ........................................................ 20, 21

*Russo v. Massachusetts Mut. Life Ins. Co.*,
    274 A.D.2d 878, 711 N.Y.S.2d 254 (2000) ...................................................... 22

*Salem v. Seigel*,
    126 N.Y.S.2d 214 (Sup. Ct. 1953) ............................................................. 13, 14

*Spagnola v. Chubb Corp.*,
    574 F.3d 64 (2d Cir. 2009) ....................................................................... 2, 3

*Spokeo, Inc. v Robins*,
    136 S. Ct. 1540 (2016) ................................................................................ 19

*Trevathan v. Select Portfolio Serv'g, Inc.*,
    2015 WL 6913144 (S.D. Fla. 2015) ................................................................ 4

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*,
    112 F. Supp. 3d 122 (S.D.N.Y. 2015) ........................................................ 12, 15

*U.S. Bank Nat. Ass'n as securities intermediary v. PHL Variable Ins. Co.*,
    2015 WL 4610894 (S.D.N.Y. July 30, 2015) .................................................... 16

*Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*,
    994 F. Supp. 202 (S.D.N.Y. 1998) ................................................................ 20

**Statutes**

N.Y. Ins. Law § 4224 ................................................................................ 7, 11

N.Y. Ins. Law § 4226 ............................................................................. passim

N.Y. Ins. Law § 89 .................................................................................... 11

New York Insurance Law § 4226 .................................................................... 25

**Rules**

FRCP 15 ................................................................................................. 17

**Regulations**

11 NY-CRR 1.5 ......................................................................................... 23

11 NY-CRR 53-3.2 ..................................................................................... 23

Plaintiff owns a life insurance contract issued by Defendant AXA Equitable Life Insurance Company ("AXA") on a standard form called Athena Universal Life II ("AUL II"). That contract expressly provides when and how AXA is authorized to raise the cost of insurance ("COI"), which is a major component of a policyholder's premium that the company gets to keep for itself. The contractual limitations include requiring any increase to be "on a basis that is *equitable* to all policyholders of a *given class*" and determined "based on *reasonable assumptions*" as to certain enumerated factors, of which only mortality and investment income are at issue, and in accordance with certain "*procedures and standards* on file." In 2016, AXA imposed an extraordinary COI increase, but only on a *subset* of AUL II customers: those unlucky enough to own policies with issue ages 70+ and face value $1+ million. The First Amended Complaint ("FAC") alleges in detail – based on actuarial science, standards of actuarial practice, mortality data and experience, surveys, implementation details (e.g., step-up v. interpolation), regulatory filings, and risk classifications – why AXA's COI increase breached the terms of the contract.

But rather than accept these allegations as true, AXA ignores, mischaracterizes, or disputes many of the allegations, and then jumps straight to a merits debate, asking the Court to adopt AXA's construction of the insurance terms "equitable," "given class," "reasonable assumptions," and "procedures and standards on file," even though resolution of those disputed issues cannot be resolved on a motion to dismiss, and certainly not in favor of the carrier that drafted this contract of adhesion. *See, e.g., MIC Gen. Ins. Co. v. Chambers*, Case No. 15-CV-3324 (JMF), 2016 WL 3198307, at *3 (S.D.N.Y. June 8, 2016) (Furman, J.) (denying summary judgment).[1] AXA also repeatedly references and seeks judicial notice of a 1-page letter from the

---

[1] "If a term is ambiguous, the general rule is that ambiguities in an insurance policy must be construed in favor of the insured. By contrast, a construction favorable to the insurer will be sustained only if it is the sole construction which may fairly be placed on the words used." *MIC Gen. Ins. Co.*, 2016 WL 3198307, at *3 (quotations, citations, and alterations omitted).

1

New York Department of Financial Services (NYDFS) that states that the COI increase was "unobjectionable." What AXA completely fails to do, however, is cite a single case or reason that establishes that this letter is a *defense* to a breach-of-contract claim.  For good reason – as AXA knows, from the very case it cites in its motion, the "unobjectionable" remark is not even a defense on the *merits on summary judgment*, and likewise does nothing to support its *Twombly* arguments.  *See Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 467 (S.D.N.Y. 2014).[2] While AXA's initial motion to dismiss cited this letter in support of a filed-rate doctrine defense, Dkt. No. 19 at 21, AXA completely omitted any reference to that defense in this motion in the face of the robust allegations in the FAC.

The FAC also alleges, in the alternative, that if AXA's justification for the COI increase is to be believed and it really did experience a $500 million profit shortfall due to declining mortality and investment experience, then AXA lied about its financial condition and the benefits of AUL II, which is a clear-cut violation of New York Insurance Law § 4226. While AXA claims Plaintiff, a COI increase victim, suffered no injury and thus has no Article III standing to allege such a claim, the FAC clearly alleges otherwise.  *See, e.g.,* FAC ¶ 78 (had false statements not been made, policy purchase price would have been "much less"; misrepresentations "destroyed" the "marketability" of the policy and its "value" has "substantially diminished"). AXA's motion to dismiss should be denied in its entirety.

---

[2] Judge McMahon denied the insurer's motion for summary judgment on the breach-of-contract claim on this same theory, reasoning that: "The NYSID agent's brief email stating that it had 'no objection' to the 2011 COI Rate Adjustment (which the agency was not statutorily required to approve) is not equivalent to the agency engaging in a thorough, public, and legally-required evaluation of a policy form or premium rate." *Fleisher*, 18 F. Supp. 3d at 467.  *See also Beller v. William Penn Life Ins. Co. of N.Y.*, 8 A.D.3d 310, 313 (N.Y. App. Div. 2004) (reversing application of filed-rate doctrine because it did not apply to breach-of-contract claim where insurer allegedly raised COI rates in violation of policy terms); *Spagnola v. Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2009) (reversing dismissal of breach-of-contract claim against insurer, citing *Beller* for proposition that an "insurer's customary filed rates do not insulate insurer from contract claim" regarding increases to those rates).

## BACKGROUND

AUL II policies are universal life policies, the central feature of which is a flexible premium. FAC ¶ 2. For these policies, premiums paid in excess of minimum charges are credited towards the policy account value – essentially a savings account – which earns interest. The policies are marketed as a flexible-premium policy because a policyholder may keep her policy account value at zero, freeing her to put capital toward higher-yield investments. *Id.* ¶¶ 15-17. The COI charge is deducted directly from the policy account and belongs entirely to the insurance company. The size of the COI charge is highly significant to universal life policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the policyholder forfeits the COI charge entirely to AXA and the policyholder earns no interest on it. *Id.* ¶ 17. Given the importance of COI charges, each policy in this product line includes identical language placing three separate restrictions on when and how AXA can increase COI rates:

> Changes in policy cost factors [including COI rates] will be on a basis that is **equitable to all policy holders of a given class**, and will be determined **based on reasonable assumptions** as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse. . . . Any change in policy cost factors will be determined in accordance with **procedures and standards on file**, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered

*Id.* ¶19. The terms of all AUL II policies are identical, and prospective policyholders cannot negotiate over the policy's terms. *Id.* ¶ 20.

