UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                         :

IN RE:                                                  :

                                                    :

AXA EQUITABLE LIFE INSURANCE COMPANY    :        16-CV-740 (JMF)
COI LITIGATION                                :

                                                  :        OPINION AND ORDER

*This Document Relates to All Actions*       :

                                                  :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

In this putative class action, the Brach Family Foundation, Inc. (the "Brach Foundation") and Allen Dyer, as Trustee of the Currie Children Trust sue Defendant AXA Equitable Life Insurance Company ("AXA").[1]  Plaintiffs' claims — for breach of contract and violation of several New York and California statutes — stem from AXA's announcement in 2015 that it was increasing the cost of insurance ("COI") for a group of flexible-premium life insurance policies. This litigation and a handful of related cases, mostly before this Court, followed.  Plaintiffs now move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for certification of a class action.  More specifically, Plaintiffs move for certification of a nationwide class to pursue claims for breach of contract and certification of five sub-classes to pursue the statutory claims.  For the reasons that follow, Plaintiffs' motion — reframed to seek certification of two nationwide classes, one for claims based on the policies themselves and one based on AXA's alleged misrepresentations, and related sub-classes — is granted in part and denied in part.

---

[1]    AXA recently rebranded itself as "Equitable," but, because the conduct at issue occurred before its rebranding, the Court will refer to it — as the parties do — as AXA.  *See Equitable, Announcing Equitable* (Jan. 14, 2020), https://equitable.com/news/2020/announcing-equitable-a-new-day-for-the-160-year-old-financial-services-company.

## BACKGROUND

The Court has already spilled considerable ink addressing motions in this case and related litigation against AXA.  *See In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2019 WL 1382437 (S.D.N.Y. Mar. 27, 2019); *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646 (S.D.N.Y. Aug. 22, 2018); *EFG Bank AG v. AXA Equitable Life Ins. Co.*, No. 17-CV-4767 (JMF), 2018 WL 1918627 (S.D.N.Y. Apr. 20, 2018); *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238 (S.D.N.Y. Mar. 9, 2018); *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89 (S.D.N.Y. 2018); *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2017 WL 5151357 (S.D.N.Y. Nov. 3, 2017), *reconsideration denied sub nom. In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2018 WL 3632500 (S.D.N.Y. July 30, 2018); *Brach Family Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2016 WL 7351675 (S.D.N.Y. Dec. 19, 2016); *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424 (S.D.N.Y. 2015).  The Court will assume familiarity with those prior opinions and, thus, will summarize the relevant background only briefly.

The Brach Foundation, a New York not-for-profit corporation, and Allen Dyer, as Trustee of the Currie Children Trust, own life insurance contracts issued by AXA on a standard form called Athena Universal Life II ("AUL II").  ECF No. 188 ("TAC"), ¶¶ 2, 10-11; *id*. at Ex. E ("Currie Policy"); ECF No. 1 ("Compl."), at Ex. A ("Doe Policy")).  AUL II policies are flexible-premium universal life policies, pursuant to which a policyholder is required to make an initial premium payment and, thereafter, can choose when and how much to pay in premiums. *See* TAC ¶¶ 2, 16-18.  Premiums are placed in a policyholder's Policy Account — the functional equivalent of a savings account — from which AXA deducts the COI and administrative charges

on a monthly basis.  *See id.*  If the Policy Account is insufficient to cover the charges, the policy will lapse (absent a no-lapse guarantee); in the meantime, the policyholder earns interest on any funds in the Policy Account.  *See id.* ¶¶ 2, 5, 17.  Upon the insured's death, AXA pays the policy beneficiary the specified death benefit, also known as the face amount of the policy.  *See* Doe Policy 3, 5-6; TAC ¶ 21.  In the case of the Brach Foundation, the policy — issued in 2007 — has a face amount of $20 million and was issued on the life of a woman who was eighty one years old at the time of issuance.  *See* TAC ¶ 10; Doe Policy 3; Currie Policy 3.  The Currie Children Trust's policy was issued in 2006, has a face value of $4.2 million, and was issued on the life of Malcolm Currie, who was eighty years old at the time of issuance.  TAC ¶ 11.

Significantly, under the terms of the AUL II policies, AXA is permitted, subject to certain restrictions, to change the COI — which is typically the largest expense that a policyholder has to pay.  *See* TAC ¶¶ 17, 19; *see also* Doe Policy 3.  The AUL II policies, however, contain a "Changes in Policy Cost Factors" provision, which states that changes in the COI

> will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses.  Any change in policy cost factors will never result in . . . policy charges that exceed the maximum policy charges guaranteed in the policy.  Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

Doe Policy 11.  According to the Complaint, the terms of all AUL II policies are identical, and prospective policyholders may not negotiate over a policy's terms.  *See* TAC ¶ 21.

In February 2015, AXA represented in a public filing that it had not observed any changes in "experience factors," including mortality, "underlying any nonguaranteed elements" such as the COI.  *See id.* ¶¶ 9, 49.  Only eight months later, however, AXA announced that,

effective March 8, 2016, it would be increasing the COI rates for any AUL II policy with (1) an issue age (that is, the age of the insured at the time of policy issuance) of seventy years or older and (2) a face value of one million dollars or more — a change that affected the Brach Foundation policy and approximately 1,700 other policies.  *See id.* ¶¶ 3, 22.  AXA publicly stated that the increase was warranted because the company "expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established."  *Id.* ¶¶ 7, 23.  This case — and a handful of parallel lawsuits, some pending before this Court and some pending in state court (together, the "Related Actions") — followed.  *See* Nos. 17-CV-4803 (JMF), 17-CV-4767 (JMF), 17-CV-7751 (JMF), 17-CV-9355 (JMF), 18-CV-2111 (JMF), and 18-CV-10730 (JMF); *Neuman v. AXA Equitable Life Ins. Co.*, N.Y. Sup. No. 656262/2016; *Hobish v. AXA Equitable Life Ins. Co.*, N.Y. Sup. No. 650315/2017.

Plaintiffs allege three sets of claims.  First, they bring claims for breach of contract, alleging that AXA violated provisions of the policies that allow a COI rate increase only if the increase is equitable to all policyholders of a given class; based on reasonable assumptions regarding enumerated factors, including changes in assumptions about mortality and investment experience; and determined in accordance with defined procedures and standards.  *See, e.g.*, TAC ¶¶ 7, 19-20, 71.  Second, and relatedly, Plaintiffs assert that, because AXA's breach of contract was systematic, it also gives rise to claims under the California Unfair Competition Law ("CUCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, and the California Elder Abuse and Dependent Adult Civil Protection Act (the "California Elder Abuse Law"), Cal. Welf. & Inst. Code § 15600, *et seq.*  And third, Plaintiffs bring statutory claims under New York and California law based on their contention that AXA made certain misrepresentations in

connection with the sale and maintenance of the policies.  In particular, Plaintiffs allege that, as

early as July 10, 2006, *see* TAC ¶ 101, AXA knew that it would later increase COI rates but that

it concealed that knowledge — and therefore the long-term cost of the policy — in illustrations

depicting premium payments, account values, and death benefits.  *See id.* ¶¶ 101-02.  Plaintiffs

argue that these misrepresentations were part of a scheme that violates the CUCL, Section 349 of

the New York General Business Law, and Section 4226 of the New York Insurance Law.

Plaintiffs now move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for

class certification.  In particular, they move for certification of a nationwide "Contract Class"

consisting of:

> All owners of [AUL II policies] issued by AXA . . . that were subjected to a cost
> of insurance rate increase announced by AXA on or about October 1, 2015,
> excluding [D]efendant AXA, its officers and directors, members of their
> immediate families, and the heirs, successors or assigns of any of the foregoing,
> and the policies-in-suit in in the Related Actions.

ECF No. 355 ("Proposed Order"), at 1.  In addition, they seek certification of the following "sub-

classes":

- a nationwide "Section 4226 Sub-Class," defined as: "All members of the Contract Class
  who are owners of AUL II policies without a Lapse Protection Rider issued after July 10,
  2006";

- a "New York GBL Sub-Class," defined as: "All New York residents who are members of
  the Section 4226 Sub-Class";

- a "California UCL Increase Sub-Class," defined as: "All California residents who are
  members of the Contract Class";

- a "California UCL Illustration Sub-Class," defined as: "All California residents who are
  members of the Section 4226 Sub-Class"; and

- a "California Elder Abuse Sub-Class," defined as "All California residents who are
  members of the Contract Class and whose AUL II policies are funded by a California
  resident aged 65 or older."

