**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| BRACH FAMILY FOUNDATION, INC., *et al.*, |
| Plaintiffs, |
| v. |
| AXA EQUITABLE LIFE INSURANCE COMPANY, |
| Defendant. |

No. 16 Civ. 740 (JMF)

**BRIEF OF THE AMERICAN COUNCIL OF LIFE INSURERS AS *AMICUS CURIAE***
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

David W. Ogden
Kelly P. Dunbar
Kevin M. Lamb
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C.  20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

Jarret A. Zafran
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Avenue
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888

## TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE*...................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................2

ARGUMENT .........................................................................................................5

I.    PROPER INTERPRETATION OF COST-OF-INSURANCE PROVISIONS SHOULD TAKE
      ACCOUNT OF THE FUNDAMENTAL BARGAIN OF INSURANCE, ACTUARIAL
      PRINCIPLES, AND STATE REGULATION OF LIFE INSURANCE.................................5

      A.    COI Provisions Should Be Interpreted Consistent With The Fundamental
            Bargain Of Life Insurance Policies And Established Actuarial Principles.............6

      B.    COI Provisions Should Be Interpreted Consistent With State Regulatory
            Principles And Practices ........................................................................9

II.   ILLUSTRATIONS ARE SUBJECT TO PROFESSIONAL STANDARDS OF PRACTICE AND
      COMPREHENSIVE STATE REGULATION..........................................................16

CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Consolidated Edison Co. of N.Y. v. Allstate Insurance Co.*,
   774 N.E.2d 687 (N.Y. 2002) .............................................................................................5

*Country-Wide Insurance Co. v. Wagoner*,
   384 N.E.2d 653 (N.Y. 1978) ...........................................................................................15

*County of Columbia v. Continental Insurance Co.*,
   634 N.E.2d 946 (N.Y. 1994) .............................................................................................5

*Cragg v. Allstate Indemnity Corp.*,
   950 N.E.2d 500 (N.Y. 2011) .............................................................................................5

*Fleisher v. Phoenix Life Insurance Co.*,
   18 F. Supp. 3d 456 (S.D.N.Y. 2014) ...............................................................................14

*Great Minds v. Fedex Office & Print Serices, Inc.*,
   886 F.3d 91 (2d Cir. 2018) ...........................................................................................5, 15

*Hanks v. Voya Retirement Insurance & Annuity Co.*,
   No. 16-cv-6399, 2020 WL 6439185 (S.D.N.Y. Sept. 30, 2020) ..................................9, 13

*Hugo Boss Fashions, Inc. v. Federal Insurance Co.*,
   252 F.3d 608 (2d Cir. 2001) ..............................................................................................6

*In re Estates of Covert*,
   761 N.E.2d 571 (N.Y. 2001) .............................................................................................5

*Johnson v. Travelers Insurance Co.*,
   199 N.E. 637 (N.Y. 1936) .................................................................................................5

*Kurcsics v. Merchants Mutual Insurance Co.*,
   403 N.E.2d 159 (N.Y. 1980) ...........................................................................................15

*State Farm Mutual Automobile Insurance Co. v. Fitzgerald*,
   38 N.E.3d 325 (N.Y. 2015) .............................................................................................15

*Westchester Fire Insurance Co. v. Schorsch*,
   129 N.Y.S.2d 67 (App. Div. 2020) ....................................................................................5

## DOCKETED CASES

*AXA Equitable Life Insurance Company v. Brach*, No. 20-2848 (2d Cir.).....................................1

*Vogt v. State Farm Life Insurance Co.*, Nos. 18-3419, 18-3434 (8th Cir.) .....................................1

# STATUTES, RULES, AND REGULATIONS

11 N.Y.C.R.R.
    § 48.0 ......................................................................................................14
    § 48.1 ......................................................................................................14
    § 53-1.3 .............................................................................................18, 19
    § 53-2.6 ...................................................................................................20
    § 53-2.7 .............................................................................................16, 20
    § 53-3.3 .......................................................................................18, 19, 20
    § 53-3.4 ...................................................................................................20
    § 53-3.7 ...................................................................................................18

Fed. R. Civ. Proc. 23(f) ...........................................................................................1

N.Y. Ins. Law
    § 3201 ....................................................................................................12
    § 3203 ....................................................................................................14
    § 3209 ....................................................................................................17
    § 4232 ....................................................................................................13

# REGULATORY GUIDANCE

Actuarial Standards Board, Actuarial Standards of Practice
    Preface to ASOPs, Doc. No. 073 (1989) .........................................................7
    No. 1, *Introductory Actuarial Standard of Practice* § 1 (rev. ed. Mar. 2013)....................7
    No. 2, *Nonguaranteed Charges or Benefits for Life Insurance Policies and
        Annuity Contracts* (rev. ed. Mar. 2013) ................................................8, 9, 14
    No. 24, *Compliance with the NAIC Life Insurance Illustrations Model
        Regulation* (rev. ed. Dec. 2016) .....................................................8, 17, 18, 19
    No. 54, *Pricing of Life Insurance and Annuity Products* (rev. ed. June 2018)...................8

National Association of Insurance Commissioners
    *Life Insurance* ........................................................................................2
    *Life Insurance Buyer's Guide* (2018) ............................................................16
    *Life Insurance Disclosure Model Regulation*, MDL-580 (2018) .......................11
    *Life Insurance Illustrations* (Feb. 25, 2020) ..................................................17
    *Life Insurance Illustrations Model Regulation*, MDL-582 (Apr. 2001)..............17, 18, 19
    *State Insurance Regulation* (2011) ..........................................................10, 11
    *The U.S. National State-Based System of Insurance Financial Regulation
        and the Solvency Modernization Initiative* (2013).........................................12
    *Universal Life Insurance Model Regulation*, MDL-585 (Jan. 2001)................11

