UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
:
IN RE: :
:
AXA EQUITABLE LIFE INSURANCE COMPANY :
COI LITIGATION :
:
*This Document Relates to All Member Cases* :
:
:
-------------------------------------------------------------------X

16-CV-740 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

INTRODUCTION ........................................................................................................................ 2

BACKGROUND ........................................................................................................................... 4

   A.   Factual Background........................................................................................................ 4

   B.   Procedural Background .................................................................................................. 9

CROSS-MOTIONS FOR SUMMARY JUDGMENT ................................................................ 12

   A.   Legal Standards ........................................................................................................... 12

   B.   Breach-of-Contract Claims ......................................................................................... 14

      1.   Choice of Law ....................................................................................................... 14

      2.   Contractual Standing ............................................................................................. 15

      3.   Definition of "Given Class" .................................................................................. 19

      4.   Reasonableness of Mortality Assumptions........................................................... 24

      5.   Procedures and Standards on File.......................................................................... 32

      6.   Minimum Interest Rate .......................................................................................... 33

      7.   Burden to Establish Damages ............................................................................... 34

      8.   Appropriate Remedy for Croft Plaintiffs' Breach-of-Contract Claims ..................... 37

   C.   Illustration-Based Claims ........................................................................................... 39

      1.   Standing ................................................................................................................. 39

      2.   Section 4226 Claims ............................................................................................. 42

         a.   Whether the AUL II Illustrations Constituted Misrepresentations............................ 43

         b.   Whether Any Misrepresentation Was "Knowing" ...................................... 50

      c.    The Choice of Law Applicable to Currie Plaintiffs' Section 4226 Claim.................. 52

      d.    Claims on Behalf of Predecessors-in-Interest ............................................ 56

    3.    Section 349 Claims................................................................................ 57

    4.    Common Law Fraud Claims.................................................................... 59

    5.    Currie Plaintiffs' California Law Claims ................................................. 63

      a.    The CUCL Claims ............................................................................ 63

      b.    The Elder Abuse Law Claims............................................................. 66

MOTION TO STRIKE ................................................................................... 70

MOTIONS TO EXCLUDE EXPERT TESTIMONY ............................................... 73

  A.    Legal Standards....................................................................................... 73

  B.    Plaintiffs' Motion to Exclude.................................................................... 75

    1.    Timothy Pfeifer....................................................................................... 75

    2.    Glen Hubbard ........................................................................................ 80

    3.    Mary Jo Hudson and Howard Mills .......................................................... 81

  C.    AXA's Motion to Exclude Expert Testimony ................................................. 83

CONCLUSION............................................................................................... 85

## INTRODUCTION

In these lawsuits — a class action[1] and related individual actions[2] — life insurance policyholders bring claims against Defendant AXA Equitable Life Insurance Company

---

[1]     *In re AXA Equitable Life Ins. Co. COI Litig.*, 16-CV-740 (JMF), formerly captioned *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*

[2]     *The Duffy 2004 LLC v. AXA Equitable Life Ins. Co.*, No. 17-CV-4803 (JMF); *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, No. 17-CV-4767 (JMF); *Eunice Peterson Fam. P'ship LLLP v. AXA Equitable Life Ins. Co.*, No. 18-CV-10730 (JMF); *Croft Irrevocable Tr. v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF); *LSH CO v. AXA Equitable Life Ins. Co.*, No. 18-CV-2111 (JMF).

("AXA")[3] arising from an increase in the charges associated with certain life insurance policies. Specifically, they arise from a 2016 increase in the "cost of insurance" or "COI" — a monthly charge deducted from the value of a policyholder's account — on a subset of Athena Universal Life II ("AUL II") universal life insurance policies.  Plaintiffs principally allege that the increase in COI violated the terms of their insurance policies.  They also allege that AXA issued policy illustrations, or documents depicting the performance of a given policy under various assumptions, that were false or misleading because the illustrations failed to disclose the likelihood of a future increase in COI based on AXA's mortality experience and changing assumptions as to future mortality since AUL II's initial pricing in 2004.

AXA now moves for summary judgment on all claims, and Plaintiffs in the related individual actions ("Individual Plaintiffs") cross-move for partial summary judgment on their breach-of-contract claims.  Both sides also move to exclude the reports and testimony of various expert witnesses, and Individual Plaintiffs move to strike, on the basis of judicial estoppel, a portion of AXA's Rule 56.1 statement of material undisputed facts and the evidence cited therein.  For the reasons that follow, the Court denies AXA's motions for summary judgment nearly in their entirety.  The exceptions are for (1) one set of Individual Plaintiffs' breach-of-contract claims regarding the guaranteed minimum interested rate; (2) the claims of registered owners in the class related to the illustration-based claims who purchased policies *after* the COI Increase; (3) another set of Individual Plaintiffs' illustration-based Section 349 claims; and (4) Class Plaintiffs' and a set of Individual Plaintiffs' claims based on the interests of prior

---

[3]     In January 2020, AXA rebranded itself as "Equitable."  *See* Equitable, *Announcing Equitable*, https://equitable.com/news/2020/announcing-equitable-a-new-day-for-160-year-old-financial-services-company.  Because the conduct at issue occurred before the rebranding, and for consistency with this Court's prior opinions in this action, the Court will continue to refer to the company as "AXA."

policyholders, as to which AXA's motion for summary judgment is granted.  The Court also denies Individual Plaintiffs' partial motion for summary judgment as to their breach-of-contract claims.  Finally, with limited exceptions, the Court denies the parties' motions to exclude expert testimony and Individual Plaintiffs' motion to strike.

## BACKGROUND

The following facts — drawn from the admissible materials that the parties submitted in connection with these motions — are either undisputed or, where noted, described in the light most favorable to the relevant non-moving party.  *See, e.g.*, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).  The Court assumes general familiarity with its many prior opinions in this case and, thus, recounts the relevant facts only briefly.[4]

### A.  Factual Background

Plaintiffs are registered and beneficial owners of AUL II policies, which are flexible-premium universal life insurance policies that AXA issued between 2004 and 2008.  *See* ECF No. 1-1 ("Doe Policy"), at 1; ECF No. 457-42 ("Brown Rpt."), ¶¶ 20, 42; ECF No. 457-36 ("Pfeifer Rpt."), ¶¶ 31, 44.[5]  AUL II policies have both an insurance component and a savings

---

[4]     *See In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172 (S.D.N.Y. Aug. 13, 2020); *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2019 WL 1382437 (S.D.N.Y. Mar. 27, 2019); *Croft v. AXA Equitable Life Ins. Co.*, No. 17-CV-9355 (JMF), 2018 WL 4007646 (S.D.N.Y. Aug. 22, 2018); *EFG Bank AG v. AXA Equitable Life Ins. Co.*, No. 17-CV-4767 (JMF), 2018 WL 1918627 (S.D.N.Y. Apr. 20, 2018); *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238 (S.D.N.Y. Mar. 9, 2018); *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89 (S.D.N.Y. 2018); *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2017 WL 5151357 (S.D.N.Y. Nov. 3, 2017), *reconsideration denied sub nom. In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2018 WL 3632500 (S.D.N.Y. July 30, 2018); *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2016 WL 7351675 (S.D.N.Y. Dec. 19, 2016); *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424 (S.D.N.Y. 2015).

[5]     Except where otherwise noted, all record citations are to the 16-CV-740 docket.

component, and their premiums are flexible, as opposed to fixed.  Doe Policy 1-2; Brown Rpt. ¶ 20; Pfeifer Rpt. ¶¶ 32-33.  That means that AUL II policyholders make premium payments into an interest-bearing Policy Account from which AXA, in turn, deducts COI and other charges. Doe Policy at 1-2, 7-9; Brown Rpt. ¶¶ 20, 28-29; Pfeifer Rpt. ¶¶ 32-33.  After making an initial premium payment, the policyholder can generally decide when and how much to pay in premiums, within certain limits.  Doe Policy 1-3, 7; Brown Rpt. ¶ 20; Pfeifer Rpt. ¶¶ 32-33.  As long as the Policy Account contains sufficient funds to cover the monthly deductions, the policy remains in force, and the policyholder earns interest on any remaining funds.  Doe Policy 1-3, 7; Brown Rpt. ¶¶ 20, 28-29; Pfeifer Rpt. ¶¶ 32-33.  Upon the insured's death, the policy beneficiary receives a Death Benefit in an amount determined based on the face amount of the policy, among other factors.  *See* Doe Policy 2, 5-6.

Typically, the COI is the most significant expense associated with an AUL II policy. Brown Rpt. ¶¶ 23, 53, 207.  It is largely determined by multiplying the monthly COI rate by the net amount at risk, or the difference between the Death Benefit and the amount in the Policy Account, divided by $1,000.  Doe Policy 8; Brown Rpt. ¶¶ 28-29.  Significantly, the COI rate scale is a non-guaranteed element of an AUL II policy, meaning that AXA is entitled to change it, subject to certain restrictions.  Doe Policy 9; Brown Rpt. ¶ 22; Pfeifer Rpt. ¶¶ 24, 34, 43. Among these restrictions, COI rates can never exceed a contractually guaranteed maximum rate scale, and any changes in COI rates must comply with a clause in the policy titled "Changes in Policy Cost Factors."  Doe Policy 4, 9; Brown Rpt. ¶¶ 30-31; Pfeifer Rpt. ¶ 35.  A representative version of that clause provides:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes,

investment income, and lapses.  Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy.  Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

ECF No. 495, at 1-70 ("Class Pls.' 56.1 Resp."), ¶ 11; ECF No. 512, at 1-143 ("Indiv. Pls.' 56.1 Resp."), ¶ 37.

AXA set the original rate scale for AUL II policies in 2004, when it first sold them, and that scale remained in effect for over a decade.  *See* ECF No. 462 ("Def.'s Class 56.1 Stmt."), ¶¶ 8, 12.  In October 2015, AXA announced that it was raising COI rates on some — but not all — AUL II policies and that the increase would take effect on March 8, 2016.  Class Pls.' 56.1 Resp. ¶ 12; Indiv. Pls.' 56.1 Resp. ¶ 38.  This action (the "COI Increase" or "Increase") applied only to AUL II policies with (1) an issue age of at least seventy, meaning the age of the insured at the time of policy issuance was seventy or older; and (2) a face amount of at least $1 million ("70+/$1M+" policies).  Class Pls.' 56.1 Resp. ¶¶ 12-13; Indiv. Pls.' 56.1 Resp. ¶¶ 39-40.  The Increase affected policies with issue ages of seventy through seventy-nine and issue ages of eighty through eighty-five differently.  That is, COI rates for the former group of policies were increased by one percentage scale, and COI rates for the latter group of policies were increased by a different percentage scale.  Class Pls.' 56.1 Resp. ¶¶ 42-43; Indiv. Pls.' 56.1 Resp. ¶¶ 78-79; Brown Rpt. ¶ 52; Pfeifer Rpt. ¶¶ 9, 183; ECF No. 457-19 ("COI Increase Mem."), at 5.[6] Depending on the issue age of the policy (seventy through seventy-nine or eighty through eighty-

---

[6]     According to Class Plaintiffs, the actual effective date was delayed by up to two months for a subset of the affected policies, leading to a delay in when some of the affected policies experienced an increase.  Class Pls.' 56.1 Resp. ¶¶ 12, 43-44; ECF No. 457-46 ("R. Mills Rpt."), ¶¶ 32-33.

five) and its duration (that is, how long the policy had been in effect), COI for affected policies increased between 7.3% and 72.5% for a given year.  COI Increase Mem. 5.

AXA internally documented the basis for the COI Increase in a memorandum dated September 18, 2015.  Class Pls.' 56.1 Resp. ¶ 14; Indiv. Pls.' 56.1 Resp. ¶ 41; *see* COI Increase Mem.  As relevant here, the mortality assumptions on which the COI Increase was based were a new set of assumptions that AXA had adopted internally in 2013 as its "current best estimate" assumptions, called "ELAS 12."  Class Pls.' 56.1 Resp. ¶¶ 19-20; Indiv. Pls.' 56.1 Resp. ¶¶ 48-49; COI Increase Mem. 2, 9; Brown Rpt. ¶ 50; Pfeifer Rpt. ¶¶ 6, 46.  Between 2014 and 2015, AXA analyzed the expected future profitability of the block of AUL II policies that were in force as of the third quarter of 2014 in light of ELAS 12.  COI Increase Mem. 9; Brown Rpt. ¶ 63; Pfeifer Rpt. ¶ 48.  To do so, AXA compared the present value of future profits of these policies under its then-current best estimate assumptions, including ELAS 12, on the one hand, with their present value of future profits under what AXA maintains were the original assumptions that it used to develop the COI rate scale for AUL II at pricing, on the other hand.  COI Increase Mem. 4; Brown Rpt. ¶¶ 63-66; Pfeifer Rpt. ¶ 48.  (Plaintiffs dispute that the latter set of assumptions accurately reflect the mortality assumptions on which AUL II's original COI rate scale was based.  *See* ECF No. 499 ("Class Pls.' MSJ Opp'n"), at 8-9, 41-42; Brown Rpt. ¶¶ 66, 165-66.)  The result of this analysis was a $527 million shortfall in present future value of profits — the difference between $70 million under the purported assumptions at pricing and negative $475 million under the updated assumptions.  COI Increase Mem. 4.  Based on its then-current best estimate assumptions, including ELAS 12, AXA calculated that the COI Increase would reduce the shortfall by $428 million.  *Id.* at 5.

When each AUL II policy was sold, and upon request by the policyholder thereafter, AXA issued illustrations depicting how the policy would perform under a range of assumptions. *See* Brown Rpt. ¶¶ 39-42; ECF No. 457-108 ("Jantz Decl."), ¶¶ 4-5; *see, e.g.*, ECF No. 457-61 ("Currie Policy Illustration"). These illustrations demonstrated how the policy would perform under two different hypothetical scenarios: a non-guaranteed scenario and a guaranteed scenario. *See* Class Pls.' 56.1 Resp. ¶ 51; Indiv. Pls.' 56.1 Resp. ¶ 100; Brown Rpt. ¶¶ 206-07; Pfeifer Rpt. ¶¶ 247-48; Currie Policy Illustration. The guaranteed scenario depicted the policy's performance based on the maximum COI rate scale and expense charges and the minimum credited interest rate permitted under the policy — in other words, the worst-case scenario from the policyholder's perspective. *See* Class Pls.' 56.1 Resp. ¶ 51; Indiv. Pls.' 56.1 Resp. ¶ 100; Brown Rpt. ¶ 206; Pfeifer Rpt. ¶¶ 247-48. The non-guaranteed scenario, by contrast, depicted the policy's performance based on an assumed COI rate scale and other non-guaranteed policy elements that could be more or less favorable to the policyholder than the rates actually charged in the year depicted. *See* Brown Rpt. ¶ 206; Pfeifer Rpt. ¶ 247.

From when AXA began issuing AUL II policies in 2004 until after it announced the COI Increase in late 2015, the non-guaranteed scenario in AXA's sales and in-force illustrations was based on AUL II's original and then-current COI rate scale; that is, it depicted the policy's future performance assuming that the COI rate scale in effect at that time would continue in the future years illustrated. Class Pls.' 56.1 Resp. ¶ 51; Indiv. Pls.' 56.1 Resp. ¶ 100; Brown Rpt. ¶ 42; Pfeifer Rpt. ¶¶ 263, 272. The illustrations, however, contained disclaimers to the effect that this outcome was not guaranteed, and even unlikely, including: "This illustration assumes that the currently illustrated non-guaranteed elements [including COI rates] will continue unchanged for

all years shown.  This is not likely to occur, and actual results may be more or less favorable than

those shown."  Class Pls.' 56.1 Resp. ¶ 52; Indiv. Pls.' 56.1 Resp. ¶ 101.

## B.  Procedural Background

On February 1, 2016, Brach Family Foundation (the "Brach Foundation") filed a putative

class action against AXA (the "Brach Action").  *See* ECF No. 1.  The Brach Foundation owns an

AUL II policy issued in 2007, which has a face amount of $20 million and was issued on the life

of a woman who was eighty-one years old at the time of issuance.  *Id.* ¶ 12.  The Foundation

asserted a claim for breach of contract, alleging that AXA's COI materially violated various

restrictions set forth in the AUL II policies, *id.* ¶¶ 51-57; and a claim for violation of New York

Insurance Law Section 4226 ("Section 4226") on the ground that illustrations used by AXA in

the marketing and sale of the AUL II policies contained material misrepresentations, ECF No.

71, ¶¶ 72-89.  On March 16, 2018, after the Court denied AXA's second motion to dismiss, *see*

ECF No. 135, the Brach Foundation filed an amended complaint adding as named plaintiffs

Malcolm Currie, one of the creators of the Currie Children Trust, and Allen Dyer, Trustee of the

Currie Children Trust (together, "Currie Plaintiffs"), ECF No. 188 ("TAC"), ¶ 11.  The Currie

Children Trust owns an AUL II policy issued in 2006, with a face value of $4.2 million, and was

issued on the life of Malcolm Currie, who was eighty years old at the time of issuance.[7]  *Id.*  The

amended complaint asserted the same claims and added an illustration-based claim under New

York's General Business Law Section 349 ("Section 349"), as well as illustration-based

California law claims.  *Id.* ¶¶ 96-126.

---

[7]      Malcolm Currie died on April 18, 2021.  His wife and the executor of his estate, Barbara
Currie, was later substituted for him as a plaintiff here.  *See* ECF No. 593.

On August 13, 2020, the Court certified (1) a nationwide Policy-Based Claims Class consisting of, to the extent relevant here, "all individuals who, on or after March 8, 2016, owned AUL II policies that were issued by AXA and subjected to the COI rate increase announced by AXA on or about October 1, 2015"; (2) a nationwide Illustration-Based Claims Class based on Section 4226, consisting of, to the extent relevant here, "all individuals who, on or after March 8, 2016, owned an AUL II policy unaccompanied by a Lapse Protection Rider that was issued by AXA and subjected to the COI rate increase announced by AXA on or about October 1, 2015"; and (3) a New York Illustration-Based Claims Sub-Class, based on Section 349, consisting of "all members of the Illustration-Based Claims Class who reside in New York." *In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *8, *15-16.  The Court appointed Allen Dyer as class representative of the nationwide classes and the Brach Foundation as class representative of the nationwide classes and the New York sub-class. *See id.* at *16.  In the same decision, the Court declined to certify several additional California subclasses for policy-based and illustration-based claims brought under California's Unfair Competition Law, as well as policy-based claims under California's Elder Abuse Law, concluding that Plaintiffs had failed to meet Rule 23's requirements as to all three proposed subclasses. *See id.* at *8-9, *16.  The Currie Plaintiffs continue to pursue these claims individually.  *See* Class Pls.' MSJ Opp'n 59-60.

In addition to the Brach Action, five individual actions were filed in, or transferred to, this Court between June 23, 2017, and November 16, 2018, and accepted by the undersigned as related to the Brach Action.  *See* 17-CV-4803 (the "Duffy Action"), ECF No. 43; 17-CV-4767 (the "EFG Action"), ECF No. 50; 18-CV-10730 (the "Peterson Action"), ECF No. 13; 17-CV-

9355 (the "Croft Action"), ECF No. 17; 18-CV-2111 (the "LSH Action"), ECF Nos. 1, 4.[8]  To

the extent relevant here, these actions can be summarized as follows:

- The Duffy Action was transferred from the Central District of California, and is brought by two Washington-based LLCs (together, "Duffy Plaintiffs"), each of which owns an AUL II policy.  17-CV-4803, ECF Nos. 19 ("Duffy Compl."), 43.  The first was issued in 2005, with a face amount of $3 million, insuring the life of James Duffy, who was eighty-five at the time of issuance.  Indiv. Pls.' 56.1 Resp. ¶¶ 27-28.  The second was issued in 2006, with a face amount of $5 million, insuring the life of Robert Tull, who was eighty at the time of issuance.  *Id.* ¶¶ 30-31.

- The EFG Action, which was also transferred from the Central District of California, is brought by Plaintiffs EFG Bank AG ("EFG"), the Cayman Islands branch of a Swiss bank; eight Delaware statutory trusts owned by German public institution Erste Abwicklungsanstalt; and Wells Fargo, N.A., as EFG's securities intermediary, (together, "EFG Plaintiffs") and asserts claims based on 105 AUL II policies.  Indiv. Pls.' 56.1 Resp. ¶¶ 7-16; 17-CV-4767, ECF Nos. 50, 225 ("EFG Compl.").