In February 2015, AXA represented in public filings that it had not experienced any differences in its mortality or investment experience than originally anticipated. *Id.* ¶¶ 9, 48. But 7 months later, in October 2015, AXA suddenly announced that it was raising COI rates as much as 70%, but only on AUL II policies with issue ages 70+ and with face values of $1+ million, which accounts for about 1,700 policies. *Id.* ¶ 21. AXA has publicly stated that the increase is

based on only two factors: changes in mortality and investment income experience. *Id.* ¶ 22.

Plaintiff Brach Family Foundation is a not-for-profit corporation and an owner of an AUL II policy that was subject to the unlawful COI increase.[3] The insured was aged 81 at issuance and the policy has a $20 million face value. The policy remains in force. *Id.* ¶ 10.

## STANDARD OF REVIEW

**Rule 12(b)(6).**        In ruling on a motion to dismiss, the Court must limit its analysis to the "four corners" of the complaint. *IHS Acquisition XV, Inc. v. Kings Harbor Care Ctr.*, 98-cv-7621, 1999 WL 223152, at *2 (S.D.N.Y. Apr. 16, 1999). To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137-38 (2d Cir. 2013).

**Judicial Notice & The *Sub Silentio* Filed-Rate Doctrine.**        AXA asks the Court to take judicial notice of the truth of the matters contained in a 1-page letter it received from the NYDFS absent any context, the contents of which are nowhere referenced in the FAC.[4] AXA then wrongly asks the Court to view that evidence in the light most favorable to AXA, contending that the evidence means, as a matter of law, that the regulator "vetted" the increase, reached a conclusion "[a]fter review and discussion of the materials," and "would have pointed out" if the increase breached the contract. MTD at 1, 3, 7. Because this document is outside the

---

[3] AXA repeatedly suggests that the Brach Family Foundation purchased the policy at issue "[h]oping to profit from the death of an elderly woman." MTD at 7. There is no support for this accusation in the FAC.

[4] AXA is wrong to contend that the NYDFS letter is subject to judicial notice. *See, e.g., In re RadPro SecurPass Scanner Cases*, No. 13-CV-6095 CS, 2014 WL 4054310, at *3 (S.D.N.Y. Aug. 13, 2014) (taking judicial notice of public documents but declining to take judicial notice of a brochure that was not a matter of public record). The NYDFS letter is anything but a matter of public record; all communications between AXA and NYDFS about the COI increase were confidential, and AXA has fought tooth and nail to keep it that way. *See* Dkt. No. 29, Ex. A at *1-3 (AXA's letter motion to seal FAC). Every case AXA cites involve either clearly public communications, *see, e.g., Paskar v. City of New York*, 3 F. Supp. 3d 129, 134 (S.D.N.Y. 2014) (judicial notice of EPA regulations and an EPA manual available online), or communications which are probably public but about which the court does not specify, *see, e.g., Trevathan v. Select Portfolio Serv'g, Inc.*, 2015 WL 6913144, *3 (S.D. Fla. 2015) (judicial notice of insurance rates properly filed with Florida insurance regulator).

pleadings, the Court cannot consider it for the truth of the matter on a motion to dismiss. *Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice permitted to note the "existence of the [communications], not the truth of the facts asserted in the opinion."). This means that the letter may not be used to determine whether Plaintiff adequately pleaded that AXA breached its contractual obligations, as "[s]uch a submission to prove [a] substantive issue before the Court is inappropriate on a motion to dismiss." *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498-99 (S.D.N.Y. 2003). The Court should ignore AXA's attempt to sneak its legally deficient filed-rate defense into the motion under a different (indeed, no) label.

## ARGUMENT

### I.      Plaintiff states a plausible claim for breach of contract

To state a claim for breach of contract, a plaintiff must allege [1] an agreement, [2] adequate performance by the plaintiff, [3] breach by the defendant, and [4] damages. *See Fisher v. Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011). "Unless for some reason an ambiguity must be construed against the plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) (reversing Rule 12(b)(6) dismissal of contract claim). As this Court recently explained on summary judgment:

> In resolving disagreements regarding the terms of an insurance policy, New York courts determine as a threshold matter whether the contested term or provision is ambiguous. A term is considered ambiguous under New York law if there is a reasonable basis for a difference of opinion as to the meaning of the policy. If a term is ambiguous, the general rule is that ambiguities in an insurance policy must be construed in favor of the insured. By contrast, a construction favorable to the insurer will be sustained only if it is the only construction which may fairly be placed on the words used.

*MIC Gen. Ins. Co. v. Chambers*, Case No. 15-CV-3324 (JMF), 2016 WL 3198307, at *3 (S.D.N.Y. June 8, 2016) (Furman, J.) (citations, quotation marks, and alterations omitted).

AXA challenges only the element of breach, but does so by wrongly citing to extrinsic evidence not referenced in the FAC and by contradicting, ignoring, or spinning in the light most favorable to AXA the allegations of the FAC.

### A.  The COI increase is inequitable to all policyholders of a given class

The FAC alleges in detail that the increase is not "equitable to all policy holders of a given class." FAC ¶¶ 24-37. It alleges that by targeting a *subset* of all AUL II policies, the COI increase is unfair, arbitrary, punitive, and has no actuarially sound basis. *Id.* ¶¶ 3, 6, 26, 34. The FAC further alleges that even *within* the subset of policy owners subjected to the rate hike, the increase is also inequitable. *Id.* ¶¶ 29, 30, 33, 37. The FAC specifies that the COI increase is not equitable due to AXA's mortality assumptions and experience, *id.* ¶¶ 27-29; investment experience, *id.* ¶¶ 26-27, 30, 32; actuarial standards of practice (ASOP), *id.* ¶ 35; the mechanism for implementation (via sudden steps at certain ages, rather than gradual), *id.* ¶¶ 26-29, 32; the fact that it targets policies based on issue age and face amount, *id.* ¶ 31; the increase's disparate application within and amongst risk-class groups, *id.* ¶¶ 33, 39; and the fact that it targets and punishes the elderly and minimal-funders, *id.* ¶¶ 34, 36. The magnitude of the COI increase is also extraordinary and has no relationship to and cannot be supported by any actuarial or economic experience or data. *Id.* ¶¶ 1, 4, 8, 38.