*Id.* at 2.  Finally, Plaintiffs move for appointment of the Brach Foundation as class representative for the Contract Class, the Section 4226 Sub-Class, and the New York GBL Sub-Class; Allen Dyer, as trustee of the Currie Children Trust, as class representative for the Contract Class, the Section 4226 Sub-Class, and the three California Sub-Classes; and for appointment of Susman Godfrey L.L.P. as class counsel.  *See id.*

## LEGAL STANDARDS

The relevant standards are well established.  A party seeking certification must demonstrate by a preponderance of the evidence that all the requirements of Rule 23 have been met.  *See Levitt v. J.P. Morgan Secs., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).  That means, first, satisfying the "four threshold requirements of Rule 23(a) — numerosity, commonality, typicality, and adequacy of representation."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).  On top of those requirements, the Second Circuit has "recognized an implied requirement of ascertainability."  *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (internal quotation marks omitted).  If those threshold requirements are met, the moving party must also "demonstrate through evidentiary proof that the class satisfies at least one of the three provisions for certification found in Rule 23(b)."  *In re U.S. Foodservice*, 729 F.3d at 117 (internal quotation marks omitted).  Here, Plaintiffs seek certification of classes under Rule 23(b)(3), which means that they "must establish: (1) predominance — that the questions of law or fact common to the class members predominate over any questions affecting only individual members; and (2) superiority — that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.* (internal quotation marks omitted).  In evaluating whether the moving party has met its burden, the Court must engage in a "rigorous

analysis," in which it is permitted to "probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

      In reviewing a class certification motion, a court must apply these standards to each cause of action — meaning the "identity of facts surrounding the occurrence," not "the legal theory upon which [the plaintiff] cho[oses] to frame [the] complaint." *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 39 (2d Cir. 1992). That is due, in part, to rules of preclusion. In traditional litigation, plaintiffs must assert all claims arising from a cause of action, and if they do not, they may not later pursue any omitted claims. *See* Restatement (Second) of Judgments § 24(1) ("When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar . . . the claim extinguished includes all rights of the plaintiff to remedies against defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."). Significantly, these principles of preclusion also apply to absent class members, at least under certain circumstances. *See Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation. . . . Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply."); *Ferris v. Cuevas*, 118 F.3d 122, 130 (2d Cir. 1997) ("Certainly, the judgment of a true class action with adequate representation . . . would be binding on members of the class for *res judicata* purposes."); *see also Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940) ("[M]embers of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties, or where the interest of the members of the

class, some of whom are present as parties, is joint, or where for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter." (citations omitted)); *Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224 (3d Cir. 2009) (noting that "[b]y seeking only partial relief" on behalf of the proposed class, the plaintiff "may be engaging in claim splitting, which is generally prohibited by the doctrine of *res judicata*"). *See generally* WILLIAM B. RUBENSTEIN, 6 NEWBERG ON CLASS ACTIONS § 18:16 (5th ed. 2020) ("With some exceptions . . . the class action judgment bars class members from pursuing individual lawsuits that arise from the same transaction and occurrence as the class action, but it does not bar class members from pursuing individual lawsuits that are not transactionally related to the class's claims.")

That has two salient implications for purposes of class certification. First, if the Court were to certify a class to pursue some but not all claims that the putative class representatives seek to assert, certification of the class could cause absent class members to forfeit those claims that the class representatives may not assert on behalf of the class. *See, e.g.*, *Brewer v. Lynch*, No. 08-CV-1747 (BJR), 2015 WL 13604257, at *10 (D.D.C. Sept. 30, 2015) (holding that, were the plaintiffs to abandon claims for forms of relief that the proposed class representative could not pursue, it would "jeopardize the [absent] class members' ability to subsequently pursue [those] claims" (internal quotation marks omitted)), *aff'd sub nom. In re Brewer*, 863 F.3d 861 (D.C. Cir. 2017). Second, and relatedly, absent class members might lose any claims that arise from the same nucleus of operative facts that the putative class representatives — whether wittingly or unwittingly — fail to pursue. *See Pearl v. Allied Corp.*, 102 F.R.D. 921, 924 (E.D. Pa. 1984) ("[C]lass members whose claims would be abandoned by the plaintiffs [and proposed class representatives] may find themselves precluded by the doctrine of *res judicata* from

asserting those claims in subsequent actions.").  These phenomena are referred to as claim splitting; that is, the claims of absent class members are split and, to the extent not asserted, may be precluded.[2]  It is important for a court confronted with a motion for class certification to be attentive to the possibility of claim splitting — mindful that neither the named plaintiff nor the defendant may be incentivized to raise the issue on behalf of absent class members.

## DISCUSSION

As noted, Plaintiffs seek certification of a nationwide Contract Class and five "sub-classes," one of which is also nationwide and the rest of which are limited to either New York residents or California residents.  *See* Proposed Order 1-2.  As the parties' briefing makes clear, these proposed classes and sub-classes largely correspond to discrete claims: the Contract Class, as its name suggests, to contract claims and the various sub-classes to Plaintiffs' statutory claims under New York and California law.  *See, e.g.*, ECF No. 376 ("Reply"), at 2-3 (describing the proposed nationwide Section 4226 class as a "sub-class" of the Contract Class, even though putative class members' alleged injuries arose from "false illustrations" rather than the breach of contract).  With the motion framed as such, AXA does not oppose certification of the Contract Class (although it does take minor issue with Plaintiffs' definition of the class), *see* ECF No. 364 ("Opp'n"), at 38-39; but it does oppose certification of the statutory sub-classes (which it refers to as "classes"), *see id.* at 17-38.  The majority of the parties' briefing is thus focused on the appropriateness of pursuing Plaintiffs' statutory claims on a class-wide basis.

---

[2]     These consequences may not apply to members of classes certified under Rule 23(b)(1) and (2), as some courts have held that inclusion in a mandatory class does not bar a class member from later asserting a claim for money damages arising out of the same transaction.  *See, e.g.*, *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 392 (9th Cir. 1992) ("Because Brown had no opportunity to opt out of the [aggregate] litigation, we hold there would be a violation of minimal due process if Brown's damage claims were held barred by *res judicata*."); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114-15 (E.D.N.Y. 2012) (collecting cases).

The problem is that this is not the right way to approach the question of class certification.  As discussed above, the analysis must focus on a common nucleus of operative facts, not on the legal claims asserted.  That is, although a court must identify "the class claims, issues, or defenses" when certifying a class, Fed. R. Civ. P. 23(c)(1)(B), a motion for class certification puts at issue all claims actually and potentially asserted on behalf of putative class members.  It follows that, where certification is sought pursuant to Rule 23(b)(3), a court must consider whether the action as a whole — including all legal theories asserted — meet the requirements for certification.  *Cf. In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 464 (S.D.N.Y. 2018) ("[I]f an action includes multiple claims, one or more of which might qualify as a certifiable claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4) of Rule 23." (internal quotation marks omitted)); *In re Livent, Inc. Noteholders Sec. Litig.*, 210 F.R.D. 512, 518 & n.3 (S.D.N.Y. 2002) (certifying class under Rule 23(c)(4), not Rule 23(b)(3), because only some claims were certifiable).  If some claims are excluded — whether by the court or by the plaintiffs, and whether that is because they are not susceptible to class adjudication or because of other reasons — class members may be precluded by a judgment from raising them later.  *See, e.g.*, *Brewer*, 2015 WL 13604257, at *10.  The Court can identify these dynamics only by focusing on the common nucleus of operative facts.

In this case, some of Plaintiffs' claims — namely, their claims for breach of contract and for systematic breaches of contract under the California Unfair Competition Law ("CUCL") — flow from the AUL II policies themselves; others flow from AXA's alleged misrepresentations in illustrations.  *See Brown v. Lockwood*, 76 A.D.2d 721, 738-39 (2d Dep't 1980) ("In most instances, the fraudulent representations made to induce the plaintiff to enter into a contract are

different from the promises of performance contained in the contract itself.  Where such is the

case, an action to recover for fraud in the inducement involves proof of the facts of a different

phase of the transaction than that involved in an action to recover for breach of the contract

itself.").  It is that distinction, not Plaintiffs' claims or legal theories, that should inform the

definition of the putative classes.  For these reasons, the Court ordered supplemental briefing

regarding, among other things, whether the proposed classes should be re-defined.  *See* ECF No.