New York Department of Financial Services
    Circular Letter No. 4 (Mar. 16, 1983)............................................................14
    *Institution Definitions and Descriptions*: *Life Insurance Companies*...............11
    *Life Bureau Filing Guidance Note* (July 17, 2019) .........................................19

*Life Bureau Filing Guidance Note*:  *Guidance for Life Insurance Policy
Illustrations* (Aug. 22, 2008) ....................................................................17
*Policyholder Protection* ..................................................................................11

## OTHER AUTHORITIES

Abraham, Kenneth S., *Four Conceptions of Insurance*, 161 U. Pa. L. Rev. 653 (2013) ..............12

American Council of Life Insurers, *What You Should Know About Buying Life
Insurance* (2018)..........................................................................................................2

*Appleman on Insurance* (Law Library ed. 2020)...........................................6, 7, 10, 11, 12, 14, 16

*Couch on Insurance* (3d ed. Dec. 2020) ....................................................................................14

Rubin, Harvey W., *Dictionary of Insurance Terms* (4th ed. 2000) .................................9

Shechtman, Richard G., *New Concepts in Life Insurance Planning: Universal Life*,
13 Cumb. L. Rev. 219 (1982) ...............................................................................7

## INTEREST OF *AMICUS CURIAE*

The American Council of Life Insurers ("ACLI") is the largest life insurance trade association in the United States, representing the interests of hundreds of member companies.[1] ACLI's member companies are the leading providers of financial and retirement security products covering individual and group markets, including life, annuity, disability income, and long-term care insurance products. ACLI's members account for 95 percent of the life insurance industry's total assets, premiums, and annuity considerations, and serve 90 million families.

ACLI has a strong interest in the proper resolution of this action. This case is one example of a recent surge of litigation retrospectively challenging life insurance companies' calculation of so-called "cost-of-insurance" ("COI") charges in universal life insurance products. Combining flexible premium payments with a death benefit, universal life insurance products provide many advantages for consumers in return for these COI charges. Yet these life insurance products have been the subject of increasing litigation, both in lawsuits alleging that the insurer has assessed COI charges incorrectly from the policy's inception, and in suits (like this one) alleging that an insurer improperly increased COI charges while a policy was in force.

As the leading trade association representing the life insurance industry, ACLI has a unique perspective on and stake in the issues raised in these cases. Specifically, although a court must consider the plain language of the specific insurance policy before it in any given case—

---

[1] Attorneys from counsel's law firm other than undersigned counsel represented AXA Equitable Life Insurance Company ("Equitable") in its petition for permission under Federal Rule of Civil Procedure 23(f) to file an interlocutory appeal in *AXA Equitable Life Insurance Company v. Brach*, No. 20-2848 (2d Cir. 2020). Undersigned counsel had no role in that representation. Prior to that representation, undersigned counsel had represented ACLI in submitting *amicus curiae* briefs addressing similar insurance-related issues in other cases. *See, e.g.*, ACLI Br., *Vogt v. State Farm Life Ins. Co.*, Nos. 18-3419, 18-3434 (8th Cir. Feb. 5, 2019). Equitable is itself a member of ACLI. No counsel for a party authored this brief in whole or in part, however, and no person other than ACLI or its counsel made a monetary contribution to its preparation or submission.

and the language of COI provisions may vary in some respects—ACLI has a broad interest in ensuring that courts do so with a proper understanding of the business and regulation of life insurance, as well as the universal life insurance products at issue.  COI charges are a contractual mechanism by which insurers try to cover various costs associated with providing life insurance and obtain a reasonable profit margin—outcomes that are necessary so that insurers can operate as a going-concern and continue to pay out promised benefits to insureds.  Having been reviewed and approved by state regulators, these COI provisions are vital to the basic bargain of universal life insurance policies.  Policy illustrations are likewise strictly regulated by states and subject to detailed actuarial standards and mandated disclosures applied throughout the industry.  The policy language and illustrations in this case should be interpreted in light of the comprehensive oversight by state regulators and the fundamental bargain between insurer and insured.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case involves claims that Equitable improperly increased COI charges for a particular type of life insurance product, called universal life insurance.  Consumers typically purchase universal life insurance products to protect their dependents against financial hardship if the insured person dies prematurely (through the payment of a death benefit), to accumulate tax-advantaged savings during the life of the insured that can be used in a time of financial need, and for estate-planning purposes, among other reasons.  *See, e.g.*, ACLI, *What You Should Know About Buying Life Insurance* 3 (2018); National Association of Insurance Commissioners ("NAIC"), *Life Insurance*, https://content.naic.org/cipr_topics/topic_life_insurance.htm (visited Jan. 28, 2021).  These insurance products give policyholders the flexibility to adjust monthly premium payments and death benefit amounts over time, depending on their specific needs and objectives.  *See, e.g.*, ACLI, *What You Should Know*, *supra*, at 3.

The Equitable policy here is a type of universal life insurance product that included a COI charge.  That charge is a "non-guaranteed element" of the policy, meaning that although there is a guaranteed maximum rate, any rate below the maximum is not guaranteed and may be adjusted consistent with the terms of the policy.  The policy here states that changes in the COI charge will be determined based on "reasonable" mortality and other assumptions, and "in accordance with procedures and standards" filed with state regulators such as New York's Department of Financial Services ("DFS").  Dkt. 464 ¶ 11.  In addition, it provides that COI changes "will be on a basis that is equitable to all policyholders of a given class."  *Id*.  In 2016, citing changes in mortality and investment expectations, Equitable increased the COI rates for policies with a face value of $1 million or more, where the insured's age when the policy was issued (the "issue age" for the policy) was 70 years or older.  Dkt. 464 ¶¶ 12-13.  Plaintiffs then filed suit alleging that the increase breached the contract and that Equitable's policy illustrations related to COI were misleading.