- The Peterson Action, which was transferred from the District of Arizona, is brought by Plaintiffs Eunice Peterson Family Partnership LLP, which owns an AUL II policy with a face amount of $2.5 million, issued in 2007, insuring the life of Eunice Peterson, who was eighty-three at the time of issuance, and E. Peterson Investments, LLC ("EPI"), which was created to invest in the policy (together, "Peterson Plaintiffs").  Indiv. Pls.' 56.1 Resp. ¶¶ 17-22; 18-CV-10730, ECF Nos. 13, 10 ("Peterson Compl."), ¶¶ 4, 35.  The Peterson policy was terminated for non-payment in August 2018 but reinstated shortly thereafter.  Indiv. Pls.' 56.1 Resp. ¶¶ 230-31.

- The Croft Action, which was also transferred from the District of Arizona, is brought by Plaintiffs James M. Croft and Daniel E. Croft (together, "Croft Plaintiffs"), as trustees of the James & Eileen Croft Irrevocable Trust, which owned an AUL II policy with a face amount of $5 million, issued in 2006, insuring the life of James E. Croft, who was eighty-four at the time of issuance.  Indiv. Pls.' 56.1 Resp. ¶¶ 23-24; 17-CV-9355, ECF No. 17, 40 ("Croft Compl."), ¶ 32.  In July 2017, Croft Plaintiffs allowed their policy to lapse and, in September 2017, it was terminated.  Indiv. Pls.' 56.1 Resp. ¶¶ 236-37.  In November 2017, James E. Croft died.  *Id.* ¶ 238.

- The LSH action, which was originally filed in this District, is brought by Plaintiffs LSH CO ("LSH") and Wells Fargo, N.A. (together, "LSH Plaintiffs"),

---

[8]     A sixth action was transferred to this Court from Arizona and consolidated with the Brach Action for all purposes. *See* 17-CV-7751 (the "Wenokur Action"), ECF No. 64.

as LSH's securities intermediary, and asserts claims based on fifty-three AUL II policies.  18-CV-2111, ECF Nos. 1, 4, 58 ("LSH Compl."); Indiv. Pls.' 56.1 Resp. ¶¶ 1-6.

Following motion practice, Plaintiffs in all five individual actions assert claims for breach of contract based on AXA's COI Increase.  *See* Duffy Compl. ¶¶ 64-68; EFG Compl. ¶¶ 73-77; Peterson Compl. ¶¶ 110-16; Croft Compl. ¶¶ 82-88; LSH Compl. ¶¶ 98-102.  LSH Plaintiffs assert claims for violations of Section 4226 and Section 349, and common law fraud claims with respect to fifty-three policies.  LSH Compl. ¶¶ 120-45.  Peterson Plaintiffs also assert claims for common law fraud.  Peterson Compl. ¶¶ 117-51.  Finally, both Peterson and Croft Plaintiffs assert a claim for rescission.  Peterson Compl. ¶ 152; Croft Compl. ¶ 152.

Before the Court now are several sets of motions.  First, AXA moves for summary judgment as to all claims.  *See* ECF Nos. 456, 459.  Individual Plaintiffs cross-move for partial summary judgment solely as to the meaning of the term "given class" in the AUL II policies. *See* ECF No. 494; ECF No. 510 ("Indiv. Pls.' MSJ Mem."), at 20.  Second, AXA and Plaintiffs each filed omnibus motions to exclude their opponent's experts, on an array of grounds.  *See* ECF Nos. 479, 524.  Finally, Individual Plaintiffs move to strike a portion of AXA's 56.1 statement on the basis of judicial estoppel.  *See* ECF No. 502.

## CROSS-MOTIONS FOR SUMMARY JUDGMENT

The Court will begin by addressing the parties' cross-motions for summary judgment. More specifically, the Court will address the motions with respect to Plaintiffs' breach-of-contract claims.  The Court will then turn to Plaintiffs' illustration-based claims, including their Section 4226 and Section 349 claims and Individual Plaintiffs' common law fraud claims. Finally, the Court will address Currie Plaintiffs' California law claims.

**A.  Legal Standards**

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).  In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where, as here, both sides move for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it."  *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).  "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Id.* (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).  To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence,"

*Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## B. Breach-of-Contract Claims

The Court, like the parties, begins with the threshold issues of choice of law and contractual standing before addressing whether summary judgement is appropriate as to: (1) the meaning of the term "given class" and whether AXA's COI Increase was "equitable to all policyholders of a given class"; (2) the reasonableness of AXA's mortality assumptions; (3) whether the COI Increase was "in accordance with procedures and standards on file"; and (4) whether the COI Increase resulted in policyholders being credited below the minimum interest rate. Finally, the Court turns to the parties' argument as to (5) Plaintiffs' entitlement to damages for the alleged breach and (6) whether Croft Plaintiffs are entitled to rescission.

### 1. Choice of Law

With respect to Class Plaintiffs' breach-of-contract claims, both parties cite New York law in their briefs. *See* ECF No. 463 ("Def.'s Class MSJ Mem."), at 19-23; Class Pls.' MSJ Opp'n 11-15. Under the choice-of-law rules of New York, as the forum state, such "implied consent" is "sufficient to establish choice of law." *Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) (internal quotation marks omitted); *accord N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 229 (S.D.N.Y. 2020).

With respect to Individual Plaintiffs' breach-of-contract claims, the Croft and Peterson actions were transferred to this Court from Arizona pursuant to 28 U.S.C. § 1404(a). *See* 18-CV-

10730, ECF No. 12; 17-CV-9355, ECF No. 16.  Accordingly, as to these actions, the Court

"must follow the choice-of-law rules that prevailed in the transferor court."  *Ferens v. John*

*Deere Co.*, 494 U.S. 516, 519 (1990).  Plaintiffs argue, and AXA does not dispute, that Arizona's

choice-of-law rules require application of Arizona law to Croft and Peterson Plaintiffs' breach-

of-contract claims.  *See* Indiv. Pls.' MSJ Mem. 15.[9]

      The EFG and Duffy actions were transferred here from California.  *See* 17-CV-4767,

ECF No. 48; 17-CV-4803, ECF No. 41.  Plaintiffs argue, and again AXA does not dispute, that

California's choice-of-law rules point to eighteen states the laws of which could apply to EFG

Plaintiffs' breach-of-contract claims.  Indiv. Pls.' MSJ Mem. 16 & n.13.  Plaintiffs do not state

what law they believe applies to Duffy Plaintiffs' claims.  *Id.* at 16.  Critically, neither party

identifies any conflict between California law and the law of other potentially implicated states.

Indeed, Plaintiffs concede that "minor differences in contract interpretation under the laws of

those [other] States . . are not implicated by or dispositive of" the arguments at issue.  *Id.*  "When

neither party identifies a meaningful conflict between California law and the law of another

state, California courts apply California law."  *Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d

1135, 1138 (9th Cir. 2003).  Accordingly, the Court will apply California law to EFG and Duffy

Plaintiffs' claims.

## 2.  Contractual Standing

      As a threshold matter, AXA argues that Individual Plaintiffs EFG, LSH, and EPI — each

of which is the beneficial, but not registered, owner of its respective policy, *see* Indiv. Pls.' 56.1

---

[9]     Individual Plaintiffs further contend that "Arizona contract law generally follows
California law," citing purported similarities between four Arizona state-court decisions and a
section of Individual Plaintiffs' brief that cites California law throughout.  Indiv. Pls.' MSJ Mem.
15 n.12.  The Court is not persuaded based on such limited data that Arizona law "generally
follows" the law of California.

Resp. ¶¶ 5, 8, 14-15, 17-19 — lack "contractual standing" to maintain breach-of-contract claims

under the policies, *see* ECF No. 467 ("Def.'s Indiv. MSJ Mem."), at 15-16.[10]  It is certainly true

that, in general, "under New York law, only the policy owner has standing to sue based on an

insurance policy."  *Brettler Tr. of Zupnick Fam. Tr. 2008 A v. Allianz Life Ins. Co. of N. Am.*, 842

F. App'x 710, 712 (2d Cir. 2021) (summary order); *accord Rosano v. Freedom Boat Corp.*, No.

13-CV-842 (SJF) (AYS), 2015 WL 4162754, at *4 (E.D.N.Y. July 8, 2015); *Pike v. N.Y. Life*

*Ins. Co.*, 901 N.Y.S.2d 76, 82 (2d Dep't N.Y. App. Div. 2010).  Nevertheless, courts in this

District have held that "a beneficial owner who lacks standing to enforce a [contract] may

receive authorization to sue from the registered [owner], even if the [contract] does not

specifically provide for such authorization."  *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr.*

*Co.* ("*Royal Park II*"), No. 14-CV-4394 (AJN), 2016 WL 439020, at *3 (S.D.N.Y. Feb. 3, 2016)

(cleaned up); *accord Diverse Partners, LP v. AgriBank, FCB*, No. 16-CV-9526 (VEC), 2017 WL

4119649, at *3-6 (S.D.N.Y. Sept. 14, 2017); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr.*

*Co.*, 172 F. Supp. 3d 700, 712 (S.D.N.Y. 2016).  These decisions derive from *Allan Applestein*

*TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005), in which the

Second Circuit, applying New York law, held that such authorization is effective when expressly

contemplated by the contract at issue.

　　　Although the parties do not cite cases from California or Arizona applying the *Applestein*

rule (or its equivalent), AXA does not press — and thus has waived — any argument that the

rule is particular to New York law.  *See, e.g.*, *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,

218 F. Supp. 2d 369, 392-93 & n.116 (S.D.N.Y. 2002) (holding that an issue a party failed to

---

[10]　　　The doctrine of "contractual standing," which addresses "whether a party has the right to
enforce a contract," is "distinct from Article III standing and does not implicate subject-matter
jurisdiction."  *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020).

raise in its memorandum of law was waived).  In any event, the contract doctrine on which the *Applestein* rule rests does have analogues in California and Arizona law.  *See, e.g.*, *Pony v. Cnty. of Los Angeles*, 433 F.3d 1138, 1143-44 (9th Cir. 2006) ("[C]ontractual rights . . . are freely assignable under California law."); *Highland Vill. Partners, LLC v. Bradbury & Stamm Const. Co.*, 195 P.3d 184, 187 (Ariz. Ct. App. 2008) ("Generally, rights and duties under a contract are freely assignable.").  Accordingly, the Court concludes that the rule applies to the Peterson and EFG Actions as well.

Applying the *Applestein* rule here, the Court easily concludes that the registered owners have authorized EFG, LSH, and EPI to enforce the AUL II policies because the registered owners of the relevant policies are co-plaintiffs alongside the beneficial owners.  *See* Indiv. Pls.' 56.1 Resp. ¶ 14 (identifying Wells Fargo, a plaintiff in the LSH Action, as the registered owner of the LSH Policies); *id.* ¶¶ 15, 17-18 (identifying Wells Fargo, a plaintiff in the EFG Action, as the registered owner of the EFG Policies); *id.* ¶ 17 (identifying the Eunice Peterson Family Partnership, LLLP, a plaintiff in the Peterson Action, as the registered owner of the Peterson Policy).[11]  That fact distinguishes the instant case from precedents in which written authorization was required to be filed with the court.  *See, e.g.*, *Applestein*, 415 F.3d at 245; *Diverse Partners*, 2017 WL 4119649, at *3-6; *Phoenix Light*, 172 F. Supp. 3d at 712; *Royal Park II*, 2016 WL 439020, at *3; *cf. One William St. Cap. Mgmt. LP v. U.S. Educ. Loan Tr. IV*, 986 N.Y.S.2d 21, 22 (1st Dep't N.Y. App. Div. 2014) (permitting a non-party to a contract to cure its lack of

---

[11]   Individual Plaintiffs state in their brief that "Wells Fargo is a plaintiff suing side-by-side with the beneficial owner *and* has authorized this suit," Indiv. Pls.' MSJ Mem. 19 (emphasis added), suggesting that they have obtained written authorization to sue from Wells Fargo.  But Plaintiffs cite nothing in the record to support that assertion.  Plaintiffs are encouraged to file any authorization from Wells Fargo.  For that matter, if only out of an abundance of caution, Plaintiffs are encouraged to file authorizations from all registered owners.

contractual standing by adding the registered owners as "nominal petitioners").  Thus, EFG, LSH, and EPI have contractual standing to bring claims for breach of the AUL II policies.

AXA argues that "*Applestein* applies only to a noteholder's right to assert contract claims against an issuer of debt securities," but it cites no authority for that proposition, ECF No. 553 ("Def.'s Indiv. MSJ Reply"), at 4 n.3, and nothing in *Applestein* supports it.  To the contrary, the rule from *Applestein* derives from the general principle that, "under New York law, contracts are freely assignable absent language which expressly prohibits assignment," *Royal Park II*, 2016 WL 439020, at *3 (cleaned up) — which applies beyond the debt securities context, *see, e.g.*, *Zurich Am. Ins. Co. v. Wausau Bus. Ins. Co.*, No. 16-CV-3643 (VSB), 2018 WL 4684112, at *5 (S.D.N.Y. Sept. 28, 2018); *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, No. 14-CV-2495 (ER), 2016 WL 4382709, at *6 (S.D.N.Y. Aug. 16, 2016); *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 320 (S.D.N.Y. 2013); *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, No. 07-CV-2514 (JS) (AKT), 2013 WL 752259, at *6 (E.D.N.Y. Feb. 26, 2013); *Corbett v. Firstline Sec., Inc.*, 687 F. Supp. 2d 124, 129 (E.D.N.Y. 2009).

AXA also asserts, in a single sentence, that "the [AUL II] Policy provides that only [AXA] and [r]egistered [o]wners can exercise rights under the Policies."  Def.'s Indiv. MSJ Mem. 16.  The Court need not consider this conclusory assertion, however, particularly in light of AXA's failure to pinpoint in its opening brief the precise language of the AUL II policy on which it relies.  *See, e.g.*, *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)); *see also Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n* ("*Royal Park I*"), 109 F. Supp. 3d 587, 607 n.111 (S.D.N.Y. 2015) (rejecting the argument that a series of contracts "[did] not allow the registered [owners] to

authorize other parties to sue" because the relevant party "[had] not cited any clause of the [contract] to support this contention").  In any event, AXA's argument is unpersuasive.  In its reply, AXA clarifies that it relies on a clause stating that, "[a]s the owner, you are entitled to exercise all rights of this policy while the insured person is living."  Def.'s Indiv. MSJ Reply 4 (quoting Indiv. Pls.' 56.1 Resp. ¶ 89).  But that clause does not suggest, let alone provide, that *only* the owner is entitled to exercise the rights of the policy.[12]  In short, because the registered owners of the EFG, LSH, and Peterson policies have sued alongside the beneficial owners, the beneficial owners have contractual standing.

### 3.  Definition of "Given Class"

Turning to the merits of the parties' contract claims, Plaintiffs allege first that AXA breached the "Changes in Policy Cost Factors" provision of the AUL II policies because the COI Increase was not "equitable to all policyholders of a given class."  TAC ¶ 71(a); Peterson Compl. ¶¶ 86-87, 112-13; Duffy Compl. ¶ 66(a); Croft Compl. ¶¶ 84-85; LSH Compl. ¶ 101(a); EFG Compl. ¶ 75(a).  Pressing competing definitions of the term "given class," AXA and Individual Plaintiffs each move for summary judgment on this claim; Class Plaintiffs, meanwhile, argue that the claim should be resolved at trial.  *See* Def.'s Class MSJ Mem. 19-20; Indiv. Pls.' MSJ Mem. 19-25; Class Pls.' MSJ Opp'n 10.  The Court is inclined to conclude, on balance, that

---

[12]     AXA also cites the provision of the policy stating that AXA "will not be bound by an assignment unless" it "received [the assignment] in writing."  Def.'s Indiv. MSJ Reply 4 (quoting Indiv. Pls.' 56.1 Resp. ¶ 90).  The Court previously declined to address whether that provision prohibits assignment, *see In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *8, and given that the parties have not meaningfully renewed their arguments on that score, the Court declines to do so now.  In any event, it is far from clear that the provision is enforceable.  *See Brettler Tr.*, 842 F. App'x at 712 (explaining that that the enforceability of a similar provision is "likely a question best answered by the New York Court of Appeals since there is no binding precedent on the issue" and granting a *Jacobson* remand on the grounds that certification may be appropriate).

AXA has the stronger of the two competing interpretations of the term.  That said, the Court cannot say as a matter of law that AXA's interpretation is the correct one or, if it is, that AXA would necessarily prevail.  Accordingly, both motions must be denied on this claim.

"Under New York law, an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."  *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted).[13]  "The initial interpretation of a contract," including "whether the terms of the insurance contract are ambiguous," is "a matter of law for the court to decide."  *Id.*  "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading."  *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 572 (2d Cir. 1991) (citation omitted).  "The existence of an ambiguity, if any, is to be ascertained from the face of an agreement without regard to extrinsic evidence."  *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019) (internal quotation marks omitted).  A court may look to "a body of state law or an established custom" to determine the meaning of a disputed term as a matter of law, *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001), but only if that custom and usage is "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto," *L. Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).

---

[13]     Neither party points to any material difference between the contract law of New York and the contract law of either California or Arizona.  Accordingly, and because "state contract law defines breach consistently such that the question will usually be the same in all jurisdictions," *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013), the Court assumes that the applicable standards will be the same for all claims.

"Once a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Morgan Stanley Grp. Inc.*, 225 F.3d at 276.  At the summary judgment stage, however, "the court may resolve ambiguity in contractual language as a matter of law" only if "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary," or "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (cleaned up).  Similarly, "the rule of *contra proferentem*, which generally provides that where an insurer drafts a policy any ambiguity in the policy should be resolved in favor of the insured," *Morgan Stanley Grp. Inc.*, 225 F.3d at 276 (cleaned up), applies at summary judgment only where there is an ambiguity in the contract and neither side submits extrinsic evidence or a reasonable factfinder could not, as a matter of law, resolve an ambiguity in the drafter's favor by resort to extrinsic evidence, *see Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 43 (2d Cir. 2006) ("If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage.").

Applying the foregoing standards here, the Court cannot resolve the parties' dispute as a matter of law.  "Class" is undefined in the AUL II policy.  Plaintiffs argue that it refers to the "rating class" listed at the beginning of each policy, relying only the text of the policy and extrinsic evidence of AXA's intent.  *See* Class Pls.' MSJ Opp'n 10; Indiv. Pls.' MSJ Mem. 19;

Doe Policy 3.[14]  By contrast, AXA argues that the term means "any actuarially valid grouping of policies used by an insurer to determine non-guaranteed elements."  Def.'s Class MSJ Mem. 16.[15]  In support of this definition, AXA relies on the general meaning of the term "class," the usage of the term "given class" in the industry, and *Hanks v. Voya Ret. Ins. & Annuity Co.*, 492 F. Supp. 3d 232 (S.D.N.Y. 2020), in which another Court in this district held — albeit applying Texas law — that a provision of a universal life insurance policy that required COI adjustments to be made "on a class basis" unambiguously permitted the insurer to adjust rates "based on [any] groups of insureds with the same characteristics," *id.* at 243; *see* Def.'s Class MSJ Mem. 16-18.  Given these competing interpretations, the Court concludes that the term "given class" is ambiguous.  Indeed, the Court held as much at the motion to dismiss stage, although it did so in light of a proposed definition different than the one on which Plaintiffs rely here.  *See Brach Fam. Found.*, 2016 WL 7351675, at *3 (concluding that "[a]t best . . . the term [given class] is ambiguous" where AXA relied on the same definition of "given class" it advances here and the Brach Foundation argued that "class" refers to "all AUL II policyholders").  Accordingly, "[i]t is the responsibility of the trier of fact," *Macey v. Carolina Cas. Ins. Co.*, 674 F.3d 125, 130 (2d Cir. 2012) (per curiam), to determine the meaning of the term.