AXA nevertheless argues that the increase was "equitable" within a "given class," *by definition*, because AXA should be permitted to *redefine* the term "given class" from what it meant at issuance (in 2004-07) to mean something new now (in 2016): namely, the class now equals only those hit by the increase. This proposed construction is wrong, and cannot be resolved in AXA's favor on the pleadings. The FAC also alleges that the COI increase is not equitable even under AXA's proposed, new definition.

### i.   AXA's definition of "class" should be rejected

Without once mentioning the legal standards governing construction of a contract on a motion to dismiss, AXA asks the Court to construe the term "given class" in its favor. The FAC pleads that the "given class" includes those hit by the increase and those not hit by the increase, and no distinction was made between these groups at the time of initial pricing. FAC ¶¶ 26-29, 32. AXA disagrees, and argues that "given class" means whatever subset of AUL II policyholders that AXA decides, years after the contracts were issued, to target for a COI increase. Not only do AXA's authorities undermine its position, but the fact that AXA needs to resort to extrinsic evidence demonstrates why this issue cannot be resolved on the pleadings.

To support its definition, AXA points to General Counsel opinions from NYDFS to support its definition of "given class." But these opinions rebut AXA's claim that the "given class" can be redefined at AXA's will. AXA says that the FAC "makes sense only if the 'given class'" is "all AULII policyholders." MTD at 20. Even if this were true – it is not – the NYDFS line of authority that AXA relies upon has taken *the exact position that AXA criticizes*. *See* N.Y. Dep't of Ins. Op. No. 7-2-03, 2003 WL 24312445, at *1 (July 2, 2003) *B]ecause all insureds who are* covered under the same product co*nstitute a class*, they must be treated alike." (emphasis added)). Another NYDFS opinion cited by AXA states that "a 'class' may appropriately be all applicants for, and insureds under, *a particular policy*" – i.e., a product line such as AULII. *See* N.Y. Dep't of Ins. Op. No. 00-12-05, 2000 WL 34630175, at *4 (Dec. 13, 2000) (emphasis added).[5] AXA's definition of "class" is also contradicted by other uses of

---

[5] These opinions interpret "class" as the phrase is used in N.Y. Ins. Law § 4224(a)(2), which bars a life insurance company from "unfair[ly] discriminat[ing] between individuals of the same class and expectation of life." As mentioned, AXA cites a 1-page letter from one employee at NYDFS, which is outside the pleadings and irrelevant. Even if it were considered, that letter did not address whether the increase was equitable, so there was no occasion for its author to consider the definition of "class."

"class" in the policy. *See, e.g.*, Policy at 3 ("RATING CLASS: STANDARD"). But most importantly, the fact that extrinsic evidence serves as the primary basis for AXA's disputed interpretation of "given class" goes to show why dismissal on the pleadings should be denied.

AXA argues in a conclusory fashion that defining "class" to equate to a whole product line renders the term "class" meaningless. Not true. Because the term "class" is used in policies *across* product lines, equating "class" with "product line" allows AXA to treat different product lines differently. *See, e.g.*, Case No. 14-cv-2904 (JMF), Dkt. No. 122-4 at 17 (May, 5, 2015 filing) (copy of non-AUL II policy, which requires COI rate changes to be "equitable to all policyholders of a given class"). This is the exact same distinction made by the 2000 NYDFS opinion AXA cites.[6] Indeed, it is AXA's nonsensical position that it can *redraw* class lines when it imposes a COI increase – and thus *change the meaning of the term "given class"* years later – that renders the phrase "given class" malleable and essentially meaningless. The COI increase at issue here is a case-in-point: the FAC alleges that the group of issue age 70+ and face value $1+ million was *not* priced as a "given class" when the policies issued.[7] FAC ¶¶ 27-29. After implementing the COI increase, AXA now says that it *redefined* the class to include only policies

---

[6] AXA references another NYDFS opinion for the purported proposition that an "insurer could define as distinct classes policies sold directly and policies sold through agents," citing N.Y. Dep't of Ins. Op. No. 02-12-02, 2002 WL 33011225, at *2 (Feb. 12, 2002). This is taken out of context. There, the NYDFS blessed an insurance company's decision to offer different payment options to *different product lines*: "A life insurer is free to set its own appropriate underwriting standards . . . which may or may not include different underwriting standards *for different products*, . . . as long as such underwriting standards have a factual and rational basis, are grounded in generally accepted insurance and actuarial principles, and are not contrary to law." This provides no support for AXA's argument that it may discriminate *within a single product line* or for its contention that it may upend the class definitions it set at initial pricing. And although AXA contends that the NYDFS documents were "produced to Plaintiff," MTD at 21, AXA fails to mention that the production was made only two business days before the deadline to file the FAC, even though AXA had the documents in its possession for months.

[7] The motion to dismiss blatantly mischaracterizes the FAC when it cites the FAC for the proposition that "the two classes to which AXA applied the increase are identical to policy classes used by AXA at the time of original pricing of these policies." MTD at 22 (citing FAC ¶¶ 27-29). The FAC says the opposite: "AUL II policies with face amounts [under $1 million] were given the same initial pricing assumptions by AXA as policies with face amounts of $1 million or more"; "AXA's mortality rate assumptions scaled progressively by age so that mortality assumptions for a policy with issue age 70 were slightly higher than a policy with issue age 69." FAC ¶¶ 27-28.

hit by the COI rate hike. AXA then argues that through this linguistic maneuver, its decision to implement the increase is immune from attack because, by definition, the victimized group constitutes the new class. MTD at 3. There is nothing to support AXA's theory that it can *change* its class definitions after policies have been priced and issued, which is an absurd result and runs counter to the reasonable expectations of the parties. FAC ¶ 31.

The disputed construction of the insurance term "class" on summary judgment in *Fleisher*, which AXA cites, *see* MTD at 24 n.33, is instructive. In *Fleisher*, owners of life insurance policies sued Phoenix Life Insurance Company over COI increases. As in this case, Phoenix imposed the COI increase only on a subset of policyholders, based on their age and face amount. *Id.* at 465. The policies in *Fleisher* stated that rate adjustments will be made "on a basis that does not unfairly discriminate within any *class* of insureds." *Id.* at 479 (emphasis added). The parties in that case produced competing expert reports on what this provision meant. Citing evidence, Plaintiffs' expert said that the term "class" is determined at issuance and encompasses all policies within a single product line, but defendant's expert disagreed. *See Fleisher,* 18 F. Supp. 3d at 481. Plaintiffs' expert also said that age and face amount were not appropriate criteria for targeting certain policyholders, and defendant's expert again disagreed. *Id.* Even with the aid of expert reports and extensive discovery, the Court concluded that there was a triable issue regarding these issues, *id.* at 481-82. At best, however, the terms at issue are ambiguous and cannot be resolved against Plaintiff on a motion to dismiss.