398.  In their supplemental brief, Plaintiffs indicate that they "agree that it is useful to distinguish

the classes which assert claims arising from the policies themselves . . . from the classes which

assert misrepresentation-based claims."  *See* ECF No. 401 ("Pls.' Supp. Br."), at 16.  For its part,

AXA does not argue otherwise.  *See* ECF No. 400 ("Def.'s Supp. Br."), at 14-17.  Accordingly,

rather than accept the parties' original framing, the Court will consider whether to certify two

overarching, nationwide classes, a "Policy-Based Claims Class" and an "Illustrations-Based

Claims Class," and sub-classes thereof as appropriate.  The Court will address each class in turn.

## A.  Certification of Policy-Based Claims Classes

The Court begins by considering a nationwide Policy-Based Claims Class and two related

subclasses: a California Policy-Based Claims Sub-Class and a California Elder Policy-Based

Claims Sub-Class.  On behalf of all members of the nationwide Policy-Based Claims Class,

Plaintiffs plan to assert claims for breach of contract; on behalf of all members of the California

Policy-Based Claims Sub-Class, Plaintiffs plan to assert additional claims under the CUCL for

systematic breach of contract; and on behalf of members of the California Elder Policy-Based

Claims Sub-Class, Plaintiffs plan to assert additional claims under the California Elder Abuse

Law for systematic breach of contract.  *See* ECF No. 353 ("Pls.' Mem."), at 24 (arguing that

elder abuse claims satisfy the predominance requirement imposed by Rule 23(b)(3) because "in

unlawfully increasing COIs on policies held by the elderly, and where an increase is targeted

only at elderly insureds, AXA knew or should have known that its conduct was likely to be

harmful to elders" (internal quotation marks omitted)).

### 1.   Nationwide Policy-Based Claims Class

The proposed nationwide Policy-Based Claims Class is defined as "[a]ll owners of [AUL

II policies] issued by AXA . . . that were subjected to a cost of insurance rate increase announced

by AXA on or about October 1, 2015, excluding [D]efendant AXA, its officers and directors,

members of their immediate families, and the heirs, successors or assigns of any of the

foregoing, and the policies-in-suit in in the Related Actions."  Proposed Order 1.  In its initial

brief, AXA did not oppose certification of the comparable proposed class — the Contract Class

— pursuant to Rule 23(b)(3), except insofar as it was proposed to include more than the

"Registered Owners of the Policies on or after the effective date of the COI Adjustment: March

8, 2016."  Opp'n 38.  In its supplemental brief, AXA changed course and now argues that the

nationwide Policy-Based Claims Class should be certified under Rule 23(c)(4), not Rule

23(b)(3).  *See* Def.'s Supp. Br. 18-19 (suggesting that the Court "certify a breach of contract

class under Rule 23(c)(4) but . . . deny certification of the fraud/misrepresentation-based claim

classes").  Regardless, the Court has an independent obligation to ensure that the standards for

class certification are met — and a responsibility to ensure that certification would not harm

absent class members, whose interests may not be aligned with those of the named Plaintiffs or

Defendants.  *See, e.g.*, *Douglin v. GreatBanc Trust Co., Inc.*, 115 F. Supp. 3d 404, 409

(S.D.N.Y. 2015) ("Even when unopposed, a motion for class certification must be evaluated on

its merits.").  Based upon its independent review, the Court concludes that a nationwide Policy-

Based Claims Class should be certified under Rule 23(b)(3).

### a.  Rule 23(a) Requirements

For starters, most of the Rule 23(a) requirements are plainly satisfied.  With more than

1,400 potential class members, the numerosity requirement is easily met.  *See* ECF No. 354-6

("Mills Rep."), at Ex. 3 (identifying 1,422 policies within the Policy-Based Claims Class); *see*

*also Rodriguez v. It's Just Lunch Int'l*, 300 F.R.D. 125, 132 (S.D.N.Y. 2014) ("Numerosity is

presumed when the proposed national class includes more than forty members." (internal

quotation marks and alterations omitted)).  Additionally, members are sufficiently identifiable to

satisfy the "modest" ascertainability requirement.  *In re Petrobras*, 862 F.3d at 269; *see* Mills

Rep. Ex. 3 (identifying policies whose owners are members of the Policy-Based Claims Class).

Given that the AUL II policies are form contracts, and that the COI increase resulted from a

single decision based on common analysis, both the commonality and typicality requirements are

easily met.  *See Hanks v. Lincoln Life & Annuity Co. of N.Y.*, 330 F.R.D. 374, 379-81 (S.D.N.Y.

2019) (holding that a proposed nationwide breach-of-contract class satisfied the commonality

and typicality requirements because "[t]he policies of the putative class contain substantially

similar language on COI rate increases" and were subjected to the same rate increase).

Indeed, the only Rule 23(a) requirement that warrants discussion is the adequacy of

representation.  *See* Fed. R. Civ. P. 23(a)(4).  As noted, Plaintiffs allege, on behalf of absent class

members in California, that AXA's "systematic breach" of AUL II contracts constitutes a

violation of the UCL and, on behalf of absent class members in California whose policy

premiums are paid by individuals over the age of sixty-five, that the systematic breach

constitutes a violation of the California Elder Abuse Law.  *See* Pls.' Mem. 24; Proposed Order 2.

But Plaintiffs do not seek to bring any such claims under the laws of other jurisdictions —

raising claim-splitting concerns.  *See, e.g.*, *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.

Supp. 595, 606 (S.D.N.Y. 1982).[3]  Under such circumstances, the Court must assure itself that *all* absent class members — not only those on whose behalf additional claims are asserted — are adequately represented.  *See Nafar*, 339 F. App'x at 225 (vacating the certification of a class because the district court did not consider the "very important issue" of claim-splitting and the risks of preclusion "in assessing the adequacy of representation requirement"); *Feinstein*, 535 F. Supp. at 606 (noting that "a serious question of adequacy of representation arises when the class representatives profess themselves willing . . . to assert on behalf of the class only" some claims arising from the transaction and occurrence at issue).  That calls for the Court to consider "the lost value of [any] waived claims (percent risk of future preclusion multiplied by the value of the waived claim)" and "the strategic value of the decision to waive."  *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 413 (5th Cir. 2017).

Because the parties did not address these concerns in their initial briefing, the Court ordered them to do so in supplemental briefing.  *See* ECF No. 398, at 2-3.  After reviewing the parties' supplemental briefs, the Court is satisfied that all class members are adequately represented.  On the one hand, the strategic value of pursuing claims on behalf of a nationwide class is substantial.  Indeed, if the class were limited to the two states in which the proposed representatives reside, those who live elsewhere might not have a meaningful opportunity to litigate their claims for breach of contract.  By contrast, the marginal value of any waived claims appears to be relatively low.  For the most part, claims of systematic breach require the same quantum of evidence.  *See* Pls.' Mem. 24 (arguing that common issues predominate as to claims for systematic breach because "the claim turns on the very same conduct at issue with respect to

---

[3]    These concerns do not apply to New York residents.  Because the Brach Foundation is a New York resident, the Court is satisfied that, if there were a statutory claim available and it were in the class's best interests to raise it, Plaintiffs would have asserted it.

the breach of contract claim" (internal quotation marks omitted)); Opp'n 30 (noting that

Plaintiffs' "theory is indistinguishable from the contract claim").  And as a general matter, the

recovery available for systematic breach is no greater than the recovery available for breach of

contract.  *See* Pls.' Supp. Br. 5 (noting that, on behalf of California class members, Plaintiffs

seek damages "calculated in the same manner as the damages being sought on the claim for

breach of contract").  It is true that treble damages are available under California's Elder Abuse

Law.  *See* Cal. Civ. Code § 3345(b).  But that is the exception rather than the norm, *see* Carolyn

L. Dessin, *Financial Exploitation Statutes' Impact on Domestic Relations Practice*, 16 J. Am.

Acad. Matrim. Law. 379, 381-425 (2000) (identifying only four other states that provide for

civil damages and only one — Arizona — that provides for treble damages), and Plaintiffs'

submissions suggest that very few class members are eligible to seek treble damages under other

states' laws.  *See* Mills Rep. Ex. 14 (identifying just eight Arizona policies).