A key question in this case is not whether Equitable was entitled to increase the COI rate (it was), but on which "class" of policyholders that increase could be assessed.  Plaintiffs argue that the COI was not "equitable to all policyholders of a given class" because "class" refers only to "rating class" (a categorization based on an insured's comparative health risks and tobacco use, such as standard/non-smoker).  Yet Plaintiffs do not contest that there are other ways of classifying insurance policies for the purpose of determining a charge or benefit that are actuarially reasonable and better address the source of the increased cost to the insurer in providing the insurance.  The issue age and face value amount of the policy—the classifications Equitable used to define the policies subject to the COI adjustment here—are common and appropriate ways for insurers to price risk.

ACLI agrees with Equitable that "given class" should not be interpreted to mean only "rating class."  Rather, in its statutory and regulatory context and under well-established actuarial principles, a "class" of insurance policies unambiguously refers to any actuarially reasonable grouping of policies—a meaning that permits the insurer to consider a number of factors in setting COI charges, such as the policy's face value and issue age.  ACLI writes separately as an *amicus curiae* to offer, from the broad perspective of the insurance industry, two points about the critical insurance context that may assist the Court in interpreting the policy and in adjudicating the parties' dispute about whether Equitable's illustrations were misleading:

*First*, proper judicial interpretation of a universal life insurance policy must consider the fundamental economic bargain represented by these insurance products, which provide economic security to a pool of policyholders while allowing the insurer to set charges at a level sufficient to cover the risks created by that pool and earn a profit.  Judicial interpretation must likewise take into account the comprehensive regulation of these products and policy forms by the states. In particular, courts should not interpret COI provisions in a way that undermines the essential bargain of insurance or interferes with the vital role state regulators like DFS play in ensuring that policyholders are treated fairly and that life insurers remain able to pay out death benefits to insureds.  These principles weigh heavily in favor of Equitable's interpretation of "given class." *See* Equitable Br. 19-24 (Dkt. 465).

*Second*, courts should be wary of construing life insurance illustrations in a manner inconsistent with governing actuarial standards and comprehensive state regulation.  For example, under New York's regulatory regime, Equitable was required to have an actuary designated by the insurer's board of directors as the company's illustration actuary, who annually certifies to DFS that all illustrations comply with state rules and actuarial standards.  And DFS regulations not only dictate in detail how an illustration must be prepared, but also mandate

4

disclosures that must be included in and provided with any illustration.  This context, in particular, further supports Equitable's argument as to why creating a private right of action to enforce illustration regulations would risk significant interference with state insurance regulation.  *See* Equitable Br. 36-39.

These contextual points support Equitable's interpretation of the policy language at issue and its position that its illustrations were not misleading to policyholders as a matter of law.

## ARGUMENT

### I.    PROPER INTERPRETATION OF COST-OF-INSURANCE PROVISIONS SHOULD TAKE ACCOUNT OF THE FUNDAMENTAL BARGAIN OF INSURANCE, ACTUARIAL PRINCIPLES, AND STATE REGULATION OF LIFE INSURANCE

Insurance policies are "creatures of contract" and must be construed according to general state-law "principles of contract interpretation."  *In re Estates of Covert*, 761 N.E.2d 571, 576 (N.Y. 2001); *see Johnson v. Travelers Ins. Co.,* 199 N.E. 637, 640 (N.Y. 1936).  Courts must "construe the policy in a way that 'affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.'"  *Consol. Edison Co. of N.Y. v. Allstate Ins. Co.*, 774 N.E.2d 687, 693 (N.Y. 2002).  In addition, the policy must be interpreted "as a whole" "with due regard to the subject matter that is being insured and the purpose of the entire contract," *Westchester Fire Ins. Co. v. Schorsch*, 129 N.Y.S.2d 67, 74 (App. Div. 2020) (citing *Cnty. of Columbia v. Cont'l Ins. Co.*, 634 N.E.2d 946, 950 (N.Y. 1994)), and as the policy would be understood by "a reasonably intelligent person … who is cognizant of the customs and terminology as generally understood in the particular trade or business," *Great Minds v. Fedex Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (internal quotation marks omitted); *see Cragg v. Allstate Indem. Corp.*, 950 N.E.2d 500, 502 (N.Y. 2011).  Thus, when courts interpret state-law contracts, "an established definition provided by state law or industry usage will serve as a default rule, and that definition will control unless

5

the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617-18 (2d Cir. 2001).

Consistent with those principles, this Court should interpret the term "given class" in light of the fundamental bargain of life insurance, actuarial principles, and the close state regulatory supervision of the life insurance industry. Given that context, the COI increase here was "equitable" to a "given class" because it applied to an actuarially reasonable grouping of policies, as determined by actuarial standards of practice and regulated by DFS. Plaintiffs' artificial reading of the policy language ignores this important interpretive context.