AXA argues that the Court can rely on evidence of the meaning of "given class" in the industry to resolve this ambiguity as a matter of law, but AXA fails to show that "given class" is an established term in the industry.  First, although AXA relies on various provisions of New

---

[14]     The six rating classes applicable to AUL II are: Preferred Plus Non-Tobacco, Preferred Non-Tobacco, Preferred Tobacco, Standard Non-Tobacco, Standard Tobacco, and Substandard C, D, E, and F, Non-Tobacco and Tobacco User.  ECF No. 547 ("Def.'s 56.1 Resp."), ¶ 7.

[15]     Here, and in analyzing other issues for which AXA's arguments are the same as to Class and Individual Plaintiffs, the Court relies solely on AXA's briefing as to Class Plaintiffs.

York law, it fails to identify any provision adopting the definition of "given class" it proposes.
*Cf. Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 479 (S.D.N.Y. 2014) (relying on
interpretations of "a nearly identical provision in New York Insurance Law" to determine the
meaning of a disputed term).  AXA also points to a "no-objection letter" obtained from the New
York Department of Financial Services ("DFS"), which received notice of AXA's proposed COI
increase and declared it "unobjectionable," Def.'s Class 56.1 Stmt. ¶ 47,[16] and an amicus brief
filed by the American Council of Life Insurance, stating that, in the context of COI provisions,
"the actuarial grouping of policies is an industry norm, strongly supporting [AXA's] position
regarding the plain meaning of given class," ECF No. 478 at 9.  That evidence, however, does
not show that AXA's definition is so "well settled" and "uniformly acted upon" as to support
judgment for AXA as a matter of law.  *L. Debenture Tr. Co. N.Y.*, 595 F.3d at 466.  Accordingly,
the Court must treat AXA's evidence of custom and usage as extrinsic evidence.  *See, e.g.*, *U.S.
Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the
meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent,"
which "may be proven by extrinsic evidence, including evidence of trade usage.").  But because
Plaintiffs also offer extrinsic evidence of the parties' intent, including a 2004 Pricing Memo
written by AXA and an AUL II Product Guide distributed by AXA to its salesforce, both of
which use "class" to refer to "ratings class," *see* ECF No. 457-65, at 2; ECF No. 516-3, at 8,
21,[17] the policies' "interpretation becomes a question of fact and summary judgment is

---

[16]     The admissibility of this letter is addressed below in note 41.

[17]     References to page numbers in both of these filings (ECF Nos. 457-65, 516-3) are to the
page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

inappropriate." *Mellon Bank, N.A.*, 31 F.3d at 116; *see also Dean v. Tower Ins. Co. of New York*, 19 N.Y.3d 704, 709 (N.Y. 2012).[18]

Finally, Individual Plaintiffs argue that their interpretation must prevail as a matter of law because "any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer." Indiv. Pls.' MSJ Mem & Opp'n 25 (cleaned up); *see also id.* at 20. But the doctrine of *contra preferentum* upon which Plaintiffs rely does not entitle them to summary judgment where, as here, there is relevant extrinsic evidence of the parties' intent which must be weighed by the factfinder at trial. *See Parks Real Est. Purchasing Grp.*, 472 F.3d at 43.

In short, upon careful consideration of the AUL II policy as a whole and the parties' competing extrinsic evidence, the Court holds that "given class" is ambiguous and that the ambiguity must be resolved by a jury. In any event, even if AXA's interpretation of "given class" is the correct one, Plaintiffs cite evidence from which a reasonable jury could conclude that the classes to which the AUL II Increase applied were not actuarially reasonable, rendering summary judgment improper in any event. *See* Class Pls.' MSJ Opp'n 17-20; Indiv. Pls.' MSJ Mem. 27. In either case, summary judgment on this claim must be denied.

### 4. Reasonableness of Mortality Assumptions

AXA also moves for summary judgment on Class Plaintiffs' and Individual Plaintiffs' claims that the COI Increase breached the "Changes in Policy Cost Factors" provision insofar as that clause requires changes in COI to be "based on reasonable assumptions as to . . . mortality."

---

[18]     For that reason, this case should also be distinguished from *Hanks*, in which neither party offered any extrinsic evidence of intent and the Court was left with only the plain language of the contract. *See* 492 F. Supp. 3d at 239, 243.

Class Pls.' 56.1 Resp. ¶ 11; Indiv. Pls.' 56.1 Resp. ¶ 37; *see* Def.'s Indiv. MSJ Mem. 21-25.[19]

AXA's motions must be denied, however, because a reasonable jury could conclude that the

ELAS 12 mortality assumptions, which were used to justify the COI Increase, were developed

using a materially flawed methodology that treated 70+/$1M+ policies differently from all

others.  In particular, admissible evidence supports Plaintiffs' argument that the mortality

assumptions underlying the Increase were reverse-engineered to support AXA's desired result.

*See, e.g.*, Class Pls.' MSJ Opp'n 25 (arguing that "AXA's own documents and data . . . show that

AXA singled out the victims of the COI increase for disparate, actuarially unjustified treatment

in order to hit them with an increase" (internal quotation marks omitted)); Indiv. Pls.' MSJ Mem.

29 ("In developing ELAS 12, AXA ignored years of favorable mortality experience, violated its

own policies and procedures for setting assumptions, and applied special rules to artificially

inflate the assumptions for the [t]argeted [g]roup only.").

        For example, Class Plaintiffs' actuarial expert, Jeremy J. Brown, details several ways in

which AXA "unreasonably manipulated ELAS 12," each of which "inflated mortality rates for

the targeted group later hit by the COI increase" — namely, the 70+/$1M+ group.  Brown Rpt.

¶ 93; *see also* Class Pls.' MSJ Opp'n 25-28 (discussing the data manipulations).  For instance,

AXA altered its standard methodology for constructing ELAS 12 for the 70+/$1M+ nonsmoker

policies.  For the most part, the study of AXA's mortality experience that was used to develop

ELAS 12 included five and a half years of data, from January 2007 to June 2012.  *See* Brown

Rpt. ¶ 95.  Additionally, "to ensure that outlier claims and other random fluctuations did not

skew the study results," AXA made two adjustments to the 2007-2012 data set.  *Id.* ¶ 96.  First, it

---

[19]      AXA justified the COI Increase based on purported changes to mortality and investment
income assumptions, *see* COI Increase Mem. 2, but the reasonableness of the latter is not in
dispute, *see* Class Pls.' 56.1 Resp. ¶ 37; Indiv. Pls.' 56.1 Resp. ¶ 67.

implemented a credibility-weighting methodology, under which AXA supplemented its own

internal mortality experience with industry mortality data "in places where the sample of data in

the 5.5-year study for particular groups of insureds was insufficient." *Id.* Second, AXA capped

face amounts in the data set at $6 million, "to remove some volatility in AXA['s] experience

arising from large face amount policies." *Id.* (cleaned up). That is, a single death that triggered a

death benefit of over $6 million was treated as a claim for $6 million. *See id.* ¶ 117. Separate

from these adjustments, AXA also graded its assumptions to create a smooth transition between

the select and ultimate periods. *See id.* ¶¶ 142-43.[20]

But AXA deviated from this approach for the 70+/$1M+ nonsmoker policies. Whereas

AXA used five-and-a-half years of data for all other groups, it used only eighteen months of

data, from January 2012 through June 2013, for the 70+/$1M+ nonsmoker policies. *See* Brown

Rpt. ¶¶ 99, 119. This change also conflicted with AXA's usual practice. According to Class

Plaintiffs' actuarial expert, every other internal mortality table that AXA had ever used in

connection with AUL II was developed using at least five years of data. *Id.* ¶ 112. AXA also

exempted the 70+/$1M+ policies alone from the credibility-weighting methodology and the $6

million cap that it applied to the remainder of the data. *See id.* ¶¶ 99-100. With respect to

grading, AXA introduced a "sudden cliff in the grading period start from duration 10 to duration

2" at issue age 76. *Id.* ¶ 143.

---

[20]     "The select period refers to the time period where underwriting is relevant information in
estimating future mortality experience, which is sometimes referred to as the 'select effect.'" *Id.*
¶ 85. It "generally consists of the first 10 to 25 policy durations," whereas "[t]he 'ultimate
period' refers to the period after the select period ends. *Id.* ¶ 86; *see also* Pfeifer Rpt. ¶ 125
n.189 ("The 'select' period is a period of years after issuance of a policy issue during which an
insurer assumes that its initial underwriting will impact its future mortality experience. The
'ultimate' period refers to the subsequent period, when an insurer assumes that its initial
underwriting no longer is likely to impact its future mortality experience.").

According to Class Plaintiffs' actuarial expert, Brown, this "[c]herry-[p]ick[ed]" methodology lacked actuarial justification and demonstrates that ELAS 12 "was not developed from a data-driven process designed to produce a good faith estimate of future mortality." *Id.* ¶¶ 103, 105. Instead, he continues, it was "manipulated to achieve a particular result (i.e., justify a COI increase) and single out a particular group (i.e., 70+/$1M+ policies)." *Id.* ¶ 103. He elaborates that the eighteen-month data set used for the 70+/$1M+ policies alone "was not a sufficiently large data set to be credible," a problem "made far worse by AXA's decision not to 'blend' in industry data to supplement its own data." *Id.* ¶ 110. Moreover, according to Brown, the eighteen-month data set used for the 70+/$1M+ group was skewed in favor of higher mortality by the June 2013 death of a single insured, Leo Zisman, who had been covered by five $5 million AUL II policies, for a total of $25 million in coverage. *Id.* ¶¶ 111 n.154, 114-15. Brown states that "[a] well-designed and reasonable experience study will not be significantly influenced by the inclusion or exclusion of any one death," but the inclusion of the Zisman policies in the eighteen-month data set, in conjunction with the abandonment of the $6 million cap for any single death, caused a 13.7% drop in the actual-to-expected mortality ratios for males in the data set — a difference sufficient to "make a massive difference in future profit calculations" (the metric ultimately used to justify the COI Increase). *Id.* ¶¶ 116-17. He also opines that "the sudden step up in the grading start period between issue ages 75 and 76 significantly inflated older age mortality rates for no actuarially justifiable reason." *Id.* ¶ 144. Individual Plaintiffs' actuarial expert, Carl Harris, likewise opines that the ELAS 12 mortality assumptions for 70+/$1M+ policies were "not reasonable" for several reasons, including (1) the "[u]se of a different analysis period for mortality experience"; (2) "[d]eviation from the normal AXA process of credibility weighting with industry mortality experience"; and (3) "[d]eviation

from the normal AXA process of removing excess claim amounts from an experience study to reduce volatility."  ECF No. 460-63 ("Harris Rpt."), at 83.

Plaintiffs also cite evidence from which a reasonable jury could infer that the ways in which AXA purportedly skewed its methodology in developing ELAS 12 with respect to the 70+/$1M+ policies materially affected the resulting mortality tables — the assumptions on which the COI Increase was based.  *See* Class Pls.' MSJ Opp'n 33-35.  Class Plaintiffs' modeling expert, James Rouse, constructed a "Corrected ELAS 12" set of assumptions that used the same five-and-a-half-year study period of January 2007 through June 2012 for those policies as for all others, applied the same credibility blending methodology, applied the same $6 million cap, and removed the "jump" in the start duration for select-to-ultimate grading at issue age 76. ECF Nos. 457-44, 457-45 ("Rouse Rpt."), at 50-52 & n.82.[21]  He found that removing these manipulations significantly decreased the resulting mortality assumptions for that group, meaning that the corrected assumptions predict that insureds will live longer, generating greater profit from AUL II.  *See id.* at 52-54.  For example, Rouse concluded that simply correcting the manipulation of the study period length — that is, using the same 2007-2012 study period for 70+/$1M+ policies as for all other policies in the study — and applying the $6 million cap resulted in significantly lower mortality among male insureds in this group, decreasing the actual-to-expected ratio for these policies (male 70+/$1M+) from 46.6% to 31.7%.  *Id.* at 32, 35-36, 47.[22]  For female insureds in the 70+/$1M+ group, the use of the 2007-2012 study period and

---

[21]     Because certain paragraphs of Rouse's expert report use duplicative paragraph numbers, *see* Rouse Rpt. 40-46, the Court cites to the report by page number.

[22]     An actual-to-expected ratio is the metric used to adjust an industry mortality table to reflect an insurer's internal experience.  *See id.* at 26-27.  The numerator reflects the total value of claims that the insurer actually experienced among a particular group of policies during the study period, while the denominator reflects the total value of claims that the insurer would have expected among that group based on the industry table used as a base — in this case, the 2001

the $6 million cap decreased the actual-to-expected ratio from 59.8% to 43.9%.  *Id.* at 35-36, 38, 47.

Moreover, Plaintiffs point to evidence from which a reasonable factfinder could conclude that these deviations were no accident, but rather a calculated effort to secure a particular result. Specifically, in a July 11, 2013 email, Gershon Firestone, an AXA actuary, explained that the "reason" he recommended using the January 2012 to June 2013 data set "only" for 70+/$1M+ nonsmoker policies was that "this is the group Dominique wants to hit so why should we introduce volatility into the other groups."  ECF No. 492-21 ("Firestone Email"); Brown Rpt. ¶ 99.  "Dominique" was a reference to Dominique Baede, the author of the memorandum recommending the COI Increase.  *See* COI Increase Mem. 1.  Between AXA's departures from the norm for the 70+/$1M+ group and this evidence, a reasonable jury could certainly conclude that the assumptions underlying the COI Increase were unreasonable.

AXA's counterarguments are unpersuasive.  First, AXA argues that ELAS 12 is reasonable as a matter of law because the data that it used to adjust the 2001 VBT base table in developing ELAS 12 was consistent with an industry mortality study and validated by auditor PricewaterhouseCoopers ("PwC") as "within the range of reasonable assumptions," "relative to

---

Valuation Basic Table, developed by the Society of Actuaries (the "2001 VBT").  *Id.* at 26-27 & n.36.  An actual-to-expected ratio of less than 100% indicates that the insurer's experience has been more favorable to the insurer than the base table would predict, whereas an actual-to-expected ratio of more than 100% indicates that the insurer's experience has been less favorable. *Id.* at 26-27 & n.38.  To develop the final mortality assumptions — here, ELAS 12 — the insurer performs a series of computerized steps to transform the actual-to-expected ratios that it calculated into mortality tables containing a mortality rate for every combination of gender, issue age, duration, class, and size band.  *Id.* at 27-28 & n.41.  Thus, a higher actual-to-expected ratio results in worse mortality assumptions, i.e., an expectation of higher mortality and lower profits. *See id.* at 28.

industry benchmarks"[23] and because ELAS 12 is consistent with or lower than the mortality

assumptions that certain institutional investors, including some Individual Plaintiffs, used in

deciding to purchase AUL II policies.  Def.'s Class MSJ Mem. 26 (cleaned up); Def.'s Indiv.

MSJ Mem. 22-23 (cleaned up).  A reasonable factfinder could certainly rely on this evidence to

conclude that the mortality assumptions underlying the COI Increase were reasonable

notwithstanding AXA's manipulation of the data.  But the evidence well falls far short of

establishing the reasonableness of those assumptions as a matter of law.

Next, AXA points to the fact that ELAS 12 has predicted with approximately ninety-six

percent accuracy the actual mortality rates of 70+/$1M+ AUL II insureds since the second half

of 2013.  *See* Def.'s Class MSJ Mem. 27-28; Def.'s Indiv. MSJ Mem. 23-24; *see also* Pfeifer

Rpt. ¶ 165.  But just as poor performance would not, without more, establish that the

assumptions were unreasonable, strong performance does not alone demonstrate that the

assumptions were reasonable.  *Cf. MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport*

*Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) ("The foreseeability of [the defendant's]

downfall depends on the reasonableness of the projections that had been prepared.  We know,

with hindsight, that the forecasts were not realized.  But the question the court must decide is *not*

whether the projection was correct, for it clearly was not, but whether it was reasonable and

prudent when made." (cleaned up)).  Were it otherwise, Class Plaintiffs persuasively point out,

---

[23]     Class Plaintiffs argue that the audit report is inadmissible hearsay, because PwC did not
certify the report as a business record during discovery, *see* Class Pls.' MSJ Opp'n 36; Class
Pls.' 56.1 Resp. ¶ 22, although AXA did file a business-records affidavit alongside its summary
judgment reply brief, *see* ECF No. 543; ECF No. 551 ("Def.'s Class MSJ Reply"), at 18; *see also*
ECF No. 579 ("Class Pls.' MSJ Sur-Reply"), at 13-15 (arguing that the Court should disregard
the affidavit produced long after the close of fact discovery).  The Court need not and does not
decide the admissibility of the audit report because AXA's motion for summary judgment must
be denied in relevant part either way.

"then an assumption [could] flip back between 'reasonable' and 'unreasonable' as more data comes in."  Class Pls.' MSJ Opp'n 38.  That would be absurd.

Finally, AXA argues that Plaintiffs' criticisms of the methodology that AXA used to develop ELAS 12 do not create a genuine issue of material fact with respect to whether the resulting assumptions themselves were unreasonable.  *See* Def.'s Class MSJ Mem. 28-30; Def.'s Indiv. MSJ Mem. 24-25.  This argument rests on a mischaracterization of Plaintiffs' claims.  As noted, Plaintiffs do not merely contend that the methodology used to develop ELAS 12 was flawed, but also that these purported methodological flaws materially affected the resulting assumptions — for example, by increasing the actual-to-expected ratio for these male 70+/$1M+ policies from 31.7% to 46.6% and for female 70+/$1M+ policies from 43.9% to 59.8% as a result of the use of a different and shorter data set than that used for other policies and the failure to impose a $6 million cap.  Rouse Rpt. 32, 38, 47.  Indeed, Class Plaintiffs' modeling expert opines that correcting for all four data manipulations that Class Plaintiffs' and Individual Plaintiffs' actuarial experts contend were unreasonable results in a set of assumptions "predict[ing] that insured will live longer than AXA's own ELAS 12 table" predicts.  Rouse Rpt. 52.  In short, AXA's arguments do not come close to establishing that the mortality assumptions on which the COI Increase were based were reasonable as a matter of law.

In light of that conclusion, the Court need not and does not address Plaintiffs' argument that the mortality assumptions underlying the COI Increase were unreasonable for other reasons, including (1) that they did not account for reinsurance and (2) that the mortality assumptions that AXA used as its baseline to calculate the alleged profit shortfall did not accurately replicate the assumptions on which the original COI rate scale was based.  *See* Class Pls.' MSJ Opp'n 41-43; Indiv. Pls.' MSJ Mem. 9 n.5.  That said, the Court rejects AXA's argument that these issues are

not properly before the Court because they were not pleaded in the TAC.  Def.'s Class MSJ

Reply 21.  These issues fall squarely into Plaintiffs' theory that AXA breached the Policies by

"determining COI rates based on unreasonable assumptions."  TAC ¶ 71(b); *see also U.S. Bank*

*Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12-CV-6811 (CM), 2015 WL 4610894, at *2 (S.D.N.Y.

July 30, 2015) (explaining that "a party need not plead breach of contract claims with

particularity").  Moreover, AXA does not — and cannot — allege that it lacked notice of these

issues, which are explicitly addressed in its actuarial expert's report.  *See* Pfeifer Rpt. ¶¶ 74-88,

92-96.  Finally, the Court also rejects AXA's argument that Plaintiffs' theory regarding the

mortality assumptions that AXA used as its baseline was dismissed.  Def.'s Class MSJ Reply 21-

22.  AXA's argument improperly conflates a claim that the actual 2004 pricing assumptions (on

which the original COI rates were based) were unreasonable — which was dismissed, *see Brach*

*Fam. Found.*, 2016 WL 7351675, at *3 n.2 — with a claim that AXA unfaithfully reproduced

those assumptions when it calculated the alleged profit shortfall that it used to justify the COI

Increase, which Class Plaintiffs press now, *see* Class Pls.' MSJ Opp'n 41-42.