### ii.    The COI increase is plausibly inequitable under any definition of class

No matter which definition of class is adopted, this is not a close *Twombly* case. **First**, even using AXA's definition of class, the pleading is plainly sufficient. AXA concedes that any classification of policyholders must be "consistent with actuarial principles." MTD at 22. But whether AXA's classification is "consistent with actuarial principles" is plainly a disputed fact

issue, and the FAC alleges that the COI increase violates actuarial principles. *See, e.g.,* FAC ¶ 32 ("the criteria AXA used for determining whom to saddle with an enormous COI increase . . . do not coincide with any actuarially acceptable reasons . . ."); *id.* ¶¶ 26-29. Mortality and investment income experience do not meaningfully differ between issue age 70 and 69 or between face value $1 million and $900,000. *Id.* To the contrary, actuarial studies indicate **lower** mortality rates for larger face policies (¶ 27), and "investment income" cannot warrant a disparate increase for different policyholders (¶ 32). Before the increase, pricing between the targeted policies and those just outside differed only slightly; after the increase, they differ dramatically, a fact that is also inconsistent with actuarial principles. *Id.* at ¶¶ 28-29. In the *Phoenix* litigation, the parties submitted competing expert reports on this issue, and the Court held on *summary judgment* that the jury would decide "whether it is appropriate under actuarial standards to classify insureds based on their age and face amounts" when adjusting COI rates. *Fleisher*, 18 F. Supp. 3d at 481. This cannot be adjudicated in AXA's favor on the pleadings.

The increase is also inequitable *within* the group of COI hike victims that AXA says is the "class." FAC ¶ 29. AXA recognizes that an increase is "inequitable" if it forces some policyholders to "bear the costs of an anticipated shortfall that is concentrated in categories to which they do not belong." MTD 22 n. 30. The FAC similarly alleges that the increase is not distributed equitably in a way that tracks actuarial differences within the group of rate-hike victims. FAC ¶ 29. For example, AXA's rate hike imposed a sharp step-up at age 80 (and age 70). *Id.* After the increase, someone like the Plaintiff, whose policy had issue age 81, is paying significantly higher COI rates than someone who is 79, even though the difference in actuarial risk between them is insufficient to justify those sharp differences. *Id.* This is a dramatic departure from AXA's original pricing, where AXA priced smooth rate increments at all ages.

*Id.*[8] AXA's only response to this is to say in a footnote that this differential treatment is "equitable," but it does not explain why, other than to flatly contradict the FAC. MTD at 22 n.29.

New York courts interpreting New York's anti-discrimination statute consistently hold that it prohibits different treatment of insureds with similar risk, which is what AXA did here even *within* AXA's newly defined class. *See*, *e.g.*, *Metro. Life Ins. Co. v. Trilling*, 194 A.D. 178, 182 (1st Dep't 1920) (New York anti-discrimination statute would be violated if insured were permitted to pay a lower premium than other insureds of the same age).[9] An increase that would be unfairly discriminatory by statute is *a fortiori* not "equitable" within the meaning of the policy. Any ambiguity on this point must also be resolved against AXA.

**_Second_**, if AXA's improper definition of class is rejected, the FAC's inequitable theory is clearly sufficient and AXA does not seriously contest this. For example, in response to the allegation that there is no actuarial basis to discriminate between policies with issue age 69 and 70 or between policies with face amount $900,000 and $1 million, ¶ 26, AXA says that there "may" be an actuarial basis to do so, but that whether that is so "is beside the point" because such policies are in different "defined classes." MTD at 21-22. But if AXA's improper definition of class is not adopted, AXA has no basis to support dismissal of the breach of contract claim.

**_Third_**, AXA has no response to the allegation that the increase requires owners of policies with insureds rated Standard (like Plaintiff) "to subsidize any possible profit shortfall

---

[8] Citing an article outside the pleadings, MTD 22 n. 28, AXA argues that it may classify groups by 10-year bands. But AXA's increase is *still* inequitable within those bands. That is, the step-up increases resulted in a disproportionally high increase on a policy with issue age 70 (or 81) as compared to a policy with issue age 79 (or 89), without any actuarial difference that would justify that treatment. FAC ¶ 29.

[9] *See also Kern v. John Hancock Mut. Life Ins. Co.*, 186 N.Y.S.2d 992, 999 (1st Dep't 1959) (mutual company's denial of dividend to trustees holding insurance policies that renewed monthly for four months violated state anti-discrimination statute, stating "[o]therwise, the net premiums paid by them would far exceed the monthly premiums paid by others with similar claims experience for comparable group coverage"); *Fogg v. Morris Plan Ins. Soc'y*, 115 Misc. 491, 497 (Sup. Ct. App. T. 1st Dep't 1921) (premium charges violated state antidiscrimination statute where charges were based on a one-year term but policy was delivered only 259 days prior to expiration) (applying N.Y. Ins. Law § 89, the predecessor to N.Y. Ins. Law § 4224).

AXA claims to be experiencing from preferred non-smokers, which is inequitable." FAC ¶ 37.
Nor can AXA refute the allegation that its increase treats policies in the same risk classes
inequitably by imposing the increase on a Standard policy with issue age 70 but not on a
Standard policy with issue age 69. *Id.* ¶ 33. AXA claims that interpreting "class" to mean risk
class is itself "inequitable" because it would force policyholders with lower issue ages and lower
face amounts to "bear the costs of an anticipated shortfall that is concentrated" in those hit by the
increase. MTD at 22 n.30. At best, this fact-intensive debate begs the question: the FAC alleges
that the alleged losses are *not* concentrated in those hit by the increase.

Finally, AXA ignores the allegation that the increase was inequitable because it targeted
and punished investors who minimally funded their policies, and brought within its sweep those
who were not investors and did not minimally fund. FAC ¶ 36. This breach-of-contract theory
was also left for trial in the Phoenix COI litigation and cannot be dismissed on the pleadings. *See
U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.,* 112 F. Supp. 3d 122, 154 (S.D.N.Y. 2015),
*reconsideration denied* 2015 WL 4610894 (S.D.N.Y. 2015) ("Targeting [investors] would show
that Phoenix had punished life settlement investors who aggressively used a minimal settlement
feature of the PAUL policies, thereby frustrating their reasonable expectations. It would also
evince a lack of proper actuarial justification for the COI rate increases.").