      On top of that, it is noteworthy that very few class members have filed their own claims;

although there are more than 1,400 policies at issue, *see* Mills Rep. Ex. 3, the Court is aware of

only seven individual actions filed in federal and state court.  Given the totality of these

circumstances, the Court doubts that, as a practical matter, foregoing claims for systematic

breach of contract in other states is likely to reduce any class member's recovery.  Moreover, to

the extent there is any such risk, the Court can minimize it by expressly reserving the right of

absent class members who live outside of New York and California to file other claims arising

out of the policy in later litigation.  *See* Restatement (Second) of Judgments § 26(b) (providing

that the rule against claim-splitting does not apply when "[t]he court in the first action has

expressly reserved the plaintiff's right to maintain the second action").  To be sure, there is no

guarantee that a later court would honor such a reservation.  *See, e.g.*, *In re Vitamin C*, 279

F.R.D. at 115-16 (noting that "express[] reserve[ation]" of "the right of the [absent class members] to maintain [other] claims in subsequent proceedings" is "not a guarantee of what subsequent courts will actually do").  But neither Plaintiffs nor AXA provide any reason not to protect absent class members in this manner.  *See* Pls.' Supp. Br. 17-19; Def.'s Supp. Br. 17-18. And doing so would undoubtedly further reduce the already-low risk that absent class members would be precluded from later bringing valuable claims.  *See In re Vitamin C*, 279 F.R.D. at 116 (finding an express reservation "sufficient to extinguish defendants' claim-splitting concerns for the purpose of class certification").

In sum, the Court agrees with Plaintiffs that the best interests of all absent class members are served by certification.  Thus, all the requirements of Rule 23(a), including adequacy of representation, are satisfied.

### b.  Rule 23(b)(3) Requirements

AXA concedes that the Rule 23(b)(3) requirements of predominance and superiority are met, *see* Opp'n 38 (noting that AXA "does *not* oppose class certification of Plaintiffs' breach of contract claim"), and the Court has no reason to conclude otherwise.  The class members' contract claims rise and fall together.  Their contracts with AXA are identical in all material respects, and Plaintiffs allege that AXA breached each contract through a single course of action with respect to every policy included in the class.  *See* ECF No. 354-1; ECF No. 354-5, at 12; *see also Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2013 WL 12224042, at *11-15 (S.D.N.Y. July 12, 2013) (holding that common issues predominate in similar COI litigation). The overwhelming similarity of the class members' contract claims, coupled with the fact that few individual actions have been filed and the economies of scale that would be produced by litigating the claims in the aggregate, also supports a finding of superiority.  *See Public Emps.'*

*Ret. Sys. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (finding superiority where "there is no overwhelming interest by class members to proceed individually" and where "only two investors" of more than 1,600 were independently pursuing claims).  These conclusions are unaffected by the fact that class members' policies may be subject to different states' laws because, as the Second Circuit observed in affirming certification of a nationwide class, "state contract law defines breach consistently such that the question will usually be the same in all jurisdictions."  *In re U.S. Foodservice*, 729 F.3d at 126-27.

### c.  Class Definition

That leaves only the precise definition of the class.  AXA takes issue with Plaintiffs' proposed class definition in two respects.  First, it argues that the class definition should be clarified to include only policyowners on or after March 8, 2016, the effective date of the challenged COI increase.  *See* Opp'n 39.  Plaintiffs do not object, and the Court agrees.  Second, AXA argues that the class should be limited to registered owners of an AUL II policy because the policies, by their terms, prohibit assignment except "by written notice in a form satisfactory to [AXA]."  ECF No. 354-7, at 10; *see id.* (providing that AXA "will not be bound by an assignment unless [it] ha[s] received it in writing"); *see also* Opp'n 38-39.  Relying on New York law, Plaintiffs counter "that assignments without notice to the carrier are not void unless the policy expressly so states."  *See* Reply 25.  The Court is inclined to think that AXA has the better of the argument, as the policy provisions appear to prohibit assignments without notice rather than creating a "mere[] covenant against assignments, [which would] give[] rise only to a claim for damages against the assignor for violation of the covenant."  *Sullivan v. Int'l Fidelity Ins. Co.*, 96 A.D.2d 555, 556 (N.Y. App. Div. 1983); *see Cole v. Metro. Life. Ins. Co.*, 273 A.D.2d 832, 832-33 (N.Y. App. Div. 2000) (holding an assignment void where the contract

provision stated that "[a]ssignment . . . is not permitted").  But the Court refrains from reaching that conclusion today because the issue has not been fully briefed and if it proves to be incorrect then many rightful class members might not receive notice of their right to opt out of the class. In any event, Plaintiffs' proposed definition is, at this stage, acceptable.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig. (MTBE I)*, 241 F.R.D. 185, 189, 195-96 (S.D.N.Y. 2007) (certifying a class of "all persons owning real property in the vicinity of [a particular gas station] who have suffered a legally cognizable injury due to contamination" and noting that "[t]he ascertainability of a class depends on whether there will be a definitive membership in the class once judgment is rendered"); *see also* Charles A. Wright, Arthur R. Miller & Mary K. Kane, Fed. Prac. & Proc. Civ. § 1760 (3d ed. Aug. 2019) (observing that the class description need only be "sufficiently definite that it is administratively feasible for the court to determine whether a particular individual is a member").

Accordingly, the Court certifies a nationwide Policy-Based Claims Class including all individuals who, on or after March 8, 2016, owned AUL II policies that were issued by AXA and subjected to the COI rate increase announced by AXA on or about October 1, 2015, as well as those residents' heirs, successors, or assigns, and excluding Defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing, and the plaintiffs in all Related Actions.

### 2.  California Policy-Based Claims Sub-Class

The Court turns, then, to the two proposed Policy-Based Claims sub-classes, beginning with the California Policy-Based Claims Sub-Class, which includes all members of the Policy-Based Claims Class who are California residents and on whose behalf Plaintiffs seek to bring claims under the CUCL.  *See* Proposed Order 2; Pls.' Mem. 24.

The Court need not and does not decide whether the Rule 23(a) requirements are met as to this proposed sub-class because Plaintiffs' arguments founder on the Rule 23(b) requirements of predominance and superiority.  That is because AXA asserts an affirmative defense with respect to Plaintiffs' claims under the CUCL that changes the calculus.  Specifically, according to AXA, a substantial number of the policies at issue were obtained through stranger-originated life insurance ("STOLI") schemes.  *See* Opp'n 33.  In a STOLI scheme, "a life insurance policy is procured for the purpose of selling the policy to investors who, although they have no insurable interest in the life of the insured, will fund the premiums and receive the benefits when the insured dies.  In such transactions, all costs are usually borne by the investors who are, in essence, betting that the insured will die before the total cost of premiums exceeds the proceeds of the policy."  *Bernstein v. Principal Life Ins. Co.*, No. 09-CV-4925 (CM) (HBP), 2010 WL 4922093, at *1 (S.D.N.Y. Dec. 2, 2010).  STOLI schemes have been illegal under California law since 2010, *see Nationwide Life & Annuity Ins. Co. v. Pan*, No. SACV 12-0722 (AG) (RNBx), 2012 WL 13020330, at *4 (C.D. Cal. Oct. 15, 2012), and AXA argues that owners of policies that originated in such a scheme thus have unclean hands and cannot recover.

Affirmative defenses "may, and must, be considered in the predominance analysis."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 572 (S.D.N.Y. 2018).  Doing so here precludes a finding that questions of law or fact common to the class members predominate over any questions affecting only individual members.  That is because individual questions about each policy — when it was originated, to whom it was initially issued, why that individual took out a policy, whether and when the original policyholder sold the policy and to whom, and whether they had ever communicated and about what — will have to be litigated.  In arguing otherwise, Plaintiffs suggest that STOLI schemes do not give rise to an unclean hands

defense and that the defense is available only if the insurer tenders all premiums paid for any policy. *See* Reply 19 n.31. But *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 288 F.R.D. 282 (S.D.N.Y. 2012), upon which they rely, does not support the weight they put upon it. Yes, the *U.S. Bank* court stated that insurers asserting a STOLI defense "must seek a declaratory judgment." *Id.* at 287. But the authority it cited for that proposition held merely that declaratory judgment actions are permissible, not required. And yes, the *U.S. Bank* court indicated that insurers asserting a STOLI defense may not "continue to collect premiums" and instead must "tender the premiums paid to the court." *Id.* But in doing so, it relied on cases in which the insurer had learned of facts allowing for rescission of the policy. *See id.* Here, by contrast, AXA needs discovery in order to determine which policies resulted from STOLI schemes.