A.     **COI Provisions Should Be Interpreted Consistent With The Fundamental Bargain Of Life Insurance Policies And Established Actuarial Principles**

Insurance provides important benefits to policyholders based on the economic pooling of risks and the sharing of the collective costs of insuring against those risks. *See* 2 *Appleman on Insurance* § 11.01 (Law Library ed. 2020) ("The essence of insurance is … the creation of a common fund which protects participants by using the law of large numbers to spread risk."). The insurance company protects against particular risks in exchange for premium payments and other charges that cover the collective costs of providing those benefits, including a reasonable profit margin for the insurer. In the case of life insurance, policyholders receive protection against mortality risk and other insurance benefits. *See* 1 *Appleman on Insurance* § 1.01[1]. This is the essential bargain of any insurance policy: The pool of policyholders "achieves economic security," and by "[t]aking advantage of the law of large numbers … to predict accurately the frequency and amount of loss within this larger group," the insurer is able to set charges "at a level that will cover the losses, cover the insurer's overhead and expenses, and earn a profit." *Id*.

6

Under a universal life insurance policy like Equitable's, an insured may make flexible premium payments that are credited to the "account value" of the policy.  *See generally* Shechtman, *New Concepts in Life Insurance Planning: Universal Life*, 13 Cumb. L. Rev. 219 (1982).  Each month, an insurer deducts from the account value certain charges, including the COI charge, and the insurer provides the policyholder with certain credits, such as interest.  The policy continues so long as the account value is sufficient to cover the deductions each month.

Like most (if not all) universal life insurance policies, Equitable's policy contains a COI provision.  These COI provisions are a contractual mechanism by which life insurers can determine a rate designed, among other things, to cover various costs of providing insurance to the pool of policyholders who create the underlying insurance risks, while also generating a profit margin that will enable the insurer to continue to operate as a going-concern and pay out promised benefits, typically decades after the policies are issued.  "Thus unlike most whole life products, the premiums in a universal life policy are not necessarily level throughout the life of the policy."  8 *Appleman on Insurance* § 81.02[4][a].

Insurers' costs of providing insurance are determined using well-established actuarial principles.  Those principles include the Actuarial Standards Board's Actuarial Standards of Practice ("ASOPs"), which "are binding on members of the U.S.-based actuarial organizations when rendering actuarial services in the U.S."  ASOP No. 1, *Introductory Actuarial Standard of Practice* § 1 (rev. ed. Mar. 2013); Preface to ASOPs, Doc. No. 073, at 9 (1989) (noting that "actuaries are obligated to follow specific standards of practice").  The ASOPs articulate standards to guide an actuary's exercise of professional judgment, recognizing that "[a]ctuaries bring to their assignments not only highly specialized training, but also the broader knowledge and understanding that come from experience."  ASOP No. 1, § 2.9.  ASOPs are not prescriptive and do not provide for a particular method or assumption to be used.  But, as relevant here, the

ASOPs set forth detailed guidance for actuaries to follow in determining non-guaranteed charges, such as a COI charge.  *See, e.g.*, ASOP No. 2, *Nonguaranteed Charges or Benefits for Life Insurance Policies and Annuity Contracts* (rev. ed. Mar. 2013).[2]

As a matter of both historical and current practice, the pricing of life insurance products "typically requires developing an actuarial model to apply expected future experience to measure the risks inherent in the product design and the likely future profit."  ASOP No. 54, *Pricing of Life Insurance and Annuity Products*, App. 1 (rev. ed. June 2018).  The standards explain that actuarial determinations for COI (and other non-guaranteed) charges should be based on "anticipated experience factors," ASOP No. 2, § 4.2(h), including "investment income, mortality, policy termination, and expense rates," *id*. § 2.1.[3]  Put simply, the actuarial standards governing the setting of COI rates act to maintain the essential bargain in the insurance policy by assuring that the pool of policyholders receives benefits actuarially determined to cover their insurance risks and, in exchange, pays its fair share of the collective costs of insurance attributable to their collective risks.

Those principles apply here.  In the context of COI provisions like the one at issue, "given class" should be construed to mean an actuarially reasonable grouping of policies.  ASOP No. 2, for example, defines "policy class" as "[a] group of policies considered together for purposes of determining a nonguaranteed charge or benefit," like COI.  ASOP No. 2, § 2.6.  It then sets forth the criteria an actuary may consider when establishing policy classes, including

---

[2] Actuarial guidance makes clear that a non-guaranteed element of a policy is "[a]ny element … which affects policyholder costs or value, and which may be changed at the discretion of the insurer after issue."  ASOP No. 2, § 2.4.  This includes COI rates.

[3] "Experience factors" are "[a] value or set of values that represents the actual experience"—or recent historical results—"of a policy form," including "rates of mortality, expense, investment income, termination, and taxes."  ASOP No. 24, *Compliance with the NAIC Life Insurance Illustrations Model Regulation*, §§ 2.1, 2.4 (rev. ed. Dec. 2016).

"the similarity of anticipated experience factors," *id.* § 3.4, which include investment income and mortality.  Finally, it states that the actuary "may consider combining policy classes that are reasonably consistent based on the above criteria if, in the actuary's professional judgment, such combinations would be appropriate."  *Id.*  These standards accordingly make clear that the actuarial grouping of policies is an industry norm, strongly supporting Equitable's position regarding the plain meaning of "given class."  *See, e.g.*, *Hanks v. Voya Ret. Ins. & Annuity Co.*, No. 16-cv-6399, 2020 WL 6439185, at *6 (S.D.N.Y. Sept. 30, 2020) ("'[C]lass,' as used in the insurance context, is defined as a 'group of insureds with the same characteristics, established for rate-making purposes.'" (quoting Rubin, *Dictionary of Insurance Terms* 87 (4th ed. 2000))); *see also* Equitable Br. 21, 23 (discussing *Hanks*).