### 5.  Procedures and Standards on File

AXA also moves for summary judgment on Class Plaintiffs' and Individual Plaintiffs'

claims that the COI Increase breached the "Changes in Policy Cost Factors" provision insofar as

that clause requires changes in COI to be "determined in accordance with procedures and

standards on file, if required, with the insurance supervisory official of the jurisdiction in which

th[e] policy is delivered."  Def.'s Class MSJ Mem. 30; Def.'s Indiv. MSJ Mem. 26.  The parties

agree that the relevant "procedures and standards on file" are "the AUL II policy form approval

submissions," which contain an "Actuarial Basis Memorandum" reproducing the policy

provisions that form the basis of Plaintiffs' contract claims, including the provisions mandating

that COI adjustments "be on a basis that is equitable to all policyholders of a given class" and that COI rates "will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income[,] and lapses."  Class Pls.' 56.1 Resp. ¶¶ 48-49; Indiv. Pls.' 56.1 Resp. ¶¶ 85-86.  Because AXA's motions as to Plaintiffs' breach-of-contract claims based on the "given class" and "reasonable assumptions" provisions have been denied, it follows that this motion must be and is denied for the same reasons.

### 6.  Minimum Interest Rate

By contrast, the Court concludes that AXA is entitled to summary judgment with respect to EFG Plaintiffs' claim that the COI Increase breached the "Changes in Policy Cost Factors" provision because it "result[ed] in an interest crediting rate that is lower than that guaranteed in the policy."  EFG Compl. ¶¶ 69-72; *see also* Indiv. Pls.' 56.1 Resp. ¶ 87; Def.'s Indiv. MSJ Mem. 26-27.  The AUL II policies guarantee a minimum interest rate of three percent on funds maintained by the policyholder in the policy account.  *See* Def.'s Indiv. MSJ Mem. 26.  EFG Plaintiffs argue that AXA raised the COI to make up for a shortfall in investment income that it could not recoup by lowering the interest rate beneath the guaranteed minimum and, therefore, that the COI Increase was, in effect, an impermissible lowering of the interest rate.  EFG Compl. ¶¶ 69-72.

This claim is without merit as a matter of law.  It is undisputed that AXA never paid less than the three percent interest rate guaranteed by the policy.  Def.'s Indiv. MSJ Mem. 26.  EFG Plaintiffs argue that the cited provision does *more* than guarantee a three percent interest rate because, if it did not, it would be superfluous.  Indiv. Pls.' MSJ Mem. 34.  But that position contradicts the plain meaning of the policy provision.  *See Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 626 (9th Cir. 1996) (holding, as a matter of California law, that "[i]f the

meaning a layperson would ascribe to the contract language is not ambiguous, there is no place for interpretation and the court must simply apply that meaning").  Moreover, the policies provide that "changes in policy cost factors . . . will be determined based on reasonable assumptions as to . . . investment income."  Indiv. Pls.' 56.1 Resp. ¶ 87.  Courts have held that policies with similar language "cannot give rise to a breach of contract claim premised on a purported attempt to circumvent minimum guaranteed interest rates."  *Brighton Trs. v. Transamerica Life Ins. Co.*, No. 19-CV-04210 (CAS), 2019 WL 6315541, at \*10 (C.D. Cal. Aug. 28, 2019) (citing cases).  EFG Plaintiffs argue that the AUL II policies here are different because they refer to "investment income," not "interest," Indiv. Pls.' MSJ Mem. 34 n.34, but they fail to explain why a plain reading of "investment income" would not encompass consideration of interest rates.  Accordingly, AXA's motion is granted as to EFG Plaintiffs' minimum interest rate claim.

### 7. Burden to Establish Damages

Next, AXA argues that it is entitled to summary judgment on Plaintiffs' breach-of-contract claim, with respect to both whether the COI Increase was equitable to a given class and whether it was based on reasonable mortality assumptions, because Plaintiffs fail to put forth a reasonable basis for measuring damages.  *See* Def.'s Class MSJ Mem. 31-33; Def.'s Indiv. MSJ Mem. 27-29.  In particular, AXA argues that Plaintiffs' demand for damages — namely, damages equal to the value of the COI Increase, *see* Class Pls.' 56.1 Resp. ¶ 50; Indiv. Pls.' 56.1 Resp. ¶¶ 97-98 — is unsupportable because "[i]t is . . . undisputed that [AXA] was contractually entitled to adjust COI by at least some amount," Def.'s Class MSJ Mem. 31 (emphasis omitted); Def.'s Indiv. MSJ Mem. 28 (emphasis omitted).

AXA's argument is based on a misunderstanding of the relevant burdens of proof.  Under New York law, "[p]roof of damages is an essential element of a claim for breach of contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016).  The non-breaching party, however, need only show "a stable foundation for a reasonable estimate" of damages incurred as a result of the breach.  *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 81 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007); *see also Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391 (2d Cir. 2006); *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 383 (N.Y. 1974); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 109 (N.Y. 1919)).  "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." *Warehouse Wines & Spirits v. Travelers Prop. Cas. Co. of Am.*, 711 F. App'x 654, 657 (2d Cir. 2017) (summary order) (quoting *Tractebel*, 487 F.3d at 111).  In fact, once "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Process Am.*, 839 F.3d at 141 (internal quotation marks omitted); *accord Boyce*, 464 F.3d at 392; *Tractebel*, 487 F.3d at 110; *Schonfeld v. Hilliard*, 218 F.3d 164, 174-75 (2d Cir. 2000); *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2021 WL 2418225, at *3 (S.D.N.Y. June 14, 2021).  "Doubts are generally resolved against the party in breach." *Process Am.*, 839 F.3d at 141.  Thus, in the insurance context, for example, "[t]he insured bears the burden of proving the amount of damage, and the insurance company bears the burden of proving facts in

mitigation of damage." *Warehouse Wines & Spirits*, 711 F. App'x at 657 (quoting *C-Suzanne Beauty Salon, Ltd. v. Gen. Ins. Co. of Am.*, 574 F.2d 106, 114 (2d Cir. 1978)).[24]

Applying those standards here, the Court concludes that Plaintiffs have satisfied their burden to set forth a stable foundation for a reasonable estimate of their damages from AXA's alleged breach — namely, the total amount of the COI Increase that they were charged.  Class Plaintiffs' damages expert, Robert Mills ("R. Mills"), opines that "[o]vercharge damages for a monthly deduction date, *m*, are equal to the actual COI charge deducted on that date less the COI charge that would have been imposed on that date but for the 2016 COI rate increase ('but-for COI charge')."  ECF No. 457-46 ("R. Mills. Rpt."), ¶ 26.  "The but-for COI charge," he continues, "is determined by applying the COI rate that would have been in effect on date *m* but for the 2016 COI rate increase to the net amount at risk . . . on date *m*." *Id.*  "Thus, past overcharge damages are given by the following formula":

$$\text{Overcharge Damages} = \sum_{m} \text{Actual COI Charge}_m - (\text{NAAR}_m \times \text{Pre-Increase COI Rate}_m).$$

*Id.*  R. Mills also demonstrates how to calculate the net amount at risk for any monthly deduction day using data that AXA has produced.  *Id.* ¶ 27.

Contrary to AXA's assertion, it is *not* undisputed that AXA could have increased COI by at least some amount at the time of the challenged COI Increase.  *See, e.g.*, Class Pls.' 56.1 Resp.

---

[24]    Similar principles apply under Arizona and California law, which govern Croft, Peterson, EFG, and Duffy Plaintiffs' breach-of-contract claims.  *See, e.g.*, *Lewis v. N.J. Riebe Enters., Inc.*, 825 P.2d 5, 18 (Ariz. 1992) (en banc) ("Once the right to damages is established, uncertainty as to the amount of damages does not preclude recovery."); *Greenfield v. Ins. Inc.*, 19 Cal. App. 3d 803, 813 (Ct. App. 1971) ("In answer to appellant's contention that the damages are uncertain and not capable of calculation, we cite the rule that the wrongdoer must bear the risk of uncertainty which his wrong has created.  Once certainty as to the fact of damage is established, less certainty is required as to the amount of damage." (citations omitted)).

¶ 50 ("disput[ing] that . . . there is any non-speculative basis for assuming that AXA could or would have raised COI rates in the absence of the COI Increase or if facing different alleged profit shortfalls"); Rouse Rpt. 57 (opining that, before the effect of the COI Increase, AXA's "expected profits under current best estimate assumptions are well above what AXA expected under its [2006] pricing assumptions," which Plaintiffs contend are the appropriate benchmark against which to measure any profitability shortfall). It follows that, if Plaintiffs are able to prove liability on their breach-of-contract claim at trial, the burden will shift to AXA to establish whether any damages offset may be appropriate. If AXA fails to do so, Plaintiffs will be entitled to a refund of the full value of increased COI that they have paid.

### 8. Appropriate Remedy for Croft Plaintiffs' Breach-of-Contract Claims

Finally, the parties raise two related issues with respect to the appropriate remedy in the event the Croft Plaintiffs prevail on their breach-of-contract claim. First, Croft Plaintiffs seek, among other relief, "an order rescinding the contract and requir[ing] AXA to return all the premiums paid together with interest and attorney's fees." 17-CV-9355, ECF No. 40 ("Croft FAC"), at 24.[25] AXA argues — in a single paragraph unsupported by any citation to legal authority — that it is entitled to summary judgment on Croft Plaintiffs' rescission claim because "rescission would be inequitable, would not restore the status quo, and these Plaintiffs waived this remedy." Def.'s Indiv. MSJ Mem. 27.[26] Second, relying on the proposition that "[t]he

---

[25]    Peterson Plaintiffs also sought rescission, *see* 18-CV-10730, ECF No. 1 ("Peterson Am. Compl."), at 29, but because AXA has paid the death benefit on the Peterson Policy, they have withdrawn any claim for rescission, *see* Indiv. Pls.' MSJ Mem. 15 n.11.

[26]    AXA does purport to incorporate by reference two pages of a brief that it filed in an earlier stage of litigation, in which it developed its argument with respect to rescission in somewhat greater detail. *See* Def.'s Indiv. MSJ Mem. 27 (citing 17-CV-9355, ECF No. 46, at 22-23). But the Court will not indulge AXA's end run around the already enlarged briefing limitations set by the Court, *see* ECF No. 396, and, thus, declines to consider the arguments from the earlier brief here. *See, e.g.*, *Nissan Motor Acceptance Corp. v. Dealmaker Nissan, LLC*, No.

measure of damages is the value of the policy at death less the cost of carrying same," Croft

Plaintiffs argue, in the alternative, that, "[b]ecause [Croft] died before the conclusion of the

litigation, and could not have purchased another similar policy, Croft is entitled to the value of

the insurance policy as damages."  Indiv. Pls.' MSJ Mem. 38 (footnote omitted) (citing *Belser v.*

*Mut. Life Ins. Co. of N.Y.*, 77 F. Supp. 826, 830 (E.D.S.C. 1948) (applying South Carolina

law)).[27]  AXA responds to this alternative request by arguing that such a theory of recovery

"violates multiple bedrock principles of contract law."  Def.'s Indiv. MSJ Reply 23.

The Court defers judgment on these issues.  It does so not only because the parties'

briefing leaves something to be desired, but also because the disputes implicate unsettled

questions of Arizona law that the Court ultimately may not need to reach.  The Supreme Court

and the Second Circuit have held that "[n]eedless decisions of state law should be avoided both

as a matter of comity and to promote justice between the parties, by procuring for them a surer-

---

09-CV-0196 (GTS) (ATB), 2012 WL 2522651, at *2 n.2 (N.D.N.Y. June 27, 2012) ("Setting aside the risk that such reference could cause the referring document to violate the District's rule on page limitations (once it is incorporated into the referred document), such a practice also risks causing the opposing party to inadvertently overlook the attempted incorporation, and risks confusing the Court as to which 'incorporated' arguments are actually being relied upon.").

[27]    Under Arizona law, "[t]he election of remedies doctrine . . . prevents a plaintiff from both repudiating a contract and then suing on it to gain the benefit of the bargain."  *Landin v. Ford*, 727 P.2d 331, 332 (Ariz. 1986) (en banc) (cleaned up); *accord Cal X-Tra v. W.V.S.V. Holdings, LLC*, 276 P.3d 11, 30 (Ariz. Ct. App. 2012).  That said, "[a] person cannot be forced to elect before the conclusion of trial . . . the remedy he will seek."  *Vinson v. Marton & Assocs.*, 764 P.2d 736, 739 (Ariz. Ct. App. 1988); *accord Edward Greenband Enters. of Ariz. v. Pepper*, 538 P.2d 389, 391 (Ariz. 1975).  Thus, Croft Plaintiffs can proceed on both theories of recovery — rescission and contract damages — until the conclusion of trial.  *See, e.g.*, *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 676 F. App'x 654, 657 (9th Cir. 2017) (Hurwitz, J., concurring in part and dissenting in part) ("Arizona law generally allows a plaintiff to elect remedies after trial . . . ."); *Kenton v. Foster*, No. 04-CV-2005 (PCT) (PGR), 2008 WL 4700626, at *6 (D. Ariz. Oct. 23, 2008) ("Arizona law requires that a plaintiff make an election of remedies at the conclusion of the trial."); *Canton v. Monaco P'ship*, 753 P.2d 158, 160 (Ariz. Ct. App. 1987) ("Appellee was allowed to plead inconsistent theories up until the conclusion of the trial.").

footed reading of applicable law." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).  In light of that, the Court declines to make any legal rulings related to the available remedies for Croft Plaintiffs' contract claim at this juncture.  *Cf. Fleisher*, 18 F. Supp. 3d at 481 (holding, in a case involving a cost-of-insurance increase on universal life insurance policies, that there was "no basis for summary judgment motions addressed to damages issues when liability issues remain[ed] to be decided" and that "[a]ll issues relating to damages [would] be taken up at the trial").  The parties shall include any proposed special findings relevant to these issues — for example, whether Croft Plaintiffs stated their intent to rescind within a reasonable time under the circumstances, *see, e.g.*, *Fairview Dev. Corp. v. Aztex Custom Homebuilders, LLC*, No. 07-CV-0337 (PHX) (SMM), 2009 WL 529899, at *13 (D. Ariz. Mar. 3, 2009); *Mahurin v. Schmeck*, 390 P.2d 576, 580 (Ariz. 1964) — in their joint proposed special verdict form, which shall be submitted alongside their Joint Pretrial Statement.

## C.  Illustration-Based Claims

The Court turns, then, to Plaintiffs' illustration-based claims.  The Court, like the parties, will begin with the threshold issue of standing before addressing whether summary judgement is appropriate as to (1) Plaintiffs' Section 4226 claims; (2) Plaintiffs' Section 349 claims; and (3) Individual Plaintiffs' common law fraud claims.

### 1.  Standing

As a threshold jurisdictional matter, AXA contends that Wells Fargo, as the securities intermediary and registered owner of many of the policies in the Illustration Class, and as securities intermediary for Individual Plaintiff LSH, lacks Article III standing to proceed with its illustration-based claims because it suffered no direct injury from the alleged misrepresentations

in AXA's illustrations.  Def.'s Class MSJ Mem. 34-35; Def.'s Indiv. MSJ Mem. 30.  AXA
further argues the same is true for 120 of the policies in the Illustration Class for which
ownership changed hands after the COI Increase was announced.  Def.'s Class MSJ Mem. 35;
*see* Def.'s Class 56.1 Stmt. ¶ 99.

To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly
traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a
favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Significantly,
each element "must be supported . . . with the manner and degree of evidence required at the
successive stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the
summary judgment stage, as here, the plaintiffs "must 'set forth' by affidavit or other evidence
'specific facts'" that demonstrate standing.  *Id.* (quoting Fed. R. Civ. P. 56(e)).  Finally, in the
class action context, "[e]very class member must have Article III standing in order to recover
individual damages."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Applying the foregoing standards, the Court concludes that AXA's attack on Wells
Fargo's standing falls short.  To be sure, it is generally true that a plaintiff must have his or her
own "concrete stake in the lawsuit" to assert standing.  *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615,
1619 (2020).  But "an assignee can sue based on his assignor's injuries," *Sprint Commc'ns Co.,
L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008), and an assignee may pursue litigation in
order to remit the proceeds of the litigation back to the assignor, *id.* at 287; *accord Fund
Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 381 (2d Cir. 2021) ("[An] injury
is no less redressable through an award of damages simply because legal title to [the original
owners'] claims is now owned by someone else.").  Moreover, the Second Circuit recently
clarified that pre-suit assignments of a claim do not raise constitutional standing issues, but

should be analyzed instead as an issue of capacity to sue.  *See Fund Liquidation Holdings*, 991

F.3d at 381-82.  These principles are enough to dispose of AXA's arguments with respect to

Wells Fargo, whose role is closer to that of assignee than to that of the uninjured "investment

advisor" with "a mere power-of-attorney" at issue in *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte

& Touche LLP*, 549 F.3d 100, 105 (2d Cir. 2008), upon which AXA relies, *see* Def.'s Indiv. MSJ

Reply 25; *see also* Class Pls.' MSJ Opp'n 57 ("Wells Fargo is the holder of the policy

account."); Indiv. Pls.' 56.1 Resp. ¶ 5 (describing LSH's agreement with Wells Fargo); ECF No.

460-113, § 2.1.

　　By contrast, the Court concludes that registered owners in the Illustration-Based Class

who purchased policies *after* the COI Increase cannot press their claims.  Def.'s Class MSJ

Mem. 35.  For one thing, Plaintiffs fail to address AXA's argument on that score, thereby

forfeiting any counterarguments and abandoning the relevant claims.  *See, e.g.*, *Jackson v. Fed.

Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment

should be denied as to some claims while not mentioning others may be deemed an abandonment

of the unmentioned claims.").  For another, by definition, an owner who purchased a policy after

the COI Increase was announced could not have been injured by a purportedly misleading

illustration that did not forecast the Increase.  *Cf. In re AXA Equitable Life Ins. Co. COI Litig.*,

2020 WL 4694172, at *11 (explaining that "the relevant question is not what choice purchasers

would have made had they been aware of that which the seller had attempted to hide, but rather

whether the defendant abided by its representation and, if the defendant failed to do so, whether

that failure injured the plaintiffs, monetarily or otherwise" (internal quotation marks omitted)).  It

follows that, absent assignment of a pre-existing claim to such purchasers — and there is no

suggestion, let alone evidence, of such an assignment here — any such owners cannot establish

injury in fact or traceability and their claims must be dismissed for lack of standing.

### 2. Section 4226 Claims

With that, the Court turns to the merits of Plaintiffs' illustration-based claims, beginning

with their claims under Section 4226.  To the extent relevant here, Section 4226 provides that no

insurer authorized to sell life insurance in New York shall "issue or circulate, or cause or permit

to be issued or circulated on its behalf, any illustration, circular, statement or memorandum

misrepresenting the terms, benefits or advantages of any of its policies or contracts."  N.Y. Ins.

Law § 4226(a)(1).  As the Court has previously held, to establish a claim under Section 4226,

Plaintiffs must show that (1) AXA misrepresented the terms, benefits, or advantages of its AUL

II policies; (2) the misrepresentation was material; (3) AXA knew that it had misrepresented the

terms, benefits, or advantages of the AUL II policies; (4) AXA knew that the documents

containing the misrepresentation would be communicated to the claimants, directly or indirectly;

(5) the claimants received such a document or learned of the misrepresentation, directly or

indirectly; (6) AXA did not abide by its representation; and (7) the claimants were thereby

injured.  *See In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *12.

The Court will begin and, like the parties, focus primarily on the issue of whether a

reasonable jury could conclude that the AUL II illustrations misrepresented "the terms, benefits

or advantages" of the policies within the meaning of the statute.  N.Y. Ins. Law § 4226(a)(1).

The Court then turns to a number of ancillary issues, including (1) whether a jury could find that

any misrepresentation was knowing, (2) choice of law issues, and (3) whether LSH Plaintiffs can

proceed with claims based on the interests of prior policyholders.