### B.  The COI increase was plausibly not based on any enumerated factors

The FAC alleges that the COI increase breached AXA's promise that COI rate changes
"will be determined based on reasonable assumptions as to expenses, mortality, policy and
contract claims, taxes, investment income, and lapse." FAC ¶ 38. AXA's sole challenge to this
theory is that it is implausible. This argument fails.

### i.    The COI increase was not based on mortality or investment earnings

Citing to mortality tables, investigative reports, studies done by the Society of Actuaries,

surveys, AXA's regulatory filings, and AXA's decision to reprice the AUL II program five times between 2004-13, the FAC alleges that mortality has improved since AXA initially priced the policies and today, and AXA's own reported investment income has not materially changed in recent years to warrant this COI increase. FAC ¶¶ 8-9, 27, 35, 40-48 (mortality) & ¶¶ 8-9, 32, 35, 50-52 (investment income).[10] If the Court "accept[s] [these] factual allegations in the complaint as true," as it must, the FAC plainly states a claim for breach of contract. *Bruce v. U.S. Dep't of Justice*, 314 F.3d 71, 73-74 (2d Cir. 2002).

Citing no supporting legal authority, AXA seems to be under the impression that, in order for Plaintiff to state a claim for breach, it must identify some non-enumerated factor AXA relied on. *See* MTD at 23. But the plain terms of the AUL II contracts require a COI adjustment to be "based on" reasonable assumptions as to the enumerated factor, and the FAC alleges that AXA has identified only two such factors as the basis. FAC ¶ 22.  It is therefore plainly sufficient for Plaintiff to allege that AXA did *not* base its decision to increase COI rates on those two enumerated contract factors – that is all that is required to adequately allege a breach. *See, e.g., Fleisher,* 18 F. Supp. at 470 (agreeing that "based on" phrase means that "COI rate adjustments must be 'based on' the enumerated factors and only those factors"); *Salem v. Seigel*, 126 N.Y.S.2d 214, 215-16 (Sup. Ct. 1953) (noting that the breach of a contractual obligation "occurs . . . regardless of the reason for such failure.").

---

[10] AXA criticizes the FAC's use of "industry mortality tables" for being "basically devoid of AXA-specific allegations." MTD at 18 n.23. But the law does not require that the FAC cite to all of AXA's alleged proprietary assumptions, which AXA itself claims are "trade secrets". MTD at 13. *See also Fixed Income Shares: Series M, et al. v. Citibank N.A., et al.*, Case No. CV 14-9373-JMF (S.D.N.Y. (Sept. 8, 2015 Order (Dkt. 52)) at 15-16 (denying motion to dismiss in part because "[a]t the pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual loans in the specific trusts [as] such information, at this stage, is uniquely in the possession of defendants") (Furman, J. (citations omitted)). Indeed, it would be *im*plausible to assume that somehow all of insureds covered by AUL II policies hit by the COI increase miraculously avoided the pervasive mortality improvements of the industry at the time. *Id.* at 16.

AXA also argues that, under the FAC's reading of the contract, "*no* COI increase could ever be permissible because there will always be some limitation or definition not 'enumerated' in the Policies." MTD at 24. This makes no sense. Plaintiff's theory regarding enumerated factors is straightforward: a change in COI rates must be "*based on* reasonable assumptions as to" one of the enumerated factors. This language does not render every COI increase unlawful, but it does restrict the *reasons* for which AXA can implement an increase – reasons that AXA bargained for in its form insurance contracts.[11]

### ii.   AXA unlawfully targeted minimally funded policies

Even if the FAC were required to allege a non-enumerated factor on which the increase was based (which is not required), the FAC does so: the FAC alleges that AXA targeted persons who minimally funded their policies. FAC ¶ 36. AXA argues that this is implausible because FAC ¶ 36 states that the increase "include[s] many individuals who did not minimally fund," as if it is somehow impossible to catch dolphins (non-minimal funders) in nets (age 70+ and $1+ million) targeted at tuna (minimal funders). The fact that the group of targeted policies includes *some* with positive account values does not render it implausible that "AXA increased the COI rate on a group of policyholders that were selected *in part* for their pattern of premium payments." *Id*. (emphasis added).

AXA seems to acknowledge its mistake in a footnote, and pivots to argue that it has an unfettered right to target minimal funders, citing *Fleisher*. MTD at 24 n.33. But *Fleisher* does not support AXA's motion. There, the Court on summary judgment decided the *factors* Phoenix

---

[11] AXA argues that under the FAC's reading it could never target certain risk classes – for example, smokers or males – with an increase. That is incorrect: nothing in the FAC necessarily suggests, for example, that it would be "inequitable" to impose an increase only on smokers if the increase were based on a reasonable change in expectations regarding smokers' mortality and no one else's. Further, AXA's argument is irrelevant because the groups targeted for a COI increase bear *no relationship* to AXA's risk classifications. *See* FAC ¶¶ 33, 37.

could consider under the policy, not the disputed fact-question whether the evidence produced in discovery established that the carrier's COI increase was *in fact* based on those factors. *See* Case No. 12-cv-6811, Dkt. 362 (June 4, 2014 Order) at 2 ("[T]his Court's 'investment earnings' holding was never about PHL's *actual* investment earnings; it interpreted the policy language and nothing more."). In denying Phoenix's motion *in limine* to exclude evidence of its financial condition, the Court later explained that "if Phoenix cannot attribute the decline in *investment earnings* to any subset of policy holders then it would be unfairly discriminatory to impose the rate increase on those policyholders – in effect punishing them for exercising a contractual right in violation of both the contract itself and the covenant of good faith and fair dealing." *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 153 (S.D.N.Y. 2015). In a similar vein, the FAC pleads that the increase on these policies is not *in fact* driven by any change in investment income owing to the funding pattern of the targeted policies, and that the size and scale of the increase is disproportionate to any adverse investment income experience that AXA can prove after discovery. *See* FAC ¶¶ 50-52.[12]

### C. AXA had no change in *reasonable* assumptions if its justification are accepted

The FAC alleges that "if AXA's story trying to justify the COI increase is to be believed," and mortality experience has miraculously been worse for AXA than priced at issuance, there still would be a breach because AXA's reasonable assumptions had not changed.