In the alternative, Plaintiffs attempt to dismiss the STOLI defense as "speculative." *See* Reply 19 n.31. In light of the red flags identified by AXA's expert, ECF No. 369-30, Ex. 249 ("Hubbard Rep."), ¶¶ 81-91, however, the Court concludes that that label is unwarranted. As the Sixth Circuit recognized in the very case Plaintiffs cite, "where defendants point to some evidence that a defense will indeed apply to some class members" — as AXA does here — the common and individual issues of that defense must be considered. *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016). Plaintiffs also incorrectly argue that AXA's defense cannot defeat certification because it is relevant to remedies, not liability. *See* Reply 24-25. Although "the fact that [remedies] may have to be ascertained on an individual basis" is not necessarily fatal to class certification, it is "one factor" that must be considered when determining whether "issues susceptible to generalized proof 'outweigh' individual issues." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Considering all of the

relevant factors, the Court cannot find that common issues predominate over individual ones. Thus, Plaintiffs' motion to certify a California Policy-Based Claims Sub-Class is denied.[4]

### 3. California Elder Policy-Based Claims Sub-Class

The second proposed Policy-Based Claims sub-class is the California Elder Policy-Based Claims Sub-Class, which includes all members of the California Policy-Based Claims Class whose policies are funded by a California resident aged sixty-five or older and on whose behalf Plaintiffs seek to bring claims under the California Elder Abuse Law  *See* Proposed Order 2.

The Court concludes that this Sub-Class cannot be certified either, however, because Plaintiffs fail to prove by a preponderance of the evidence that Mr. Dyer — the proposed class representative — adequately represents the sub-class and that his claims are typical of those held by the proposed class.  For starters, it is not at all clear that Mr. Dyer is even a member of the proposed sub-class: Plaintiffs do not show by a preponderance of the evidence that someone over the age of sixty-five pays premiums associated with the policy owned by the Currie Children Trust, of which Mr. Dyer is trustee.  *See* ECF No. 369-9, Ex. 42 ("M. Currie Dep."), at 200 (testifying that he does not recall any premium payment that he or his wife made in their personal capacities); ECF No. 369-9, Ex. 38 ("B. Currie Dep."), at 220 (testifying that "for the entire time of the policy" the funds "used to pay premiums on the policy [have come] from a trust"). The Court cannot certify a class whose proposed representative does not even belong in it.  *See Norman v. Conn. State Bd. of Parole*, 458 F.2d 497, 499 (2d Cir. 1972) ("[I]t is clear that

---

[4]     The Court recognizes that, without a California Policy-Based Claims Sub-Class, class members who would fall into that sub-class might be precluded from later bringing claims for systematic breach under the CUCL.  But for the reasons stated by Plaintiffs, *see* Pls.' Supp. Br. 15 & n.13, the Court perceives that risk to be low.  Moreover, as Plaintiffs note, *see id.* at 5, the claims have minimal marginal value.  Accordingly, the Court's conclusion that claims for systematic breach under the CUCL are not susceptible to class treatment does not alter the Court's conclusion regarding the Policy-Based Claims Class writ large.

a named plaintiff cannot bring suit for a class of which he is not a part.").  Second, even if the

Curries do pay the premiums, Plaintiffs do not explain why that confers standing upon *Mr. Dyer*,

*as a trustee*, under the California Elder Abuse Law.  Accordingly, the Court concludes that

Plaintiffs' motion to certify a California Elder Policy-Based Claims Sub-Class founders on both

the typicality and adequacy-of-representation requirements and must be denied.[5]

## B.  Certification of Illustration-Based Claims Classes

Plaintiffs also move for certification of a nationwide class with respect to claims arising

out of alleged misrepresentations, along with sub-classes of New York and California residents.

In particular, Plaintiffs seek certification of (1) a nationwide Illustration-Based Claims Class, on

whose behalf Plaintiffs seek to assert claims under Section 4226 of the New York Insurance

Law; (2) a New York Illustration-Based Claims Sub-Class, on whose behalf Plaintiffs also seek

to assert claims under Section 349 of the New York General Business Law; and (3) a California

Illustration-Based Claims Sub-Class, on whose behalf Plaintiffs seek to assert additional claims

under the CUCL.  The Court considers each in turn.

### 1.  Nationwide Illustration-Based Claims Class

First, Plaintiffs move to certify a nationwide class composed of all members of the

Policy-Based Claims Class "who are owners of AUL II policies without a Lapse Protection Rider

---

[5]        The Court concludes that it is prudent to expressly reserve — and does expressly reserve
— the absent class members' rights to later pursue claims under the California Elder Abuse Law.
Unlike the claims for systematic breach under the CUCL, elder abuse claims may have
substantial value, as treble damages may be available.  *See* Cal. Civ. Code § 3345(b).  And while
Plaintiffs argue that claim preclusion would not apply where the Court refuses to certify a class,
*see* Pls.' Supp. Br. 15 & n.13, that may not be true here, as the Court's denial is based on the
characteristics of the proposed class representative, not the nature of the claims.  *See, e.g.*,
*Feinstein*, 535 F. Supp. at 606-07 (explaining that, where a class representative asserts claims
only for "breach of an implied warranty," class members with claims "for death, injury, accident-
related property damages, or other consequential damage" would face "significant risks of being
told later that they had impermissibly split a single cause of action").

issued after July 10, 2006." Proposed Order 2.[6] On behalf of this nationwide class, Plaintiffs

seek to bring claims under Section 4226 of the New York Insurance Law. In particular, they

allege that AXA knew it would have to increase the COI of the AUL II policies as early as July

10, 2006, but concealed that fact in illustrations promulgated in connection with the sale and

maintenance of the policies until the increase was announced in 2015.

Much of the parties' dispute regarding certification is attributable to disagreements over

the elements of a Section 4226 claim. Accordingly, the Court begins with the substantive law

and then turns to the requirements of Rule 23.

### a. Elements of a Claim Under Section 4226

Section 4226 provides, in relevant part, that no insurer authorized to sell life insurance in

New York shall "issue or circulate, or cause or permit to be issued or circulated on its behalf, any

illustration, circular, statement or memorandum misrepresenting the terms, benefits or

advantages of any of its policies or contracts." N.Y. Ins. Law § 4226(a)(1). If an insurer

"knowingly violates" that edict or "knowingly receives any premium or other compensation in

consequence of such violation . . . any person aggrieved" may file suit against the insurer, and

the insurer is "liable to a penalty in the amount of such premium or compensation." *Id.*

§ 4226(d). The parties disagree about whether the "person aggrieved" must have received,

reviewed, and relied on the misrepresentation. *Compare* Pls.' Mem. 21-23, *with* Opp'n 17-19.

Plaintiffs have the better of the argument with respect to reliance. Significantly, the

statute contains no reference to reliance. And neither the legislative history nor the limited case

---

[6]     It is not immediately apparent why the proposed class is limited to owners of AUL II
polices "without a Lapse Protection Rider," as neither party addresses the issue. Nevertheless,
the limitation is proposed by Plaintiffs and the Court fails to see any problems inherent in the
limitation. Accordingly, the Court need not and does not address it further.

law interpreting Section 4226 itself suggests that a reliance requirement should be read into the statute. *See* Pls.' Mem. 22 n.72 (noting that, in 1969, the New York Legislature amended Setion 4226's sister provision, regulating the conduct of insurance brokers and agents, to require reliance, but it added no such requirement to Section 4226); *Brenkus v. Metro. Life Ins. Co.*, 309 A.D.2d 1260, 1262-3 (4th Dep't 2003) (affirming dismissal of a fraud claim because the plaintiff could not "establish the essential elements of actual and reasonable reliance," but holding that a claim under Section 4226 could proceed). AXA argues that the statute should be read to require proof of reliance because only those "aggrieved" by a misrepresentation can file suit and they can recover only an amount equal to "any premium or other compensation" the insurer received "in consequence of" the misrepresentation. N.Y. Ins. Law § 4226(d); *see* Opp'n 17-18 (citing *Gale v. IBM Corp.*, 9 A.D.3d 446, 447 (N.Y. App. Div. 2004)). But courts have held that "aggrieved" should be interpreted broadly to mean any plaintiff who meets the standing requirements of Article III. *See Robainas v. Metro. Life Ins. Co.*, No. 14-CV-9926 (DLC), 2015 WL 5918200, at *7 (S.D.N.Y. Oct. 9, 2015) ("[A]n aggrieved party [under Section 4226] is one that experiences some sort of wrong or harm. . . . [C]ourts have understood 'aggrieved' as requiring an injury-in-fact coextensive with the requirements of Article III."), *aff'd sub nom. Ross v. AXA Equitable Life Ins. Co.*, 680 F. App'x 41 (2017) (summary order). And, depending on the alleged injury and theory of causation, someone can be "aggrieved" — that is, harmed — by a misrepresentation without necessarily having relied on it. For example, a misrepresentation can artificially inflate the market price of a product, causing a plaintiff to pay more for it than she otherwise would have — regardless of whether she even saw the misrepresentation. *See, e.g., Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1104 (N.D. Cal. 2018) ("It is well-established that the 'price premium' attributable to an alleged misrepresentation on product

labeling or packaging is a valid measure of damages in a mislabeling case under [certain statutes].")); *accord In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827 (SI), 2011 WL 4501223, at *3 (N.D. Cal. Sept. 28, 2011).[7]  Thus, Section 4226 does not necessarily require a plaintiff to prove that she reviewed and relied upon a misrepresentation.  The plaintiff must do so only if it is required by the particular injury and theory of causation alleged.