Equitable applied this definition of "given class" to increase the COI rate on two classes of policies with a face value $1 million and over and an issue age of 70 or older—the classes of policies for which Equitable's mortality assumptions changed the most and resulting projected losses were most significant.  Prior to implementing the adjustment, Equitable submitted to regulators information concerning its proposal that clearly identified the classes of policies to which the adjustment would be applied.  And as discussed below, regulators lodged no objection. Consistent with the interpretive rules that life insurance policies must be construed reasonably and in accordance with relevant context, *see supra* pp. 5-6, this Court should interpret the Equitable policy at issue in a manner that takes into account industry custom and usage.

**B.    COI Provisions Should Be Interpreted Consistent With State Regulatory Principles And Practices**

The extensive state regulation of life insurance policies also provides essential context for judicial interpretation of COI provisions, and this Court should interpret those provisions wherever possible in harmony with state regulatory objectives.  Judicial interpretations of these

rate provisions that restrict insurers from recovering the full collective costs associated with providing insurance threaten state regulatory objectives and undermine the public interest.

The insurance industry generally—and the life insurance industry specifically—have long been subject to regulation by the states.  *See* NAIC, *State Insurance Regulation* 1-5 (2011).[4] The state regulatory systems reflect that there is a significant public interest in "solvent insurers who are financially able to make good on the promises they have made" and in "insurers … treat[ing] policyholders and claimants fairly."  *Id*. at 2.  "All regulatory functions" exercised by states attempt "to meet these two objectives."  *Id.*

All states regulate the insurance industry comprehensively.  "Each state, and the District of Columbia, has an office in the executive branch that is charged with regulating the business of insurance."  2 *Appleman on Insurance* § 8.02[1][a].  "States have broad, indeed plenary, power to regulate the business of insurance."  *Id.* § 8.02[2][a].  "Insurance regulation is structured around several key functions, including insurer licensing, producer licensing, product regulation, market conduct, financial regulation and consumer services."  NAIC, *State Insurance Regulation*, *supra*, at 2.

As part of this sweeping regulatory authority, states have ongoing monitoring responsibilities and may require insurance companies to make quarterly or annual filings relating to an insurer's financial condition.  *See* 2 *Appleman on Insurance* § 9.06[3].  State regulators may, among other things, revoke or suspend the company's license to operate within the state, prohibit the company from engaging in certain types of conduct, impose administrative penalties or fines, or order restitution to policyholders.  *See* 8 *Appleman on Insurance* § 84.04[1].  New York is no exception.  Each life insurer licensed in New York submits to DFS comprehensive

---

[4] https://www.naic.org/documents/topics_white_paper_hist_ins_reg.pdf.

annual and quarterly reports on its financial condition and is subject to regular on-site examinations by DFS's insurance examiners.[5]

An important aspect of state regulation is the NAIC model regulations.  NAIC "is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory oversight."  NAIC, *State Insurance Regulation*, *supra*, at 2.  NAIC has issued model regulations governing both universal life insurance policies, *see, e.g.*, NAIC, *Universal Life Insurance Model Regulation*, MDL-585 (Jan. 2001), and required disclosures to policyholders in connection with those policies, *see, e.g.*, NAIC, *Life Insurance Disclosure Model Regulation*, MDL-580 (2018).  NAIC model regulations form the basis for many states' regulatory regimes.  *See* 8 *Appleman on Insurance* § 84.04[4].  This scheme is structured to ensure that life insurers treat policyholders fairly and that insurers remain able to pay out benefits to insureds.

Two features of state regulation are especially relevant to understanding the role that COI provisions play in life insurance policies:

---

[5] *See* DFS, *Policyholder Protection*, https://www.dfs.ny.gov/consumers/life_insurance/ policyholder_protection_and_the_licgc (visited Jan. 28, 2021); DFS, *Institution Definitions and Descriptions: Life Insurance Companies*, https://www.dfs.ny.gov/institution_definition (visited Jan. 28, 2021) ("The Department conducts annual reviews of reserves; issues certificates of reserve valuation; reviews actuarial opinions and memoranda; audits minimum statutory formula reserves; reviews rates and actuarial aspects of life insurance and annuity policy forms; reviews reserve procedures for separate account plans of operation; reviews applications for the creation of continuing care retirement communities; conducts legal reviews and evaluations of life insurance and annuity contracts, reviews related policy forms and life settlement contracts; and drafts regulations and proposed legislation in connection with life insurance policies and annuity contracts.").

*First*, life insurance policy forms—such as the Equitable universal life policy at issue in this case—are subject to close state regulatory supervision and control.  "The states have the power to regulate policy forms pursuant to their police power.  This means that the insurance commissioners have the power to regulate all terms of the contract the insurer proposes to use." 2 *Appleman on Insurance* § 10.01; *see* Abraham, *Four Conceptions of Insurance*, 161 U. Pa. L. Rev. 653, 662 (2013) ("[S]tate administrative regulation requires premarket approval of the terms of insurance policies.").  In New York, "[n]o policy form shall be delivered or issued … unless it has been filed with and approved by [DFS]."  N.Y. Ins. Law § 3201(b)(1).

*Second*, state regulators closely monitor life insurance companies to ensure that policies are self-supporting and that insurers can ultimately make good on their promises to pay death benefits to policyholders.  "Because insurers collect premium[s] today in exchange for a promise to pay claims at some future date"—often several decades into the future—state regulation is designed to guarantee that insurers remain in a position to make good on those promises. 2 *Appleman on Insurance* § 8.02[2][d].  To that end, state regulation imposes a variety of requirements on life insurance companies, including those relating to:  mandatory minimum capital stock and reserves; permissible and prohibited investments; affiliate transactions; reinsurance agreements; reporting of financial information; and mandatory onsite examinations by regulators.  *See, e.g.*, NAIC, *The U.S. National State-Based System of Insurance Financial Regulation and the Solvency Modernization Initiative* §§ 2(14), 3(3) (2013).[6]

This backdrop of state regulation should inform this Court's interpretation of the COI provision at issue, both because regulators did not object to or oppose the adjustment at issue, and because the disputed policy language derives from the state statutory and regulatory scheme.