### a.   Whether the AUL II Illustrations Constituted Misrepresentations

First, the Court concludes that a reasonable jury could find that the illustrations misrepresented "the terms, benefits or advantages" of the policies.  N.Y. Ins. Law § 4226(a)(1).  It is undisputed that, from the time AXA began selling AUL II policies in 2004 through sometime in 2015, AXA issued sales and in-force AUL II policy illustrations depicting COI charges that assumed the original, pre-COI Increase rate scale would continue throughout the lifetime of the policy.  *See* ECF No. 516-141, at 5-6 & n.1 (stating the change was made in December 2015); ECF No. 495, at 71-112 ("Class Pls.' 56.1 Stmt."), ¶ 40 (stating the change was made in October 2015); *see also* Indiv. Pls.' MSJ Mem. 12 ("None of the [AUL II] illustrations AXA distributed between 2004 and 2015 depicted a COI rate increase.").  Plaintiffs contend that that constituted a misrepresentation, citing evidence that the COI Increase announced in October 2015 was planned — and therefore should have been incorporated into AXA's illustrations of future COI charges — as early as July 2006.  *See* Class Pls.' MSJ Opp'n 49; Indiv. Pls.' MSJ Mem. 42-44 & n.44.  That month, AXA developed new internal mortality assumptions based on the 2001 VBT (as previously noted, an industry mortality table developed by the Society of Actuaries).  *See* ECF No. 492-68 ("2006 Pricing Mem."); *see* Brown Rpt. ¶¶ 45, 224; Pfeifer Rpt. ¶ 74.  AXA had originally priced AUL II according to mortality assumptions based on a different industry mortality table developed by the Society of Actuaries.  Class Pls.' 56.1 Resp. ¶ 23; Indiv. Pls.' 56.1 Resp. ¶ 52; Brown Rpt. ¶ 40; Pfiefer Rpt. ¶¶ 38-39.  The 2001 VBT, which was already available when AXA priced AUL II, was "steeper" than the table AXA had originally used, meaning it predicted that mortality rates would increase more rapidly with age.  Class Pls.' 56.1 Resp. ¶ 32; ECF No. 512, at 144-91 ("Indiv. Pls.' 56.1 Stmt."), ¶¶ 12-13; Brown Rpt. ¶ 221; Pfeifer Rpt. ¶¶ 40, 228.  Class Plaintiffs' actuarial expert opines that

the decision to use a less steep (i.e., more optimistic, from the insurer's perspective) mortality table as the basis for AUL II's original pricing "helped AXA make AUL II a more competitive product."  Brown Rpt. ¶ 222.

Between 2004 and 2006, AXA's actuaries began to "discuss[] a possible COI rate increase" on AUL II in light of updated profitability projections based on the 2001 VBT.  Pfiefer Rpt. ¶ 41; *see also* Brown Rpt. ¶ 43 ("AXA's actuaries . . . concluded that older-age policies would be unprofitable with current COI charges under the [2006] mortality assumption[s]."). Then, in 2006, AXA's pricing team formally recommended a COI Increase on AUL II policies with issue ages of seventy and older.  Brown Rpt. ¶ 43; ECF No. 492-42, at 100 (acknowledging that AXA's "pricing team recommend[ed] a COI increase on AUL II . . . in early 2006").  AXA did not immediately implement that recommendation, *see* Pfeifer Rpt. ¶ 78, but — beginning in 2007 — it did incorporate a "potential" (according to AXA) or "planned" (according to Plaintiffs) future COI Increase for AUL II into its "best estimate" financial assumptions for purposes of its U.S. GAAP and International Financial Reporting Standards accounting and its statutory asset adequacy testing pursuant to New York Insurance Regulation 126, *see* Class Pls.' 56.1 Stmt. ¶ 39; Brown Rpt. ¶¶ 46-47, 225-31; Pfeifer Rpt. ¶ 43; *see also* Def.'s Class MSJ Mem. 15 (acknowledging that AXA's "*forward-looking* mortality assumptions for [AUL II] changed as early as 2007").  Further, an AXA representative has acknowledged that "AXA's best estimate as of 2007 was that COIs in the future would be higher than what had been set at pricing."  ECF No. 516-169, at 93.  That the COI Increase was planned well before 2015 is confirmed by contemporaneous documents.  For example, an AXA document from June 2007 shows that the insurer internally calculated the projected profits from new sales of AUL II policies based on an "assumed COI Increase . . . consistent with higher expected mortality."

ECF No. 492-83, at 18; *see* Class Pls.' 56.1 Stmt. ¶ 39.  From the foregoing facts alone, a reasonable jury could conclude that the illustrations AXA issued between 2006 or 2007 and 2015 were misleading for failing to depict a future COI Increase that AXA already knew it would impose.

On top of that, Plaintiffs' case is strengthened by New York's Insurance Regulation 74 ("Reg. 74"), which provides that a violation thereof "may be considered . . . a violation of . . . section 4226 of the Insurance Law."  11 N.Y.C.R.R. § 53-1.5.  The regulation mandates that, if a life insurance policy illustration "shows any non-guaranteed elements, they cannot be based on a scale more favorable to the policyowner than the insurer's illustrated scale at any duration."  *Id.* § 53-3.3(a)(7).  The insurer's "illustrated scale" is defined, in turn, as "a scale of non-guaranteed elements currently being illustrated that is not more favorable to the policyowner than the lesser of: (1) the disciplined current scale; or (2) the currently payable scale."  *Id.* § 53-1.3(m).  The "currently payable scale" refers to "a scale of non-guaranteed elements in effect . . . as of the preparation date of the illustration or declared to become effective within the next 95 days."  *Id.* § 53-1.3(h).  Meanwhile, the "disciplined current scale" refers in relevant part to "a scale of non-guaranteed elements constituting a limit on illustrations currently being illustrated by an insurer that is reasonably based on actual recent historical experience, as certified annually by an illustration actuary designated by the insurer."  *Id.* § 53-1.3(i).  Put more simply, as AXA's own expert acknowledges, Reg. 74 "obligates illustrations to depict policy values and benefits calculated using a scale of [non-guaranteed elements] that it based on actual recent historical experience if such [a] . . . scale would depict lower policy values and less benefits to the

policyholder than . . . the current scale."  Pfeifer Rpt. ¶ 255.[28]  And Class Plaintiffs' actuarial

expert opines that, once AXA finalized its new internal pricing assumptions based on the 2001

VBT in July 2006, it "should have changed its [disciplined current scale], and thus reflected

increased COIs in AXA's illustrated scale."  Brown Rpt. ¶ 233; *see id.* ¶¶ 234-35.  That evidence

alone is sufficient to establish a genuine dispute of material fact as to whether AXA violated

Reg. 74.[29]

AXA makes a forceful argument for the proposition that Reg. 74 is not privately

enforceable, but it is ultimately beside the point.  As AXA explains, DFS promulgated Reg. 74

pursuant to Section 3209(k) of the New York Insurance Law.  Def.'s Class MSJ Mem. 36-37.  At

least one New York Court has concluded that Section 3209(k) does not create a private right of

action, *see Jackson v. Ffriend*, 2019 WL 2156410, at *7 (N.Y. Sup. Ct. May 17, 2019), and

Plaintiffs do not argue otherwise.  Instead, they point to the portion of Reg. 74 stating that "a

violation of this Part may be considered . . . a violation of . . . section 4226," 11 N.Y.C.R.R.

§ 53-1.5, which indisputably *does* confer a private right of action.  Class Pls.'s MSJ Opp'n 53.

But it is far from clear that DFS can enact a regulation that confers a private right of action from

a statute that does not, merely by cross reference to another provision.  In the federal context, for

example, the Supreme Court has explained that "[l]anguage in a regulation may invoke a private

right of action that Congress through statutory text created, but it may not create a right that

---

[28]    Thus, both the regulatory text and the testimony of AXA's own expert contradict AXA's
argument that Reg. 74 "*require*[*s*] that non-guaranteed values *must* be based on COI rates then in
effect," Def.'s Class MSJ Mem. 40; Def.'s Indiv. MSJ Mem. 35 — an argument that, in any
event, is based entirely on administrative guidance issued over three years *after* the COI Increase
took effect, *see id.*; *see also* Class Pls.' 56.1 Resp. ¶ 66; Indiv. Pls.' 56.1 Resp. ¶ 115.

[29]    In light of that conclusion, the Court need not and does not address Plaintiffs' argument
that AXA violated Reg. 74 by issuing illustrations that failed self-support testing requirements.
*See, e.g.*, Class Pls.' MSJ Opp'n 52; Indiv. Pls.' MSJ Mem. 45.

Congress has not." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). And similarly, the Second

Circuit has concluded that "it is unlikely that the New York legislature, while not intending to

grant a direct private right of action under" one statute, "did intend a private right of action to be

available to anyone who took the extra step of alleging . . . a violation of" a separate statute.

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 201 (2d Cir. 2005). That logic would seem to

support the conclusion that Reg. 74 cannot be privately enforced.[30]

That said, once again, the Court need not and therefore does not resolve that unresolved

question of New York law. *See In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740

(JMF), 2018 WL 3632500, at *3 (S.D.N.Y. July 30, 2018) (declining to reach this issue); *Brach

Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2017 WL 5151357, at

*2 (S.D.N.Y. Nov. 3, 2017) (same); *see also, e.g.*, *Valencia ex rel. Franco*, 316 F.3d at 305

("Needless decisions of state law should be avoided both as a matter of comity and to promote

justice between the parties." (cleaned up)). That is because Plaintiffs' Section 4226 claims may

proceed even if Reg. 74 is not privately enforceable, both (1) because the claims are not based

solely on a violation of Reg. 74 and (2) because Reg. 74 can "match and fortify [the Court's]

determination" that AXA violated Section 4226 by issuing misrepresentative illustrations.

*Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 347 (N.Y. 1999); *see* Class Pls.' MSJ

Opp'n 54 (arguing that even if a violation of Reg. 74 does not establish a *per se* violation of

Section 4226, "it is still relevant evidence" (emphasis omitted)); Indiv. Pls.' MSJ Mem. 41

(arguing that Plaintiffs are not "[a]sserting [a] [c]ause of [a]ction" under Reg. 74, but rather that

AXA's violations "provide additional support" for their Section 4226 claim). Accordingly, and

---

[30]     Notably, that interpretation would not render Reg. 74's cross-reference to Section 4226
superfluous, as Section 4226 is *also* enforceable by DFS.

because AXA's motion for summary judgment fails regardless, the Court need not and does not decide here whether Plaintiffs can directly enforce Reg. 74.

AXA's counterarguments fall short.  First, AXA points to disclaimers in the illustrations, including a warning that "[t]his illustration assumes that the currently illustrated non-guaranteed elements [including COI rates] will continue unchanged . . . .  This is not likely to occur, and actual results may be more or less favorable than those shown."  Class Pls.' 56.1 Resp. ¶ 52; Indiv. Pls.' 56.1 Resp. ¶ 101.  Relying on *Gaidon*, AXA argues that these disclaimers "preclude a fraud-based claim as a matter of law."  Def.'s Class MSJ Mem. 42.  In *Gaidon*, however, the defendant's disclaimers were sufficient because the changes to the plaintiffs' illustrated premiums were ultimately due to a factor outside the company's control, namely "sharply declining interest rates."  94 N.Y.2d at 343; *see also id.* at 349-50.  Here, by contrast, a reasonable factfinder could find, as discussed above, that AXA had already made the decision to increase COI rates when it issued the illustrations.  If so, then the disclaimers themselves could be said to be misleading because AXA would have known that "actual results" could *not* "be more *or* less favorable than those shown," Class Pls.' 56.1 Resp. ¶ 52; Indiv. Pls.' 56.1 Resp. ¶ 101; it would have known that actual results would be less favorable.  In other words, although the calculations in *Gaidon* were "wholly unrealistic," 94 N.Y.2d at 350, they were not knowingly false, as Plaintiffs contend AXA's were, *see also Plavin v. Grp. Health Inc.*, 857 F. App'x 83, 85 (3d Cir. 2021) (holding that the plaintiff sufficiently alleged a misrepresentation pursuant to Section 4226 where he alleged "that [the insurer's] statement that reimbursement under [the policy] 'may be less than the fee charged by the non-participating provider' was misleading because [the insurer] *knew* that reimbursement amounts would always be significantly less than the fee charged" (emphasis added)).

AXA also argues that any misrepresentation in its illustrations was immaterial as a matter of law, citing this Court's prior holding that "if AXA is correct" that "a reasonable person would not understand the illustrations to constitute projections," then "the illustrations are not material, and Plaintiffs' claims will fail." *In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *14; *see* Def.'s Class MSJ Mem. 43-44; Def.'s Indiv. MSJ Mem. 38-39.  But a factfinder could conclude that a reasonable person would understand the illustrations to have constituted projections of future COI rates.  For example, Class Plaintiffs' actuarial expert opines that, "[b]ecause an illustration is the only means for a prospective or current policyholder to understand the future cost of a life insurance policy, illustrations effectively function as a price tag for universal life insurance."  Brown Rpt. ¶ 245; *see also* Rouse Rpt. 60 ("Because a life insurance policy such as AUL II does not disclose the current COI rates that will be actually charged to policy holders, a current-assumptions illustration is the only way to determine what the policy will cost and how it will perform in the future under AXA's current assumptions.").  Further, one AXA actuary testified in her deposition that she could not "name any other document" than an illustration "that a prospective customer can rely on to understand how a life insurance product will perform in the future."  ECF No. 492-26, at 27-28.  And another AXA actuary testified that "you figure out how much a life insurance product costs" by "[u]sing the illustration."  ECF No. 492-36, at 139.  In light of this evidence, the Court cannot conclude that AXA's alleged misrepresentations in the illustrations were immaterial as a matter of law.  *Cf. ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (stating that, in the securities fraud context, "[t]he materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act" (cleaned up)).

**b.  Whether Any Misrepresentation Was "Knowing"**

Next, AXA argues that no reasonable jury could find that any violation of Section 4226 was "knowing" on the ground that its illustration actuary testified that he "*believed* [AXA] complied with all applicable laws, regulations, and ASOPs."  Def.'s Class MSJ Mem. 44 (emphasis added); Def.'s Indiv. MSJ Mem. 39 (emphasis added); *see also* Def.'s Class MSJ Reply 41 (arguing that no evidence supports a finding that AXA's illustration actuary "'knew' he was violating Reg. 74"); Def.'s Indiv. MSJ Reply 34 (same).  But that argument confuses factual knowledge with legal knowledge; only the former is required to establish a knowing statutory violation.  Section 4226 creates a cause of action against "[a]ny . . . insurer that knowingly violates any provision of this section."  N.Y. Ins. Law § 4226.  Interpreting analogous statutory language, the Supreme Court has repeatedly held that, "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense," not proof of "knowledge of the law."  *Bryan v. United States*, 524 U.S. 184, 192-93 (1998) (internal quotation marks and footnote omitted).  For example, in *United States v. Int'l Mins. & Chem. Corp.*, 402 U.S. 558 (1971), the Court interpreted a statutory provision that provides that a person who "knowingly violates any . . .  regulation" pertaining to the safe transportation of corrosive liquids may be criminally liable.  *See id.* at 559 (quoting 18 U.S.C. § 834(f)).  The Court held that only knowledge of the "specific acts or omissions" constituting the relevant regulatory violation was required to prove a criminal violation, as opposed to knowledge that the acts or omissions were proscribed by law.  *Id.* at 562.  Thus, "[a] person thinking in good faith that he was shipping distilled water when in fact he was shipping some dangerous acid would not be covered," *id.* at 563-64, but a person who knowingly shipped dangerous acid would be covered, regardless of whether he knew that such conduct was illegal.

Put differently, the Court held that the statute did not "signal an exception to the rule that ignorance of the law is no excuse." *Id.* at 562.  Likewise, the Second Circuit has held that "the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal."  *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001).

The Court finds no basis to depart from this well-established rule of statutory interpretation here and agrees with the Third Circuit's recent decision in *Plavin*, which held that allegations that an insurer "knowingly made material misrepresentations about [its] [p]lan" suffice to "plead knowledge" for purposes of a Section 4226 claim.  2021 WL 2026868, at *86; *see also id.* (reversing the district court's holding that the plaintiffs were required to plead "nefarious intent").  In arguing to the contrary, AXA cites *Cilente v. Phoenix Life Ins. Co.*, 21 N.Y.S.3d 236 (1st Dep't N.Y. App. Div. 2015), for the proposition that there is "no § 4226 liability where the violation was 'inadvertent and not knowing,'" *see* Def.'s Class MSJ Mem. 45; Def.'s Indiv. MSJ Mem. 40, but AXA reads too much into the case.  In *Cilente*, the New York Appellate Division affirmed the grant of summary judgment to the defendants on a Section 4226 claim where their "failure to provide [a required] disclosure was inadvertent and not knowing." 21 N.Y.S.3d at 238.  Given the context, however, the court's statement that the "plaintiffs [had] not raised a triable issue concerning [the defendants'] knowledge of the noncompliance with the statutes" refers to the failure to prove knowing conduct, not to prove a knowing violation.  The Court declines to read *Cilente* to depart without comment from the rule of statutory interpretation described above; to the extent it does, the Court declines to follow it.

In short, the Court holds that Section 4226 requires Plaintiffs to prove only that AXA knew of the "specific acts or omissions" constituting the relevant regulatory violation, not that

AXA knew the acts or omissions violated the law.  And there is plainly evidence from which a reasonable factfinder could infer that kind of knowledge on AXA's part.

### c.   The Choice of Law Applicable to Currie Plaintiffs' Section 4226 Claim

Next, AXA argues that choice-of-law principles preclude Currie Plaintiffs from maintaining a claim under Section 4226 because they reside in California.  *See* Def.'s Class MSJ Mem. 45-47.  Notably, however, this Court has already held — at least three times — that a plaintiff need not reside in New York to bring a claim under Section 4226 against a New York-based insurer such as AXA.  *See Yale v. AXA Equitable Life Ins. Co.*, No. 14-CV-2904 (JMF) (S.D.N.Y. Nov. 12, 2014), ECF No. 55, at 6 ("[D]efendant's argument that Section 4226 applies only to New York residents is . . . without merit"); *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238, at *2 (S.D.N.Y. Mar. 9, 2018) ("AXA contends that Section 4226 does not apply to non-New York policyholders.  The Court, however, previously rejected that precise argument in *Yale v. AXA Equitable Life Ins. Co.*, and . . . AXA presents no compelling reason to revisit or distinguish that ruling." (cleaned up)); *In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *12 ("[A]lthough AXA attempts to reargue the point, the Court has repeatedly held that Section 4226 applies to AXA's policies issued outside of New York." (citation omitted)).  Put simply, Section 4226 provides for recovery by "any person aggrieved" by certain enumerated conduct of an "insurer authorized to do in [New York] the business of life . . . insurance."  N.Y. Ins. Law § 4226.  It says nothing about the residency of the aggrieved person or where they were located at the time of the injury.

AXA's contention that Currie Plaintiffs' California residency bars their Section 4226 claim fares no better when reframed as a choice-of-law argument.  "A federal court sitting in diversity applies the choice-of-law rules of the forum state. . . .  Under New York choice-of-law

rules, the first step in any choice-of-law inquiry is to determine whether there is an actual conflict between the rules of the relevant jurisdictions." *Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) (internal quotation marks omitted).  "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 672 F.3d 155, 157 (2d Cir. 2012).  By contrast, if an actual conflict exists, a court applies "New York choice-of-law rules to decide which jurisdiction's substantive law controls.  In tort cases, New York applies the law of the state with the most significant interest in the litigation." *Kinsey*, 991 F.3d at 176.  "Interest analysis is a flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 337 (2d Cir. 2005) (internal quotation marks omitted).  Where the substantive rule at issue is conduct-regulating, as opposed to loss-allocating, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Licci I*, 672 F.3d at 158.  Where, as here, the defendant's allegedly wrongful conduct and the plaintiff's resulting injury took place in different jurisdictions, "the place of the allegedly wrongful conduct" often, although not always, "has superior interests in protecting the reasonable expectations of the parties who relied on the laws of that place to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 739 F.3d 45, 50-51 (2d Cir. 2013) (per curiam) (cleaned up).