---

[12] Moreover, the *Fleisher* Court was, respectfully, mistaken in its summary judgment holding (albeit based on its review of the evidence and arguments presented there, which may be different here after discovery) that the investment income factor can, as a matter of contract interpretation, permit an increase to be based on funding patterns. *See also* FAC ¶¶ 50-52. Judge McMahon relied on the definition of "investment earnings" in the Dictionary of Insurance Terms, but ignored its definition of "investment income" as "earnings by an insurance company from *dividends* on its equity portfolio, *rent* from real estate and other property it owns, and *interest* on its bond holdings." Harvey W. Rubin, *et al.*, Dictionary of Insurance Terms 268 (6th ed. 2013). Under that definition, investment income is limited to income earned *from* investments (*e.g.*, interest and dividends), not the actual cash (e.g., premiums) *that was invested*. A COI increase targeting minimal funders would thus violate the plain terms of the contract.

FAC ¶ 49. AXA treats this as a separate theory of breach and mistakenly argues that it can increase COI rates even if had no change in reasonable assumptions. The policy states that "[c]hanges in policy cost factors . . . will be determined based on reasonable assumptions as to" the six enumerated factors, including mortality. It is bedrock law that an insurance company's *original* COI rates have to be based on reasonable assumptions. FAC ¶ 77 ("The Disciplined Current Scale must be 'reasonably based on actual recent historical experience.'"). Putting these together, a reasonable insured would understand the policy to mean that COI rates can be increased only if there is a change in reasonable assumptions – e.g., she would understand that if reasonable mortality expectations only *improved* since issuance, then no massive COI hike could be "based on" a change in mortality expectations for the *worse*. If there is any ambiguity on this point, it must be resolved against the insurer, especially on a motion to dismiss.[13]

Any COI increase that did not reflect a change in reasonable assumptions would also violate the "equitable" prong, which incorporates actuarial principles that also require COI increases be based on changes to reasonable *original* assumptions. FAC ¶37; *see U.S. Bank Nat. Ass'n as securities intermediary v. PHL Variable Ins. Co.*, 2015 WL 4610894, at *4 (S.D.N.Y. July 30, 2015) ("By showing that Phoenix's original assumptions were unreasonable and by showing more reasonable assumptions, U.S. Bank can establish that reasonable actuarial analysis does not support the COI rate increase.").

---

[13] Limits on reasonable assumptions for original COI rates are needed to "safeguard against '*bait and switch*' tactics" by insurers. *See* N.Y. Gen. Counsel Op. No. 6-29-2001 (#2), 2001 WL 34906716, at *3 (June 29, 2011) (emphasis added). A bait-and-switch involves showing future unreasonably low COI rates at *initial* pricing to entice prospective policy owners to purchase the product, followed years later by a COI increase that reflects actual experience that induces shock-lapses, forfeits of the premiums paid, and wipes out the policy owner. FAC ¶ 5. Interpreting the contract's parameters on COI increases as permitting an increase even where there is no change in reasonable assumptions would thwart a key purpose of these provisions, and in the least, would be a breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989) (implied covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement").

### D.  AXA's construction of "procedures and standards on file" should be rejected

AUL II policies expressly state that any COI rate increase must be "determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered." FAC ¶ 68(d). The FAC alleges that the COI increase breached this provision in at least two ways.[14] *See* FAC ¶ 54 (unfair discrimination laws); *Id.* ¶ 55 (false interrogatory response).

Citing to Black's Law Dictionary, AXA contends that the term "procedures and standards on file" should be construed to mean only the procedures and standards AXA filed with regulators. But the entries AXA cites define "procedure" as a "specified method or course of action," and "standard" as a "criterion for measuring *acceptability*, quality or accuracy." MTD at 16 (emphasis added)). New York's rule that a COI increase may not discriminate unfairly within a class of policyholders and that an insurer must answer interrogatories truthfully are "specified method[s]" in which insurers may implement a COI increase and determine the "acceptability" of any increase. At a minimum, the proper construction of this contract term is disputed and "is not dismissible on the pleadings." *Eternity Glob. Master Fund Ltd.,* 375 F.3d at 178.

In the alternative, if for any reason the Court were to adopt AXA's proposed construction (which it should not), pursuant to FRCP 15, leave to amend should be granted. On May 13, 2016, *after* Plaintiff filed its FAC, AXA produced a document it submitted to the NYDFS entitled "NGE Policy and Implementation Process" which provides that "The following documents AXA's policy on assessing the need for actions with respect to Non-Guaranteed Elements (NGE)

---

[14] The FAC mentions two examples of how AXA has breached this provision. AXA cites *Brooks v. AIG SunAmerica Assurance Company* to argue that Plaintiff may not identify other procedures and standards on file not specified in the FAC later in this litigation. 480 F.3d 579 (1st Cir. 2007). *Brooks* says no such thing. In *Brooks*, the First Circuit upheld a dismissal on *summary judgment* because the plaintiff failed to uncover any procedure or standard on file which the defendant violated. *Id.* 585-87.

for [life insurance] policies and the implementation process for such actions." Declaration of Steven Sklaver ¶ 2 ("NGE Policy"). The COI rate is one such NGE. *See* ASOP No. 2.4. This document is therefore also part of the "procedures and standards on file" with an insurance regulator that AXA's COI increase violated, *even under AXA's proposed construction of that term*. AXA's procedures and standards state "[w]e will not make any NGE actions to recoup past losses" and then lists certain documents by which it is clear that "recoup past losses" means that AXA's profit objective must be fixed at issuance and cannot be changed during the lifetime of the product. *See* NGE Policy at 2 ("we will not make any changes to NGEs for any policies based upon changes in profit objectives"). The FAC already alleges that AXA has used the increase to increase its profit objectives on some policies, *see, e.g.,* FAC ¶¶ 50-52, 74-76, and to the extent those allegations do not already suffice for Rule 8 purposes, leave to amend should be granted so that specific reference to this AXA procedure and standard document just produced by AXA, and breach thereof, should be granted. *See also Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (leave to amend "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party").

## II.    Plaintiff has standing and adequately alleges a violation of § 4226

Section 4226 bars all life insurers from "issu[ing] or circulat[ing] . . . any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts" and also bars a carrier from making "any misrepresentation of the financial condition of such insurer." N.Y. Ins. Law § 4226(a)(1), (4). In the face of declining mortality rates nationwide, and despite misrepresentations about its supposedly healthy financial condition, AXA claims that it suddenly now expects a half-billion dollar cash flow shortfall because policyholders are now expected to die *faster* than it projected when it originally priced

the policies. FAC ¶¶ 40-49, 52, 73-79. *If* true, then AXA knowingly filed false interrogatories with regulators, misrepresented its financial condition, and issued false illustrations and annual statements misrepresenting the benefits of advantages of its AUL II product. FAC ¶¶ 9, 73-78. AXA argues that this claim should be dismissed for lack of Article III standing and for failure to state a claim. Neither argument has merit.