An inflated market price does not appear to be at issue in this case, but, relying on *Stutman v. Chemical Bank*, 95 N.Y.2d 24 (N.Y. 2000), Plaintiffs argue that their alleged injury and theory of causation do not require proof of reliance either.  *See* Reply 5-10.  The plaintiffs in *Stutman* had taken out a loan from the defendant, and the note provided that the plaintiffs could "prepay the principal at any time without incurring 'any prepayment charge.'"  95 N.Y.2d at 26. The borrowers later sought to refinance the loan with another bank, but the defendant bank informed the plaintiffs that it would charge an "attorney's fee" to carry out the steps necessary to do so.  *See id.* at 27.  The borrowers alleged that the bank had violated Section 349 of the New York General Business Law "by promising . . . that there would be no 'prepayment charge'" and then assessing a fee when they sought to refinance their loan.  *Id.* at 29.  Because the fee was really a "prepayment charge" in disguise, the plaintiffs argued, "the note was deceptive for not revealing that fee."  *Id.*  The Appellate Division dismissed the plaintiffs' claims because they had not shown that disclosure of the fee would have affected their decision to take out the loan.  *See*

---

[7]      Imagine, for example, that a company sells a pen and advertises that it is a rugged writing instrument that can survive any environment, all the while knowing that the pen will break the first time it falls onto a hard surface.  Before it is released, the pen generates significant buzz due to its alleged ruggedness and, because the initial supply is limited, the company charges a high price.  One customer purchases the pen at that high price not because it can withstand abuse, but because it looks just like the pen that a cherished relative used, and the customer intends to frame it.  That customer is surely "aggrieved," even though the misrepresentation was irrelevant to the customer's decision to purchase the pen.  But for the misrepresentation, the price of the pen may have been lower, and the customer would have paid less for it.

*id.* at 30.  The Court of Appeals reversed, holding that the Appellate Division had confused causation with reliance, which is not required by Section 349, and that the plaintiffs had satisfied the former requirement merely by alleging that "because of the defendant's deceptive act, they were forced to pay a $275 fee that they had been led to believe was not required."  *Id.*  In other words, the *Stutman* court held, where a seller wrongly promises that there will be no fees, the mere payment of the hidden fee later is sufficient to establish causation.

Thus, *Stutman* recognized a second theory of causation based on neither reliance nor market price.  *Stutman* did involve claims under Section 349, not Section 4226.  But the statutes are substantially similar (indeed, the parties here effectively treat them as the same), and the decision is useful because it illuminates the difference between reliance, which neither statute requires, and causation, which is required by both.  *See* ECF No. 386 ("Sur-reply"), at 5.  And Plaintiffs' allegations here are materially indistinguishable from those in *Stutman*.  Like the plaintiffs in *Stutman*, Plaintiffs here argue that AXA hid fees.  Like the plaintiffs in *Stutman*, Plaintiffs here argue that AXA made misrepresentations regarding the future costs of the AUL II policies.  Like the plaintiffs in *Stutman*, Plaintiffs here allege that AXA knew its representations were false when they were made.  And like the plaintiffs in *Stutman*, Plaintiffs here allege that AXA eventually imposed the fees it had hidden.  Under *Stutman*, that is enough to satisfy the requirement of causation.  And contrary to AXA's contentions, that is not inconsistent with the injury-in-fact requirement for Article III standing.  *See* Sur-reply 5-7.  *Stutman* demonstrates that New York law guarantees purchasers what they were promised, at least when the promise was made in bad faith.  Thus, the relevant question is not what choice purchasers would have made had they been aware of that which the seller had attempted to hide, but rather whether "the defendant abided by its representation" and, if the defendant failed to do so, whether that failure

injured the plaintiffs, monetarily or otherwise.  *In re Amla Litig.*, 320 F. Supp. 3d 579, 592 (S.D.N.Y. 2018).  Broken promises are plainly cognizable injuries under Article III; to hold otherwise would be inconsistent with the litigation of contract claims in federal court.

The Court, therefore, agrees with AXA's contention that, given the nature of the harms alleged in this case, each Plaintiff may recover only if she actually read, received, or became aware of a misrepresentation.  Otherwise, the promise-based theory would make little sense. Consider, for example, a variation on the facts in *Stutman*.  If the misrepresentations there had been made to other borrowers, and the Stutmans had conceded that neither they nor anyone else involved in the decision to take out the loan had been aware of the representation, it would be hard to explain how they can be said to have been "aggrieved."  Put differently, people generally have no right to the benefit of a promise of which they were completely unaware.  Plaintiffs' arguments to the contrary are unpersuasive.  To be sure, the court in *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239 (E.D.N.Y. 2019), did state that, in light of *Stutman*, it would be "inappropriate[]" to read a "*seeing* requirement" into Section 349.  *Id.* at 267.  But the theory of causation alleged in *Hasemann* was that "the advertising and labeling practice allowed a price premium to be charged."  *Id.* at 264.  The market-price-based theory of causation, unlike the promise-based theory, does not depend on the consumer's awareness of the representation.  And Plaintiffs here are not proceeding based on the market-price-based theory. Moreover, the *Hasemann* court did not reject an exposure requirement entirely; instead, it rejected the defendants' bid to adopt an individualized exposure requirement and found that, "in the current case, exposure was sufficiently uniform" to raise a plausible Section 349 claim.  *Id.* at 267.

Notably, the requirement to prove exposure is not overly demanding.  In *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817 (2016), the New York Court of Appeals confirmed

that "indirect communication" can establish a claim for fraud, provided that the defendant made "the statement . . . with the intent that it be communicated to plaintiff and that the plaintiff rely on it." *Id.* at 828; *see also Amusement Ind., Inc. v. Stern*, 721 F. App'x 9, 12 (2d Cir. 2018) (summary order).  The same principle applies here.  Plaintiffs can meet the exposure requirement by showing that AXA promulgated documents containing an alleged misrepresentation, knowing that the documents or the alleged misrepresentation would be communicated to the claimants, directly or indirectly, and that the claimants actually received such a document or became aware of the alleged representation, directly or indirectly.  It follows that Plaintiffs need not show that they "personally review[ed]" the challenged illustrations.  Opp'n 18.  It would suffice if, for example, a prospective policy owner relied on a financial advisor to review the materials containing the illustration, provided that the advisor actually did so.

In sum, to establish a claim under Section 4226, Plaintiffs must show that (1) AXA misrepresented the terms, benefits, or advantages of its AUL II policies; (2) the misrepresentation was material; (3) AXA knew that it had misrepresented the terms, benefits, or advantages of the AUL II policies; (4) AXA knew that the documents containing the misrepresentation would be communicated to the claimants, directly or indirectly; (5) the claimants received such a document or learned of the misrepresentation, directly or indirectly; (6) AXA did not abide by its representation; and (7) the claimants were thereby injured.

### b.  Rule 23(a) Requirements

With that, the Court turns to the Rule 23 analysis itself.  Most of the Rule 23(a) requirements are easily satisfied by the proposed nationwide Illustration-Based Claims Class and do not require extended discussion.  First, the class clears the numerosity bar several times over, as it encompasses owners of 679 AUL II policies.  *See* Mills Rep. Ex. 6.  Second, because AXA

maintains records of each policy's registered owner, there is no dispute that class members are readily ascertainable.  Third, several common issues bind the class — for example, whether the illustrations were misleading, whether any misrepresentation was material, and AXA's knowledge — and satisfy the commonality requirement.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011) ("[A] single common question will do.").  Finally, because the proposed class representatives challenge the very same conduct as other class members, they satisfy the typicality requirement.  AXA contests none of these elements.  Indeed, in its opposition and sur-reply, AXA seemed to concede that the proposed nationwide Illustration-Based Claims Class meets *all* requirements under Rule 23(a).  *See* Opp'n 17-25 (arguing only that common questions do not predominate over individual ones); Sur-reply 2-9 (same).