---

[6] https://www.naic.org/documents/committees_e_isftf_related_white_paper_state-based_financial_reg_smi_130825.pdf.

The relevant COI adjustment here was reviewed by 17 state insurance regulators, including DFS, which conducted a review both before and after the adjustment was announced. *See* Dkt. 458, Ex. 101 ¶ 80.  DFS reviewed the detailed actuarial pricing underlying Equitable's proposed adjustment.  After reviewing Equitable's initial *and* supplemental data, DFS found the adjustment to be "unobjectionable" and "justified."  *Id.* ¶¶ 88-91; *see* Dkt. 458, Ex. 109 ¶¶ 27-31.  The record reflects that the materials DFS reviewed included the analysis Equitable used to identify the "given classes," and how the adjustment would be applied to those classes.  *Id.* ¶¶ 43-44; *see* Dkt. 458, Ex. 101 ¶ 115.  DFS's "non-objection" letter further stated that DFS was "satisfied that the increase in the cost of insurance charges did not reflect an increase in [Equitable's] profit goals, but instead was based on changes in [Equitable's] future expectations as to mortality and investment earnings from those that were used in the original pricing of these policies."  Dkt. 458, Ex. 50.  DFS well understands whether a proposed increase would be "equitable to all policyholders of a given class."  Indeed, it has objected to other COI adjustments because of how the insurer defined the classes.[7]  But DFS found no grounds to object here.

Moreover, DFS is particularly well-placed to supervise issues relating to COI rate adjustments because the term "given class" in Equitable's policy derives from New York's insurance law, which DFS administers and enforces.  Section 4232 of the state's insurance law authorizes insurers in New York to issue universal life insurance policies, provided that non-guaranteed amounts credited to the policy must be distributed "on a basis equitable to all policyholders ***of a given class***."  N.Y. Ins. Law § 4232(b)(4) (emphasis added).  Because an

---

[7] DFS objected, for example, to a proposed COI increase by Voya Retirement Insurance and Annuity Company in December 2016, disagreeing with how Voya defined the class to which the increase would apply.  *See* Dkt. 458, Ex. 109 ¶ 32.  Consequently, Voya postponed its proposed increase for New York policyholders.  *See Hanks*, 2020 WL 6439185, at *2.

adjustment to the COI rate changes the amounts credited to the policy, *see, e.g.*, *id*.

§ 3203(a)(16), Equitable was subject to this mandate for the COI rate change at issue.  And yet

DFS again found nothing objectionable about this change.

That lack of regulatory objection makes sense.  New York's insurance law does not

mandate or constrain how insurers may group policies into "given classes."  New York Insurance

Regulation 210—which DFS promulgated in 2018 to establish "standards for the determination

and any readjustment of non-guaranteed elements" such as COI charges—defines "[c]lass of

policies" as "all policies with similar expectations as to anticipated experience factors that are

grouped together for the purpose of determining non-guaranteed elements."  11 N.Y.C.R.R.

§§ 48.0(a), 48.1(e).  That definition, in turn, essentially mirrors the definition of "policy class"

under ASOP No. 2, providing life insurers the flexibility to adjust COI rates based on mortality,

investment income, and other experience factors.  *See supra* pp. 8-9; Dkt. 458, Ex. 109 ¶ 39.[8]

This statutory and regulatory context should inform this Court's interpretation of "given

class," and it refutes Plaintiffs' effort to artificially treat "given class" as the same as "rating

class."  "When the plain language of an insurance policy provision is based on statutory

authority, the policy must be interpreted and construed in a manner consistent with the statute."

2 *Couch on Insurance* § 19:2 (3d ed. Dec. 2020).  Existing statutory and regulatory provisions

form a part of all contracts of insurance to which they are applicable.  *See* 8 *Appleman on

Insurance* § 84.04[1]; 2 *Couch on Insurance* § 19:1.  And any "policy provision mandated by

---

[8] DFS's previous guidance similarly required that adjustments in policy factors like COI "will be by class and based upon changes in future expectations for such elements as: investment earnings, mortality, persistency and expenses."  DFS, Circular Letter No. 4 (Mar. 16, 1983) (withdrawn).  Additionally, when faced with a similar provision—allowing COI adjustments "on a basis that does not discriminate unfairly within any class of insureds"—Chief Judge McMahon relied on similar statutory definitions in concluding that an adjustment will not be deemed unfair "as long as it can be justified under accepted actuarial principles."  *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 479-80 (S.D.N.Y. 2014); *see id.* at 480-81 (citing ASOP No. 2, § 3.4).

statute" must be interpreted consistent with "the intent of the legislative and administrative

sources of the legislation." *State Farm Mut. Auto. Ins. Co. v. Fitzgerald*, 38 N.E.3d 325, 328

(N.Y. 2015); *see also Kurcsics v. Merchs. Mut. Ins. Co.*, 403 N.E.2d 159, 163 (N.Y. 1980);

*Country-Wide Ins. Co. v. Wagoner*, 384 N.E.2d 653, 655 (N.Y. 1978).  The issue age and face

value amount of the policy are common and appropriate ways for insurers to price risk.  A

narrow interpretation of "given class" that allows insurers to look only at a limited set of

characteristics (e.g., a "rating class") would unduly constrain an insurer's ability to charge

policyholders a fair price based on the risk associated with the policy.