With respect to whether there is an actual conflict between New York and California law, AXA points to the fact that the analogous California statute to Section 4226 — Section 790.03(a)

of California's Insurance Code, which proscribes "misrepresentation" and "false or misleading statements" relating to insurance policies as "unfair methods of competition and unfair and deceptive acts or practices in the business of insurance," Cal. Ins. Code § 790.03(a) — does not provide for private enforcement, *see* Def.'s Class MSJ Mem. 46-47; *see also, e.g.*, *Metro Servs. Grp. v. Travelers Cas. & Sur. Co. of Am.*, No. 21-CV-02178 (YGR), 2021 WL 2633416, at *3 (N.D. Cal. June 25, 2021) ("Section 790.03 was not intended to create a private civil cause of action against an insurer." (citing *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 758 P.2d 58, 75 (Cal. 1988))); Cal. Ins. Code § 790.035 ("Any person who engages in any unfair method of competition or any unfair or deceptive act or practice defined in Section 790.03 is liable to the state for a civil penalty . . . ."). By contrast, Section 4226 expressly provides for private enforcement. *See* N.Y. Ins. Law § 4226(d) ("Any such insurer that knowingly violates any provision of this section . . . shall . . . be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved . . . ."). But the difference is not as great as first meets the eye because, as Plaintiffs note, a violation of Section 790.03 may serve as the basis for a claim under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq. See* Class Pls.' MSJ Opp'n 58-59; Def.'s Class MSJ Reply 42-43; *see also Zhang v. Superior Ct.*, 304 P.3d 163, 177 (Cal. 2013) (holding that "a litigant may not rely on the proscriptions of section 790.03 as the basis for a UCL claim," but that "when insurers engage in conduct that violates both [section 790.03] and obligations imposed by other statutes or the common law, a UCL action may lie").

In any event, assuming without deciding that an actual conflict does exist, *see, e.g.*, *Licci II*, 739 F.3d at 47, the Court concludes that New York has the greater interest in adjudicating Currie Plaintiffs' relevant claims. To be sure, Currie Plaintiffs are California residents and the

Currie Policy was issued in California.  *See* Class Pls.' 56.1 Resp. ¶¶ 3, 5.  But AXA is a New

York company headquartered in New York, *see* Indiv. Pls.' 56.1 Resp. ¶ 31, and New York has a

compelling interest in regulating the conduct of insurers based here, *see, e.g.*, *Simon v. Philip*

*Morris Inc.*, 124 F. Supp. 2d 46, 72 (E.D.N.Y. 2000) ("With regard to deterrence, New York has

an obvious and substantial interest in ensuring that it does not become either a base or a haven

for law breakers to wreak injury nationwide."); *cf. Licci I*, 672 F.3d at 158 ("New York, not

Israel, has the stronger interest in regulating the conduct of New York-based banks operating in

New York.").  AXA's sole argument to the contrary is that, "[f]or fraud-based claims, . . . 'the

locus of the tort is generally deemed to be the place where the injury was inflicted' — typically

where the plaintiff is located — 'rather than where the fraudulent act originated.'"  Def.'s Class

MSJ Mem. 45-46 (quoting *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013)).  The Second

Circuit did make passing reference to that traditional rule in *Thelen*.  *See* 736 F.3d at 220 (citing

Restatement (First) of Conflict of Laws § 377 n.4).  In *Licci II*, however the Second Circuit

considered at length and ultimately "reject[ed] the view . . . that the law of the place of injury

*ordinarily or always* governs where conduct-regulating rules are involved."  *Licci II*, 739 F.3d at

51 (emphasis added).  Put differently, at a minimum, "where the loss was suffered is not

conclusive and does not trump a full interest analysis."  *Thomas H. Lee Equity Fund V, L.P. v.*

*Mayer Brown, Rowe & Maw LLP*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009).  Were there any

doubt that this holds true in the context of fraud-based claims, courts in this District have often

concluded that New York has the greater interest in adjudicating claims arising from allegedly

fraudulent acts that were committed in New York but injured plaintiffs in other jurisdictions.

*See, e.g.*, *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 524 (S.D.N.Y. 2013), *aff'd*

*sub nom. AHW Inv. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 F. App'x 2 (2d Cir. 2016) (summary

order); *Thomas H. Lee Equity Fund V, L.P.*, 612 F. Supp. 2d 267, 284 (S.D.N.Y. 2009); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 193-94 (S.D.N.Y. 2006); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001).  For the reasons stated above, this Court reaches the same conclusion here.

### d.   Claims on Behalf of Predecessors-in-Interest

Finally, AXA is entitled to summary judgment with respect to LSH Plaintiffs' and Class Plaintiffs' Section 4226 claims based on the interests of prior policyholders.  *See* Def.'s Indiv. MSJ Mem. 40; LSH Compl. ¶¶ 130-32.  This Court has already held that, "to establish a claim under Section 4226, Plaintiffs must show," among other things, that "the claimants received . . . or learned of the misrepresentation, directly or indirectly" and that "the claimants were thereby injured."  *In re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *12.  In this case, however, the prior policyholders sold their polices before the COI Increase, LSH Compl. ¶ 96; TAC ¶ 82, and, thus, cannot have been injured by that Increase.  Class Plaintiffs do not even respond to AXA's argument on these claims and, thus, have abandoned them.  *See Jackson*, 766 F.3d at 195.  LSH Plaintiffs, meanwhile, argue that the prior policyholders' have assignable claims under Section 4226 because a cause of action need not be complete to be assignable.  Indiv. Pls.' MSJ Mem. 49 (citing *SEC v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 537-38 (S.D.N.Y. 2001), *rev'd in part, vacated in part*, 297 F.3d 127 (2d Cir. 2002)).  But the issue here is not that the prior policyholders' claims were incomplete when LSH purchased the policies and later became complete.  Instead, the prior policyholders' claims never materialized because they were not injured by the alleged misrepresentation.  In fact, LSH Plaintiffs allege that the prior policyholders were paid *more* for their policies because of AXA's alleged misrepresentations.

*See* LSH Compl. ¶ 96 (asserting that "AXA's fraud artificially inflated the price of the policies in the secondary market").  Thus, the Section 4226 claims of prior policyholders must be dismissed.

### 3. Section 349 Claims

AXA's arguments with respect to Plaintiffs' Section 349 claims can be addressed swiftly. For starters, its arguments concerning Class Plaintiffs' Section 349 claims fail for the same reasons that its arguments for summary judgment concerning the Section 4226 claims failed.[31] In particular, a reasonable factfinder could conclude that AXA's illustrations issued between 2006 or 2007 and 2015 were misleading because they failed to depict a future COI Increase that AXA knew at the time it would later impose.  For the same reason, AXA's reliance on the enhanced disclosures in *Gaidon* is also unpersuasive.  *See* Def.'s Class MSJ Mem. 48.  As discussed, AXA's disclosures were intended to and did make clear that the non-guaranteed elements could change, but they did not place policyholders on notice that AXA had already made a determination to increase the COI.  *Cf. Gaidon*, 94 N.Y.2d at 347.

By contrast, AXA is entitled to summary judgment on LSH Plaintiffs' Section 349 claims because there is no evidence that any relevant deception occurred in New York.  The claims are predicated on four AUL II policies that were originally issued in New York and eventually purchased by LSH, a Luxembourg-based investment vehicle, through its Florida-based investment manager CMG Surety LLC ("CMG") and its South Dakota-based securities intermediary, Wells Fargo.  *See* Indiv. Pls.' 56.1 Resp. ¶¶ 1, 3, 5-6, 12, 137, 140; *see also* 18-CV-2111, ECF No. 46 ¶ 6 (stipulating to dismissal of LSH Plaintiffs' Section 349 claim to the extent it was predicated on "policies issued in states other than New York").  Significantly,

---

[31]    AXA also argues that Wells Fargo lacks standing to pursue a Section 349 claim.  Def.'s Class MSJ Mem. 48.  That argument is rejected for the same reason the Court rejected AXA's argument as to Wells Fargo's standing to proceed under Section 4226.

among the fifty-three AUL II policies that LSH Plaintiffs own in total, only "a few" were purchased from the policies' original owners.  Indiv. Pls.' 56.1 Resp. ¶¶ 2, 6.  The rest were acquired from other investors.  *Id.* ¶ 6.  Conspicuously, LSH Plaintiffs do not argue, much less adduce evidence, that LSH purchased any of the four New York-issued AUL II policies from a seller who was located in New York.  *See* Indiv. Pls.' MSJ Mem. 50 ("These New York-issued policies were . . . sold by their New York owners and *ultimately* to LSH." (emphasis added)).  Instead, they argue that because the relevant policies were *once* sold in New York, the alleged deception of LSH downstream in the chain of commerce is sufficiently connected to New York to support a Section 349 claim.  *See id.*  That argument does not withstand scrutiny.

On its face, Section 349 prohibits only "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service *in this state*."  N.Y. Gen. Bus. Law § 349 (emphasis added).  Consistent with that plain language, the New York Court of Appeals has held that, to prove a Section 349 claim, "the transaction in which the consumer is deceived must occur in New York."  *Goshen v. Mut. Life Ins. Co.*, 774 N.E.2d 1190, 1195 (N.Y. 2002).  In *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), a case on which Plaintiffs rely, *see* Indiv. Pls.' MSJ Mem. 50, the Second Circuit elaborated on that standard, holding that where a transaction took place across jurisdictions, Section 349's territorial requirement is satisfied as long as "some part of" the transaction occurred in New York — even if the plaintiff was located elsewhere, *id.* at 124 (internal quotation marks omitted).  Thus, the court held that a Virginia resident who had traded on a New York-based online foreign currency exchange could bring a Section 349 claim against the exchange.  *Id.* 118-19, 122.  Still, the *Cruz* court focused on the transaction in which the plaintiff directly participated.  *See id.* at 123 ("[A] deceptive transaction in New York falls within the territorial reach of section 349 and suffices to give an

out-of-state victim *who engaged in the transaction* statutory standing to sue under section 349."
(emphasis added)).  That focus accords with the New York Court of Appeals' statement in
*Goshen* that the "intent" of Section 349, as reflected in "both the text of the statute and the
history," is "to protect consumers in *their* transactions that take place in New York State."  774
N.E.2d at 1196.  LSH Plaintiffs, however, fail to identify *any* transaction in which they
participated, let alone *any* part of which took place in New York.  Thus, AXA's motion for
summary judgment on LSH Plaintiffs' Section 349 claims must be granted.

### 4.  Common Law Fraud Claims

Next, the Court turns to LSH and Peterson Plaintiffs' common law fraud claims.  *See*
LSH Compl. ¶¶ 120-26, Peterson Compl. ¶¶ 117-52.  To prove fraud under New York law, a
plaintiff must show "(1) a material misrepresentation or omission of fact (2) made by a defendant
with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the
plaintiff; and (5) resulting damage to the plaintiff."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells
Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021).[32]   AXA contends that Plaintiffs' claims fail
because they have not identified an actionable misrepresentation or omission in AXA's
illustrations, they cannot establish that they relied on any misrepresentation, Plaintiffs cannot
show that AXA acted with intent to defraud, and any reliance would not be reasonable.  Def.'s
Indiv. MSJ Mem. 43-50.  The Court is not persuaded and AXA's motion for summary judgment
is therefore denied.

First, AXA argues that Plaintiffs fail to identify a materially false or misleading statement
in the illustrations.  Although AXA initially argues that "projections" like those made in its

---

[32]     The parties agree that the Court can and should apply New York law because the relevant
principles are consistent across the relevant jurisdictions.  Def.'s Indiv. MSJ Mem. 42-43; Indiv.
Pls.' MSJ Mem. 51.

illustrations are not actionable, it does not dispute that "statements about 'future events can' support a fraud claim if 'known by the author to be false or made despite the anticipation that the event will not occur.'"  Def.'s Indiv. MSJ Reply 36; *see also Cristallina S.A. v. Christie, Manson & Woods Int'l, Inc.*, 117 A.D.2d 284, 294-95 (N.Y. 1986).  Indeed, it is well established that "a promise made with a preconceived and undisclosed intention of not performing it, constitutes a misrepresentation."  *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986) (cleaned up).  Here, as already discussed, a reasonable factfinder could conclude that AXA *knew* that it would raise COI rates at the time it issued illustrations depicting the continuation of its current rates, rendering that depiction false or misleading.  And again, although the illustrations contained a disclaimer stating that "actual results may be more or less favorable than those shown," that disclaimer would itself be false and misleading if AXA *knew* that actual results would be less favorable.  *Goshen* is not to the contrary.  There, the court found that the plaintiffs' fraud claim could not proceed because they had failed to adduce any evidence that there was "a deliberate plan or scheme on the part of any person associated with" the insurance company "to manipulate [its] financial condition (or its presentation in the illustrations)."  *Goshen v. Mut. Life Ins. Co.*, No. 600466, 1997 WL 710669, at *7 (N.Y. Sup. Ct. Oct. 21, 1997), *aff'd*, 684 N.Y.S.2d 791 (1999), *aff'd as modified sub nom. Gaidon*, 94 N.Y.2d 330.

Next, AXA argues that LSH Plaintiffs cannot prove actual reliance because they did not themselves review the illustrations.  Def.'s Indiv. MSJ Mem. 44-45.[33]  LSH Plaintiffs concede

---

[33]    AXA further argues that LSH Plaintiffs "disclaimed . . . reliance" on the illustrations, but the email on which AXA relies merely states that Plaintiffs did not rely on "internal communications [of IFA] that LSH was not privy to" in making its investment decision.  *See* 18-CV-2111, ECF No. 128-4, at 11.

that the illustrations were reviewed by their "third party service providers," CMG and IFA, *see*

Indiv. Pls.' 56.1 Resp. ¶ 168, but contend that reliance by a third party reviewer on behalf of the

prospective policyholder is sufficient.  Plaintiffs have the better of the argument.  In *Pasternack*

*v. Lab'y Corp. of Am. Holdings*, the Court of Appeals explained that "indirect communication

can establish a fraud claim, so long as the statement was made with the intent that it be

communicated to the plaintiff and that the plaintiff rely on it."  59 N.E.3d 485, 492 (N.Y. 2016).

Here, AXA intended its illustrations to reach buyers of the policies and policyholders, the alleged

misrepresentation was communicated to Plaintiffs' advisors, who used it, in turn, to make an

investment recommendation to Plaintiffs.  *See* Indiv. Pls.' 56.1 Resp. ¶ 168 (LSH Plaintiffs'

investment advisors "reviewed and relied on AULII policy illustrations and made policy

purchase and maintenance decisions as LSH, on behalf of LSH, and at LSH's direction"); *cf. In*

*re AXA Equitable Life Ins. Co. COI Litig.*, 2020 WL 4694172, at *12 (citing *Pasternack* and

holding that the element of "exposure" for a Section 4226 claim is met where "a prospective

policy owner relied on a financial advisor to review the materials containing the illustration,

provided that the advisor actually did so").[34]  Meanwhile, AXA's argument that LSH and

---

[34]     AXA relies on *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 412 F. Supp.
3d 392 (S.D.N.Y. 2019), *see* Def.'s Indiv. MSJ Reply 38, which was affirmed by the Second
Circuit after briefing on these motions was completed (a decision neither party brought to the
Court's attention), *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 13 F.4th 247
(2d Cir. 2021).  The Second Circuit's decision certainly makes the question a closer one, but the
Court concludes that *Loreley* is distinguishable.  There, the Court held that the plaintiff investors
failed to show reliance where the plaintiffs' investment advisor's "filtering and evaluation
process [for the information containing the alleged misrepresentation] was extensive."  13 F.4th
at 261.  Moreover, the defendants in *Loreley* "did not intend for their representations to be passed
to [the plaintiff] without filtering and modification" through the investment advisor, and the
defendants "expected" the advisor "would conduct its own due diligence on the deals."  *Id.* at
262.  Here, by contrast, a reasonable factfinder could conclude that LSH's advisors acted as a
conduit for information in the illustrations rather than "filtering and modify[ing]" it.  *See* Indiv.
Pls' 56.1 Resp. ¶¶ 168 (LSH's advisors "reviewed and relied on AULII policy illustrations and
made policy purchase and maintenance decisions as LSH, on behalf of LSH, and at LSH's

Peterson Plaintiffs did not rely on the illustrations because they calculated their own minimum premium is similarly unpersuasive given clear evidence in the record that Plaintiffs and their advisors reviewed the illustrations, which AXA fails to controvert.  Indiv. Pls.' 56.1 Resp. ¶ 168, ECF No. 512, at 195-69 ("Peterson Pls.' 56.1 Stmt."), ¶ 1.  AXA's argument that Plaintiffs cannot prove specific intent to defraud is unpersuasive for much the same reason.  Def.'s Indiv. MSJ Mem. 49-50.  AXA provided illustrations to registered policyholders, allegedly aware that they contained misrepresentations.  *See* Indiv. Pls' 56.1 Resp. ¶¶ 189-90 (AXA provided illustrations to Wells Fargo, which it "forwarded . . . on to LSH," and AXA knew that Wells Fargo was acting as a "[s]ecurities [i]ntermediary" for the beneficial owner of the policies).  AXA need not have been aware of the identities of the beneficial owners of the policies.  At best, AXA raises issues of fact that must be resolved at trial.

Finally, AXA argues that any reliance by Plaintiffs on the illustrations was unreasonable as a matter of law because the illustrations contained disclaimers and because Plaintiffs are sophisticated investors with access to industry information.  Def.'s Indiv. MSJ Mem. 45-48.  The Court is not persuaded.  Again, Plaintiffs' claims turn on their argument that AXA *knew* at the time it issued the relevant illustrations that it intended to increase the COI and nonetheless issued illustrations that projected the same COI into the future.  The disclaimers do not provide a warning to policyholders that AXA was affirmatively misrepresenting its future plans.  Once again, therefore, AXA's reliance on *Goshen* is unpersuasive.  In *Goshen*, the plaintiffs contended that "they had a right to believe that the interest and dividend assumptions upon which their . . .

---

direction"), 170 ("[P]eriodically, LSH would review policy files at [its advisor's] facilities" including "a test sample of the policies . . . that had been purchased on their behalf.").  And there is certainly no suggestion that *AXA* intended its illustrations to be reviewed by an advisor, rather than the policyholder.

premium policies were based would not change, or, were at best, irrelevant: i.e., that they were somehow guaranteed." 1997 WL 710669, at *8. Given the disclaimers, the court found that reliance on the illustrations for that purpose was unreasonable. But that is different than Plaintiffs' contention here, which is that they relied on the illustrations as a representation that AXA had not already decided to increase the COI. For the same reason, Plaintiffs' sophistication does not make their reliance unreasonable. Put simply, a reasonable jury could conclude that they had no way of knowing that AXA was affirmatively concealing that it had already decided on a COI Increase. (In fact, AXA itself almost seems to argue that no reasonable investor should have assumed that it was accurately representing that it had not already decided to increase the COI.) New York courts have held that reliance is unreasonable where sophisticated plaintiffs "enjoy access to critical information but fail to take advantage of that access." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006). But here Plaintiffs had no access to the information they allege that AXA misrepresented.

In short, LSH Plaintiffs' common law fraud claims survive summary judgment.

### 5. Currie Plaintiffs' California Law Claims

Finally, the Court turns to Currie Plaintiffs' claims under California law. The Court will begin with their Unfair Competition Law claims, then turn to their Elder Abuse Law claims.

### a. The CUCL Claims

To state a claim for unfair competition pursuant to California's Unfair Competition Law ("CUCL" or "UCL"), a plaintiff must allege an "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200 *et seq*. AXA argues that it is entitled to summary judgment with respect to Currie Plaintiffs' CUCL claims because (1) they are duplicative of Plaintiffs' contract claims, (2) Currie Plaintiffs did not rely on any of the alleged

misrepresentations in the illustrations when purchasing the policy, (3) the illustrations were not fraudulent, and (4) Currie Plaintiffs have an alternative adequate remedy at law.  Def.'s Class MSJ Mem. 53-58.  The Court is unpersuaded, so AXA's motion for summary judgment is denied.

To begin, although an alleged breach of contract alone is not sufficient to create CUCL liability, *see Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010), "a systematic breach of certain types of contracts . . . can constitute an unfair business practice" sufficient to give rise to liability under the CUCL, *Feller v. Transamerica Life Ins. Co.*, No. 2:16-CV-01378 (CAS) (AJW), 2016 WL 6602561, at *13-14 (C.D. Cal. Nov. 8, 2016) (holding that the plaintiffs stated a claim under CUCL where they alleged that an insurer "systematically and excessively rais[ed] policy rates in an attempt to induce forfeiture of elderly policyholders' policy benefits or compel payment of higher premiums").  For the reasons discussed above, a reasonable jury could find that AXA engaged in an unfair business practice by "target[ing] the 70+/$1M+ grouping by manipulating ELAS 12."  Class Pls.' MSJ Opp'n 60.  AXA further argues that Plaintiffs' claims must be brought as a class claim, *see* Def.'s Class MSJ Mem. 54 n.59, but "[t]here is nothing in the word 'practice' that necessarily limits section 17200 cases to those actions involving multiple victims," *Allied Grape Growers v. Bronco Wine Co.*, 249 Cal. Rptr. 872, 884 (Cal. Ct. App. 1988), *as modified on denial of reh'g* (Aug. 26, 1988) (upholding a Section 17200 "unfair practice" claim based upon a contractual relationship).