### A.  The FAC establishes every element of standing

To show standing, a Plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1547 (2016). At the motion-to-dismiss stage, a plaintiff "has no evidentiary burden." *Carter v. HealthPort Techs., LLC*, __ F.3d __, 2016 WL 2640989, at *6 (2d Cir. 2016).

The FAC meets all three elements easily. The FAC alleges that AXA "filed materially false interrogatories," "misrepresented its financial condition," and sent policy owners illustrations that "were not based on 'reasonable actual recent historical experience,'" as required by the law and actuarial standards of practice. FAC ¶¶ 9, 75-77. These misrepresentations inflicted injury because, among other things, COI increases have resulted and had the truth been known, the policy would never have been purchased or at least would have been purchased at a cheaper price and, now that the truth has been disclosed, the policy's value has been "substantially diminished" and its marketability for re-sale has been "destroyed." *Id.* ¶ 78. Finally, Plaintiff's injury is redressable because Plaintiff will receive a return of all premiums paid as a result of AXA's misconduct. *See id.*, prayer for relief ¶ 4; N.Y. Ins. Law § 4226(d).

AXA argues that Plaintiff has failed to plead injury and causation because the FAC includes "no information whatsoever about *its* transaction in acquiring the policy." MTD at 8. AXA's standing theory boils down to this: Because the FAC's allegations use plural nouns

(policy owner*s*) instead of singular nouns (policy owner), the FAC has failed to show that the Brach Family Foundation – as opposed to some other putative class member – has standing. It is no surprise that AXA cannot cite a single case for this proposition, which strays far from the principle that "general factual allegations of injury resulting from the defendant's conduct may suffice" at the motion to dismiss stage. *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 994 F. Supp. 202, 206-07 (S.D.N.Y. 1998).[15]

The FAC clearly alleges injury traceable to the violation: it alleges that the "size of the COI charge is highly significant to" policyholders (¶17); the illustrations sent from issue date until 2015 were misleading by showing future COI rates based on unreasonably favorable assumptions (¶77); and that these material misrepresentations "injured plaintiff" because, for policies purchased after issuance, "the purchaser would have paid much less for the policy" had AXA not made these misrepresentations and their value has been destroyed (¶78).[16] *See also NECA-IBEW Health & Welfare Fund* v. *Goldman Sachs & Co.*, 693 F.3d 145, 151-52 (2d Cir. 2012) (Article III standing where purchaser "plausibly alleged . . . a diminution in the value" of mortgage-backed securities where issuers misstated the creditworthiness of mortgage borrowers).

Next, AXA says this case is just "like" *Ross v. AXA Equitable Life Insurance Company*, 115 F. Supp. 3d 424 (S.D.N.Y. 2015). While *Ross* involved the same defendant and cause-of-action, the similarities end there. The *Ross* plaintiffs' main theory of injury due to "shadow

---

[15] To the extent, however, that the Court prefers more details about the Plaintiff's acquisition of the policy, as AXA so requests in its motion, leave to amend should be granted to add such (irrelevant) details, especially because this is the first time that the § 4266 claim has been addressed in a motion to dismiss, and because such an amendment would not possibly prejudice AXA.

[16] In a blatant mischaracterization of the FAC, AXA points to a number of allegations related to the class action allegations as reasons why the named Plaintiff lacks standing. For example, it notes the FAC's reference to lapse protection riders, something Plaintiff's policy lacked. MTD at 9. But Plaintiff never made any representation that *its* policy had a lapse protection rider. While it is true that a named plaintiff must demonstrate that it has standing, )*Ross*, 115 F. Supp. 3d at 437, it is certainly *not* the case that including class-action allegations in a complaint somehow cuts against a named plaintiff's claim to injury-in-fact.

insurance" was fear: that they purchased a policy less secure than AXA represented and that, due to AXA's misrepresentations, they *feared* AXA would be unable to pay death benefits. In dismissing the case for lack of standing, the Court was careful to point out that "Plaintiffs do not allege that they would not have purchased policies from AXA but for its nondisclosures, or that they suffer any past or current financial harm by virtue of its misrepresentations. [A]ny risk of harm that they face is a risk of harm in the *future*." )*Id.* at 437 (emphasis in original). In short, the only thing the *Ross* plaintiffs had to fear was fear itself. Unlike the plaintiffs in )*Ross*, the Plaintiff here has *already* suffered an injury as a result of the conduct. FAC ¶ 78.

Citing nothing other than its say-so, AXA also argues that the FAC's allegations that Plaintiff overpaid for its AUL II policy at the price it did but for AXA's misrepresentations are too speculative. This conclusory argument makes no sense, ignores the economics of life insurance, *see, e.g.,* FAC ¶ 2 ("The COI charge is typically the highest expense that a policyholder pays."), and contradicts case law as courts routinely find standing for such misrepresentation claims based on similar allegations. *See, e.g., In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 777 (S.D.N.Y. 2012) ("named Plaintiffs and the members of the class have suffered . . . injury (a decline in their Certificates' value) traceable to a single, allegedly unlawful act by Defendants (disseminating Offering Documents with misrepresentations and omissions)"). A "more stringent view . . . would essentially collapse the standing inquiry into the merits." *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003).

AXA lastly mischaracterizes the § 4226 claim, arguing that "[i]f the FAC is right, then AXA, by *underestimating* mortality and charging COI rates based on those lowered assumptions, held those rates *down* 'for years,' making AULII policies 'cheaper' than they otherwise would have been." MTD 9-10. This is a merits argument, and it is unpersuasive. The FAC says no such

thing; rather, the FAC alleges that, if AXA's justification for the COI hikes is to be believed, then "its mortality rates are *now* much worse than its mortality assumptions in the early 2000s," when these policies issued. FAC ¶77. And so, AXA never actually charged cheap rates to policyholders; AXA only *showed* cheap rates in the *future* (i.e., in 2016 and beyond) as an inducement to buy or continue to fund the policy, and then took those cheap rates away from policy owners before they were realized. *See also id.* ¶¶ 5, 78. That is a bait-and-switch that causes immediate injury for which Article III standing exists.