Prompted by the Court's order directing the parties to address the issue of claims-splitting, however, AXA now opposes certification of the Illustration-Based Claims Class on the ground that "Plaintiffs' claim-splitting strategy creates 'an irreconcilable conflict with the class,' rendering Plaintiffs inadequate class representatives."  Def.'s Supp. Br. 2 (quoting *Slade*, 856 F.3d at 412-13).  Upon review of the parties' supplemental submissions, the Court disagrees.  First, although AXA attempts to reargue the point, *see id.* at 6-7, the Court has repeatedly held that Section 4226 applies to AXA's policies issued outside of New York.  *See Yale v. AXA Equitable Life Ins. Co.*, No. 14-CV-2904 (JMF), ECF No. 55, at 6-7 (S.D.N.Y. Nov. 12, 2014); *Brach Family Found.*, 2018 WL 1274238, at *2.[8]  Second, Plaintiffs assert, without dispute from

---

[8]     AXA also argues that, even if Section 4226 applies outside of New York, choice-of-law and due process principles suggest that it will not apply to most class members' claims.  *See* Def.'s Supp. Br. 7-11.  The Court is not convinced, but it need not weigh in on these arguments here.  These arguments might be relevant to the analysis under Rule 23(b)(3) — indeed, AXA now argues, for the first time, that class adjudication is unmanageable because choice-of-law and due process inquiries must be individualized, *see id.* at 8 — but AXA failed to raise them in both its opposition and sur-reply.  That is reason enough to disregard them.

AXA, that the potential recovery under Section 4226 — namely, damages "in the amount of all premiums or other compensation AXA received," Pls.' Supp. Br. 6 (internal quotation marks omitted) — is likely to exceed recovery from any foregoing state-specific claims.  Finally, as discussed above, the Court can — and does — expressly reserve the right of absent class members who live outside of New York and California to file other claims arising out of the representations at issue.  *See In re Vitamin C*, 279 F.R.D. at 115-16.

Accordingly, the Court finds that the nationwide Illustration-Based Claims Class meets all of Rule 23(a)'s requirements, including the adequacy-of-representation requirement.

### c.  Rule 23(b)(3) Requirements

The Rule 23(b)(3) requirements are also satisfied.  First, the Court finds that common issues — that is, those "subject to generalized proof, and thus applicable to the class as a whole," *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) — predominate over individual ones.  In order to recover under Section 4226, each class member must prove that AXA misrepresented the terms, benefits, and advantages of the AUL II policies; that these misrepresentations were material; that AXA knew its representations were false or misleading at the time they were made; that AXA knew its misrepresentations would be communicated to policy owners; and that AXA did not abide by its representations.  Against this veritable laundry list of common questions, AXA identifies two elements that it claims require individualized proof: class members' knowledge or receipt of the alleged misrepresentations and damages.  *See, e.g.*, Opp'n 17-18, 33-34.[9]  But neither undermines a finding of predominance.

---

[9]      In one sentence, AXA also states that "resolving whether each claim is subject to an affirmative defense due to participation in a STOLI scheme" is an "individual inquiry."  Opp'n 24.  But AXA's opposition's stray reference to an "affirmative defense" does not properly raise one.  First, in the same sentence, AXA suggests that whether a policy was acquired as part of a STOLI scheme is relevant only to reliance — which, as explained, is not an element of a claim

Taking the latter issue first, the Court finds that Plaintiffs propose an adequate damages methodology for class certification purposes.  AXA argues that Plaintiffs simply propose "adding up premiums paid on the Policies that are part of the proposed class, whether by current or prior owners."  *Id*. at 34.  Were that the only methodology offered by Plaintiffs' expert, the Court might agree that it is inadequate because it does not match Plaintiffs' theory of harm.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." (internal quotation marks omitted)); *Stutman*, 95 N.Y.2d at 30 (holding that the defendant's misrepresentation caused a loss equal to the hidden fee).  But Plaintiffs' expert also "calculated COI overcharges . . . using the same formulas, uniform methodology, and data sources" as for the claims for breach of contract.  *See* Mills Rep. ¶¶ 46, 49.  This methodology is consistent with the theory of harm Plaintiffs press in this motion, and it eliminates any concerns regarding individualized damages inquiries.  *See Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 369 (S.D.N.Y. 2014) ("Here, the plaintiffs' theory of damages is consistent with their theory of liability, and computing damages is likely to be a mere matter of arithmetic.").[10]

---

under Section 4226.  *See id.* (arguing that, if a policy was involved in a STOLI scheme, "illustrations likely played no role in the prior owner's purchase and sale decisions").  Second, AXA repeatedly suggests that STOLI schemes were common in California, but it does not make similar allegations with respect to most other jurisdictions.  *See, e.g.*, *id*. at 16 ("AUL II policies were among those targeted . . . in a widespread STOLI scheme based in California and Wisconsin, where many Policies were issued."); ECF No. 369, ¶¶ 102, 111-15, 161-78 (alleging STOLI schemes in California).  Most importantly, however, AXA expressly asserts an unclean hands defense only with respect to claims under California law.  *See* Opp'n 32 (arguing that "Plaintiffs ignore . . . the necessity of mini-trials to address AXA eq.'s affirmative defense of unclean hands to the California Statutory Claims").

[10]     It is true that this theory of damages differs from certain injuries alleged in the complaint, *see, e.g.*, TAC ¶ 91 (alleging that, but for the misrepresentations, policy owners "would not have bought the policy at all or, if purchased after issuance, the purchaser would have paid much less"); *id.* ¶ 92 (alleging that, but for the misrepresentations, "Plaintiffs would have avoided pouring hundreds of thousands of dollars of additional premiums into the policy [prior to the

Nor do questions regarding class members' knowledge or receipt of the challenged misrepresentations defeat predominance.  For one thing, there is at least some relevant common evidence.  AXA issues an illustration in connection with its initial sale of every policy, which must be signed by the policy owner.  *See* ECF No. 354-36, at 8.  AXA also keeps records of illustrations issued to policy owners and other authorized individuals while the policy is "in force," and it has maintained copies of all such illustrations issued since 2012.  *See* ECF No. 365 ("Jantz Decl."), ¶ 7.  And, although AXA does not have records of illustrations generated by third-party brokers or agents using AXA's illustration software, *see id.* ¶ 6, Plaintiffs argue that a factfinder can infer knowledge because illustrations are the only indicator of projected future COI rates, critical information about the policies' cost, *see* Reply 11-12.  AXA claims, first, that a reasonable person would not understand the illustrations to constitute projections, *see* Opp'n 22-23 n.15; ECF No. 369-30, Ex. 252 ("Pfeifer Rep."), ¶¶ 245-50, but that is of limited relevance at this stage.  That is a common question, and if AXA is correct, the illustrations are not material, and Plaintiffs' claims will fail on a class-wide basis.  AXA also argues that there are other sources for information about COI rates, such as policy lapse notices and annual policy statements.  *See* Sur-reply 8.  But each source of information that AXA identifies reflects only the then-prevailing COI rate.  They say little about what rates are likely to be in the future.  *See, e.g.*, Mills Rep. ¶¶ 25-28 & Table 3 (showing that COI rates increase each year); ECF No. 354-11 ("Rouse Rep."), at 71 (graphs showing increasing COI rates).  Several million dollars may ride on future COI rates.  *See* ECF No. 377-1 ("Rouse Rbtl. Rep."), ¶¶ 55-65.

---

COI increase]"); *id.* ¶ 93 (alleging that "[t]he marketability of Plaintiffs' policies . . . has also been destroyed by AXA's materials misrepresentations").  To the extent this theory of injury is new, it does not prejudice AXA; it raises no new issues and essentially duplicates the proposed measure of damages for Plaintiffs' claims for breach of contract.

To be clear, the Court does not hold that individual inquiries — into what class members knew or whether they received misrepresentations — are unnecessary.  But the importance of any such inquiry would pale in comparison to the critical common issues — including whether the illustrations were materially misleading and whether AXA knew they were at the time.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." (internal quotation marks omitted)).  Common questions are not just "more substantial" than individual ones — they form the crux of the class claims.  *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010).  The Court's conclusion would not change even if it were to conclude that more trial time would be devoted to these individual issues than common ones.  *See* Wright, Mary K. Kane, Fed. Prac. & Proc. Civ. § 1778 ("It seems specious and begging the question to say that if these 500 law suits were brought into a class so that proof on the issues of conspiracy need be adduced only once and the result then becomes binding on all 500, that thereby the common issue of conspiracy no longer predominates because from a total time standpoint, cumulatively individual damage proof will take longer." (quoting *Minnesota v. U.S. Steel Corp.*, 44 F.R.D. 559, 569 (D. Minn. 1968))).  When "the nature and significance" of common issues is weighed against individual issues, the balance tips firmly in favor of aggregation.  *In re Petrobras*, 862 F.3d at 271.