Various state regulators had the responsibility to review the relevant policy language and

subsequent COI adjustment for the classes here, and consistent with the actuarial standards

discussed above, they did so with the understanding that COI rate adjustments reflect numerous

factors and are applied to policy classes defined in part by actuaries' professional judgment.

Whether or not such state regulatory review is dispositive of the interpretive question, it is at

least a relevant interpretive point for what "a reasonably intelligent person" familiar with the

"customs and terminology" of the trade would understand by the policy language, *Great Minds*,

886 F.3d at 94, that regulators found no inconsistency between the classes of policyholders to

whom the COI rate adjustment applied and either the state-law mandate reflected in Equitable's

COI provision or the actuarial standards supporting these policy groupings.

* * *

In short, in interpreting Equitable's policy, the Court should take account of the economic

bargain of insurance, actuarial principles, and the backdrop of state regulation.  Attention to

those contextual considerations elucidates and confirms that a COI increase is equitable to "a

given class" if it is applied to an actuarially reasonable grouping of policies as determined by

factors set forth in the actuarial standards of practice, subject to close supervision by DFS and other state regulators. Plaintiffs' interpretation overlooks this critical interpretive context.

## II.   ILLUSTRATIONS ARE SUBJECT TO PROFESSIONAL STANDARDS OF PRACTICE AND COMPREHENSIVE STATE REGULATION

Plaintiffs' illustration claims are similarly divorced from important regulatory context. Plaintiffs allege that Equitable's illustrations of non-guaranteed elements were based on outdated mortality assumptions and thus materially misrepresented the terms, benefits, and advantages of the policy. Those claims fail for the reasons Equitable has explained. But ACLI writes separately to emphasize that life insurance policy illustrations must comply with actuarial standards and are subject to comprehensive state regulation designed to ensure that policyholders are fully informed. The Court should consider that context in resolving the parties' disputes over Equitable's illustrations. In particular, this regulatory backdrop supports Equitable's position (*see* Equitable Br. 36-39) that permitting private enforcement of New York's Regulation 74 could interfere with state insurance regulation by permitting courts and juries to arrive at disparate interpretations of these technical regulatory requirements.

An illustration is a written summary of a life insurance policy prepared by the insurer to educate the policyholder by demonstrating how the policy will work under specific scenarios, with a particular set of assumed rates and charges. *See, e.g.*, NAIC, *Life Insurance Buyer's Guide* 5 (2018) (an illustration "helps explain how the policy works");[9] 11 N.Y.C.R.R. § 53-2.7 (same); 8 *Appleman on Insurance* § 88.02[3][c]. As suggested by the name, illustrations are meant to illustrate the mechanics of how a policy works, not to provide predictions of future performance. They may be provided to the insured in connection with the sale of the policy ("sales" or "basic" illustrations) or created after the policy has been in force for one year or more

---

[9] https://www.naic.org/documents/prod_serv_consumer_lig_lp.pdf.

("in-force" illustrations).  *See* NAIC, *Life Insurance Illustrations Model Regulation*, MDL-582, § 4(H) (Apr. 2001).  States strictly regulate the form and content of both sales and in-force illustrations.

In 1995, NAIC first developed its Life Insurance Illustrations Model Regulation 582 and the Actuarial Standards Board released a companion ASOP (No. 24), which provides guidance for U.S.-based actuaries seeking to comply with the NAIC model and state-specific regulation. *See* ASOP No. 24, Background; NAIC, *Life Insurance Illustrations* (Feb. 25, 2020).[10]  States vary in their adoption of NAIC's model regulation.  New York's Regulation 74 is based on Model Regulation 582, as DFS was tasked with promulgating illustration regulations "consistent, to the greatest extent practicable and in the public interest as determined by the superintendent, with the [NAIC] illustration regulations."  N.Y. Ins. Law § 3209(k); *see* DFS, *Life Bureau Filing Guidance Note*:  *Guidance for Life Insurance Policy Illustrations* (Aug. 22, 2008).[11]

Regulations like NAIC's Model Regulation 582 and New York's Regulation 74 contain highly technical provisions that require uniform interpretation by state regulators.  Inconsistent judicial interpretations would threaten the efficacy of these provisions and create regulatory uncertainty that is detrimental to both insurers and consumers.  That is why the New York Legislature and NAIC each chose *not* to make such provisions privately enforceable and instead delegated oversight to state insurance regulators with actuarial expertise.  As NAIC provides, state insurance departments like DFS "provide regulatory oversight to ensure that all companies under their jurisdiction abide by the standards defined in the model."  NAIC, *Life Insurance Illustrations*, *supra*; *see generally* Equitable Br. 36-39.

---

[10] https://content.naic.org/cipr_topics/topic_life_insurance_illustrations.htm.

[11] https://www.dfs.ny.gov/apps_and_licensing/life_insurers/guidance_life_insurance_policy_illustrations.

Regulation 74 provides comprehensive oversight of illustrations in several significant ways:

*First*, all illustrations must be developed by an "illustration actuary," a licensed actuary with certain credentials who is appointed by the board of directors of each insurer.  11 N.Y.C.R.R. § 53-1.3(o) (defining illustration actuary); *id.* § 53-3.7(c) (specifying required credentials and obligations); *see also* NAIC, *Life Insurance Illustrations Model Regulation*, MDL-582, § 11 (same).  An illustration actuary must annually certify to DFS that the insurer's illustrations are based on the applicable actuarial standards of practice (ASOP No. 24), a process subject to review by DFS and its actuaries.  *See* 11 N.Y.C.R.R. §§ 53-1.3(o), 53-3.7(b), 53-3.7(d); *see* Dkt. 458, Ex. 109 ¶ 56.  If the identity of the responsible illustration actuary changes, the insurer must notify DFS and justify the personnel change.  *See* 11 N.Y.C.R.R. § 53-3.7(h).