Next, AXA contends that Currie Plaintiffs fail to show reliance on the allegedly misleading illustrations.  "A showing of actual reliance under the UCL requires a plaintiff to establish that the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct."  *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1014

(N.D. Cal. 2013) (internal quotation marks omitted).  "To survive summary judgment, Plaintiffs are required to set forth . . . specific facts indicating that Plaintiffs actually saw the misrepresentations about which they complain, and that those misrepresentations were substantial factors in Plaintiffs' decisions."  *Id.* at 1019 (cleaned up).  Here, Malcolm Currie testified that he reviewed the sales illustration when deciding whether to purchase the policy, and Barbara Currie, his wife, testified that she reviewed the in-force illustration and that it was "the price tag document that [she and her husband] lived by."  Class Pls.' 56.1 Resp. ¶¶ 70-71.  Their testimony is sufficient evidence of reliance to defeat summary judgment.  AXA further argues that Malcolm Currie lacked standing because he was not personally injured by any misrepresentation, on the theory that he did not personally pay the premiums on the policy.  That is true, but the money to pay the premiums was loaned and gifted to the Currie Children Trust by the Currie Family Trust, which contained "[e]verything [the Curries'] own[ed], [their] house, . . . assets."  Class Pls.' 56.1 Resp. ¶ 88.

AXA's last two arguments require little more discussion.  AXA's arguments that its illustrations were not likely to deceive the public and that the disclaimers in the illustrations prevented the public from being misled are without merit for the same reasons that the Court has already concluded that a reasonable jury could find that the illustrations contained misrepresentations.  And AXA's argument that Currie Plaintiffs have an adequate alternative remedy at law also fails because their policy is still in force and they seek an injunction prohibiting AXA from continuing to charge the higher COI fees going forward.  *See* Class Pls.' Opp'n at 60; TAC ¶ 117; *cf. Silvercrest Realty, Inc. v. Great Am. E&S Ins. Co.*, No. 11-CV-01197 (CJC) (ANX), 2012 WL 13028094, at *3 (C.D. Cal. Apr. 4, 2012) (concluding that a

plaintiff must support a request for "injunctive relief" pursuant to Section 17200 with "a threat of ongoing future conduct"). Accordingly, Currie Plaintiffs' CUCL claim survives.

### b. The Elder Abuse Law Claims

AXA's motion for summary judgment with respect to Currie Plaintiffs' Elder Abuse Law claim presents a closer question, but the Court concludes that it too should be denied. California's Elder Abuse Law "was enacted to protect elders by providing enhanced remedies which encourage private, civil enforcement of laws against elder abuse and neglect." *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp. 2d 998, 1001 (C.D. Cal. 2006).[35] Its financial abuse provision applies to claims for "[f]inancial abuse of an elder," which is defined, to the extent relevant here, as "[t]ak[ing], secret[ing], appropriat[ing], obtain[ing], or retain[ing] . . . personal property of an elder . . . for a wrongful use or with intent to defraud, or both." Cal. Welf. & Inst. Code § 15610.30(a)(1) (internal quotation marks omitted). An "elder" is "any person residing in [California], 65 years of age or older." *Id.* § 15610.27. For purposes of the statute, "a person or entity takes, secretes, appropriates, obtains, or retains real or personal property when an elder . . . is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder." *Id.* § 15610.30(c). Thus, to prevail on their elder abuse claim, Currie Plaintiffs must

---

[35]    Courts are divided on whether the Elder Abuse Law merely provides additional remedies or also establishes an independent cause of action. *Compare Berkley v. Dowds*, 61 Cal. Rptr. 3d 304, 313 (Cal. Ct. App. 2007) (holding that the statute "does not create a cause of action as such, but provides for attorney fees, costs and punitive damages under certain conditions"), *with Perlin v. Fountain View Mgmt., Inc.*, 77 Cal. Rptr. 3d 743, 750 (Cal. Ct. App. 2008) (holding that a violation of the statute "constitute[s] an independent cause of action"); *see also, e.g., Gross v. Wells Fargo Bank*, No. 13-CV-1250 (W) (BGS), 2014 WL 232272, at *5 (S.D. Cal. Jan. 21, 2014) (discussing the split); *Keshish v. Allstate Ins. Co.*, No. 12-CV-03818 (MMM) (JCx), 2012 WL 12887077, at *7 n.37 (C.D. Cal. July 30, 2012) (same); *Das v. Bank of Am., N.A.*, 112 Cal. Rptr. 3d 439, 453 (Cal. Ct. App. 2010) (same). For purposes of this motion, the Court assumes without deciding that the statute provides an independent cause of action.

establish that someone over the age of sixty-five paid premiums associated with the Currie

Policy or otherwise was deprived of property as a result of the COI Increase.  *See In re AXA*

*Equitable Life Ins. Co. COI Litig.*, No. 16-CV-740 (JMF), 2020 WL 4694172, at *9 (S.D.N.Y.

Aug. 13, 2020) (addressing this requirement in the context of class certification).  They also must

show that the COI Increase satisfies the "wrongful use" element of the statute.

There is no dispute that Mr. Currie qualifies as an "elder" within the meaning of the

statute, as he was over sixty-five at all relevant times and a resident of California.  *See* ECF No.

457-6, at 3 (stating that Malcolm Currie was eighty years old at the date of policy issuance);

Class Pls.' 56.1 Resp. ¶ 5.[36]  The tougher question is whether the conduct here could qualify as

financial abuse of Mr. Currie, as the Currie Policy's owner and beneficiary is the Currie Children

Trust, of which Mr. Currie was neither a trustee nor a beneficiary.  Class Pls.' 56.1 Resp. ¶ 3.

The Court concludes that it could.  Mrs. Currie testified that the funds used to pay premiums on

the Currie Policy have come from the Currie Family Trust "for the entire time of the policy,"

including through the sale of investments held in the Currie Family Trust.  ECF No. 457-85 ("B.

Currie Tr."), at 218-19; *see also* ECF No. 457-84, at 198 (Mr. Currie's testimony that he

"believe[d]" the family trust had provided the funds for premium payments since the inception of

the policy, but that the attorney taking the deposition would "have to ask [his] wife").  These

transfers have taken the form of both loans and gifts.  Class Pls.' 56.1 Resp. ¶¶ 84, 87.

According to Mrs. Currie, following the COI Increase, she and Mr. Currie were forced to

"liquidate . . . assets" of the Currie Family Trust — of which the two were co-trustees — to make

---

[36]     The parties point to no evidence of the age of anyone else associated with the Currie
Policy, so the Court assumes for purposes of these motions that Mr. Currie was the only relevant
"elder" within the meaning of the statute.

the payments required to keep the policy in force.  B. Currie Tr. 33-34, 216, 218; *see* ECF No. 457-91 ("Currie Family Trust Decl."), at 1; ECF No. 457-92, at 2.

Notably, AXA does not dispute that when an elder uses his or her money to pay premiums associated with a life insurance policy, that constitutes property deprivation within the meaning of the Elder Abuse Law, regardless of whether the elder has a property interest in the policy itself.  *See* Def.'s Class MSJ Mem. 50-51; *see also Mahan v. Charles W. Chan Ins. Agency, Inc.*, 222 Cal. Rptr. 3d 360, 846, 864-65 (Cal. Ct. App. 2017) (holding that elders were deprived of property, within the meaning of the Elder Abuse Law, because they were forced to "reach into their pockets and sell assets to provide more cash" to a trust of which their daughter was the trustee, to keep a life insurance policy held by the trust in force).  Instead, AXA's motion is premised on the fact that the payments came from the Currie Family Trust, not from Mr. Currie *himself*.  Def.'s Class MSJ Mem. 50-51.  But that does not defeat the claim.  First, although some of the funds used to pay the Currie Policy premiums were indeed lent from the Currie Family Trust to the Currie Children Trust, other funds were transferred outright, as gifts.  *See* Class Pls.' 56.1 Resp. ¶ 87.  Second, under California law, which governs the Currie Family Trust, *see* Currie Family Trust Decl. 41, a trustee holds legal title to trust property, *see, e.g.*, *Moeller v. Superior Ct.*, 947 P.2d 279, 285 (Cal. 1997) ("A trust is a fiduciary relationship with respect to property in which the person holding legal title to the property — the trustee — has an equitable obligation to manage the property for the benefit of another — the beneficiary." (emphasis omitted) (citing cases)); *accord Boshernitsan v. Bach*, 276 Cal. Rptr. 3d 109, 114 (Cal. Ct. App. 2021), *reh'g denied* (Apr. 5, 2021); *Portico Mgmt. Grp., LLC v. Harrison*, 136 Cal. Rptr. 3d 151, 157 (Cal. Ct. App. 2011); *Greenspan v. LADT, LLC*, 121 Cal. Rptr. 3d 118, 146 (Cal. Ct. App. 2010).  In analyzing elder abuse claims, other courts have focused on whether

any elder was deprived of property to which he or she held legal title.  *See, e.g.*, *Kerrigan v. Bank of Am.*, No. 09-CV-02082 (DDP) (OPx), 2011 WL 3565121, at *8 (C.D. Cal. Aug. 12, 2011) (holding that the plaintiff had not "pleaded or offered facts to support a finding that [the] [d]efendant wrongfully took property from [the] [p]laintiff" because the "[p]laintiff was not record title owner" of his home "at the time of the subject loan"); *cf. Bounds v. Superior Ct.*, 177 Cal. Rptr. 3d 320, 329 (Cal. Ct. App. 2014) (recognizing that the transfer of title from an elder to a defendant is sufficient, although not necessary, to constitute a deprivation of property within the meaning of the statute).  In light of that, the Court concludes that property held by the Currie Family Trust, of which Mr. Currie was trustee, was Mr. Currie's property for purposes of the Elder Abuse Law.

Whether Currie Plaintiffs can prove the "wrongful use" element of the statute also presents a close question, but the Court concludes that they have satisfied their burden at the summary judgment stage.  The statute provides that conduct property is taken "for a wrongful use if, among other things, . . . the person or entity knew or should have known" that the taking was "likely to be harmful to the elder."  Cal. Welf. & Inst. Code § 15610.30(b).  Where a plaintiff's elder abuse claim is predicated on a breach of contract, he or she must prove, "in addition to" the breach itself, that the defendant "actually [knew] that it is engaging in a harmful breach, or reasonably should be aware of the harmful breach."  *Paslay v. State Farm Gen. Ins. Co.*, 203 Cal. Rptr. 3d 785, 799-800 (Cal. Ct. App. 2016); *see also, e.g.*, *King v. Portfolio Pres., LLC*, No. 2:19-CV-01916 (JAM) (CKD), 2021 WL 677913, at *4 (E.D. Cal. Feb. 22, 2021) (applying that standard), *report and recommendation adopted*, 2021 WL 1634515 (E.D. Cal. Apr. 27, 2021); *Yokell v. Draper*, No. 18-CV-02124 (JSC), 2018 WL 3417514, at *9 (N.D. Cal. July 13, 2018) (same).  As discussed above, on the record in this case, a reasonable jury could

find that AXA knew that the COI Increase was not based on reasonable mortality assumptions.
*See* Class Pls.' 56.1 Statement ¶ 20; Rouse Rpt. 33-51.  It follows that a reasonable jury could
find that AXA knew or should have known that the COI Increase was likely to be harmful to Mr.
Currie.

In short, AXA's motion for summary judgment with respect to Currie Plaintiffs' Elder
Abuse Law claim must be and is denied.

## MOTION TO STRIKE

Next, Individual Plaintiffs move to strike paragraphs 54 through 58 of AXA's Rule 56.1
Statement and the evidence cited in those paragraphs.  *See* ECF No. 502.  Individual Plaintiffs
contend that AXA is judicially estopped from arguing — as it does in the relevant portions of its
Rule 56.1 Statement and elsewhere, *see, e.g.*, Def.'s Indiv. MSJ Mem. 23-24 — that the
mortality assumptions underlying the COI Increase were reasonable because they are largely
consistent with actual experience since the Increase took effect.  *See generally* ECF No. 508
("Pls.' Mot. Strike Mem."); *see also, e.g.*, ECF No. 466, ¶ 57 (citing testimony that "mortality
experience for AULII 70+/1M+ Policies for 2013 through 2018 was 'in line with' the ELAS 12
assumptions").  The basis for the motion is a letter that AXA filed in June 2018 in response to
Plaintiffs' motion to compel production of certain experience data, in which AXA argued that
"[n]one of [the] information [sought] demonstrates the reasonableness of assumptions AXA
made in 2015" given that "mortality information that did not exist in 2015 . . . could not have
formed the basis of AXA's decision to adjust COI rates."  ECF No. 230, at 2.  AXA then
criticized Plaintiffs' apparent "intention of litigating their contract and fraud-based claims by
hindsight."  *Id.*  Nevertheless, AXA agreed to produce certain "documents sufficient to show its
actual to expected mortality ratios for AULII and updated mortality assumptions for AULII post-

dating its announcement of the COI Adjustment," although not the "underlying analyses, software programs, or emails."  *Id.* at 2-3.  In a text-only Order, the Court directed AXA to "promptly produce the documents it consent[ed] to produce" and invited Plaintiffs to "file a new letter motion" if they "believe[d] they [were] entitled to" more.  ECF No. 232.  Plaintiffs now argue that the Court's Order constituted judicial adoption of AXA's position that hindsight evidence is irrelevant to the reasonableness of the mortality assumptions underlying the COI Increase, such that the doctrine of judicial estoppel bars AXA from arguing otherwise now.  *See* Pls.' Mot. Strike Mem. 8-9.

The doctrine of judicial estoppel serves "to protect the integrity of the judicial process" by "generally prevent[ing] a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (internal quotation marks omitted); *see also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997) ("The courts invoke judicial estoppel as a means to preserve the sanctity of the oath or to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings." (internal quotation marks omitted)).  Although judicial estoppel is a flexible, equitable doctrine, courts consider certain factors when determining whether to apply it in a particular case:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . .   A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire*, 532 U.S. at 750-51 (internal citations and quotation marks omitted) (cleaned up); *accord BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 192 (2d Cir. 2017); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695 (2d Cir. 2011).  The Second Circuit "has

further limited judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (summary order) (cleaned up); *accord Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019).

Individual Plaintiffs' judicial estoppel argument founders at the second step of the analysis. Put simply, the Court's text-only Order did not adopt AXA's arguments about the relevance of the evidence at issue. Instead, the Court merely directed AXA to produce the documents it had consented to produce and otherwise denied Plaintiffs' motion, albeit without prejudice to a renewed application. If the Court had ruled that the documents were irrelevant, it would not have invited Plaintiffs to renew the motion. Under such circumstances, the doctrine of judicial estoppel simply does not apply. *See, e.g.*, *BPP Illinois, LLC*, 859 F.3d at 194 ("Judicial estoppel does not apply unless the party's former position has been adopted in some way by the court in the earlier proceeding." (internal quotation marks omitted)); *Safelite Glass Corp.*, 128 F.3d at 72 ("[E]stoppel only applies when a tribunal in a prior proceeding has accepted the claim at issue by rendering a favorable decision."); *see also, e.g.*, *O'Dette v. Fisher*, No. 12-CV-2680 (ILG) (SMG), 2014 WL 6632470, at *7 (E.D.N.Y. Nov. 21, 2014) (declining to apply judicial estoppel where the party invoking the doctrine could "point to nothing in the [relevant] order to suggest that the court even considered, much less adopted, [the opposing party's] statement"); *U.S. Dep't of Hous. & Urb. Dev. v. K. Capolino Const. Corp.*, No. 01-CV-390 (JGK), 2001 WL 487436, at *7 (S.D.N.Y. May 7, 2001) (same, where "nothing in the decision . . . indicates that the [court] adopted" the allegedly inconsistent argument). That is, AXA's reversal of position on relevance, in the absence of a judicial decision adopting its prior position, "introduces *no* risk of inconsistent court determinations" — much less a certain risk, as required in the Second Circuit

— "and thus poses little threat to judicial integrity." *New Hampshire*, 532 U.S. at 751 (emphasis added) (internal quotation marks and citation omitted). Accordingly, Individual Plaintiffs' motion to strike must be and is DENIED.[37]

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

Finally, each side moves to exclude expert testimony offered by the other. The Court will begin with a recitation of the relevant legal standards, then turn to the parties' motions.

### A. Legal Standards

The admissibility of expert testimony is governed by Rule 702, which provides, in relevant part, that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to

---

[37] In light of that conclusion, the Court need not and does not address AXA's arguments that judicial estoppel applies only to a prior inconsistent statement adopted by a court in a *different* proceeding or that Individual Plaintiffs fail to show prejudice. *See* ECF No. 538, at 14-18. The Court also expresses no view on whether the doctrine of judicial estoppel applies to legal arguments or merely to factual claims. *Cf. Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*, 324 F. App'x 117, 119 (2d Cir. 2009) (summary order) ("Even assuming that [a particular party's] former claim . . . is inconsistent, *as a factual matter*, with his current claim . . . , *rather than simply an alternative legal theory*, judicial estoppel does not apply." (emphasis added)).

the task at hand." *Id.* at 597. "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted). "Although a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *Id.* (internal quotation marks omitted); *see also Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005) ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ."). Further, "although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Gen. Motors*, 2016 WL 4077117, at *2 (cleaned up). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

In addition to Rule 702, expert testimony may be excluded under Federal Rules of Evidence 402 and 403, if it is irrelevant or more prejudicial than probative, *see, e.g.*, *Tchatat v. City of New York*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016), and may also be excluded as a sanction for failing to comply with discovery obligations under Rule 37 of the Federal Rules of Civil Procedure, *see, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2017 WL 2880882, at *2 (S.D.N.Y. July 5, 2017). In determining whether preclusion is warranted as a sanction under Rule 37, "a court must consider four factors: '(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the new evidence; (3)

the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance.'" *Id.* (quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)) (cleaned up).

## B.  Plaintiffs' Motion to Exclude

Plaintiffs move to exclude some or all of the testimony of four of AXA's experts: Timothy Pfeifer, Glenn Hubbard, Mary Jo Hudson, and Howard Mills ("H. Mills").  The Court will address Plaintiffs' arguments as to each expert in turn.

### 1.  Timothy Pfeifer

First, Plaintiffs move to exclude a portion of Pfeifer's testimony pursuant to Rule 37.  In particular, Plaintiffs contend that Pfeifer's opinions relating to an error in the baseline mortality assumption AXA used to calculate the COI Increase should be precluded because AXA withheld evidence of the fact that in 2018, after this litigation began, AXA discovered its error, developed new models, and presented those new models to DFS.  *See* ECF No. 532 ("Pls.' Mot. Exclude Mem."), at 4-5.  More specifically, Plaintiffs allege that AXA withheld "internal communications and memoranda about the 2018 analysis" and "calendar invites and direct email communications between AXA personnel and DFS employees from July 19, 2018."  *Id.* at 6-7. With respect to the first category, AXA represents that it "is not aware of any non-privileged, responsive documents that were not produced," although it suggests in a footnote that some privileged documents may not have been logged or produced, pursuant to a discovery agreement between the parties.  *See* ECF No. 581 ("Def.'s Mot. Exclude Opp'n"), at 11 & n.6.  With respect to the second category, the parties appear to agree that AXA failed to timely produce a cover email to DFS attaching the July 19, 2018 presentation and referencing the AXA-DFS

meeting, as well as calendar invites for that meeting identifying the AXA participants.  *Id.* at 11; ECF No. 587 ("Pls.' Mot. Exclude Reply"), at 4-5.