### B.  Plaintiff adequately alleges a claim for relief under § 4226

#### i.      Rule 9(b) does not apply to claims under § 4226

Under Federal Rule 9(b), a claim that requires a showing of "a false statement is not *per se* one of those Special Matters that Rule 9 requires be specially pleaded. Rather, the particularity requirement of Rule 9(b) is limited to averments of fraud or mistake." *John P. Villano Inc. v. CBS, Inc.*, 176 F.R.D. 130, 131 (S.D.N.Y. 1997). "Fraud requires, not just the making of a statement known to be false, but also, *inter alia,* a specific intent to harm the victim and defraud him of his money or property." *Id.* By its terms, sections 4226(a)(1) & (4) require only a showing that an insurer knowingly misrepresented the terms, benefits, or advantages of a policy or misrepresented its financial condition. Accordingly, "no proof of fraudulent intent is required to sustain an Insurance Law § 4226 violation" *Russo v. Massachusetts Mut. Life Ins. Co.*, 274 A.D.2d 878, 879, 711 N.Y.S.2d 254, 256 (2000), *rev'd in part on other grounds sub nom. Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 750 N.E.2d 1078 (2001). The statute makes no mention of fraudulent or specific intent to harm a victim. This is confirmed by cases AXA cites showing that New York courts have distinguished fraud from § 4226(a), *see*, *e.g.*, *Cilente v. Phoenix Life Ins.*, 2014 WL 70336 (N.Y. Sup. Ct. 2014) (dismissing claims for fraud but permitting claims under § 4226 to go to trial), and other similar statutory causes-of-action for

misleading business practices, *see, e.g.*, *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343-44 (Ct. App. 1999) (dismissing fraud claims but not dismissing statutory claim under GBL § 349, characterizing the claim as "critically different" from "fraud"). Plaintiff's claim under § 4226(a) is therefore not subject to Rule 9(b)'s requirement to plead with specificity. But even if it is, the FAC is sufficient because it apprises AXA of the circumstances and nature of the alleged misstatements it is being called upon to defend against.

### ii.   AXA's false statements

Rule 9(b), if it applies, requires "fraud allegations [] to specify the time, place, speaker, and content of the alleged misrepresentations." *Farberware, Inc. v. Groben*, 764 F. Supp. 296, 301 (S.D.N.Y. 1991). The "allegations must be specific enough to allow the defendant a reasonable opportunity to answer the complaint and must give adequate information to allow the defendant to frame a response." *Id.* (quotation marks omitted).

The FAC specifies specific statements (illustrations, annual reports, and interrogatories), along with AXA's failure to update its rates,[17] and explains why these statements were false. *See, e.g.,* FAC ¶¶ 9, 73-77. New York regulations, which are incorporated in § 4226,[18] bar any "illustration that depicts policy performance more favorable to the policy owner than that produced by the illustrated scale" that is "reasonably based on" the insurer's "actual recent historical experience." 11 NY-CRR 53-3.2; *id.* at 53-1.3(m). Paragraph 77 of the FAC expressly alleges that AXA did exactly that. The FAC also points to false statements made in AXA's

---

[17] AXA suggests that it had no duty to update its rates, but this is not true. Under ASOP 24, AXA was obligated to "reflect changes in experience promptly once changes have been determined to be significant and ongoing." ASOP 24 § 3.4.2.

[18] *See* 11 NY-CRR 1.5 ("In addition to any other penalties provided by the laws of this state, a violation of this Part may be considered . . . a violation of . . . Section 4226 of the Insurance Law).

"interrogatories [filed annually] with regulators," FAC ¶ 75.[19]

AXA also argues that it cannot be held liable under § 4226 for its false statements about future mortality experience, relying on a line of Second Circuit cases in the *federal securities fraud* context that conclude that mistaken predictions, without more, are insufficient to show fraud. MTD at 12 (citing *Decker v Massey-Ferguson Ltd.*, 681 F.2d 111, 117 (2d Cir. 1981). AXA has offered no rationale for why a federal principle about securities fraud – subject to the heightened pleading requirements of the PSLRA – is applicable to a New York insurance statute. Regardless, the FAC has certainly pleaded "the more" that AXA thinks is required – AXA's future expectations were required to be "reasonably based on [its] actual recent historical" experience and, if AXA's story is to be believed, its original expectations reflected in illustrations through 2015 were not reasonably based on AXA's actual recent experience, since mortality experience has steadily improved since issuance. The FAC also specifically pleads the "bait-and-switch" motive for this (¶73, 78). *See, e.g.*, *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926, 942-43 (S.D.N.Y. 1989) (denying motion to dismiss securities fraud claim over misleading business forecasts where complaint sufficiently pleaded scienter).

### iii.    AXA knowingly made false statements

AXA contends that the knowledge requirement in § 4226 has not been adequately pled. But the FAC alleges that AXA's repriced the program and updated mortality assumptions internally five times between 2004-13, while hiding this information from Plaintiff; *id.* ¶ 74; and

---

[19] AXA says that it was under no duty to disclose its mortality assumptions. But if AXA's justification for the increase is adopted, the misrepresentations in this case were annual reports and illustrations circulated to policyholders reflecting unreasonably low pricing projections that were *based* on the aggressive haircuts AXA applied to the 75-80 mortality table. (¶ 37, 73).  AXA also misled the public when it represented, in responses it submitted to NYDFS to interrogatories, that its current experience matched the anticipated experience factors (e.g., mortality experience) underlying nonguaranteed elements of its life insurance policies (e.g., COI charges).

that an alleged $500 million profit shortfall does not appear "overnight" but has to have been known to AXA for years, *id.* These allegations of AXA's knowledge easily satisfies *Twombly*.

### iv. The FAC adequately alleges that Plaintiff is a "person aggrieved"

For the reasons stated above, the FAC clearly states that Plaintiff was injured and that this injury resulted from the alleged violations. FAC ¶ 78. Furthermore, AXA is wrong when it asks the Court to read into § 4226 the elements of fraud, including reasonable reliance. The plain text of § 4226 requires only that the plaintiff show a knowing misrepresentation, and New York courts have declined to write in a reasonable reliance requirement into § 4226. *See, e.g.*, *Cilente*, 2014 WL 70336 (N.Y. Sup. Ct. 2014) (dismissing claims for fraud on "reasonable reliance" grounds but permitting claims under § 4226 to go to trial). Because reasonable reliance is not an element of a section 4226 claim, AXA's disclaimers in its false illustrations are irrelevant. AXA cites to no case that has ever held that a contractual disclaimer absolves a carrier from liability for knowingly making false statements prohibited by § 4226. For good reason: that statute has no "safe harbor" provision excusing a carrier's misconduct and issuance of false statements if accompanied by a disclaimer of reliance.

Dated: June 21, 2016

s/ Steven Sklaver
Seth Ard
SUSMAN GODFREY L.L.P.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel.:   212-336-8330
Fax:    212-336-8340
sard@susmangodfrey.com

Steven G. Sklaver (*pro hac vice*)
Frances S. Lewis
Rohit D. Nath (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950

Los Angeles, CA 90067-6029
Tel:    310-789-3100
Fax:    310-789-3150
ssklaver@susmangodfrey.com
flewis@susmangodfrey.com

*Attorneys for Plaintiff and the Class*