Finally, the Court finds that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  AXA argues that individual questions render class litigation unmanageable, *see* Opp'n 35, but denying certification on that ground alone "is disfavored and should be the exception rather than the

rule," *In re Petrobras*, 862 F.3d at 268 (internal quotation marks omitted).  In any event, for reasons already described, AXA's concerns regarding the burdens of individual inquiries are overstated.  AXA also argues that class certification is unwarranted because the putative class members are "'highly sophisticated, knowledgeable financial institutions or wealthy private investors' who are unlikely to 'need [plaintiffs] to defend their interests.'"  Opp'n 35 (quoting *Royal Park Invs. v. Wells Fargo Bank, N.A.*, No. 14-CV-9764 (KPF) (SN), 2018 WL 739580, at * (S.D.N.Y. Jan. 10, 2018)).  The sophistication of putative class members is certainly relevant, *cf. Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014), but it is not dispositive, particularly when, as here, "the advantages of unitary adjudication exist to determine the defendant's liability," *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011) (internal quotation marks omitted).  That conclusion is bolstered by the fact that only a handful of AUL II policies nationwide are the subject of separate lawsuits.  *See id.* at 120-21.

In sum, the Court finds that the requirements of Rule 23(a) and (b)(3) are satisfied and thus grants Plaintiffs' motion to certify a nationwide Illustration-Based Claims Class composed of all individuals who, on or after March 8, 2016, owned an AUL II policy unaccompanied by a Lapse Protection Rider that was issued by AXA and subjected to the COI rate increase announced by AXA on or about October 1, 2015, excluding defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing, and the plaintiffs in the Related Actions.

### 2.  New York Illustration-Based Claims Sub-Class

The Court also finds that Plaintiffs meet their burden with respect to certification of the proposed New York Illustration-Based Sub-Class — composed of all members of the

Illustration-Based Claims Class who reside in New York — on whose behalf Plaintiffs seek to assert additional claims under Section 349 of the New York General Business Law.  Notably, the elements of a claim under Section 349 of the New York General Business Law are so similar to the elements of a claim under Section 4226 of the New York Insurance Law that the parties' briefs hardly distinguish between the two.  *See* Pls.' Mem. 23; Opp'n 25-26; Reply 2-7; Sur-reply 5-7.  Thus, the Court need only address two additional points, and briefly at that.

First, although the proposed New York Illustration-Based Claims Sub-Class is limited to members of the Illustration-Based Claims Class who reside in New York, it still satisfies Rule 23(a)'s numerosity requirement because fifty-three of the policies whose owners are eligible for inclusion in the nationwide class are owned by New York residents.  *See* Mills Rep. Ex. 7.[11] Second, AXA argues that, for one reason or another (typicality, adequacy of representation, and predominance), certification of the proposed New York Illustration-Based Claims Sub-Class should be denied because defendants are liable under Section 349 only for "consumer-oriented" conduct, *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 435 (S.D.N.Y. 2009), and Plaintiffs' proposed class representative, the Brach Foundation, is an investor, not a consumer, *see* Opp'n 29, 35-36.  These arguments are meritless.  It is well established that, under Section 349, "[t]he critical question . . . is whether *the matter* affects the public interest in New York, not whether the suit is brought by a consumer or competitor."  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (emphasis added).  In other words, any plaintiff harmed by

---

[11]     In light of the fact that many AUL II policies are owned by investors who acquired the policies on the secondary market, *see* Hubbard Rep. ¶ 19, it is possible that there are fewer than fifty-three *owners* of these policies — the relevant question for purposes of the numerosity requirement.  But AXA is the only party in a position to confirm whether that is the case (because it refuses to identify the policy owners until after class certification, *see* ECF No. 354-39), and it makes no such argument.

consumer-oriented conduct can recover under Section 349, regardless of whether the plaintiff is itself a consumer.  *See id.*  Brach Foundation is therefore similarly situated to other class members; its claims are thus typical of the class, and it is an adequate representative.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("To establish typicality under Rule 23(a)(3), the party seeking certification must show that each member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." (internal quotation marks omitted)).  Additionally, there is no predominance problem.  In fact, if anything, the question of whether AXA's conduct was consumer-oriented is another question common to the proposed Sub-Class.

For these reasons, and for those discussed above with respect to the nationwide Illustration-Based Claims Class, the Court grants Plaintiffs' motion to certify the New York Illustration-Based Claims Sub-Class composed of all members of the Illustration-Based Claims Class who reside in New York.

### 3. California Illustration-Based Claims Sub-Class

Finally, Plaintiffs move to certify a California Illustration-Based Sub-Class — composed of all members of the Illustration-Based Claims Class who reside in California — on whose behalf Plaintiffs seek to assert misrepresentation-based claims under the CUCL.  But that request falls short for the reason that Plaintiffs' request for certification of a California Policy-Based Claims Sub-Class fell short: in light of AXA's unclean-hands STOLI defense, individual questions would predominate over common ones.  Accordingly, Plaintiffs' request for certification of a California Illustration-Based Sub-Class must be and is denied.  *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 98 (S.D.N.Y. 2017) (denying class certification because "the scale" of activity giving rise to unclean hands defenses was so significant that "Defendants'

counterclaims on the basis of unclean hands . . . would rapidly become the focus of th[e] litigation" were the class certified).[12]

## CONCLUSION

In conclusion, Plaintiffs' motion for class certification is GRANTED in part and DENIED in part. Specifically, the Court GRANTS Plaintiffs' motion to certify a nationwide Policy-Based Claims Class, a nationwide Illustration-Based Claims Class, and a New York Illustration-Based Claims Sub-Class, and it DENIES Plaintiff's motion to certify a California Policy-Based Claims Sub-Class, a California Elder Policy-Based Claims Sub-Class, and a California Illustration-Based Claims Sub-Class. The Court also GRANTS Plaintiffs' motion to appoint Allen Dyer as class representative of the Policy-Based Claims Class and the Illustration-Based Claims Class; GRANTS their motion to appoint the Brach Foundation as class representative of the Policy-Based Claims Class, the Illustration-Based Claims Class, and the New York Illustration-Based Claims Class; and GRANTS their motion to appoint Susman Godfrey L.L.P. as class counsel, substantially for the reasons set forth in their memoranda of law. As noted above, the Court expressly reserves the rights of all absent class members outside of New York and California to later bring any claim not actually litigated here, as well as the right of all absent class members to assert related claims under the California Elder Abuse Law.

No later than **two weeks from the date of this Opinion and Order**, Plaintiffs shall file a proposed order consistent with this Opinion and Order and prescribing procedures by which class members will be provided notice and an opportunity to opt out of the class. By the **same**

---

[12]     The Court concludes that its decision to deny certification of a California Illustration-Based Claims Sub-Class does not undermine its finding of adequate representation regarding the nationwide Illustration-Based Claims Class for the same reasons that the Court reached that conclusion with respect to the nationwide Policy-Based Claims Sub-Class. *See supra* note 3.

**date**, Plaintiffs shall file a letter brief addressing why their proposals for notice and opting out are consistent with the requirements of Rule 23 and due process.

One housekeeping matter remains.  By Order dated April 10, 2018, the Court granted the parties permission to file documents temporarily under seal.  *See* ECF No. 212.  Both Plaintiffs and AXA filed documents under seal in connection with the motion for class certification.  *See, e.g.*, ECF Nos. 356, 367, 370-71, 382, 387, 402. It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  Moreover, the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (citing cases).  Thus, any party that believes any materials currently under seal should remain under seal or be redacted is ORDERED to show cause in writing, no later than **two weeks from the date of this Opinion and Order**, why doing so would be consistent with the presumption in favor of public access. If, by that deadline, no party contends that any particular documents should remain under seal or in redacted form, then the parties shall promptly file such documents publicly on ECF.

The Clerk of Court is directed to terminate ECF No. 352.

SO ORDERED.

Dated: August 13, 2020
      New York, New York

_____
JESSE M. FURMAN
United States District Judge