*Second*, Regulation 74 and ASOP 24 set forth exacting standards for illustrations.  *See generally* ASOP No. 24, *Compliance with the NAIC Life Insurance Illustrations Model Regulation* (rev. ed. Dec. 2016).  To assist the policyholder or applicant in identifying minimum benefits that the policyholder may receive, any illustrations of guaranteed elements of the policy (e.g., maximum COI rates and minimum interest rates) must be shown first and clearly labeled as guaranteed.  *See* 11 N.Y.C.R.R. § 53-3.3(a)(6), (8); *id.* § 53-3.3(c)(1)(i).  Any illustration of non-guaranteed elements like COI charges are shown later and likewise labeled as non-guaranteed to avoid speculation that might mislead policyholders.

In addition, Regulation 74 requires that any non-guaranteed elements like COI rates that are reflected in illustrations cannot be "more favorable to the policyowner" than either of:  (1) the set of nonguaranteed elements reflecting those actually in effect for the policy at the time the illustration is prepared (the "currently payable scale"), or (2) the set of non-guaranteed elements that the illustration actuary must certify, exercising his or her professional actuarial judgment, is

in compliance with Regulation 74 and ASOP 24 (the "disciplined current scale").  *See* ASOP No. 24, §§ 2.2, 2.3, 2.4, 3.3, 3.4.1, 3.4.2; 11 N.Y.C.R.R. §§ 53-1.3(h)-(i), 53-3.3(a)(7).  In other words, Regulation 74 places constraints on what non-guaranteed elements an insurance company's illustrations may depict; illustrations cannot reflect non-guaranteed elements pulled out of thin air.

Moreover, with respect to "in-force" illustrations like the ones at issue, DFS's guidance makes clear that insurers must use the "currently payable scale" for COI rates.  *See* DFS, *Life Bureau Filing Guidance Note* (July 17, 2019) ("The in-force illustration … must be based on the then current non-guaranteed elements.").[12]  That is precisely what Equitable did.  Dkt. No. 464 ¶¶ 57-58.  Plaintiffs' attempt to create different and inconsistent requirements through private enforcement underscores why such enforcement of Regulation 74 is inappropriate and why the New York Legislature instead chose to empower experienced actuaries and state regulators in DFS to determine the proper interpretation and application of these highly technical provisions.

*Third*, Regulation 74 mandates extensive disclosures within and alongside any illustration shown to a policyholder or purchaser.  Indeed, these regulations achieve a core goal "to ensure that illustrations do not mislead purchasers of life insurance."  NAIC, *Life Insurance Illustrations Model Regulation*, MDL-582, § 1.  To that end, like the actuarial standards that it tracks, Regulation 74 protects policyholders in several ways, beginning with a required disclaimer that "[the] illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown," that "[t]his is not likely to occur," and that therefore "actual

---

[12] https://www.dfs.ny.gov/apps_and_licensing/life_insurers/guidance_note_regulation_74.

results may be more or less favorable than those shown." 11 N.Y.C.R.R. § 53-3.3(b)(5); *id.* § 53-3.4(a)(3).[13]

As shown above, the content, format, and accompanying disclosures of an insurer's illustrations are all heavily constrained by actuarial standards, state rules, and robust regulatory supervision and enforcement, precisely to ensure that the illustrations do not misrepresent the terms, benefits, and advantages of the policy and mislead consumers.  State regulators like DFS have the necessary expertise to interpret and enforce these provisions in a way that protects consumers while providing critical uniformity and certainty for insurers operating in their jurisdictions.  ACLI respectfully submits that this regulatory context should inform the Court's resolution of Plaintiffs' illustration claims and, in particular, the Court's assessment of the availability of a private right of action to enforce New York's Regulation 74.

## CONCLUSION

The Court should grant summary judgment to Equitable.

---

[13] Regulation 74 further mandates that no life insurance policy be issued in New York unless the prospective purchaser has been provided a copy of the Life Insurance Buyer's Guide, *see* 11 N.Y.C.R.R. § 53-2.6(a), which expressly cautions buyers that "nobody knows what will happen in the future," and that they "should be ready to adjust [their] financial plans if the cash value doesn't increase as quickly as shown in the illustration," *id.* § 53-2.7.  If an illustration is marketed with the policy, at the time the policy is delivered, the applicant or policyholder must sign and date an acknowledgment that "any non-guaranteed elements illustrated are subject to change and could be either higher or lower," and the agent or broker for the insurer must certify that she has not made any statements "inconsistent with the illustration."  *Id.* § 53-3.3(d)(1)-(2).

Dated:  January 28, 2021                    Respectfully submitted,

                                            /s/  Jarret A. Zafran
                                            David W. Ogden
                                            Kelly P. Dunbar
                                            Kevin M. Lamb
                                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                            1875 Pennsylvania Ave., N.W.
                                            Washington, D.C.  20006
                                            Tel.: (202) 663-6000
                                            Fax: (202) 663-6363
                                            david.ogden@wilmerhale.com

                                            Jarret A. Zafran
                                            WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                            7 World Trade Center
                                            250 Greenwich Avenue
                                            New York, NY 10007
                                            Tel.: (212) 230-8800
                                            Fax: (212) 230-8888

                                            *Counsel for Amicus Curiae the American*
                                            *Council of Life Insurers*