The Court agrees that some sanction is warranted, but exclusion of Pfeifer's opinions concerning the 2018 analysis in their entirety is not.  Beginning with the offending party's "explanation for the failure to comply with the disclosure requirement," *Gen. Motors*, 2017 WL 2880882, at *2, AXA argues that its failure to produce the second category of documents — which it appears to concede were responsive to Plaintiffs' discovery requests — was an "oversight" and that "outside counsel . . . did not know about the existence of the cover email and calendar invite."  Def.'s Mot. Exclude Opp'n 11.  But outside counsel's lack of knowledge does not excuse AXA's failure to disclose these materials.  Moreover, it is difficult to understand how AXA could have overlooked the email despite timely producing the presentation that had been attached to the email.  At the same time, the belatedly disclosed evidence is not of great importance, and Plaintiffs suffered only limited prejudice.  *See Gen. Motors*, 2017 WL 2880882, at *2.  Significantly, AXA did timely disclose the presentation it gave at the meeting with DFS. *See* Def.'s Mot. Exclude Opp'n 11; *see also id.* at 9 (explaining that other documents relevant to the revised analysis were produced during fact discovery).  Accordingly, the only evidence Plaintiffs lacked was the fact of the meeting with DFS.  But the fact of the meeting should have been obvious from the presentation itself, as it includes an "agenda" for a meeting held on July 19, 2018, regarding the revised analysis; requests "confidential" treatment of the presentation pursuant to New York law (suggesting that this was a meeting with an external party); and refers to the "Department."  *See* ECF No. 533-4, at 1.  Regardless, Plaintiffs suffered only limited prejudice from AXA's incomplete disclosure.  Notably, they received the withheld documents in September 2019, but sought no relief until now.  *See* ECF No. 584-18.

In the final analysis, the Court concludes, as an exercise of its discretion, that a sanction

is warranted for AXA's discovery violation, but only a mild one.  *See Downey v. Adloox Inc.*,

No. 16-CV-1689 (JMF), 2018 WL 794592, at *1 (S.D.N.Y. Feb. 8, 2018) ("[A] district court has

'wide discretion' in deciding whether to impose sanctions and, if it does, what sanctions to

impose." (quoting *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 297-98 (2d Cir. 2006)).

Specifically, because AXA failed to disclose the fact of its 2018 meeting with DFS, AXA may

not rely on the fact of that meeting or on DFS's response to the revised analysis at trial.

Accordingly, references in the Pfeifer Report to the 2018 DFS meeting are precluded, *see, e.g.*,

ECF No. 481-7 ¶¶ 53, 84, 87 n.144, as are any references to the meeting elsewhere in AXA's

expert reports.  In addition, AXA may not argue at trial that it disclosed its revised analysis to

DFS in 2018 or that "[]DFS acknowledged the revision and required no further action by AXA."

*Id.* ¶ 53.  AXA may, however, rely at trial on the revised analysis itself, which was clearly

disclosed.  Finally, AXA represents in its brief that it "is not aware of any non-privileged,

responsive documents that were not produced."  Def.'s Mot. Exclude Opp'n 11.  The Court is

relying on this representation and will not hesitate to impose further sanctions on AXA if it turns

out that AXA has withheld any other responsive material.

Next, Plaintiffs contend that Pfeifer's opinions with respect to AXA's mortality

experience subsequent to the COI Increase should be excluded because evidence of what

happened after AXA's decision is irrelevant to whether its assumptions were reasonable.  *See*

Pls.' Mot. Exclude Mem. 9.[38]  But in similar scenarios — where a factfinder is called upon to

---

[38]    Plaintiffs also rehash the arguments they made in their motion to strike, which the Court
rejected above.  In any event, to the extent Plaintiffs press the point that AXA once argued that
similar evidence was irrelevant, they would do well to remember they once argued the opposite
themselves.  *See* ECF No. 228, at 1 ("Plaintiffs seek . . . *relevant* documents: [including] AXA's
mortality experience for AUL [II] after its announcement of the COI increase.").

judge the reasonableness of projections — courts have held that such hindsight evidence is relevant, though not dispositive, in determining the reasonableness of a projection or prediction. "While a court may not use the benefit of hindsight to override the company's judgment as to what was otherwise reasonably foreseeable at the time, a court may carefully consider the events that transpired following the challenged transaction in evaluating what was reasonably foreseeable at that time." *In re Adelphia Commc'ns Corp.*, No. 02-CV-41729 (VEC), 2015 WL 1208588, at *8 (S.D.N.Y. Mar. 17, 2015), *aff'd*, 652 F. App'x 19 (2d Cir. 2016) (summary order); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 205 (2d Cir. 2007) ("A plan's experience in the market, *i.e.*, the actual rate of return on the plan's investments, is relevant to determining whether an actuarial rate is reasonable."); *In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000) ("Actual performance of the debtor following the transaction is evidence of whether the parties' projections were reasonable."); *Est. of Detwiler v. Offenbecher*, 728 F. Supp. 103, 139 (S.D.N.Y. 1989) ("In assessing the reasonableness of the method of preparing forecasts, evidence regarding the circumstances at the time is important. However, courts also have considered actual results, particularly where those results proved exculpatory.").

To be sure, some Courts have excluded such hindsight evidence. But Plaintiffs point to no authority — let alone binding authority — excluding hindsight evidence where the plaintiff was challenging the reasonableness of a similar projection, as Plaintiffs are here. *Cf. IGT v. High 5 Games, LLC*, 380 F. Supp. 3d 390, 395 (S.D.N.Y. 2019) (holding, in the context of a trademark dispute, that the "reasonableness determination should be 'based on the information known to [the plaintiff] at that time,'" but not addressing whether hindsight evidence was admissible); *Perona v. Time Warner Cable Inc.*, No. 14-CV-02501 (MWF), 2016 WL 9087260, at *2 (C.D. Cal. Aug. 12, 2016)  (excluding, in the context of a disability claim, hindsight evidence of the

plaintiff's medical condition after employment termination because it was "not relevant to whether, at the time she was terminated, it was likely that she would have been able to return to work after her finite medical leave"); *In re Blue Stone Real Est.*, 487 B.R. 573, 577 (Bankr. M.D. Fla. 2013) (overruling objections to the payment of fees to a distribution agent because "the services in question had a reasonable likelihood of benefitting the estate at the time they were provided" and "a court does not determine reasonableness through hindsight").[39]

Plaintiffs' remaining arguments concerning Pfeifer's testimony can be swiftly addressed. First, they challenge his testimony concerning AXA's methodologies and assumptions and certain opinions concerning Stranger-Originated Life Insurance or "STOLI."  *See* Pls.' Mot. Exclude Mem. 12-14.  In both instances, however, Plaintiffs' objections go to the weight, not the admissibility, of Pfeifer's opinions and should be vindicated not through exclusion of the evidence, but rather through "[v]igorous cross-examination, [and] presentation of contrary evidence." *Daubert*, 509 U.S. at 596.  Finally, Plaintiffs contend that Pfeifer should be precluded from relying on a report served after the deadline for his original report.  *See* Pls.' Mot. Exclude Mem. 9.  But, whether or not the report at issue is properly characterized as a supplemental expert report under Rule 26(e) of the Federal Rules of Civil Procedure — an issue on which the parties disagree — exclusion is unjustified because Plaintiffs fail to identify any prejudice they suffered.  *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (denying exclusion even though an untimely report was not a supplemental report under Rule 26 where the party moving to exclude failed to identify any prejudice).  Pfeifer's supplemental report discloses no new opinions but only revised calculations

---

[39]     Notably, the Second Circuit has also rejected the use of hindsight evidence to disprove fraud. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[R]eject[ing] the legitimacy of alleging fraud by hindsight." (internal quotation marks omitted)).

and newly available data, *see* ECF No. 533-25, and, in any event, Plaintiffs were provided with the report prior to their deposition of Pfeifer, *see* Def.'s Mot. Exclude Opp'n 17-18.  Indeed, Plaintiffs do not even attempt to identify any prejudice suffered as a result of the untimely report. *See* Pls.' Mot. Exclude Reply 10-11; *cf. Gen. Motors*, 2016 WL 4077117, at * 5 n.6 (declining to strike untimely supplemental report because "[a]lthough there [wa]s some merit to [the moving party's] complaint that [the] supplemental affidavit . . . [was] improper, . . . [it] merely amplif[ied] and provide[d] more support for the opinions that [the expert] previously offered").

## 2.  Glen Hubbard

Next, Plaintiffs challenge Hubbard's opinions concerning (1) the proper way to calculate damages (namely, whether damages are equal to the difference between the COI Increase and a reasonable increase in a "but for" world); (2) the appropriate discount rate; (3) whether damages should be based on the life of the policies; (4) purchasers' use of illustrations; and (5) whether the policies at issue exhibit the characteristics of STOLI policies.  Pls.' Mot. Exclude Mem. 14-25.[40]  The Court is not persuaded.  As the Court explained above, Plaintiffs do not bear the burden of proposing a hypothetical COI Increase that would have been reasonable and subtracting it from their damages calculation, as AXA contends.  But that does not preclude *AXA* from presenting such evidence in arguing for a lower quantum of damages.  Meanwhile, the other issues Plaintiffs identify go to the weight, not the admissibility, of Hubbard's testimony, and can adequately be addressed at trial.  To the extent Hubbard offers opinions at trial inconsistent with his expertise, Plaintiffs may object.  *See Boyce*, 2020 WL 5209526, at *1.

---

[40]    Plaintiffs assert that Hubbard's testimony should also be excluded under Rule 37, *see* Pls.' Mot. Exclude Mem. 14, but it is not clear why.

### 3. Mary Jo Hudson and Howard Mills

Finally, Plaintiffs seek to preclude in their entirety the testimonies of Hudson and H. Mills pursuant to Rules 401, 403, and 702. *See* Pls.' Mot. Exclude Mem. 26-33. The Court is unpersuaded as to Rules 401 and 403. To determine whether expert reports "contain[] any relevant opinions or conclusions," a court must "begin by identifying the issue that the testimony is offered to support." *Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 402 (S.D.N.Y. 2013). Here, AXA argues that the reports are relevant to two issues: (1) "[AXA's] good faith" and (2) "the definition of 'given class.'" Def.'s Mot. Exclude Opp'n 33. The Court agrees and finds that, as to these two issues, the probative value of the proffered testimony is not substantially outweighed by the danger of unfair prejudice, confusion, or the like. With respect to the first issue, the testimony of Hudson and H. Mills, both of whom have substantial industry expertise, *see id.* at 33-37, is plainly relevant to the question of how the term "given class" is customarily used in the industry, *see, e.g.*, *Fidelity Nat'l Title Ins. Co. v. Cole Taylor Bank*, 878 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (insurance industry executive could testify about the customs and practice of the title insurance industry because "her testimony clarified some of the terminology in the relevant evidence"). Similarly, on the question of good faith, the experts may testify to the fact that the relevant regulators did not object to AXA's COI Increase. To the extent that their opinions, and DFS's "no-objection" letter and other regulatory evidence, risk prejudicing the jury, the issues can be addressed via limiting instructions.[41]

---

[41] In support of their arguments, Plaintiffs cite cases in which evidence similar to the "no-objection" letter was excluded as irrelevant or prejudicial. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 145 (S.D.N.Y. 2015) (excluding letter from state insurance regulator concluding that COI change was improper because the letter though "plainly relevant" was "also highly prejudicial"); *Negrete v. Allianz Life Ins. Co. of N. Am.*, No. 05-CV-6838 (CAS), 2013 WL 6535164, at *1 (C.D. Cal. Dec. 9, 2013) (concluding "that neither party should be allowed to offer evidence concerning actions taken — or not taken — by state

That said, some of Hudson's and H. Mills's opinions are plainly inadmissible under Rule 702. In particular, "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *accord Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) ("[I]t is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms."). In light of that principle, neither expert may offer opinions suggesting that DFS's (or any other regulator's) response to AXA's actions is dispositive of any legal issue in this case. Similarly, Hudson's opinions that AXA did not unfairly discriminate against policyholders of a given class, *see* ECF No. 533-16, at 28, and that Section 4226 does not apply to policyholders not domiciled in New York are plainly inadmissible legal conclusions, *see id.* ¶ 145. So too, H. Mills may not offer his similar opinion regarding Section 4226, *see* ECF No. 533-17, ¶ 61, or his opinion that Regulation 74 is not privately enforceable, *see id.* ¶ 69; *see also id.* ¶¶ 59-64, 69-75. Nor may he testify about the impact of private enforceability on the regulatory environment. *See id.* ¶¶ 69-75. In addition, as Plaintiffs contend, Pls.' Mot. Exclude Mem. 27, neither expert has actuarial expertise and, thus, may not offer any opinion as to whether AXA's classes were, in fact, actuarially reasonable, *see* ECF No. 533-16 ¶ 115. As to the other issues raised in Plaintiffs' motion, the

---

insurance regulators"). But Plaintiffs seek here to exclude only the *testimonies* of Hudson and H. Mills; they do not seek to exclude *the letter* itself (and, indeed, they do not appear even to agree as to the letter's admissibility). *Compare* Class Pls.' MSJ Opp'n. 21-22 (arguing that the letter's "value (if any) must be weighed by a jury"), *with* ECF No. 567 ("Indiv. Pls.' MSJ Reply"), at 7-9 (arguing that the letter is inadmissible because it is hearsay, is not a business record, and is more prejudicial than probative). Accordingly, the Court declines to address the letter's admissibility here.

Court concludes that they go to the weight, not the admissibility, of the experts' testimony or raise limitations on their testimony that may adequately be policed through objections at trial.[42]

## C. AXA's Motion to Exclude Expert Testimony

Finally, AXA moves to exclude portions of the testimony of eight of Plaintiffs' experts. *See* ECF No. 482 ("Def.'s Mot. Exclude Mem.").[43]  Although the parties spill considerable ink on the motion, the Court need not do the same.  For one thing, most of AXA's arguments go to weight, not admissibility, and are properly addressed through vigorous cross-examination.  *See, e.g.*, *Discepolo v. Gorgone*, 399 F. Supp. 2d 123, 129 (D. Conn. 2005) ("Defendant's cross-examination can effectively reveal to the jury inaccuracies, imprecision, or fallacies in [the proposed expert's] analysis to enable the jury to decide how much of [the proposed expert's] testimony to credit or not credit and what weight to give it in the context of all the evidence, . . .").  For another, many of AXA's arguments (for instances, its arguments that some experts improperly offer legal opinions or opinions as to AXA's intent or regulators' states of mind) implicate only isolated opinions or sentences in Plaintiffs' experts' reports and can be adequately addressed through particularized objections at trial.  *See Gen. Motors*, 2016 WL 4077117, at *7.

In light of these considerations, the Court need only address a few points here, to wit:

---

[42]    The foregoing aside, it is not clear why AXA would need to call *both* Hudson and H. Mills.  Unless and until AXA demonstrates why there is a need to call two regulatory experts, it may call only one at trial.  *See* Fed. R. Evid. 403.

[43]    AXA also moves with respect to Plaintiffs' expert R. Mills, but the parties actually agree that he will offer only one of his damages methodologies at trial, the COI overcharge model.  *See* ECF No. 528 ("Pls.' Mot. Exclude Opp'n"), at 47; ECF No. 562 ("Def.'s Mot. Exclude Reply"), at 25.  Accordingly, the Court need not and does not address the parties' arguments as to R. Mills.  Going forward, "it would be far better — for the parties and the Court — to limit briefing to matters that are actually in dispute."  *Gen. Motors*, 2016 WL 4077117, at *7.

- AXA's objection to the opinions of James Rouse, Deborah Senn, and Jeffrey Angelo on the ground that they are not qualified to offer actuarial opinions, *see* Def.'s Mot. Exclude Mem. 22-25, 28-34, is overruled. None of the three purports to be an actuarial expert or to offer actuarial opinions. Instead, all three rely on the actuarial opinions of Brown (whose expertise AXA does not dispute) to formulate their opinions. *See* ECF No. 528 ("Pls.' Mot. Exclude Opp'n"), at 24-25, 38. That is unobjectionable. *See, e.g.*, *In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *22 (S.D.N.Y. July 28, 2017) ("It is well established that an expert may rely upon another expert to form an opinion under Rule 703, which provides that an expert may rely upon the opinion of another '[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject.'").[44]

- The Court declines to consider AXA's argument that the testing Carl Harris claims was necessary is not required as a matter of law. *See* ECF No. 562, ("Def.'s Mot. Exclude Reply"), at 27-28. AXA raised the argument for the first time in its reply, and it has not been adequately briefed. *See, e.g.*, *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

- The Court rejects AXA's argument that Stephen Parrish's opinions should be precluded because (1) he lacks the qualifications necessary to offer them and (2) they are unreliable. Def.'s Mot. Exclude Mem. 54-62. As to Parrish's qualifications, AXA contends that his only qualification to opine on the illustrations is that he had a "role in drafting a model illustration regulation for the American Council of Life Insurers." Def.'s Mot. Exclude Mem. 54. But, setting aside AXA's arguments regarding the relevancy of that particular qualification, it is apparent that Parrish has sufficient and relevant qualifications to opine on the illustrations. *See* Pls.' Mot. Exclude Opp'n 72-73 (describing more than forty years of experience in the life insurance industry, including participating in the sale of numerous UL policies). Similarly, the Court is unpersuaded that Parrish's opinions regarding how policyholders typically use illustrations are excludable because he did not conduct any consumer surveys or use a similar methodology given his personal experience in the market. *See Vazquez v. City of New York*, No. 10-CV-6277 (JMF), 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) ("Defendants' . . . objections — to [the witness's] qualifications and the reliability of his methods . . . — ultimately go to the weight of his testimony rather than to its admissibility.").

In short, although some of AXA's arguments with respect to Plaintiffs' experts undoubtedly have

merit, there is no need to address them at this stage of the litigation. None of the arguments

---

[44]     As with AXA with respect to Hudson and H. Mills, it is not clear why Class Plaintiffs would need to call *both* Senn and Angelo. Unless and until Class Plaintiffs demonstrate why there is a need to call two regulatory experts, they may call only one at trial. *See* Fed. R. Evid. 403.

provide a basis to exclude any of Plaintiffs' experts altogether and, therefore, can be adequately addressed through particularized objections at trial.

## CONCLUSION

For the foregoing reasons, AXA's motions for summary judgment are DENIED, except as to (1) EFG Plaintiffs' breach-of-contract claim regarding the guaranteed minimum interested rate; (2) the claims of registered owners in the class related to the illustration-based claims who purchased policies *after* the COI Increase; (3) LSH Plaintiffs' illustration-based Section 349 claims, and (4) Class Plaintiffs' and LSH Plaintiffs' claims based on the interests of prior policyholders, with respect to which AXA's motions are GRANTED.  Also DENIED are: Individual Plaintiffs' partial motion for summary judgment; the parties' motions to preclude (except as set forth above and without prejudice to particularized objections at trial); and Individual Plaintiffs' motion to strike.

The parties shall confer and, **within four weeks of the date of this Opinion and Order**, submit a joint letter proposing a trial plan for these cases, along with a proposed schedule for pretrial submissions consistent with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman.  In the meantime, the Court is firmly of the view that the parties should try to settle this case without the need for an expensive and risky trial (all the more so given the backlog of trials due to the COVID-19 pandemic).  To that end, the parties shall **confer immediately** about the prospect of settlement and conducting another round of settlement discussions under the supervision of the private mediator.  If the parties agree that further discussions would be appropriate, they should promptly advise the Court and, if needed, seek an appropriate extension of the deadline above.

The parties are also reminded that any application to maintain materials submitted in connection with these motions under seal or redacted is due **within two weeks of the date of this Opinion and Order.**  Any opposition is due **within two weeks** of any application, and any reply is due **within one week** of any opposition.  *See* ECF No. 453.[45]  Any document for which the parties do not move for the Court to maintain under seal or in redacted form within two weeks of the date of this Opinion and Order shall be unsealed without any further notice to the parties.  To that end, the parties shall, no later than **three weeks of the date of this Opinion and Order**, file a joint letter with the list of the ECF numbers of the filings to be unsealed.

The Clerk of Court is directed to terminate ECF Nos. 456, 459, 479, 483, 494, 502, and 524.

SO ORDERED.

Dated: March 31, 2022
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[45]     For purposes of these and all future filings with the Court, the parties (and especially Class Plaintiffs' counsel) are reminded that all memoranda of law, without exception, and all other submissions, to the extent feasible, must be filed in *text-searchable format*, pursuant to Paragraphs 3.D and 6 the Court's Individual Rules and Practices.